**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| DEBRA HELTON, | |
| Plaintiff, | Civil Action No.: |
| v. | 5:21-cv-00404 |
| THE GEO. D. WARTHEN BANK, | |
| Defendant. | **JURY TRIAL DEMANDED** |

**COMPLAINT**

COMES NOW, Plaintiff Debra Helton, and brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and the Age Discrimination in Employment Act, 29 U.S.C. § 623.  Plaintiff alleges that Defendant The Geo. D. Warthen Bank subjected Plaintiff to discrimination based her sex and age, including through said Defendant's termination of Plaintiff's employment, respectfully showing the Court as follows:

**JURISDICTION AND VENUE**

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 & 1343 and the enforcement provisions of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was employed, and the events underlying this action occurred, in Washington County, Georgia, which is located within this judicial district.

**PARTIES**

3.

Plaintiff Debra Helton (hereinafter, "Plaintiff" or "Helton") is a citizen of the United States and a resident of Georgia, and she was between 40 and 70 years of age at all times at issue.  At all times relevant to this suit, Ms. Helton was employed with Defendant The Geo. D. Warthen Bank.

4.

At all relevant times, Ms. Helton was considered a covered, non-exempt employee under Title VII of the Civil Right Act of 1964 and the Age Discrimination in Employment Act.

5.

Defendant The Geo. D. Warthen Bank (hereinafter, "Defendant") is a domestic banking corporation, incorporated under the laws of the State of Georgia.  Defendant's principal address is 216 North Harris Street, Sandersville, Washington County, Georgia 31082.  Defendant may be served with process through its Registered Agent, Karen Wilson, located at 213 North Thomas Street, Davisboro, Washington County, Georgia 31018.

6.

Defendant is a private employer engaged in interstate commerce with an annual revenue in excess of $500,000.00.  Defendant has employed in excess of 20 employees, working for at least twenty calendar weeks, in 2020 and preceding years.  Defendant is a covered employer within the meaning of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act.

**STATEMENT OF FACTS**

7.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 6, as if the same were set forth herein.

8.

Ms. Helton began her employment with Defendant on October 31, 1988, working as a bank teller.

9.

On October 8, 2019, as Ms. Helton approached nearly thirty-one years of service to Defendant, she was abruptly terminated from her position.

10.

Before she was fired, Ms. Helton had risen through Defendant's ranks, and she served most recently as Defendant's Vice President and Compliance Officer, working out of Defendant's sole branch in Sandersville, Georgia.

11.

At all relevant times, Ms. Helton's performance was exemplary, and, but for the incidents alleged herein, Defendant had not subjected Ms. Helton to any disciplinary action in any of the four decades that she was employed.

12.

However, Defendant is known to target its older employees on occasion.

13.

By way of example, in October 2016, Defendant closed its second banking location, and underwent a purported consolidation of its workforce. During this process, Defendant laid off three of its employees who were all in their sixties, and whose performance had otherwise been satisfactory. Like Ms. Helton, Defendant offered these employees a severance package, which the three employees accepted on account of the difficulty that they anticipated in finding other work,

but despite the fact that the agreement purportedly required such employees to waive and release any claims of age discrimination.

14.

Moreover, Defendant not only ignores, but effectively encourages, its male employees and officers who exhibit assertive or aggressive conduct toward other employees, behavior that often rises to the level of being inappropriate for the workplace.  As a result, male employees who exhibit such assertive or aggressive conduct generally do not receive disciplinary action.

15.

Conversely, when Defendant's female employees express conduct that is seen as aggressive, abrasive, or even merely assertive, they are generally subjected to disciplinary action, up to and including demotion or termination of their employment.

16.

When Defendant considers its female employees' behavior to be assertive, Defendant's frequently justifies its response as having a problem with the woman's "attitude."

17.

By way of example, Ken Bibb, one of Defendant's other officers who is male, was known to routinely speak to other employees so harshly that they ultimately ended up in tears and considered resigning their employment as a result. Defendant refused to subject this male officer to any disciplinary action or otherwise address his conduct in any way.

18.

Lamar Doolittle, another male officer, displayed aggressive conduct much more frequently; however, Defendant has entirely failed to address the conduct.  According to one female employee, Della Brown, Mr. Doolittle spoke to her disrespectfully over a period of years.

On one specific occasion, when Ms. Brown asked Mr. Doolittle for assistance over a matter in which he supervised, Mr. Doolittle yelled at Ms. Brown, telling her that he did not like her "attitude."

19.

On another occasion, Mr. Doolittle got upset with a subordinate, Rachel Black, when the teller's counting of cash in anticipation of opening prevented him from performing routine maintenance on the computers that the tellers were assigned.  According to Ms. Black, Mr. Doolittle "lost his marbles," yelling at the tellers in a manner so harshly that it caused the female tellers to be concerned for their own safety.  While Mr. Doolittle spoke severely to Ms. Black, he actually invaded her personal space and yelled in her face, telling Ms. Black that if she did not like the way that Mr. Doolittle was speaking to her, she could pack her stuff and go. Not only was Mr. Doolittle's conduct not addressed by Defendant, Defendant subjected Ms. Black to disciplinary action for this incident instead.

20.

Jessica Ford last served as Defendant's coordinator for online banking and manager over credit card transactions.  Defendant had been receiving a number of complains concerning its online banking, but when Ms. Ford asked for Mr. Doolittle's help on several occasions, she was ignored.  When Mr. Doolittle was out of the office and Defendant received several more online banking complaints, Ms. Ford instead asked Ms. Helton for help since she was the next person in Ms. Ford's chain of command.  Ms. Helton and Ms. Ford were able to quickly resolve the issue with the vendor.  However, when Mr. Doolittle found out about what happened, he got very loud and disrespectful with Ms. Ford, used profane language toward her, and from that point forward would tell Ms. Ford that she was not a "team player."  Even though Ms. Ford had not received any

discipline in her nine-year tenure, she was first demoted, and then she found herself terminated soon thereafter.  Defendant also had Ms. Ford sign a severance agreement, waiving and releasing any claims of discrimination, at her separation.

21.

Like Ms. Helton, Kathy Brooks has worked for Defendant for approximately thirty years, and she previously worked in Defendant's loan department. Like Ms. Helton, Ms. Brooks found herself in a disagreement with a manager in the loan department concerning a compliance issue. After the disagreement, Defendant ultimately demoted Ms. Brooks and slashed her salary by approximately $16,000.00, explicitly telling Ms. Brooks that Defendant took issue with her "attitude."

22.

Mr. Doolittle was not only rude and disrespectful to female employees.  On several occasions, Mr. Doolittle actually raised his voice and yelled at the bank's president in a meeting and in front of subordinate employees.  Defendant did not subject Mr. Doolittle to any disciplinary action for such conduct.

23.

Similarly, another one of Defendant's officers, Ronnie May, was frequently so rude to his female secretary that it made her so nervous and anxious that she and her doctor felt it necessary to prescribe medication.  Not only was the bank's present aware of Mr. May's behavior, he acknowledged that Mr. May may need anger management classes; however, Mr. May was not subjected to any discipline for this conduct.

24.

Ms. Helton had achieved much success during her career that had entered its fourth decade with Defendant, both for herself and for the bank.

25.

In the 1990s, Ms. Helton earned her certification as an accredited Automated Clearing House ("ACH") Professional.  After earning this certification, Ms. Helton was responsible for implementing Defendant's ACH program, which allowed Defendant to process electronic transfers of funds.

26.

Subsequently, Ms. Helton oversaw the department over services for certificates of deposit and individualized retirement accounts ("IRA").

27.

Ms. Helton was promoted to the position of loan officer in the year 2001, and in 2009, she became the Compliance Officer after she completed banking school and compliance school.

28.

In 2012, Ms. Helton and one other person were responsible for initiating Defendant's escrow program, which required extensive study of the applicable rules and regulations. This was a significant accomplishment because it was something that Defendant's officers had simply written off as being too complicated up to that point.

29.

While this matter was pending before the Equal Employment Opportunity Commission, Defendant contended that Ms. Helton engaged in grossly improper conduct in Summer 2018.

30.

However, Ms. Helton engaged in no such violations, and she was not subjected to any discipline for any incidents in Summer 2018, suggesting that these new allegations were false.

31.

Moreover, had Ms. Helton engaged in such violations now alleged by Defendant, Defendant would have been required to report the incident to the appropriate federal authorities. Defendant failed to do so, which suggests that Ms. Helton's conduct did not violate rules of any kind.

32.

Defendant's assertion concerning the Summer 2018 incident is false, and it had nothing to do with her termination over a year later.

33.

On April 11, 2019, there was a separate incident that, by Defendant's own statements, did not play into Ms. Helton termination.

34.

During that week in April 2019, one Defendant's employees, who was normally tasked with overseeing the nightly closure of the bank, was out of work on personal leave for the week. Since all of Defendant's other authorized officers declined to step in to oversee the nightly closure, Ms. Helton volunteered to do so.

35.

However, when the day came for Mr. Helton to stand in as the supervisor for the nightly closing, she remembered that she had a medical appointment scheduled the same day after work.

As a result, Ms. Helton asked another officer to take her place.  The other officer declined Ms. Helton's request, responding that she too had an appointment scheduled that afternoon.

36.

At 4:45 pm on the day in question, Ms. Helton began watching the clock, and she offered her assistance to the employees who were counting money to close out for the day.  Around a half-hour later, around the time that Ms. Helton would have needed to leave to arrive at her appointment on time, the employees just began counting the drawer of money from the drive-in window.  This made Ms. Helton upset, not only because the employees had known that this drawer needed to be counted a thirty minutes earlier when Ms. Helton's offer to help had been declined, but because Ms. Helton's coworker who was present, who was also considered one of Defendant's officers, could have supervised the closing without requiring Ms. Helton's presence.

37.

When Ms. Helton got upset, she acknowledges that, while she did not raise her voice at the other employees, she did use a profane word in speaking to them.  The word that she used was far from the worst that had been used in this workplace, but Ms. Helton still felt the need to apologize to her coworkers for her reaction the next morning.

38.

Ms. Helton was not subjected to any disciplinary action because of the April 11, 2019 incident.

39.

However, in a meeting the day after the incident, the bank president told Ms. Helton that she had an "attitude" the prior day.

40.

Still, the April 2019 incident did not appear to be an issue, and within the next several weeks, the bank president told Ms. Helton that she had been doing a "fabulous job."

41.

Defendant later claimed that it felt like Ms. Helton had not been "respectful" to her subordinates.  This is a term that Defendant has never used to describe its male employees' conduct.

42.

Ms. Helton had previously observed what Defendant had done to female employees with an "attitude," so she tried her best to avoid controversy over the course of the next several months.

43.

However, in hindsight, it is now clear that Defendant had begun its attempts to remove Ms. Helton due to her age, and because she had exhibited conduct contrary to Defendant's expectations of how its female employees should behave.

44.

In May 2019, Defendant began slowly removing many of Ms. Helton's duties, and gave such responsibilities to its thirty-year-old Loan Operations Supervisor, Ashley Haynes.

45.

However, unlike Ms. Helton, Ms. Haynes had not completed compliance school, and she neither had any training or experience with banking compliance at that time.

46.

During this time, Defendant also removed Ms. Helton's access to certain electronic tools and record-keeping programs. As a result, Ms. Helton had to notate compliance issues and

necessary changes to accounts by hand, which was extremely inefficient and caused Ms. Helton to experience frustration as she simply attempted to perform her job.

47.

It became even more clear that Defendant was trying to push Ms. Helton out when Defendant reassigned Ms. Helton's loan portfolio to other officers in the first week of October 2019. Which, given that this was the week before Ms. Helton was terminated, would suggest that Defendant was already planning to fire Ms. Helton, and the reason provided was pretextual.

48.

As the designated Compliance Officer, one of Ms. Helton's duties was to review Defendant's electronic records to ensure that the information contained therein was consistent with the agreement underlying a customer's loan.

49.

Similarly, Ms. Helton was required to ensure that the electronic system applied customers' payments in the manner consistent with agreement. Specifically, she had to ensure that overpayments were applied to principal, interest, escrow, and late fees in a manner consistent with the loan agreement.

50.

By October 2019, there had been a number of discussions between Ms. Helton and Ms. Haynes concerning changes that Ms. Helton believed needed to be made to the payment sequences for numerous loans.

51.

Before Ms. Helton raised the issue with Ms. Hayes, Ms. Helton had sent several emails to both the bank's president and the Chief Information Officer to seek their clarification.  However, these men refused to respond to Ms. Helton's emails.

52.

Because she did not get a response, Ms. Helton was able to verify with a member of Defendant's Compliance Committee that the approach that Ms. Helton intended to suggest to Ms. Haynes was indeed the correct and appropriate approach.

53.

When Ms. Helton asked Ms. Haynes to make changes to the sequence of payments, Ms. Haynes flatly refused.

54.

Indeed, Ms. Helton and Ms. Haynes had a disagreement concerning this compliance issue. However, there is nothing to suggest that Ms. Helton's conduct was anything less than professional or that she had been rude, disrespectful, abusive, or even that she used any inappropriate language.

55.

When Ms. Haynes described this discussion, purportedly on the same day, she merely stated that Ms. Helton kept "fussing about the payment collection sequence for the loans" and further.

56.

Ms. Helton had indeed asserted herself during her attempts to ensure that the bank was in compliance with its loan agreements with its customers.

57.

Ms. Helton was certainly frustrated by the dispute and the fact that Ms. Haynes, a subordinate employee, refused to comply with Ms. Helton's directives.  As a result, she calmly stepped away from the conversation, collected a few of her personal belongings, and left the bank to take an early lunch break.

58.

Ms. Helton decided that the disagreement was not worth her time, and a few minutes after she excused herself from the conversation with Ms. Haynes, Ms. Helton sent an email to Ms. Haynes from her mobile phone, stating, "[h]ey after thinking about it, this is not a compliance issue so don't worry about making that change.  I won't check that part anymore.  I will just do the exceptions on the loan code sheet and documents that go with the real estate loans.  This will keep it simple."

59.

However, two days later, on October 9, 2019, the bank president called Ms. Helton into a meeting with the Human Resources Manager.  Mr. Bibb did not ask Ms. Helton anything about the conversation or for her side of the story.  Instead, the bank president told Ms. Helton that her conversation with Ms. Haynes had made another employee "feel uncomfortable."

60.

At that time, Mr. Bibb said to Ms. Helton, "I don't know what we're going to do about your *attitude.*"

61.

This conversation occurred merely twelve days prior to Ms. Helton's thirty-first anniversary of working for Defendant.

62.

However, Ms. Helton would not make it to that milestone as Mr. Bibb advised Ms. Helton that she was being fired, effective immediately.

63.

At that time, Defendant attempted to coerce Ms. Helton into signing a "Resignation and Transition Agreement."

64.

This severance agreement would have required Ms. Helton to waive and release her claims of discrimination based on her age and sex.

65.

In exchange for this release, the severance agreement would have allowed Ms. Helton to continue receiving her salary and health insurance until a little over two months later when such payments would end on December 31, 2019.

66.

However, what Defendant tried to force Ms. Helton to sign was not actually a severance agreement. Defendant wanted Ms. Helton to continue working, including to train the employee who would be replacing her, during the entire time that Defendant continued to compensate Ms. Helton.

67.

Defendant threatened Ms. Helton, telling her that, if she did not sign the severance agreement, she would not receive the pension that she would have otherwise been entitled.

68.

At that time, Ms. Helton knew that she had been discriminated against based on her age and because Ms. Helton did not conform to the stereotypes held by Defendant concerning how its female employees should behave.  As a result, she refused to sign the severance agreement and waive her claims against Defendant.

69.

Defendant's personnel policies provide the following:

If an involuntary termination is due to reasons other than for lack of work, such as insubordination, failure to follow instructions, inability to perform job requirements, attendance, malfeasance, or a situation where the employee violated bank policy or showed disregard for the best interests of the bank, [Defendant] will generally not pay severance pay.

70.

Defendant's desire for Ms. Helton to continue working under the terms of the severance agreement, along with the payment of a severance itself in light of Defendant's policies, suggests that Ms. Helton was not terminated for any misconduct or failure to perform her job.

71.

Defendant's stated reasons for terminating Ms. Helton are false, and instead, she was fired because of her age and because she did not conform to Defendant's stereotypes concerning how it expected its female employees and officers to behave.

72.

Defendant ultimately replaced Ms. Helton with a female who was not known to be strong willed or assertive.

73.

Ms. Helton's replacement was nearly thirty years her junior.

Procedural/Administrative Background

74.

In December 2019, Ms. Helton made initial contact with the Equal Employment Opportunity Commission (hereinafter, "EEOC").

75.

On or about January 6, 2020, Ms. Helton submitted her Charge of Discrimination to the EEOC, alleging that she had been subjected to discrimination based on her age and sex.  The EEOC assigned Ms. Helton Charge Number 410-2020-00723.

76.

Defendant had actual notice of the EEOC Charge, participated in the administrative proceedings, and was represented by counsel at that time.

77.

Ms. Helton subsequently requested that the EEOC issue a "Right to Sue letter."

78.

On August 16, 2021, the EEOC issued its Notice of Right to Sue, which Ms. Helton received, through counsel, on the same day.

79.

Ms. Helton has exhausted her administrative remedies as to the claims in her Charge of Discrimination, and she is filing the instant action within ninety days of the EEOC's issuance of the Notice of Right to Sue.

**COUNT I:**
**WRONGFUL TERMINATION IN VIOLATION OF**
**THE AGE DISCRIMINATION IN EMPLOYMENT ACT**

80.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 79, as if the same were set forth herein.

81.

Pursuant to the Age Discrimination in Employment Act, it is unlawful for an employer to discriminate against any individual with respect to the compensation, terms, conditions, or privileges of his or her employment because of such individual's age. 29 U.S.C. § 623.

82.

As alleged herein, Defendant has routinely treated its older employees less favorably than those who are younger.  Specifically, Defendant has a history of terminating, including laying off, its older employees, and when so doing Defendant attempts to have the separated employee waive and release any claims of discrimination.

83.

Plaintiff is between the ages of forty and seventy.

84.

As alleged herein, Plaintiff was qualified for the positions of Vice President and Compliance Officer.  Plaintiff had been performing the duties and responsibilities of her positions, and her performance was exemplary.

85.

On October 9, 2019, Defendant terminated Plaintiff's employment.

86.

Even if the reasons that Defendant gave for the termination were true, which they are not, Defendant has failed and refused to take similar adverse actions against similarly situated, younger employees who purportedly engaged in the same conduct as Plaintiff.

87.

Defendant replaced Plaintiff with someone who is significantly younger than Plaintiff and who is under the age of forty.

88.

Defendant will be unable to present any evidence of a legitimate, nondiscriminatory motive for terminating Plaintiff's employment and for otherwise treating Plaintiff less favorably than her coworkers who were younger than Plaintiff.

89.

Plaintiff will prove that the Defendant's stated reasons are pretextual, and that Defendant's actions were willful and indeed motivated by Plaintiff's age.

90.

Plaintiff has been injured by Defendant's discrimination based on age, and she is entitled to all damages allowed under the Age Discrimination in Employment Act, including back pay and all fringe benefits of her employment, including but not limited to health, dental, and vision insurance, accrued paid leave, contributions to a 401(k) plan and pension benefits, front pay or reinstatement, injunctive relief, liquidated damages, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT II:**
**WRONGFUL TERMINATION**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

91.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 79, as if the same were set forth herein.

92.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discharge any employee on the basis of sex.  *See* 42 U.S.C. § 2000e-2(a).

93.

"In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989).

94.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

95.

Plaintiff is a member of a protected class in that she is female.

96.

Defendant values and rewards its male employees and officers who exhibit assertive traits or are considered strong-willed. Moreover, Defendant has a history of failing and refusing to address its male employees and officers when they conduct themselves in an aggressive, hostile, abusive, or even offensive way.

97.

Defendant also has a history of taking adverse actions, including demotion and termination, against female employees or officers who are assertive or considered by Defendant as being strong-willed.  In such situations, Defendant often cites its female employee's "attitude" as the reason for taking such adverse action.

98.

Plaintiff's job performance during her nearly thirty-one year tenure working for Defendant was exemplary.

99.

Before she was terminated, Plaintiff acted assertively in the performance of her duties on several occasions.

100.

However, as alleged herein, Plaintiff's conduct was neither aggressive nor inappropriate for the workplace.

101.

At the time of her termination, Defendant explicitly referenced Plaintiff's "attitude."

102.

When Defendant terminated Plaintiff, Defendant was acting on the basis of a belief that a woman was unable to act in an assertive manner in the performance of her duties, or in the alternative, that a woman must not be assertive.

103.

Defendant terminated Plaintiff's employment on October 9, 2019, due to Defendant's notions of sex stereotyping.

104.

Accordingly, Defendant terminated Plaintiff's employment on October 9, 2019, specifically on the basis of her sex.

105.

Plaintiff will prove that Defendant's stated reasons for terminating Plaintiff's employment are inaccurate and were instead pretext to hide Defendant's discriminatory animus based on sex.

106.

Plaintiff has been injured by Defendant's wrongful termination of her, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including an award of back pay and all fringe benefits of her employment, including but not limited to health, dental, and vision insurance, accrued paid leave, contributions to a 401(k) plan and pension benefits, reinstatement and/or front pay, compensatory and punitive damages in an amount of not less than $300,000.00, or such other amount as limited by statute, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Debra Helton respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendant The Geo. D. Warthen Bank, and that said Defendant be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff Debra Helton and against Defendant The Geo. D. Warthen Bank on Count I for discrimination based on age, and grant Plaintiff all relief allowable under the Age Discrimination in Employment Act;

4)      That judgment be awarded for and in favor of Plaintiff Debra Helton and against Defendant The Geo. D. Warthen Bank on Count II for discrimination based on sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act; and,

5)      For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 12th day of November, 2021.

KENNETH E. BARTON III
Georgia Bar No. 301171
*Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com