**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

DEBRA HELTON,                          )
                                       )
    PLAINTIFF,                     )
                                       )          CIVIL ACTION FILE NO.
v.                                     )          5:21-cv-00404-MTT
                                       )
THE GEO. D. WARTHEN BANK,              )
                                       )
    DEFENDANT.                     )
_____)

**GEO D. WARTHEN BANK'S STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE TO BE TRIED
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Geo. D. Warthen Bank (the "Bank") and, pursuant to Fed. R. Civ. P. 56 and Local Rule 56, M.D. Ga., submits its Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried In Support Of Its Motion For Summary Judgment.

**The Parties and Claims**

1.

Plaintiff Debra Helton ("Plaintiff") was employed by the Bank between approximately October 31, 1988 and October 9, 2019.  (Doc. 1, Compl. ¶¶ 8-9, 85, 103; Pl. Dep. 11:7-18, 46:23-25).[1]

2.

Plaintiff, a female, alleges that she was discriminated on the basis of her age and sex when

_____

[1] Excerpts and exhibits from the June 8, 2022 Deposition of Plaintiff Deborah Helton are attached hereto as Exhibit 1.

-1-

she was terminated by the Bank at the age of fifty-seven (57) on October 9, 2019.  (Pl. Dep. 22:16-23:16, 43:4-44:1, 53:22-24; Pl. Dep. Ex. 1, EEOC Charge; Pl. Dep. Ex. 2, Doc. 1, Compl. ¶¶ 80-106).

3.

Kenneth A. Bibb ("Bibb"),[2] born in 1960 (and therefore older than Plaintiff, who was born in 1962), is the President of the Bank and supervises the Bank's day to day activities, C-Suite officials including Lamer Doolittle (the Bank's Chief Information Officer and Chief Operating Officer), and all of the Bank's vice-presidents and non-C-Suite level officers.  (Pl. Dep. 53:5-55:12; Bibb. Decl. ¶¶ 2-3; Doolittle Decl. ¶ 2).[3]

4.

Mr. Bibb is supervised by the Bank's Chief Executive Officer ("CEO"), Chris Irwin, who is older than Mr. Bibb (and in turn the Plaintiff).  (Bibb Decl. ¶¶ 3-4; Pl. Dep. 47:7-15).

5.

Mr. Bibb and Mr. Irwin are both older than the Plaintiff.  (Bibb. Decl. ¶ 3; Pl. Dep. 53:16-54:6).

6.

Mr. Bibb reports directly to Mr. Irwin and a five (5) member Board of Directors, four (4) of whom are also older than the Plaintiff.  (Bibb Decl. ¶ 4; Pl. Dep. 53:5-55:12).

7.

Lamar Doolittle, the CIO/COO, was born in 1959 (and is therefore older than Plaintiff) and

---

[2] The Declaration of Kenneth A. Bibb is attached hereto as Exhibit 2.

[3] The Declaration of Lamar Doolittle is attached hereto as Exhibit 3.

is supervised directly by Mr. Bibb, and the only employees of the Bank who exceed Mr. Doolittle's

level of authority are the President and CEO.  (Doolittle Decl. ¶¶ 2-3).

8.

Karen Wilson, born in 1965 (and therefore older than the Plaintiff) was previously

employed by the Bank until her retirement on May 27, 2022, served (including in 2019) as the

Bank's Corporate Secretary, and assisted with Human Resources functions, including maintaining

personnel files.  (Wilson Decl. ¶ 2; Pl. Dep. 67:17-68:5).[4]

9.

Plaintiff became the Bank's Compliance Officer in or around 2009, when she was

approximately forty-seven (47) years old and was appointed to this position by Mr. Bibb, replacing

an older male employee who voluntarily retired for health-related reasons.  (Pl. Dep. 50:6-52:1;

Bibb Decl. ¶ 5).

10.

During the last two years of Plaintiff's employment with the Bank, the Bank had nine (9)

officer-level employees, only two (2) of whom were men.  (Pl. Dep. 61:7-62:8).

**The Bank's Employment Policies**

11.

Plaintiff admitted at her deposition that she was familiar with the Bank's policies and

procedures as reflected in the Bank's Employee Handbook.  (Pl. Dep. 52:14-18, 55:16-56:7; Pl.

Dep. Ex. 3, Employee Handbook).

---

[4] The Declaration of Karen Wilson is attached hereto as Exhibit 4.

12.

Plaintiff was an at-will employee of the Bank.  (Pl. Dep. 56:8-57:2; Pl. Dep. Ex. 3, p. 6, GDWB 000381).

13.

It is the Bank's policy – and has been for as long as Mr. Bibb has been the Bank's President – for employees to conduct themselves at all times in a professional manner, and to cooperate cheerfully with personnel in their department and in other departments.  (Pl. Dep. 57:6-25; Pl. Dep. Ex. 3, p. 7, GDWB 000382; Bibb Decl. ¶ 6).

14.

Plaintiff admits that it was the Bank's policy to not discriminate against employees based on any protected class, including on the basis of sex and age.   (Pl. Dep. 58:14-23; Pl. Dep. Ex. 3, p. 11, GDWB 000386).

15.

At no point during Plaintiff's employment and prior to her termination did she raise any complaint, formally or informally, alleging that she or anyone else at the Bank was being treated differently because of her or their sex or age.  (Pl. Dep. 58:24-59:18).

16.

Plaintiff admits she understood the Bank's Personal Finances policy, which provides that all employees should assume the position of a regular customer when handling their personal bank business in the normal over-the-counter procedure, and further understood that no employees were permitted to transact their own or a relative's bank business while on company time using company

software.   (Pl. Dep. 59:19-60:20; Ex. 3, pp. 23-24, GDWB 000398-399; Baucom Decl. ¶ 3;[5] Wilson Decl. ¶ 4; Bibb Decl. ¶ 7).

17.

The Personal Finances policy is one of the Bank's most important policies and requires employees' personal financial affairs to be conducted in a manner as to be above regulatory or auditing criticisms or concerns.  (Doolittle Decl. ¶ 4; Bibb Decl. ¶ 7).

**Plaintiff's Employment as Compliance Officer**

18.

As the Bank's Compliance Officer, Plaintiff was charged with developing, implementing, and administering its compliance management program, making sure the Bank was complying with applicable state and federal banking regulations, and assisting with reviews, FDIC audits, and compliance examinations.  (Pl. Dep. 62:9-63:23; Bibb Decl. ¶ 9).

19.

As Compliance Officer, Plaintiff also had access to the Bank Pac Maintenance Program, a program which allowed an employee of the Bank to make changes to customer accounts while the employee using the software was physically at work, on duty, and on company time.  (Pl. Dep. 68:8-70:13).

20.

Plaintiff admits she had a duty to support the Bank's goals and values and to treat her co-workers with dignity and respect.  (Pl. Dep. 64:4-10).

---

[5] The Declaration of Kimberly Baucom is attached hereto as Exhibit 5.

21.

As Compliance Officer, Plaintiff did not have any direct subordinates, and lacked the ability to hire, fire, or recommend disciplinary action as to the Bank's lower-ranking employees. (Pl. Dep. 64:15-65:5; Doolittle Decl. ¶ 3).

22.

As the Compliance Officer, Plaintiff did not participate in employee disciplinary conferences or meetings.  (Pl. Dep. 65:8-12).

23.

Unlike Plaintiff, who was not a C-Suite officer of the Bank, Mr. Doolittle routinely attends meetings of the Bank's Board of Directors.  (Doolittle Decl. ¶ 3).

24.

Unlike Plaintiff, several individuals report directly to Mr. Doolittle, and he has the power to hire, fire, and recommend disciplinary action.  (Doolittle Decl. ¶ 3).

### Plaintiff's Violation of the Personal Finances Policy and the Resulting September 4, 2018 Email

25.

Kim Baucom is the Bank's Vice President of Operations, and also serves as the Bank's Internal Auditor and Assistant BSA Auditor.  (Baucom Decl. ¶ 2; Wilson Decl. ¶ 5; Bibb Decl. ¶ 8; Pl. Dep. 71:11-18, 72:4-6).

26.

One of Ms. Baucom's duties is to monitor employee account activities via the Bank Pac Maintenance Program.  (Baucom Decl. ¶ 4; Bibb Decl. ¶ 8; Pl. Dep. 71:19-23, 73:8-11).

27.

Internal audits such as those conducted by Ms. Baucom are required by federal and state regulations.  (Pl. Dep. 72:22-25).

28.

While conducting a routine audit in late August or early September 2018, Ms. Baucom discovered that Plaintiff appeared to be making changes to her own accounts and/or those of her relatives while on Company time and using Bank software, in violation of the Personal Finances policy.  (Baucom Decl. ¶ 4; Pl. Dep. 71:3-10, 73:12-16; Pl. Dep. Ex. 5).

29.

Ms. Baucom subsequently advised Ken Bibb of the issue, and she subsequently sent an email to all Bank employees on September 3, 2018 reminding them that, "***as an employee of the Bank, you are not permitted to make changes to anything pertaining to relatives or immediate family members.  This includes teller transactions, account transfers, and any maintenance changes including loans***."  (Baucom Decl. ¶ 4, Ex. A; Pl. Dep. 84:3-85:6, Pl. Dep. Ex. 6; Bibb Decl. ¶ 8, Ex. A) (Emphasis added).

30.

While Mr. Bibb was gravely concerned about this issue, especially because Plaintiff was the Bank's Compliance Officer, he chose not to directly punish her, and instead asked Ms. Baucom to send out the September 3rd email, hoping that Plaintiff would realize that the email was directed at her and that she would never again make a similar mistake.   (Bibb Decl. ¶ 8).

**<u>March 2019 - Plaintiff Fails to Timely Respond to an Auditor from the FDIC</u>**

31.

On March 22, 2019, Mr. Bibb received a call from the Bank's FDIC representative indicating that a compliance examination response was due on March 1, 2019, but that Plaintiff had been non-responsive to the FDIC's queries.  (Bibb Decl. ¶ 9; Pl. Dep. Ex. 13).

32.

Accordingly, Mr. Bibb emailed Plaintiff advising her of the call from the FDIC and asked her to respond "first thing" the next day that she was at work and to "copy me so that I can have for my records," in response to which Plaintiff emailed Mr. Bibb stating that the FDIC compliance exam had "completely slipped my mind."  (Bibb Decl. ¶ 9, Ex. B; Pl. Dep. 119:20-121:7; Pl. Dep. Ex. 13).

**The April 11, 2019 Incident**

33.

Denise Griswell is fifty-two (52) years old and serves as the Bank's BSA Compliance Officer and Banking Teller of Operations.  (Griswell Decl. ¶ 2).[6]

34.

On April 11, 2019, Plaintiff was the officer in charge of closing the Bank, which involves counting money and making sure it is all reconciled.  (Pl. Dep. 106:18-107:15, 108:1-18; Pl. Dep. Ex. 12; Griswell Decl. ¶ 3; Bibb Decl. ¶ 10).

35.

Around 5:15 on the evening of April 11, 2019, after a Teller in the drive-through announced that she was having problems balancing and requested a recount, which was the closing officer's

---

[6] The Declaration of Denise Griswell is attached hereto as Exhibit 6.

responsibility, Plaintiff became ill-tempered responded, "Shit, I have a damn appointment" in a loud voice.  (Griswell Decl. ¶ 3, Ex. A; Pl. Dep. 108:19-110:13, 111:2-114:16; Pl. Dep. Ex 12).

36.

Plaintiff admitted at her deposition that the language she used during the April 11, 2019 incident was "inconsistent with the company's policies," "profane," "inappropriate," "unprofessional," and "problematic behavior."  (Pl. Dep. 114:4-16).

37.

Ms. Griswell found the incident and Plaintiff's behavior to be unprofessional, and after initially reporting it to the Branch Manager, Jason Prince, she thereafter reported and discussed the incident with the Bank's President, Mr. Bibb.  (Griswell Decl. ¶ 3, Ex. A; Bibb Decl. ¶ 10).

38.

Thereafter, Mr. Bibb directly counseled and reprimanded Plaintiff, advising her that additional outbursts, unprofessional language, profanity, and a loud tone of voice would not be tolerated.  (Bibb Decl. ¶ 10; Pl. Dep. 114:17-116:13).

39.

Following the April 11, 2019, Plaintiff was also directed by Mr. Bibb to apologize to Ms. Griswell and several other individuals who witnessed the incident.  (Griswell Decl. ¶ 3, Ex. A; Bibb Decl. ¶ 10; Pl. Dep. 114:17-116:13; Pl. Dep. Ex. 12).

40.

Karen Wilson subsequently placed Ms. Griswell's incident report in Plaintiff's personnel file, along with a post-it note attached thereto which was prepared by Ms. Wilson and documents that Mr. Bibb subsequently counseled Ms. Helton on April 15, 2019 and directed her to apologize

to her co-workers as well as to control her tone of voice and language going forward.  (Wilson Decl. ¶ 3, Ex. A; Bibb Decl. ¶ 10; Pl. Dep. Ex. 12).

41.

The April 11th incident was not the first time that Mr. Bibb had spoken with Plaintiff about her tone of voice or word usage – on several previous occasions, Mr. Bibb had directly spoken with Plaintiff about her delivery in speaking with co-workers and suggested different word usage as well as to try to keep her voice down when speaking with others.  (Bibb Decl. ¶ 10; Pl. Dep. 117:6-19).

**The Discovery of Additional Violations of the Personal Finances Policy and Plaintiff's May 13, 2019 Disciplinary Warning**

42.

Ms. Baucom conducts employee audits monthly, and in April 2019, audited Plaintiff's account activity, which uncovered additional violations of the Bank's Personal Finances policy, including alterations to Plaintiff's own accounts and those of her family members while on company time and using company software.  (Baucom Decl. ¶ 5, Ex. B at pp. 1-4; Bibb Decl. ¶ 11).

43.

Plaintiff admitted at Exhibit 5 to her deposition reflects account transactions that she made while on company time to her own accounts and several other accounts of her relatives.  (Pl. Dep. 73:12-16; Pl. Dep. Ex. 5).

44.

For instance, the report run by Ms. Baucom revealed that on April 13, 2019, Plaintiff created a "suspended memo post," which temporarily prevented money from being removed from

her account with the Bank.  (Pl. Dep. 73:17-74:7; Pl. Dep. Ex. 54 at GDWB 000448).

45.

As another example, on June 25, 2018, Plaintiff created a purged a funds transfer from her account using the Bank Pac Maintenance program, which she admitted at her deposition was a violation of the Personal Finances policy.  (Pl. Dep. 74:21-75:15; Pl. Dep. Ex. 5 at GDWB 000448).

46.

While on company time, Plaintiff also made changes to her child's loan payment, to the account of her daughter's husband, to Plaintiff's husband's business checking account, and to the payment sequence on her husband's loan.  (Pl. Dep. 75:16-77:12, 77:13-78:9, 80:4-81:1, 81:2-15, 81:16-82:3, 88:16-90:3; Pl. Dep. Ex. 5 at GDWB 000449, 450, 452, 453-454).[7]

47.

Ms. Baucom was surprised and disappointed to discover Plaintiff's financial violations, particularly because Plaintiff was the Bank's Compliance Officer, as well as because the Personal Finances policy was something that all employees had been warned about previously, including most recently by Ms. Baucom herself on September 4, 2018, and she therefore once again advised Mr. Bibb of the issue.  (Baucom Decl. ¶ 5; Bibb Decl. ¶ 11).

48.

Mr. Bibb felt this was a significant violation of the Bank's policies and highly unethical,

_____

[7] A suspended memo post refers to an alteration to a transaction such that funds are removed from an account at a later date, thus keeping the balance from being deducted at that moment in time.  A fund transfer refers to moving funds from one account to another.  Purging refers to the deletion or removing of a scheduled transfer.  (Pl. Dep. 86:24-88:15).

particularly in light of Mrs. Helton's position as the Compliance Officer.  (Bibb Decl. ¶ 11).

49.

After the financial violations were reported to Mr. Bibb, and at his request, a meeting was held on or about May 13, 2019 between Plaintiff, Mr. Bibb, Ms. Wilson, and Mr. Doolittle, during which Plaintiff was reprimanded for violating the Personal Finances policy.  (Wilson Decl. ¶ 5; Bibb Decl. ¶ 11, Ex. D; Pl. Dep. 86:10-18, Pl. Dep. Ex. 7).

50.

During this same meeting, Mr. Bibb advised Plaintiff that she was to focus solely on her compliance duties and to leave the other department heads to handle their respective areas of responsibility, which was something other employees had complained about to Mr. Bibb previously, and he also reminded Plaintiff that all employees of the Bank are required to be respectful when talking to fellow co-workers and that angry outbursts will not be tolerated, which was a reference to the April 11, 2019 incident and subsequent disciplinary action.  (Pl. Dep. 100:1-14; Wilson Decl. ¶ 5, Ex. B; Bibb Decl. ¶ 11, Ex. D).

51.

Plaintiff admits she understood following the May 13, 2019 meeting that her attitude was going to be a point of focus between herself and Mr. Bibb going forward.  (PL. Dep. 101:19-22, Q. "**But you understood that your attitude was also a point of focus between you and Ken going forward**?" A. "*Exactly*.") (Emphasis added).

52.

During the May 13, 2019 meeting, Plaintiff was also instructed to maintain a positive attitude in the workplace going forward (which was something that Mr. Bibb felt was becoming a

serious issue), and thereafter, her administrative access to the Bank Pac Maintenance program was removed.  (Bibb Decl. ¶ 11; Pl. Dep. 100:1-14, 103:3-105:1, 125:25-126:4).

53.

Plaintiff admits that she was having difficulty maintaining a positive attitude at work at the time.  (Pl. Dep. 104:12-15, Q. "**And so it's true that you were having difficulty maintaining a positive attitude at work at that time**?" A. "*Yes*.") (Emphasis added).

54.

Although Mr. Bibb believed that Plaintiff's financial misconduct was very serious and highly unethical, he ultimately chose not to file a suspicious activity report with the FDIC in connection with the issue, because had he done so, Plaintiff would have never been able to work in the banking industry again and it would have destroyed her career.  (Bibb Decl. ¶ 12).

55.

Given that Plaintiff was a long-tenured employee, and because Mr. Bibb generally tries to be compassionate when dealing with his employees, he chose not to go that route out of sympathy and in an act of compassion, which in no way lessened the severity of Plaintiff's misconduct. (Bibb Decl. ¶ 12).

56.

On May 17, 2019, Plaintiff sent an email to Mr. Bibb (President) and Mr. Irwin (CEO) in which she wrote, in part, "I am fully aware that I did do and knowledge [sic] completely the transactions until further review…Nonetheless I am guilty of setting up transfers and deleting." (Pl. Dep. 98:6-99:20; Pl. Dep. Ex. 10).

**The September 23rd and October 7, 2019 Incidents**

57.

Ashley Haynes is employed by the Bank as its Loan Operations Manager, a position in which she supervises the Loan Operations Department.  (Haynes Decl. ¶ 2;[8] Bibb Decl. ¶ 13; Pl. Dep. 124:8-12).

58.

On several occasions prior to October 7, 2019, Plaintiff and Ms. Haynes had discussed and disagreed about the default collection sequence for Adjustable Rate Mortgage ("ARM") loans when a customer makes an overpayment.  (Haynes Decl. ¶ 3; Pl. Dep. 126:14-127:15).

59.

Prior to October 7, 2019, the default collection sequence for ARM loans in the event of an overpayment was "Principal, Interest, Escrow, and Late Fees," whereas Plaintiff felt that late fees should be collected before escrow fees.  (Haynes Decl. ¶ 3; Pl. Dep. 126:14-127:15).

60.

Ivan Gonzalez[9] is employed by the Bank in the Loan Operations Department, where he is supervised by Ashley Haynes.  (Gonzalez Decl. ¶ 2; Pl. Dep. 123:2-124:20).

61.

Ashley Haynes was out on vacation during the week of September 23, 2019.  (Gonzalez Decl. ¶ 3; Haynes Decl. ¶ 3; Pl. Dep. 124:21-125:5; Pl. Dep. Ex. 14).

62.

When Ms. Haynes returned to work following the week of September 23, 2019, Mr.

---

[8] The Declaration of Ashley Haynes is attached hereto as Exhibit 7.

[9] The Declaration of Ivan Gonzalez is attached hereto as Exhibit 8.

Gonzalez reported to Ms. Haynes that Plaintiff raised her voice and yelled at him in a loud voice and in an unprofessional matter after he refused to make changes to the collection sequence for ARM loans.  (Gonzalez Decl. ¶ 3; Haynes Decl. ¶ 3; Pl. Dep. Ex. 14).

63.

Mr. Gonzalez reported that he refused to make the changes that Plaintiff asked requested regarding ARM loans and that he told Plaintiff he would need to discuss them with Ms. Haynes, and further reported that when he did so, Plaintiff became upset and started yelling and hollering in an inappropriate tone of voice.  (Gonzalez Decl. ¶ 3, Ex. A; Haynes Decl. ¶ 3, Ex. A; Pl. Dep. Ex. 14).

64.

On October 7, 2019, Plaintiff asked Ms. Haynes if she was going to change the ARM collections sequence to Plaintiff's preferred collections sequence in the event of an overpayment. (Haynes Decl. ¶ 3; Pl. Dep. 126:14-127:25, 128:6-129:15).

65.

Ms. Haynes reported to Mr. Bibb that, during the October 7, 2019 incident, Plaintiff asked her to change the ARM payment collections sequence in a loud and condescending manner, and that when Ms. Haynes told Plaintiff it was not a compliance issue, Plaintiff began waiving her arms all around, said that Ms. Haynes' subordinates needed to "do it right" and then said, "well, there needs to be some training!"  (Haynes Decl. ¶ 3; Bibb Decl. ¶ 13, Ex. E; Pl. Dep. 126:14-127:25, 128:6-129:15; Pl. Dep. Ex. 14).

66.

Following the argument with Ms. Haynes, in which Plaintiff admits that she "raised [her]

-15-

voice," Plaintiff turned off the lights in her office and left work for the day, which was reported by Ms. Haynes to Mr. Bibb.  (Haynes Decl. ¶ 3; Bibb Decl. ¶ 13, Ex. E; Pl. Dep. 128:6-21).

67.

Ms. Haynes subsequently reported the September 23rd and October 7, 2019 incidents regarding Plaintiff to Ken Bibb (President) and Karen Wilson (Corporate Secretary/HR) on October 7, 2019.  (Haynes Decl. ¶ 3; Wilson Decl. ¶ 6; Bibb Decl. ¶ 13, Ex. E).

68.

The same date, about an hour or so after Plaintiff left work for the day, she sent Ms. Haynes an email in which she acknowledged that the payment sequence dispute was "not a compliance issue."  (Haynes Decl. ¶ 4, Ex. B; Pl. Dep. 129:16-131:5; Pl. Dep. Ex. 15).

69.

Mr. Bibb determined that Plaintiff's behavior during the September 23 and October 7, 2019 incidents violated the directives given to her during the May 15, 2019 disciplinary meeting, because Plaintiff did not supervise the Loan Operations Department – rather, Ms. Haynes supervised that Department – and Plaintiff had been instructed to leave the other department heads to handle their respective areas of responsibility, as well as because Plaintiff had been directed to behave courteously and professionally towards her co-workers.  (Wilson Decl. ¶ 6, Ex. C; Bibb Decl. ¶ 13; Pl. Dep. 125:25-126:4).

70.

Ashley Haynes was subsequently asked to prepare the October 7, 2019 incident report, which Ms. Wilson thereafter placed in Plaintiff's personnel file.  (Wilson Decl. ¶ 6, Ex. C; Bibb Decl. ¶ 13).

## Plaintiff's Termination

71.

Mr. Bibb (who as noted above is older than Plaintiff) subsequently made the decision to terminate Plaintiff's employment, which was communicated to her on October 9, 2019.  (Wilson Decl. ¶ 7; Bibb Decl. ¶ 14; Pl. Dep. 145:16-146:6).

72.

Ultimately, Mrs. Helton was terminated for her inappropriate and disruptive workplace conduct during the week of September 23rd and then again on October 7, 2019, which followed prior discipline related to the Personal Finance policy in May 2019 and discipline for her inappropriate and unprofessional use of language towards other co-workers on April 11, 2019. (Wilson Decl. ¶ 7; Bibb Decl. ¶ 14; Pl. Dep. 138:18-141:19, 141:23-142:3).

73.

Plaintiff was never told orally or in writing that her termination was due to her age or sex. (Pl. Dep. 141:20-22, 145:7-15).

74.

At the time of her termination, Mr. Bibb had simply lost confidence in Plaintiff's ability to interact with her co-workers, from whom he had received complaints in less than (7) months from three (3) different people, and during the same time period had discovered evidence of multiple violations of the Personal Finance policy.  (Bibb Decl. ¶ 14).

75.

Plaintiff admitted at her deposition that if a company honestly believed that an officer level employee had engaged in unprofessional behavior towards co-workers on multiple occasions

within a seven-month period, that would be a legitimate reason for separating the employee.  (Pl. Dep. 131:6-13).

76.

At the time of Mrs. Helton's termination, less than one-third (1/3) of the Bank's employees were under forty (40) years of age.  (Bibb Decl. ¶ 18; Pl. Dep. 145:16-146:6).

77.

At the time of her separation, Plaintiff was offered a standard form severance agreement that included a clause indicating that she may potentially be asked to assist with her transition and devote up to five (5) hours per week through the end of the calendar year, which is standard language the Bank includes in such situations.  (Bibb Decl. ¶ 18).

78.

However, Mr. Bibb had no intention of ever asking Plaintiff to perform any further services and has never asked a terminated employee to do so under similar circumstances.  (Bibb Decl. ¶ 18).

79.

Following Plaintiff's termination, Karen Wilson decided to research the full extent of the Personal Finance policy violations that had been committed by Plaintiff during her employment. (Wilson Decl. ¶ 8).

80.

Ms. Wilson did so on her own initiative primarily out of curiosity using the Bank Pac Maintenance program, and thereafter generated the reports shown on pages GDWB 000452-464 of Exhibit D to her declaration.  (Wilson Decl. ¶ 8, Ex. D).

-18-

81.

Ms. Wilson's report shows that Plaintiff used the Bank's software to make changes to her husband's business checking account, her husband's business loan, her personal loan, her personal line of credit, and other accounts of relatives at varying times during the years preceding her separation, something Plaintiff admits.  (Wilson Decl. ¶ 8).

**The Third-Party Compliance Contractor and Internal Compliance Committee**

82.

Following Plaintiff's separation, neither Ashley Haynes nor any other employee of the Bank replaced Plaintiff as the Compliance Officer.  (Haynes Decl. ¶ 7; Bibb Decl. ¶ 19).

83.

After Plaintiff's separation, the majority of Plaintiff's compliance duties were contracted out to a third-party, Steven Moore Compliance Services, and the remainder of Plaintiff's duties were absorbed by a seven-member internal compliance committee which works with Mr. Moore to manage the Bank's compliance committee.  (Haynes Decl. ¶ 7; Bibb Decl. ¶ 19, Ex. F; Pl. Dep. 147:6-148:15).

84.

The seven-member Compliance Committee is comprised of six (6) women and includes five (5) members who are over the age of forty (40).  (Haynes Decl. ¶ 7; Bibb Decl. ¶ 19; Pl. Dep. 147:6-148:15).

85.

Because the FDIC requires banks to have a designated compliance officer, Ashley Haynes and Stephanie McAfee were given the additional titles of "Interim Loan Compliance Office" and

"Interim Deposit Compliance Officer," respectively – however, these are merely descriptive titles, as neither of their primary job responsibilities changed following Plaintiff's separation.  (Haynes Decl. ¶ 7; Bibb Decl. ¶ 19; Pl. Dep. 148:16-149:20).

86.

In fact, the signature line of Ms. Haynes's company email still lists her title as "Loan Operations Manager" and makes no reference to compliance.  (Haynes Decl. ¶ 7).

**The 2016 Branch Closure and Resulting Restructuring**

87.

Pat Herringdine was employed by the Bank as a teller immediately prior to her retirement on July 31, 2019.  (Herringdine Decl. ¶ 2).[10]

88.

In October 2016, the Bank closed its second branch and, as part of a corporate restructuring, Ms. Herringdine and several other individuals over the age of sixty (60) were offered an early retirement package.  (Herringdine Decl. ¶ 4; Bibb Decl. ¶ 17; Pl. Dep. 149:21-150:23).

89.

However, none of these employees were forced or otherwise required to retire early – it was purely their choice to accept or reject the early retirement offer.  (Bibb Decl. ¶ 17; Pl. Dep. 149:21-150:23, 150:24-152:15).

90.

Ms. Herringdine rejected the Bank's early retirement package and instead chose to continue working until she voluntarily retired at the age of sixty-nine (69) in 2019, which the Bank

---

[10] The Declaration of Pat Herringdine is attached hereto as Exhibit 9.

supported.  (Herringdine Decl. ¶ 4; Bibb Decl. ¶ 17; Pl. Dep. 150:24-152:15).

91.

As part of the 2016 branch closure, there were four other employees who were involuntarily separated (ages 45, 48, 33, and 23) at the same time, two of whom were under the age of 40, meaning the branch's closure impacted employees across all age levels.  (Bibb Decl. ¶ 17; Pl. Dep. 150:24-152:15, 152:10-12).

92.

One of the over-forty individuals who was initially involuntarily separated at the time of the branch closure – Andrea Calloway, who was around 48 or 49 years old at the time – was ultimately rehired a short time later.  (Bibb Decl. ¶ 17; Pl. Dep. 150:24-152:15).

93.

None of the individuals who were impacted by the Bank's 2016 branch closure were terminated for poor performance or attitude problems, nor had they been accused of conducting personal banking on company time.  (Pl. Dep. 152:16-153:1).

94.

Ms. Herringdine admits that at no point during her employment did she believe that the Bank had subjected her to any type of differential treatment because of her sex or age. (Herringdine Decl. ¶ 5).

## **The Dispute Between Pat Herringdine and Ronnie May**

95.

Ronnie May was previously employed by the Bank as a vice president and bank manager until his retirement in approximately 2012.  (Herringdine Decl. ¶ 6; Wilson Decl. ¶ 10; Bibb Decl.

¶ 16).

96.

Approximately one or two years prior to Mr. May's 2012 retirement, Ms. Herringdine complained about Mr. May's behavior to the Bank's President, Mr. Bibb, who promptly addressed the matter with Mr. May and reprimanded him, and no further incidents were reported. (Herringdine Decl. ¶ 6; Wilson Decl. ¶ 10; Bibb Decl. ¶ 16).

97.

Thereafter, Ms. Herringdine had no further issues with Mr. May, and they each spoke favorably about one another at their respective retirement parties.  (Herringdine Decl. ¶ 6; Wilson Decl. ¶ 10; Bibb Decl. ¶ 16).

98.

There is no evidence that any employees of the Bank other than Ms. Herringdine ever complained about Mr. May's behavior to Mr. Bibb, and there is also no evidence that Mr. May was ever accused of violating the Bank's Personal Finances policy.  (Herringdine Decl. ¶ 6; Bibb Decl. ¶¶ 15-16).

**Rachel Green and Lamar Doolittle**

99.

Rachel Green was previously employed by the Bank from 2011 until December 2015 or 2016 as a Teller and was twenty-six (26) years old at the time of her termination from the Bank. (Green Decl. ¶ 2).[11]

---

[11] The Declaration of Rachel Green is attached hereto as Exhibit 10.

100.

Rachel Green was involved in an altercation involving Lamar Doolittle (the Bank's CIO/COO) in the Spring prior to her 2015 or 2016 termination, but did not report the incident to Mr. Bibb.  (Green Decl. ¶ 5).

### Lamar and Ben Doolittle

101.

Mr. Doolittle is the only employee of the Bank who is allowed to take a company laptop home because one of his duties as CIO is to manage the Bank's information technology systems, which allows him to assist with tech-related issues at all times and which is why he has such access. (Doolittle Decl. ¶ 5; Pl. Dep. 82:14-83:5).

102.

During his high school and college years, Ben Doolittle – the son of Lamar Doolittle – worked part-time at the Bank, during which time he worked for Kim Baucom (who serves as the Internal Auditor and Assistant BSA Auditor) – with duties including working with phones to help customers with their account balances and internet banking issues such as password resets, and making transfers of money – and therefore had access to Bank Pac and Internet Banking Administration, just like anyone else in the Bank performing an equivalent position, though like Plaintiff, he was still prohibited from moving money from employee accounts or those of his relatives using Bank software.  (Doolittle Decl. ¶ 5; Pl. Dep. 82:14-83:5).

103.

There is no evidence that any employees of the Bank ever complained about Lamar Doolittle's behavior to Mr. Bibb, let alone three (3) different co-workers within a seven a (7) month

period, and there is also no evidence that Mr. Doolittle was ever accused of violating the Bank's Personal Finances policy.  (Bibb Decl. ¶ 16; Herringdine Decl. ¶ 7; Green Decl. ¶ 5; Doolittle Decl. ¶¶ 4, 6).

104.

Unlike Plaintiff, at no point has Mr. Bibb had to counsel Mr. Doolittle about his voice, professionalism, or use of inappropriate language.  (Doolittle Decl. ¶ 6).

**<u>Jessica Ford</u>**

105.

Former employee Jessica Ford – who was a coordinator of online banking – and was terminated in 2013, was never demoted by the Bank, did not have her salary reduced at any time prior to her termination, and was not given or otherwise required to sign a separation agreement or a general release of claims.  (Bibb Decl. ¶ 20; Pl. Dep. 155:22-159:7).

**<u>Kathy Brooks</u>**

106.

In or around August 2019, it was determined that the Bank's Loan Department (where Kathy Brooks worked at the time) was overstaffed.  (Bibb Decl. ¶ 21; Pl. Dep. 171:4-172:24).

107.

However, rather than terminate an employee, the Bank chose to place the extra employee in another understaffed department.  (Bibb Decl. ¶ 21).

108.

Accordingly, Mrs. Brooks was transferred to the Teller department, resulting in her salary being downgraded to a teller's pay scale, after which Mrs. Brooks continued working for the Bank

until she voluntarily resigned on or about September 1, 2021. (Bibb Decl. ¶ 21; Pl. Dep. 171:4-172:24).

109.

There is no admissible evidence that Mr. Bibb has ever yelled, cursed, or raised his voice in an unprofessional manner or in a manner that would be inappropriate in the workplace, or that Mr. Bibb has ever been accused of violating the Bank's Personal Finances policy.  (Herringdine Decl. ¶ 8; Green Decl. ¶ 6; Griswell Decl. ¶ 5; Wilson Decl. ¶ 10).

110.

There is no evidence that any manager or supervisor of the Bank has ever made any statement (orally or in writing) that was either ageist or sexist.  (Herringdine Decl. ¶ 5; Green Decl. ¶ 4; Gonzalez Decl. ¶ 4; Baucom Decl. ¶ 6; Griswell Decl. ¶ 4; Doolittle Decl. ¶ 7; Haynes Decl. ¶ 5; Wilson Decl. ¶ 9; Bibb Decl. ¶ 15; Pl. Dep. 174:3-8).

111.

There is no evidence that any employee of the Bank other than Plaintiff has ever been accused of violating the Bank's Personal Finance's policy.  (Pl. Dep. 153:2-5; Green Decl. ¶ 5; Gonzalez Decl. ¶ 4; Griswell Decl. ¶ 4; Haynes Decl. ¶ 5; Wilson Decl. ¶ 9; Bibb Decl. ¶¶ 7, 15).

112.

At no point during Mr. Bibb's employment with the Bank has he ever personally heard, observed, or witnessed anyone other than Plaintiff yell, curse, or raise their voice in an unprofessional manner or in a manner that would be inappropriate in the workplace.  (Bibb Decl. ¶ 16).

113.

Plaintiff admits that Mr. Doolittle and Mr. Bibb had "completely different jobs" compared

to her own job responsibilities.  (Pl. Dep. 162:14-21).

Respectfully submitted,

**FREEMAN MATHIS & GARY, LLP**

*/s/ John D. Bennett*
John D. Bennett
Georgia Bar No. 059212
jbennett@fmglaw.com

100 Galleria Parkway
Suite 1600
Atlanta, GA  30339
T:  (770) 818-0000
F:  (770) 937-9960

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

DEBRA HELTON,                          )
                                       )
    PLAINTIFF,                     )
                                       )          CIVIL ACTION FILE NO.
                                       )          5:21-cv-00404-MTT
v.                                     )
                                       )
THE GEO. D. WARTHEN BANK,              )
                                       )
    DEFENDANT.                     )
_____)

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that I have this day electronically submitted the foregoing **GEO D. WARTHEN BANK'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED <u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>** with the Clerk of Court using the CM/ECF system which will automatically send e-mail notifications of such filing to all counsel of record:

Kenneth E. Barton III
Cooper, Barton & Cooper, LLC
170 College Street
Macon, Georgia 31201
keb@cooperbarton.com

    This 16th day of September, 2022.

                    **FREEMAN MATHIS & GARY, LLP**

                    */s/ John D. Bennett* _____
                    John D. Bennett
                    Ga. Bar No.: 059212
                    *Counsel For Defendant*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia  30339-5948
T:  770.818.0000
E:  jbennett@fmglaw.com