EXHIBIT 1
To Defendant's Motion for Summary Judgment

Excerpts and exhibits from the
Deposition of Plaintiff Deborah Helton

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2                  MIDDLE DISTRICT OF GEORGIA

3                       MACON DIVISION

4    DEBRA HELTON,               )

5         Plaintiff,            )     Civil Action

6    vs.                        )     5:21-CV-00404

7    THE GEO D. WARTHEN BANK,    )    Volume I of II

8         Defendant.            )

9

10                  VIDEO DEPOSITION OF:

11                     DEBRA HELTON

12                    June 8, 2022

13                  170 College Street

14                    Macon, Georgia

15                Commencing 10:13 a.m.

16                Adjourning 12:28 p.m.

17              Susan M. Breedlove, CCR

18              Mike Brown, Videographer

19

20

21

22

23

24

25

Page 2

1   APPEARANCES:

2

3   FOR THE PLAINTIFF:

4   KENNETH E. BARTON III, Esquire

5   Cooper, Barton, Cooper, LLP

6   170 College Street

7   Macon, Georgia 31201

8   478-841-9007 Phone

9   keb@cooperbarton.com

10

11  FOR THE DEFENDANT:

12  JOHN D. BENNETT, Esquire

13  Freeman, Mathis, & Gary, LLP

14  100 Galleria Parkway

15  Suite 1600

16  Atlanta, Georgia 30339-5948

17  770-818-0000 Phone

18  jbennett@fmglaw.com

19

20

21

22

23

24

25

Debra Helton , Volume I                          June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 92

1                      CERTIFICATE OF REPORTER

2

3          I, Susan M. Breedlove, certified court

4    reporter for the State of Georgia, do hereby certify

5    that the foregoing was reported by me at the time and

6    place set out in the caption hereof, and that the

7    foregoing constitutes a true and accurate transcript of

8    the same.

9              I further certify that I am not related to

10   any of the parties, nor am I an employee of or related

11   to any of the attorneys representing the parties, and I

12   have no financial interest in the outcome of this

13   matter.

14             I have hereunder subscribed my hand on the

15   17th dat of June, 2022.

16

17

18             Susan M. Breedlove, CCR B-817

19

20

21

22

23

24

25

Page 93

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF GEORGIA
2                    MACON DIVISION
3
     DEBRA HELTON,
4
              Plaintiff,
5                                   CIVIL ACTION FILE
        vs.
6                                   NO. 5:21-cv-00404-MTT
7    THE GEO. D. WARTHEN BANK,      VOLUME II of II
8          Defendant.
9
10                   DEPOSITION OF
                     DEBRA HELTON
11
12                   June 8th, 2022
                Commencing at 1:10 p.m.
13              Concluding at 3:27 p.m.
14
15          Held at Cooper, Barton & Cooper
                 170 College Street
16              Macon, Georgia  31201
17
18      Reported by Deborah J. Combs, RPR, CCR-B-1000
19
20
21
22
23
24
25

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 94

1    APPEARANCES OF COUNSEL:
2    On Behalf of the Plaintiff:
3    KENNETH E. BARTON III, Esquire
     EMILY M. WALKER, Esquire
4    Cooper, Barton & Cooper
     170 College Street
5    Macon, Georgia  31210
     (478) 202-7050
6    keb@cooperbarton.com
     emw@cooperbarton.com
7
     On Behalf of the Defendant:
8
     JOHN D. BENNETT, Esquire
9    Freeman, Mathis & Gary, LLP
     100 Galleria Parkway
10   Suite 1600
     Atlanta, Georgia  30339
11   (770)818-0000
     jbennett@fmglaw.com
12
13   The Videographer:
14   Mike Brown,
     Veritext Legal Solutions
15
16
17
18
19
20
21
22
23
24
25

Page 191

1

CERTIFICATE

2

STATE OF GEORGIA:

3

GEORGIA, BIBB COUNTY:

4

5          I, Deborah J. Combs, Certified Court

6    Reporter, State of Georgia, Certificate No. B-1000,

7    CERTIFY that acting in such capacity, I reported the

8    testimony herein, and on the foregoing pages have

9    transcribed a true and correct transcript thereof.

10          I FURTHER CERTIFY that I am not counsel

11   for, nor am I related to any party to the above case;

12   nor am I interested in the event or outcome.

13   WITNESS my hand and official seal as Certified Court

14   Reporter, State of Georgia, Certificate No. B-1000

15   this 29th day of June, 2022.

16

17

18

19

20

                    Deborah J. Combs, RPR, CCR

21                  Certificate No. B-1000

22

23

24

25

Page 11

1   morning.  In total.  To prepare for today's deposition,

2   how much time, total, did you spend?

3        A    I don't know the direct answer to your

4   question, but this has been going on since October of

5   2019, so I have been preparing since October of 2019 to

6   get this done.

7        Q    Is that when you first started anticipating a

8   potential legal claim against the Bank?

9        A    Well, no, I was fired October 9th of 2019.

10  So, October -- November.

11       Q    October, November of 2019?

12       A    2019.

13       Q    Okay.  So by no later than that date, you

14  were anticipating -- you believe that your legal rights

15  have been violated?

16       A    Yes.

17       Q    And you were anticipating a possible claim?

18       A    Yes.

19       Q    Okay. Let me get back to your preparation.

20  Aside from your lawyers -- and your lawyers are Ken and

21  Emily here in the room with us, right?

22       A    Yes.

23       Q    And their firm?

24       A    Yes.

25       Q    Have you spoken with anyone else about your

Debra Helton , Volume I                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

                                                   Page 22

1        Q     Okay, so you signed and dated this Notice of

2   Designation of Attorneys on November the 25th, 2019,

3   right?

4        A     Uh-huh (affirmative).  I signed it that day.

5        Q     Okay.  But it says effective date November

6   19th, 2019, right?

7        A     That is correct.

8        Q     I assume you anticipated litigation or a

9   legal claim against the Bank before going to see a

10   lawyer?

11        A     Yes.

12        Q     Okay. So it would have been certainly before

13   November the 19th, 2019, that you anticipated the

14   claim?

15        A     Yes.

16        Q     Okay. All right. Now, as I mentioned, I'm not

17   going to ask you about every -- every detail right now.

18   I want to get a general understanding of your claim,

19   and then we'll get more specific as we go forward,

20   okay?

21        A     Okay.

22        Q     But, basically, what you're alleging in this

23   EEOC charge is that you believe that the Bank

24   discriminated against you because of your age and

25   because of your sex; is that right?

Debra Helton , Volume I                          June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 23

1        A     Yes.

2        Q     Okay.  And the form of discrimination, or the

3   adverse action, was your termination?  That was the

4   event, right?

5        A     Right.

6        Q     Okay.  Now, am I correct to assume that you

7   didn't personally type all of the words on this letter?

8        A     Correct.

9        Q     Okay.  But am I also correct to assume that

10  you would have read this and made sure that it was

11  accurate before it was submitted?

12       A     Yes.

13       Q     All right. And, on the fourth page of Exhibit

14  1, you declared under penalty of perjury that the

15  information in the charge was true and correct.

16       A     Yes.

17       Q     All right.  Were there any other lawyers that

18  you communicated with but that you did not retain?

19       A     Yes, there was a lady in Augusta, but I

20  cannot remember her name.

21       Q     And did someone refer you to the Cooper

22  partner firm or did you find them on your own?

23       A     I found them on my own.

24       Q     Was that through like a Google search?

25       A     I don't know.  I guess I was just reading and

Debra Helton , Volume I                           June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 43

1    behavior by women.  That's the gist of the allegation,

2    right?

3         A    That's the gist, yes.

4         Q    All right, so let's go -- let's go to the

5    claims.  Like I said, we're going to kind of cover the

6    middle later, but let's go to page 17.  Next, we're

7    going to have you look at page 17 and page 19. You see

8    what I'm doing?

9         A    Okay.

10        Q    All right.  So you've got two claims or

11   causes of action in this lawsuit. One is wrongful

12   termination under the Age Discrimination and Employment

13   Act. And the other is wrongful termination in violation

14   of Title Seven of the Civil Rights Act. Is that right?

15        A    Yes.

16        Q    Okay. In the Civil Rights Act, the wrongful

17   termination that you're alleging there is based on your

18   sex, correct?

19        A    Correct.

20        Q    Okay.  So you're alleging both age and sex

21   discrimination, right?

22        A    Yes.

23        Q    Okay.  Now, you -- you're the only plaintiff

24   in this case, right?  You haven't filed a class action

25   lawsuit against the Bank, have you?

Debra Helton , Volume I                           June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 44

1        A    No.

2        Q    Okay, and you're alleging that you were

3    intentionally discriminated against because of your age

4    and your sex, right?

5        A    I don't know that it was intentionally, I

6    know that it happened.

7        Q    Okay, but let me ask it differently. You're

8    not alleging that there was like a neutral -- facially

9    neutral policy that weeds out women and older workers

10   at the Bank, are you?

11            MR. BARTON:  Object to form.  You can answer.

12            THE DEPONENT:  I am not alleging. What I'm

13        saying is that if a man raised his voice at

14        another employee, female employee, there was never

15        anything said or done about it.

16   BY MR. BENNETT:

17       Q    Right. But you're saying that you were

18   treated differently than men and younger employees,

19   right?

20       A    Yes.

21       Q    All right. So let me make sure I understand

22   this -- and those are your only two claims, right?

23   You've got age discrimination and sex discrimination.

24   You're not alleging disability or anything like

25   that --

Debra Helton , Volume I                        June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 46

1      Q     Okay.  So it's both the fact that you are a
2  woman and you're older.
3      A     Yes.
4      Q     But it's mainly the fact that you're a woman.
5      A     Yes.
6      Q     Okay.  So it -- was it a combination of those
7  two things, or are you alleging that you were
8  terminated because you were a woman who was accused of
9  doing the things that you did?
10     A     I was a woman.
11           MR. BENNETT:  Why don't we take a short
12     break?
13           VIDEOGRAPHER:  Off the record.  The time is
14     11:08.
15           (Off the record)
16           VIDEOGRAPHER: Back on the record.  The time
17     is 11:23.
18  BY MR. BENNETT:
19     Q     Okay, Ms. Helton, we're back from short
20  break.  I want to kind of go through your employment
21  history, okay?
22     A     Okay.
23     Q     So you were first hired by the Bank in 1988
24  as a bank teller, right?
25     A     Correct.

Debra Helton , Volume I                                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 47

1        Q     All right. Did you have an interview?

2        A     Yes.

3        Q     Do you remember who interviewed you?

4        A     I do not.

5        Q     Do you remember who the bank president was at

6    the time

7        A     Chris Irwin.

8              COURT REPORTER:  I'm sorry?

9              THE DEPONENT:  Chris Irwin, I-r-w-i-n.

10   BY MR. BENNETT:

11       Q     Okay.  Was Ken Bibb employed by the Bank at

12   that time?

13       A     No.

14       Q     When did he come on?

15       A     I believe 2001 -- 2000, 2001.

16       Q     Okay, and what -- what was the next position

17   you held at the Bank after the bank teller?

18       A     I went from bank teller to the CDs and IRAs.

19   At some point in there, I was moved to the branch

20   office and worked on the teller line and did CDs and

21   IRAs and new accounts when needed.

22       Q     What do you mean by the branch office?

23       A     The one that they closed in October of '16.

24       Q     Okay.

25       A     Actually, I was hired at the main office. We

Debra Helton , Volume I                                June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 50

1    remember.

2         Q    You don't have any information that was

3    anything less than voluntary on her part, correct?

4         A    No, it was voluntary. She and Ronnie May

5    retired at the same time.

6         Q    All right.  At some point after that you

7    became the company's compliance officer, correct?

8         A    Correct.

9         Q    And that was also a decision made by Ken

10   Bibb, right?

11        A    Right.

12        Q    How old were you -- first of all, that was

13   2009, correct?

14        A    I believe so.

15        Q    So you were 47?

16        A    Yes.

17        Q    Was that when you were given that role? You

18   went from loan officer to compliance officer. So that

19   was a lateral move, right?

20        A    Yes.

21        Q    And you didn't get like a raise in pay at

22   that time that, did you?

23        A    I don't believe so.  Let's back up just a

24   minute, if you don't mind.  I actually went to Ken. The

25   compliance officer at that point in time was having

Debra Helton , Volume I                          June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 51

1    some health issues. And so I went to Ken and asked, if

2    he needed a compliance officer, could I please be the

3    compliance officer?  And he -- because he laughed and

4    said, you're really asking me to be the compliance

5    officer?

6          Q    And who was the former compliance officer?

7          A    Jimmy Jones.

8          Q    Jimmy Jones?

9          A    Uh-huh (affirmative).

10         Q    And did -- did he --

11         A    He's --

12         Q    -- leave because of health issues?

13         A    He retired because of health issues.

14         Q    You don't have any information that he was

15   asked to retire, do you?

16         A    I do not.  I can find out, but I don't think

17   so.

18         Q    Well, you wouldn't have any --

19         A    I don't have any information.

20         Q    You weren't -- you weren't privy to any such

21   discussions, right?

22         A    No.

23         Q    Okay, how old was Jimmy at the time you

24   replaced him in the compliance officer position?

25         A    Estimating in his late fifties. I don't know

Debra Helton , Volume I                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 52

```
 1    for sure.
 2         Q     Okay.  And then who replaced you in the loan
 3    officer position when you became the compliance
 4    officer?
 5         A     I kept my loan portfolios, so I did lending
 6    and compliance.
 7         Q     So you were not replaced?
 8         A     No.
 9         Q     Okay, as a compliance officer, you were
10    required to be familiar with the company's policies and
11    procedures. Is that right?
12         A     You were -- I was responsible for being
13    familiar with the regulations set by the government.
14         Q     Right. But as a person who was employed by
15    the Bank for over 30 years, am I correct to assume that
16    you were familiar with the company's policies and
17    procedures as described in the employee handbook?
18         A     Yes.
19         Q     Okay.  And, in fact, you remember at some
20    point in 2019, you would propose to Ken Bibb to store
21    all those policies in a certain place, like on the F
22    drive or something like that?
23         A     I don't remember the conver -- conversation,
24    but I know we did put them on the computer.
25         Q     Okay.  And when you -- when you became --
```

Debra Helton , Volume I                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 53

1   with respect to compliance policies, you allege in some

2   of your documents that you were responsible for

3   training the then current mortgage officer 2012.

4        A    Yes.

5        Q    Okay. So just so I understand the corporate

6   hierarchy of the Bank, there's a board of directors,

7   right.

8        A    Correct.

9        Q    Okay. And there -- there are five directors;

10  is that right?

11       A    Correct.

12       Q    All right. Three of those are not employed by

13  the Bank, but two of them are officers of the Bank,

14  right?

15       A    Correct.

16       Q    Okay, so two of -- the two people who are

17  officers are Chris Irwin, the CEO, and the President

18  Ken Bibb, right?

19       A    Correct.

20       Q    Okay.  Now, Ken is older than you are, right?

21       A    Yes.

22       Q    Okay.  So at the time of your termination,

23  you were 57. And Ken was 60, around that age, right?

24       A    Somewhere around there.

25       Q    And Chris Irwin is older than Ken, correct?

Debra Helton , Volume I                     June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 54

1        A     Yes.

2        Q     And each of the board members are all older

3   than you, aren't they?

4        A     Except one.

5        Q     Who's that?

6        A     Keenan Howard.

7        Q     Okay.  Did you attend board meetings?

8        A     Only two -- only at times when the board

9   needed training as far as regulations were concerned.

10       Q     So in 2018, 2019, did you attend any board

11  meetings?

12       A     There's a possibility.

13       Q     Well, how many do you think at most you would

14  have attended?

15       A     Maybe two.

16       Q     And how often does the board meet?

17       A     Weekly.

18       Q     Okay, so -- so there's the board, and Mr.

19  Irwin, the CEO, he is the chair of the board and the

20  chief executive officer of the Bank, right?

21       A     Yes.

22       Q     Okay.  And so immediately below him is Ken

23  the president, correct?

24       A     Right.

25       Q     All right. Then immediately below him is

Page 55

1    Lamar Doolittle, the chief operations officer and the

2    chief information officer, correct?

3        A    Yes.

4        Q    Okay. And then below that are various

5    officers such as the loan officer, the compliance

6    officer -- I think there's a few others, right?

7        A    Correct.

8        Q    Okay. And you were the compliance officer?

9        A    Yes.

10       Q    And then below that are non-officer, hourly

11   employees, I assume.  Is that right?

12       A    Yes.

13                        (Defendant's Exhibit Number 3 was

14                         marked for identification.)

15   BY MR. BENNETT:

16       Q    Okay.  Let me hand you Exhibit 3. This is a

17   long one. We're not going to read the whole thing.

18   We're going to look at a few things.

19            Okay, just -- just glancing at this, can you

20   -- do you recognize this document as the employee

21   handbook of the Geo D. Warthen Bank?

22       A    Right. I'm not sure that this is the one that

23   was in effect when I was there.

24       Q    Well, sitting here today, you can't tell me

25   any changes that would be in this document as compared

Debra Helton , Volume I                                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 56

1    to the handbook that was in effect when you were

2    employed, right?

3         A    Not without comparing them.

4         Q    Okay. And you don't remember there being any

5    companywide announcements in 2018 or 2019 about changes

6    to the handbook, do you?

7         A    No.

8         Q    Okay.  All right. Let's go to page six. And

9    see at the bottom, there's these other numbers. Those

10   are called Bates labels. So we're looking at page six.

11   That's labeled GDWB 000381. You see that?

12        A    Yes.

13        Q    Okay.  All right.  We're only going to look

14   at the words that are, you know, either italicized or

15   in bold. You see those?

16        A    Uh-huh (affirmative).  I do.

17        Q    All right.  So you understood that your

18   employment with the Bank was at will correct?

19        A    Yes.

20        Q    All right.  So you didn't have an employment

21   contract that said, you, Debra Helton, could only be

22   terminated for certain specific reasons or for cause,

23   right?

24        A    Correct.

25        Q    All right.  And you were also free to resign

Page 57

1    at any point if you so chose.

2          A    Correct.

3          Q    Okay, let's go to page seven, labeled GDWB

4    382. And, specifically, let's look at the last two

5    paragraphs under customer -- customer relations.

6               Would you agree with me, Ms. Helton, that it

7    was the Bank's policy for all of its employees to

8    conduct themselves at all times in a professional

9    manner?

10         A    Yes.

11         Q    All right.  And it was also the Bank's policy

12   that its employees and officers should cooperate

13   cheerfully with personnel in their department and any -

14   - in any other departments, correct?

15         A    Correct.

16         Q    This -- this is a business where there are

17   frequently, you know, third party customers in the

18   lobby. Is that right?

19         A    Yes.

20         O

21         Q    Okay. And so, if employees of the Bank are
     arguing, the customers could potentially hear or see

22   that right?

23         A    Yes.

24         Q    And that's not good for business, is it?

25         A    No.

Page 58

1        Q      Let's go to page 11, and this is labeled 386.

2    For the record, you should be on the page that has

3    Equal Employment Opportunity policy -- excuse me --

4    Equal Employment Opportunity at the top. Do you see

5    that?

6        A      Yes.

7        Q      Okay.  Now, as the compliance officer, were

8    you tasked with making sure the Bank was also in

9    compliance with, like, the ADA?

10       A      No.

11       Q      Okay.  You were concerned with, like, FDIC

12   regulations and things of that nature, right?

13       A      Correct.

14       Q      Okay. But you would agree with me that it was

15   the Bank's written policy not to discriminate against

16   people based on any status such as race, sex, religion,

17   age, national origin, disability or veteran status,

18   right?

19       A      Correct.

20       Q      And there was also a harassment policy as

21   well as a complaint procedure, which you can see on

22   page 13 of Exhibit 3, correct?

23       A      Correct.

24       Q      Now, I know that you filed an EEOC charge

25   that was marked as Exhibit 1, and that was filed on

Debra Helton , Volume I                        June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 59

1   January the 6th, 2020. Remember that?

2        A    Yes.

3        Q    Okay. But, during your employment at no point

4   did you send a complaint, formally or informally,

5   alleging that you or anyone else was being treated

6   differently because of your -- your or their sex or

7   age, did you?

8             MR. BARTON:  Object to form.  You can answer.

9             THE DEPONENT:  No.

10  BY MR. BENNETT:

11       Q    All right.  Just to make sure that's clear,

12  did you ever raise a complaint, formally or informally,

13  that you or somebody else was being treated differently

14  because of your race or misusing it because of your sex

15  or your age?

16       A    No.

17       Q    Until after.

18       A    Until after.

19       Q    Let's go to page 24 of Exhibit 3.  I'm sorry,

20  this is not the right page. Page 23. Sorry.

21            Okay, let's look under where it says personal

22  finances. Do you see that?

23       A    Yes.

24       Q    Okay.  Now, as the compliance officer and an

25  employee, long term employee of the Bank, you

Debra Helton , Volume I                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 60

1    understood that even though, as an employee, you could

2    have your personal or business accounts with the Bank,

3    you were supposed to treat those and -- and act on

4    those only as outside of your official capacity as an

5    employee, right?

6         A    Yes.

7         Q    All right.  And, on page 23, at the -- in the

8    last paragraph it says, since you are an employee of

9    the Geo D. Warthen Bank, personal financial affairs

10   should be conducted in such a manner as to be above

11   regulatory or auditing criticisms or concerns, correct?

12        A    Correct.

13        Q    And then on the next page, second -- or the

14   first full paragraph, it says, all employees should

15   assume the position of a regular customer when handling

16   their personal bank business, right?

17        A    Correct.

18        Q    And those procedures applied to your accounts

19   as well as any relatives' banking business, correct?

20        A    Correct.

21        Q    Okay, you can put this aside.

22             I mentioned loan officer and compliance

23   officer. There was also a head of the operations

24   department. Is that right?

25        A    No, I was not it.

Debra Helton , Volume I                                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 61

1      Q    No.  There was a person who was the head of

2    the operations department, right?

3      A    Yes.

4      Q    Was that during last two years? That was

5    actually Haynes?

6      A    Yes.

7      Q    All right. Are there any other people in

8    officer positions during the last two years of your

9    employment?

10     A    Yes.

11     Q    Who?

12     A    Karen Wilson, Alice Matthews, Denise Braddy

13   Griswell.  I'm not sure about Patty Frost, I don't know

14   if she was an officer or not. And I said Karen Duncan

15   and Jennifer Wright. Patty Provo, Jason Prince, Brian

16   Moncus.

17     Q    How do you spell that?

18     A    M-o-n-c-u-s.  Tracy Welch, W-e-l-c-h,

19   Stephanie McAfee. And I think that, you know, there was

20   somebody over in operations.  Lamar Doolittle and Kim

21   Brantley.

22     Q    Did anyone have the term "chief" in their

23   title who you just mentioned other than Lamar?

24     A    Chris Irwin would have had chief.

25     Q    Right. But in terms of officers, all of those

Debra Helton , Volume I                                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 62

1    people that you mentioned, Karen Wilson, Alice

2    Matthews, Denise Griswell, Jennifer Wright, Patty

3    Provo, Jason Prince, Brian Moncus, Tracy Welch and

4    Stephanie McAfee we're all officers.

5         A    Yes.

6         Q    There was only one man in that list, right?

7    Or two, I guess. Jason and Brian.

8         A    And Lamar, yes.  Well -- yes.

9         Q    All right. So, as the compliance officer, you

10   were charged with kind of developing, implementing, and

11   administering the compliance management program, right?

12        A    Yes.

13        Q    Okay.  And what was that program?

14        A    Exactly that, compliance management.

15        Q    Okay.

16        A    That was the name of it.

17        Q    It wasn't like a software program.

18        A    That is kind of a yes/no. I mean the policies

19   were you could have software.  We did not have software

20   other than the policies thing on the computer.

21        Q    There were compliance policies, though,

22   right?  Written policies?

23        A    Yes.

24        Q    Did you draft those?

25        A    No.

Debra Helton , Volume I                                              June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 63

```
 1        Q     But you're familiar with that, right?

 2        A     Yes.

 3        Q     And so you were responsible for implementing,

 4   administering, and enforcing this?

 5        A     Yes.

 6        Q     Who -- do you know who prepared this?

 7        A     Steve -- they're out of Statesboro.  Steve

 8   Powell Group out of Statesboro, Georgia.

 9        Q     Okay.  Is that a law office?

10        A     It's a -- they do audits, financial audits as

11   well as bank audits.

12        Q     Okay. Okay.

13        A     They were instrumental in writing the

14   majority of them.

15        Q     Okay. So in a different -- in addition to

16   your work with the compliance policies and procedures,

17   you had to make sure the Bank was complying with the

18   applicable state and federal bank banking regulations,

19   right?

20        A     Correct.

21        Q     Okay.  And you also assisted with independent

22   reviews, audits, and compliance examinations, correct?

23        A     Yes.

24        Q     Okay.  So there would be people from the FDIC

25   who would periodically do an audit or request
```

Debra Helton , Volume I                          June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 64

1    information, and he would assist with gathering and

2    responding to that information?

3         A    That is true.

4         Q    All right.  Okay.  And, obviously, you were

5    tasked with supporting the company's goals and values,

6    isn't that right?

7         A    Yes.

8         Q    And you were supposed to treat people with

9    respect and dignity.

10        A    Yes.

11        Q    And do you believe that it's important for

12   officers of a company to make sure that you're setting

13   a good example for lower ranking employees?

14        A    Yes.

15        Q    Did you have the ability to hire or fire

16   people who were below you?

17        A    No.

18        Q    Who were your subordinates? Your direct

19   reports?

20        A    I did not have anyone that directly reported

21   to me.

22        Q    Did you have the ability to recommend

23   disciplinary action?

24        A    No.

25        Q    Obviously, Ken could -- could do that on his

Debra Helton , Volume I                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 65

1    own, right?

2         A    Right.

3         Q    And what about Lamar?

4         A    He could recommend.  I'm not sure that he

5    couldn't do it on his own.

6         Q    Did you participate in interviews?

7         A    Yes.

8         Q    Did you participate in employee disciplinary

9    conferences or meetings?

10        A    With employees?

11        Q    Uh-huh (affirmative).

12        A    No.

13        Q    Okay.

14                         (Defendant's Exhibit Number 4 was

15                          marked for identification.)

16   BY MR. BENNETT:

17        Q    All right, let me show you what's been marked

18   Exhibit 4. Okay. Now, this is a document that says --

19   its title is compliance officer job description. Do you

20   see that?

21        A    Yes.

22        Q    All right.  Now, the date of it is June 30th,

23   2020. Do you see that?

24        A    Yes.

25        Q    And that was after your employment with the

Debra Helton , Volume I                          June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 67

1    haphazardly.

2         Q     Okay.

3         A     Mainly dealing with the loans. Number

4    eighteen.

5         Q     You're saying you weren't?

6         A     I mean, I did not do anything with EEO

7    policy.

8         Q     Right. But you understood that, during your

9    employment, you were responsible for making sure you

10   weren't engaging in an environment involving harassment

11   of any type, right?

12        A     Correct.

13        Q     Okay.  What you're saying is you weren't

14   responsible for, you know, ensuring compliance with the

15   EEO policy?

16        A     Correct.

17        Q     That was HR?

18        A     Yes.

19        Q     And HR was Karen Wilson.

20        A     Yes.

21        Q     She was also the corporate secretary, right?

22        A     Correct.

23        Q     Karen is older than you, isn't she?

24        A     I think we're close to the same age.

25        Q     Okay.

Debra Helton , Volume I                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 68

1        A    I mean, --

2        Q    There's not a significant difference --

3        A    No.

4        Q    -- in ages there.

5        A    No.

6        Q    You can put this to the side unless was there

7    was additional comments you had.

8             All right, I want to talk about the Banc PAC

9    Maintenance Program.

10       A    Okay.

11       Q    All right. What -- what was that?

12       A    Banc PAC was our core processing software for

13   all of your account information.

14       Q    Okay.  And does that program allow someone

15   with access to it to make changes to a customer's

16   account?

17       A    Yes.

18       Q    That's not a program that everybody in the

19   Bank has access to, right?

20       A    Not everybody, no.

21       Q    You had access to that and then another

22   program called FLO?

23       A    Yes.

24       Q    And that was because of your duties as a

25   compliance officer, right?

Debra Helton , Volume I                         June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 69

1       A     Yes.

2       Q     So you had special access to certain programs

3    and software that other employees didn't because of

4    your position.

5       A     No, there were other employees that had the

6    same poss -- responsibilities as I did.

7       Q     Right, but my point --

8       A     Most of the -- excuse me -- most of the

9    officers had access to the information.

10      Q     Okay.  But most of the tellers and, you

11   know, --

12      A     No.

13      Q     -- people working in the loan department,

14   they wouldn't have that type of access, right?

15      A     The loan operations supervisor, yes, and the

16   collateral person would, yes.

17      Q     But non-supervisors did not have that same

18   access? Non-officers?

19      A     No, that's not true because the person

20   responsible for doing the collateral had access to some

21   of the information or some of the possibilities to make

22   changes.

23      Q     But not every single employee of the Bank had

24   access to the Banc PAC Maintenance Program, right?

25      A     True.

Debra Helton , Volume I                        June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 70

1      Q    Okay.  Was that a program that you could only

2   access using a -- your computer at work?

3      A    Yes.

4      Q    So the laptop that the company gave you, when

5   you were at home, were you able to access the Banc PAC

6   Maintenance Program?

7      A    No.

8      Q    So, in order to make changes to an account on

9   that program, you had to be at your desk on duty on

10  company time.

11     A    Yes.

12     Q    And you were a salaried employee, right?

13     A    Yes.

14                    (Defendant's Exhibit Number 5 was

15                     marked for identification.)

16  BY MR. BENNETT:

17     Q    Let me hand you what's marked as Defendant's

18  Exhibit 5.

19          MR. BARTON:  If you need to take a break at

20      some point.

21          THE DEPONENT:  Okay, it's good. It's just --

22      I will.

23  BY MR. BENNETT:

24     Q    Okay.  Now, this was a document that was

25  included in the Bank's response to your EEOC charge.

Page 71

1   Have you seen this before?

2        A    I have.

3        Q    Okay.  All right.  Now, this is a report

4   that's generated through the Banc PAC Maintenance

5   Program, right?

6        A    Yes.

7        Q    Okay.  And as you can see, at the top on the

8   first -- let's see, first five pages, it says Kim

9   Baucom at the top. You see that?

10       A    I do.

11       Q    All right.  Who is Kim Baucom?

12       A    She is the deposit operations supervisor.

13       Q    Well, in 2018 and 2019, she was the vice

14  president of operations as well as the Bank's internal

15  auditor, right?

16       A    Okay, yes.

17       Q    Is that right?

18       A    Yes.

19       Q    Okay.  All right.  So as the auditor, she was

20  charged with kind of periodically checking what

21  different people were doing to make sure there was no

22  fraud or improper activity, right?

23       A    Correct.

24       Q    Okay.  Am I correct that she had been in that

25  role for about five years, the five years prior to your

Debra Helton , Volume I                          June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 72

1     separation.

2          A    She'd been there awhile, but I'm not going to

3     say a time, but yes, she had been there awhile.

4          Q    Okay.  But she also managed the operations

5     department as well.

6          A    Yes.

7          Q    So she was kind of like you where she had

8     kind of dual roles.

9          A    Yes.

10         Q    Okay.  All right, so in terms of the

11    operations department, what they do is they, you know,

12    handle the Bank's wires to and from third parties,

13    right?

14         A    Yes, that's usually handled inside the Bank.

15         Q    Are they involved --

16         A    The beginning of it.

17         Q    Are they involved in ACH processing?

18         A    Yes.

19         Q    What about like account balancing and

20    unposted items?

21         A    Yes.

22         Q    Okay.  Now, in terms of internal audits, is

23    that something that is required by federal or state

24    regulations to be done?

25         A    Yes.

Debra Helton , Volume I                          June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 73

1      Q    Okay.  And you're currently working at the

2    Farmers Bank, right?

3      A    Yes.

4      Q    And do they do internal audits?

5      A    Yes.

6      Q    Do they have a compliance officer?

7      A    Yes.

8      Q    All right.  And so one of Kim's jobs though,

9    was to monitor employee accounts and what people were

10   doing on a periodic basis, right?

11     A    Yes.

12     Q    All right.  So let's look at Exhibit 5, and

13   what -- this is a document that reflects transactions

14   that you conducted while on bank employee time to your

15   account and several other accounts of your relatives?

16     A    Yes.

17     Q    Okay.  All right, so let's look at page one

18   of Exhibit 5. There's an entry dated April the 13th,

19   2019, at the top.  Do you see that?

20     A    I do.

21     Q    Okay.  And there's a reference to a suspended

22   memo post, right?

23     A    I -- it is.

24     Q    All right.  So what I understand -- I don't

25   fully understand this -- but when a change is about to

Page 74

1    be made into an account, there's some type of a memo

2    that's placed in the file, right?

3        A    Yes.

4        Q    Okay.  And so what you did here was you

5    suspended the memo to prevent the money from being

6    removed from your account.

7        A    Correct.

8        Q    You also did that on April the 12th, 2019,

9    right?

10       A    Yes.

11       Q    Okay.  There's an entry. On the first page of

12   this exhibit dated June the 25th, 2018, that says,

13   funds transfer purge. Do you see that?

14       A    I do.

15       Q    What does it mean when there's a funds

16   transfer purge?

17       A    It is removed.

18       Q    Okay, so explain to me what happened on June

19   the 25th, 2018.  What did you do?

20       A    Well, unless you have the second part --

21   without the second part, it's hard to tell you. I can

22   tell you that, yes, I did this on the bank computer.

23   But this is not anything I could not -- the funds

24   transfer purge is not anything that I could not have

25   done from a computer anywhere in the world through my

Debra Helton , Volume I                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 75

1    internet banking.

2        Q    But you used the Bank PAC Maintenance

3    Program --

4        A    I did.

5        Q    -- to do it?

6        A    Yes, I did.

7        Q    Okay, we've got to make sure we're not

8    speaking over each other.

9        A    Sorry.

10       Q    And you understood that you were not supposed

11   to use the Bank's software systems in order to conduct

12   a banking -- your own personal banking, right?

13       A    Yes.

14       Q    So that was a violation of that rule?

15       A    Yes.

16       Q    Let's go to the second page of this exhibit,

17   and it's labeled GDWB000449. There are some entries on

18   this page that are dated April the 11th, 2019, and

19   April the 26th, 2019. And we see some other entries

20   throughout this document to other people's accounts on

21   that day.

22            Okay, so looking at the -- the April 11th,

23   2019 entry involving your account, right?

24       A    Uh-huh (affirmative).

25       Q    Looks to me like what you did was you -- you

Page 76

1   added $81 to your account on that day, right?

2        A    No, this was between -- I took $81 off of my

3   account.  This was for my child's loan payment.

4        Q    Uh-huh (affirmative).

5        A    And she had called and said that she needed -

6   - I don't remember.  This was -- we changed her loan

7   payment from my account to her dad's account, plus

8   increased the transfer so that her loan payment would

9   not be behind. And that is what that is there.

10       Q    Okay. So just -- just to break this down, she

11  had a loan with the Bank, right?

12       A    Yes.

13       Q    And it was -- required her to pay the Bank

14  $162 every two weeks?

15       A    Yes.

16       Q    Okay. And instead of her coming to the Bank,

17  and you on your own personal time, and making changes,

18  what you did was you changed it to where basically,

19  only $81 would come from her daughter -- your daughter,

20  and then $81 from your husband towards that loan? Is

21  that the gist of it?

22       A    No, actually, it was moved so that both of

23  them came from my husband.

24       Q    Okay.  So -- but then you then reversed it 15

25  days later, right?

Debra Helton , Volume I                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 77

1        A     No.

2        Q     Is that true?

3        A     Well, I'm trying to see where you said I

4    reversed it because she -- we are still paying this

5    loan.  Funds transfer purged 162.

6        Q     Did you tell anyone at the Bank that you were

7    doing this?

8        A     No, nothing other than if I probably told

9    Ashley Haynes or Kathy Brooks.

10       Q     But you didn't -- you didn't tell Ken Bibb?

11       A     No. Ken probably would have wondered why I

12   was bothering him with it.

13       Q     Let's go to page three of this exhibit, which

14   is GDWB000450.

15       A     Three or four?  Three?

16       Q     Page three of this exhibit which is labeled -

17   - that's the one you should go by.  It's labeled 450.

18   You see it?

19       A     Uh-huh (affirmative).

20       Q     Okay.  Who is Nicholas Green?

21       A     That is Ashley's husband.

22       Q     So it's an account belonging to your daughter

23   and your daughter's husband?

24       A     Right.

25       Q     Okay.  And so the entries on this page match

Debra Helton , Volume I                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 78

1    the changes that we just looked at, right?

2         A    I can't -- I don't know that they match

3    because one says 120 and one says 162, but I can tell

4    you exactly what happened.

5         Q    Well, I think I understand what happened.

6         A    I mean, Ashley had -- was no longer working.

7    So, instead of -- I mean, you know, you always help

8    your children. So we took the debit off of their

9    account and put the debit on Dean's business account.

10        Q    But you understand what rules are in place

11   that prohibit --

12        A    Oh, yeah.

13        Q    -- folks like you from making changes to

14   their own personal or their family's bank accounts on

15   company time, right?

16        A    Yes.

17        Q    It's to prevent fraud, right?

18        A    Yes.  But, once again, this is something that

19   anybody could do anywhere.

20        Q    But you were the compliance officer, right?

21        A    Yes.

22        Q    You were charged with enforcing compliance

23   rules.

24        A    Yes.

25        Q    And this was a violation of those rules.

Debra Helton , Volume I                     June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 80

1    was it was an inquiry.  It was not a change because the

2    name had been changed, and that's in my notes. I don't

3    have that information.

4        Q    All right, let's go to the next page, which

5    is labeled 452.  All right. So this page shows some

6    changes made via the Banc PAC system by you to your

7    husband's business checking account, right?

8        A    Right.

9        Q    Okay. You made some transfers in December of

10   2011, as well as in May of 2014 to his account.  Is

11   that right?

12       A    These were transfers added to pay -- well,

13   the top part where it has relation to my daughter's

14   loans.  The other is, he made a loan.  I mean, this is

15   2011. But this is funds transfers to pay a loan

16   payment, it should be, that he had with the Bank.

17       Q    Okay, but my question is simply, --

18       A    Yes, I did.

19       Q    -- you made those through the Bank PAC

20   Maintenance System in 2011 and 2014, right?

21       A    I did.

22       Q    To your husband's checking account?

23       A    I did.

24       Q    Okay.  And was the business checking account

25   associated with his restaurant?

Debra Helton , Volume I                         June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 81

1       A    Yes.

2       Q    Let's go to the next page, which is 453.

3       A    453.  That's in connection with the 449.

4       Q    Did you change the payment collection

5  sequence on his loan?

6       A    Okay.  This is where I review real estate

7  loans.  Yes, it was mine, but when you review -- real -

8  - real -- laa (sounding) when you review loans and

9  there are errors, most of the time I was sitting there

10  changing the errors without even looking at whose loan

11  I was looking at.  But, yes, all this I changed.

12      Q    Okay, hold on. Just for the record, you're

13  looking at the page of Exhibit 5 that's labeled 454,

14  right?

15      A    Yes.

16      Q    So yes or no, using the Bank PAC Maintenance

17  System, did you make changes to the payment collection

18  sequence on your husband's personal loan?

19      A    Yes.

20      Q    Okay, and these changes that you made,

21  happened -- and if we look through the rest of this

22  document, it looks like they had -- some of these

23  changes happen as early as the year 2000, is that

24  correct?

25      A    Yes.

Page 82

1        Q     And they happened not every day but

2     periodically, correct?

3        A     Yes.

4        Q     All right, just put that aside.

5        A     Okay.  I, of course, am the plaintiff here,

6     but as far as these documents were concerned, if you

7     took the dates here and went back on every employee at

8     the Bank, you would find that they also make changes

9     and do transfers from their accounts.

10             MR. BENNETT:  I'm going to object as non-

11         responsive.  There was no question.

12    BY MR. BENNETT:

13       Q     Who is Cheryl Wright?

14       A     Okay, can I add one more thing please?

15             Lamar is IT and is the only person in the

16    Bank that can take a laptop home with him. During his

17    son's high school years, he added programs that his son

18    had access to at the Bank with no dual control. And,

19    you know, to me there's no difference in this and

20    giving your son access to Bank computer.

21             MR. BENNETT:  Let me object as non-

22         responsive.

23    BY MR. BENNETT:

24       Q     Was Lamar's employee -- son an employee of

25    the Bank?

Debra Helton , Volume I    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 83

```
1        A    Yes.

2        Q    Were your daughters employees of the Bank?

3        A    No.

4        Q    Was your husband an employee of the Bank?

5        A    No.

6        Q    Who is Cheryl Wright.

7        A    Cheryl Wright was a customer.

8        Q    Who is Amy Morris -- or I'm sorry, Ann

9   Morris?

10       A    A customer.

11       Q    Did she work with Helton Electrical Services?

12       A    Yes.

13       Q    Are you affiliated with Helton Electrical

14  Services?

15       A    No.

16       Q    Does that have anything to do with your

17  family?

18       A    No.

19       Q    Just a coincidence.

20       A    Yes, that's the -- different. There's three

21  sets of Heltons in Washington County.

22       Q    Okay.

23            MR. BENNETT:  Let's go to about 12:30 if we

24       can.

25                      (Defendant's Exhibit Number 6 was
```

Page 84

1              marked for identification.)

2    BY MR. BENNETT:

3        Q    Let me hand you Exhibit 6.  So at the Bank, -

4    - first of all, let's -- this is -- this exhibit is an

5    email that Kim Baucom sent to every employee of the

6    Bank on September the 4th 2018, right?

7        A    Yes.

8        Q    Okay. So there was a Listserv, whereby you

9    could send an email and every single person at the Bank

10   would receive it, right?

11       A    True.

12       Q    Okay.  So this is an email that you would

13   have received.

14       A    True.

15       Q    Did you read it at the time?

16       A    Probably not because we got so many emails

17   that, you know, we would breeze through them and keep

18   going.

19       Q    But you don't dispute that you would have

20   received this email, right?

21       A    No.

22       Q    All right. And you wouldn't dispute that what

23   Kim wrote was that as -- was basically a reminder that

24   as employees of the Bank, you're not permitted to make

25   changes to anything pertaining to relatives or

Debra Helton , Volume I                        June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 85

1    immediate family members, correct?

2         A    Correct.

3         Q    Okay.  But some of the transactions we just

4    looked at in Exhibit 5 were after September the 4th,

5    2018, correct.

6         A    Correct.

7         Q    All right. Now, was there any discussion

8    between you, Ken, or Ken or any other manager of the

9    Bank in September of 2018 about the personal

10   transactions that you had been doing?

11        A    Ken, Lamar, and Karen.

12        Q    In September of 2018?

13        A    There should be a document signed in the

14   file. Yes. Should be the only thing in my folder that's

15   -- that -- regarding those transactions that you just

16   had.

17                        (Defendant's Exhibit Number 7 was

18                         marked for identification.)

19   BY MR. BENNETT:

20        Q    Let me hand you what's marked as Exhibit 7.

21   It's actually marked on the second page. I don't know

22   why.

23        So this is a document with two different

24   pages.  Actually, here, let me give you this one. This

25   is -- this is the copy that you should have.

Debra Helton , Volume I                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 86

1      A    Okay.

2      Q    Yeah.

3           MR. BARTON:  Is it just out of order?

4           MR. BENNETT:  The ones we have are out of

5      order, the one she had.

6           MR. BARTON:  There's a second page?

7           MR. BENNETT:  Yeah.

8           THE DEPONENT:  Yeah.

9   BY MR. BENNETT:

10     Q    All right. So, for the record, Exhibit 7 is a

11  disciplinary warning and a memo that you signed on May

12  the 13th, 2019, correct?

13     A    Uh-huh (affirmative).

14     Q    Okay.  So I just want to make sure we have a

15  clear record. May -- May 2019 was when the discussion

16  happened between you, Lamar, Karen and Ken about

17  Exhibit 5, right?

18     A    Right.

19     Q    Okay. What I had asked you before was, was

20  there any discussion in September of 2018, after Kim's

21  or around the time of Kim's email, about personal

22  transactions on company time?

23     A    No.

24     Q    Okay.  So before we go to Exhibit 7, a

25  suspended memo post, I want to go back to that.

Debra Helton , Volume I                          June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 88

1          A     Right, but if you look at your reports, when

2     they were purged, there was another one added.

3          Q     All right. Changing -- if you change a fund

4     transfer, that means that you're either altering a

5     scheduled transfer by either increasing or decreasing

6     the amount, right?

7          A     Yes. In that situation, yes.

8          Q     Isn't it true that there were times that you

9     removed late charges or stopped payments on checks?

10         A     Not personal, no.

11         Q     Well, didn't you set maximum late charges on

12    your accounts or the accounts of relatives?

13         A     I think I increased the one on one of the

14    business loans because it had a lower amount and I

15    increased it.

16         Q     Okay.  So Exhibit 5, what that shows are

17    changes to your account, your personal account, right?

18         A     Personal?

19         Q     Like personal checking, right?

20         A     Yes.

21         Q     Okay.

22         A     And business.

23         Q     And then your husband's business account?

24         A     Yes.

25         Q     Your husband's business loan?

Debra Helton , Volume I                        June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 89

1       A    Yes.

2       Q    You and your husband's personal loan?

3       A    Yes.

4       Q    What was that affiliated with?

5       A    The personal one?

6       Q    Uh-huh (affirmative).

7       A    That was reviewing the loan where it was

8   added to the system to make sure it was added

9   correctly.

10      Q    All right.  Then you also made changes to

11  your husband's personal account, right?

12      A    That was in regards to -- mmmm (sounding) my

13  -- the -- same as Ashley's loan.  Changing the

14  transfers.

15      Q    Okay. But you also made changes to a personal

16  line of credit, right?  Your personal line of credit?

17      A    This is in reviewing and changing it to match

18  the policy or the regulations for the -- the account.

19      Q    Okay, but yes or no, you also made --

20      A    Yes.

21      Q    -- changes to your daughters --

22      A    Yes.

23      Q    Hold on -- your daughters, both daughters'

24  personal accounts and your son-in-law's personal

25  account?

Debra Helton , Volume I                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 90

1        A     Yes.

2        Q     Okay.

3        A     All in regards to the loan payment.

4              MR. BENNETT:  Let's take a break.

5              VIDEOGRAPHER:  Off the record at 12:28.

6              (Short break)

7              (See Volume II)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              COURT REPORTER DISCLOSURE

Page 98

1          THE VIDEOGRAPHER:  Back on the record.

2      The time is 1:10.

3          (Defendant's Exhibit No. 10 marked for

4      identification.)

5    BY MR. BENNETT:

6      Q    I'm going to hand you Exhibit 10.

7          All right.  This is an email with two

8    attachments that you had sent to Ken Bibb and Chris

9    Irwin on May the 17th, 2019, right?

10     A    Yes.

11     Q    Okay. So this was -- it looks like it was

12   a Friday; is that right?

13     A    Yes.

14     Q    So your meeting with Ken regarding the

15   disciplinary warning, that was a Monday and this was

16   a Friday, correct?

17     A    Yes.

18     Q    Why did you copy Chris Irwin on this email?

19     A    Because he's the CEO and he is the one that

20   hired me.

21     Q    Okay.  All right.  So you opened with Good

22   morning.  I would like to discuss our Monday morning

23   meeting and see if I can get some answers to

24   questions I have tossed around in my mind for a week,

25   right?

Page 99

1      A    Yes.

2      Q    And you were referring to the meeting with

3  you, Ken, Lamar and Kent, right?

4      A    Right.

5      Q    All right.  On Page 1 on this second

6  paragraph you wrote, After 30 years of employment,

7  I've never been so devastated, but I am fully aware

8  that I did do and knowledge [sic] completely the

9  transactions until further review, right?

10     A    Right.

11     Q    And at the end of the third paragraph, the

12 last sentence you said, Nonetheless, I am guilty of

13 setting up transfers and deleting, right?

14     A    Right.

15     Q    Were all of those true statements?

16     A    Yes.

17     Q    Okay.  In the fifth paragraph on this page,

18 you wrote that you understood the removal of the

19 administrative rights and BancPac but not FLO, right?

20     A    Right.

21     Q    Okay.  Now, correct me if I'm wrong, but

22 did Ashley Haynes -- she had access to both of those

23 programs before your administrative rights were taken

24 away, right?

25     A    Yes.

Page 100

1      Q     Okay.  All right.  Now, just going back to

2   the meeting on May the 13th.

3            One of things Mr. Bibb told you that you

4   needed to focus on was your compliance duties and not

5   the duties and responsibilities of people in other

6   departments going forward, right?

7      A     Yes.

8      Q     Okay.  All right.  But you deny that during

9   the meeting with Mr. Bibb on May the 13th, 2019 he

10  reminded you of the need to be respectful of your

11  co-workers and that he wouldn't tolerate angry

12  outbursts or a poor attitude?

13     A     We had that conversation, but I don't think

14  it was on that day.

15     Q     Okay.  All right.  So let's go to the

16  second page of Exhibit 10, which is labeled GDWB 779.

17           Look at the third full paragraph.  You

18  wrote, Attitude - I have addressed my attitude

19  reminding myself every day when I enter the building

20  to have self-discipline regarding attitude, right?

21     A     Right.

22     Q     And you said, Not to mention, we all have

23  an attitude when the last button is pushed, right?

24     A     Right.

25     Q     Okay.  And so does that mean that when

Page 101

1    people push your button, so to speak, you can tend to

2    become a little agitated?

3         A    No, not necessarily.  That meant in -- in

4    general when anybody is pushed to the limit, they

5    would have an attitude.

6         Q    Okay.  But in this email, you're recapping

7    your thoughts related to the May 13th, 2019 meeting,

8    right?

9         A    Yes.

10        Q    And so now you would agree with me that

11   your attitude was, in fact, discussed at that

12   meeting, right?

13        A    No, not at that meeting.  Ken and I had had

14   some conversation briefly one afternoon or one

15   morning, but I don't remember with everybody sitting

16   there having a discussion about attitude.

17        Q    Okay.

18        A    It was simply Ken and myself.

19        Q    But you understood that your attitude was

20   also a point of focus between you and Ken going

21   forward?

22        A    Exactly.

23        Q    Okay.  Is there any mention of age, or sex

24   or alleged discrimination in this email?

25        A    No.

Page 103

1    well is -- makes it difficult to work with, right?

2         A    It does.

3         Q    This is Exhibit 11.

4              (Defendant's Exhibit No. 11 marked for

5         identification.)

6    BY MR. BENNETT:

7         Q    Now, do you recognize this as a true and

8    correct copy of an email you sent to Ken Bibb on

9    May the 13th, 2019?

10        A    Yes.

11        Q    Okay.  Take a moment to read it and let me

12   know when you're done.  It's only one paragraph.

13        A    Okay.

14        Q    Okay.  All right.  So you reference -- this

15   is the day of the May 13th, 2019 meeting, right?

16        A    Uh-huh.

17        Q    Okay.  And you say that Ken had made a

18   comment this morning that you had lost your

19   enthusiasm for your job, right?

20        A    Yes.

21        Q    Was that made during the -- the

22   disciplinary conference?

23        A    Yes.

24        Q    Okay.  And you wrote in response, You could

25   not be more right.  This is a tough position and it

Page 104

1    is hard to work and keep a good attitude when you can

2    not get the staff to make changes when they are

3    needed, right?

4          A     Yes.

5          Q     And you wrote, In my 38 years of working, I

6    have never ever had the problem with attitude that I

7    do now, right?

8          A     Yes.

9          Q     Okay. Did -- he didn't respond to this

10   email either, did he?

11         A     No.

12         Q     And so it's true that you were having

13   difficulty maintaining a positive attitude at work

14   at that time?

15         A     Yes.

16         Q     Okay.  Why was that?  Why was that?

17         A     Well, lack of communication.

18         Q     Between you and the younger staff?

19         A     No, Ken and Chris.

20         Q     Between Ken, Chris and the bank?

21         A     And everything that was going on with it,

22   everything listed here.

23         Q     Okay.  So --

24         A     I mean, when you ask questions, you don't

25   get an answer, it makes it hard to concentrate and

Page 105

1    keep going forward.

2            (Defendant's Exhibit No. 12 marked for

3        identification.)

4    BY MR. BENNETT:

5        Q    Let me show you what's marked as

6    Exhibit 12.

7            This is another document that I believe was

8    included in the bank's response to its -- or excuse

9    me, the bank's position statement.

10           Have you seen it before?

11       A    No.

12       Q    Okay.  You mentioned Denise Griswell

13   before.

14           Do you remember what her title was in April

15   of 2019?

16       A    BSA officer.  I don't -- she wasn't a head

17   teller.  BSA officer, and I think she may have had

18   another title.

19       Q    What does BSA mean?

20       A    Bank Secrecy Act, but I'm not sure.

21       Q    Okay.  Well, in this particular document,

22   it -- that's her signature, right?

23           Do you recognize that?

24       A    It looks like it.

25       Q    Okay.  Well, what her title is listed as is

Debra Helton , Volume II                          June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

                                                    Page 106

1    Banking Officer of Teller Operations.

2           A     Uh-huh.

3           Q     Was that her official title?

4           A     I know she did the teller operations, so I

5    would say yes.

6           Q     Okay.  All right.  So this is a statement

7    about an incident that happened on April the 11th

8    2019, right?

9           A     Yes.

10          Q     Okay.  And as I understand it -- actually,

11   before I ask you that question, this is obviously a

12   copy of a document.  And it looks like there was a

13   sticky note that was on top of it, right?

14          A     Uh-huh.

15          Q     Do you recognize the handwriting on the

16   sticky note as that of Karen Wilson?

17          A     Yes.

18          Q     Okay.  Okay.  So as I understand it, at the

19   bank, you have to -- you have to close the bank,

20   which involves counting the money and making sure

21   it's all reconciled, right?

22          A     Uh-huh.

23          Q     Okay.  And different people are in charge

24   of doing that at different times, right?

25          A     Right.

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 107

1      Q    Okay.  On this particular week, it was

2    Jennifer Wright who had been assigned to close the

3    bank, but she had to go on vacation and you ended up

4    being the one that volunteered to do that, right?

5      A    Yes.

6      Q    Okay.  And when did you volunteer?  Like,

7    how soon before this week?

8      A    The week -- the Friday before.

9      Q    The Friday before?

10     A    Uh-huh.  Because she came and said she

11   couldn't find anybody.

12     Q    Okay.  And so on April the 11th, you were

13   the officer in charge of the -- of closing the

14   bank --

15     A    Yes.

16     Q    -- right?

17          Okay.  And so that includes making sure

18   that everybody who's there has counted and documented

19   all the monies, what's in the coin machine, the

20   teller drawers, the drive-in teller and the vault,

21   right?

22     A    No.  The only thing I was there for was to

23   make sure the door was locked.  The head teller is

24   always there to make sure all the job duties are

25   done.

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 108

1      Q      Okay.  But you were the officer in charge

2   of the closing, right?

3      A      Only locking the door.

4      Q      Only locking the door.

5             But you were there?

6      A      Yes.

7      Q      You were required to be there?

8      A      Yes.

9      Q      And there were other people there, right?

10     A      Yes.

11     Q      And the other people who were there were

12  Belinda Salisbury, Pat Herringdine, Starkayla Wiley,

13  Alice Mathews, Jimmy Lewis and Denise Griswell,

14  right?

15     A      Right.

16     Q      Was anybody else there who's not listed on

17  this document?

18     A      I don't think so, no.

19     Q      All right.  Did you have an appointment

20  that afternoon?

21     A      Yes.

22     Q      What kind of an appointment?

23     A      A doctor's appointment.

24     Q      What doctor?

25     A      I don't remember.

Page 109

1      Q     Okay.  Now, this is, like, between 4:45 and

2   5:15, right?

3      A     Yes.

4      Q     Okay.  Now most doctors don't have

5   appointments after 5:00, right?

6      A     No, they don't, correct.

7      Q     You had a hair appointment, didn't you?

8      A     No, I didn't have a hair appointment.

9      Q     Where do you get your hair done?

10     A     Let's see.  We can find out exactly what we

11  have, hopefully.

12          (Whereupon, there was a pause in the

13      proceedings.)

14          THE WITNESS:        Okay.  It could have

15      been a hair or nail.  Probably nail on

16      Thursday.

17  BY MR. BENNETT:

18     Q     A nail appointment?

19     A     Uh-huh.

20     Q     Where do you get your nails done?

21     A     At Heather Rogers.

22     Q     And where do you get your hair done?

23     A     Salon 126.

24     Q     Okay.  And if it was a doctor appointment,

25  who would it have been with?

Page 110

1      A    Chandler McDavid.

2      Q    Chandler?

3      A    McDavid.

4      Q    Is that a general practitioner?

5      A    Yes.

6      Q    What's the name of his practice?

7      A    Sandersville Family Practice maybe?  I just
8  always look up Chandler McDavid.

9      Q    Okay.  But you would have had an
10  appointment with one of those three in advance?

11      A    Yes.

12      Q    And you think it was probably hair or nail?

13      A    I think it's hair or nail.

14      Q    Do you remember telling people at the time
15  that it was a doctor's appointment?

16      A    No.  I just remember saying I had an
17  appointment, because Denise had an appointment as
18  well.

19      Q    Well, you -- you would agree with me,
20  wouldn't you, that if it was a hair or a nail
21  appointment, that that's something that could have
22  been moved once you found out that you were going to
23  be the officer in charge of closing?

24      A    Yes.

25      Q    And it would not have been an emergency?

Page 111

1     A    No.

2     Q    Okay.  All right.  So as I understand it,

3  basically what happened was at 4:45 you announced

4  you've got this appointment, let's be quite quick.

5         I'm paraphrasing, but that's the gist of

6  it, right?

7     A    Yes.

8     Q    Okay.  And then at 5:15 or around then, the

9  person who was in charge of the drive-thru teller

10  line was having issues and announced that they needed

11  to do, like, a recount or something?

12     A    To count the drawer, yes.

13     Q    Okay.  And that was Alice Mathews?

14     A    Yes.

15     Q    Okay.  Now, when that happens, that's the

16  closing officer's responsibility, right?

17     A    Yes.

18     Q    Okay.  And so you were annoyed --

19     A    Yes.

20     Q    -- it's fair to say, right?

21     A    Uh-huh.

22     Q    And you felt this was something that she

23  could have asked for assistance with previously?

24     A    Right.

25     Q    Okay.

Page 112

1     A    At 5:00 o'clock.

2     Q    Okay.  And you became frustrated?

3     A    Yes.

4     Q    And then you verbally said something to the

5  effect of, Shit, I have a damn appointment?

6     A    Yes.

7     Q    And do you remember Nakia -- I'm sorry

8  Star- -- Starkayla Wiley starting to cry?

9     A    No, I did not.

10    Q    Do you deny that she cried?

11    A    I don't know why she would have any reason

12  to cry.

13    Q    Okay.  But you did use a profane term,

14  right?

15    A    Yes.

16    Q    Were the exact words that you said, Shit, I

17  have a damn appointment?

18    A    I could not tell you.  That's been three

19  years ago.

20    Q    All right.  Well, do you remember

21  specifically what was said?

22    A    No, I don't.  I remember getting very ill.

23    Q    You got ill?

24    A    Well, I mean I got upset.  Ill -- ill not

25  throwing up, but ill-tempered.

Debra Helton , Volume II                                   June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 113

1      Q    Ill-tempered.  Oh, okay.  I see what you

2   mean.

3           And I mean, you made a scene, right?

4      A    I mean, I don't know that it was a scene.

5   All -- I mean, when I start at 4:45 asking can I help

6   with anything and, you know, at 5:15, oh, the

7   teller -- the teller's drawer needs counting at the

8   drive-in, well -- at 5:00 o'clock, I could -- they've

9   pulled the window or closed the curtain.  I could

10  have been there at 5:00 o'clock to take -- count of

11  the teller drawer had you known.

12     Q    Was Denise Griswell the department

13  supervisor?

14     A    Denise and Alice were both officers.

15     Q    Okay.

16     A    There was no reason for a third officer to

17  be there that day.

18     Q    And do you have any basis for disputing

19  Denise's statement that she tried to allay the

20  situation by replying, Don't take it personally,

21  everyone, because no doubt Debra's upset with me

22  because I refused to close the bank this afternoon

23  for her?

24     A    Yeah.  Yes.

25     Q    She said that?

Debra Helton , Volume II                       June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 114

1      A    Yes.

2      Q    And how did you respond?

3      A    I didn't say anything.

4      Q    Okay.  So after this -- well, first of all,

5    would you agree that the language that you used was

6    inconsistent with the company's policies?

7      A    Yes, but if we --

8      Q    And it was profane?

9      A    Yes.

10     Q    And inappropriate?

11     A    Yes.

12     Q    Okay.  And unprofessional?

13     A    Yes.

14     Q    All right.  And you -- you understood that

15   it was problematic behavior, right?

16     A    Yes.

17     Q    Okay.  And then there was a discussion

18   between you and Ken on April the 15th, correct?

19     A    I -- actually I thought it was the next

20   morning, but --

21     Q    Okay.  Close in time --

22     A    -- was -- that was a Thursday.  Yeah, it

23   was -- yes, sir, it was close in time, but I was

24   thinking it was the next morning.

25     Q    Okay.  Okay.  Was your discussion only

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 115

1    between you and Ken, or was someone else present?

2         A    Just Ken and myself.

3         Q    And was this in his office?

4         A    Yes.

5         Q    What do you remember about the

6    conversation?

7         A    Just that I needed to apologize to the

8    teller line, and I told him that I realized I had

9    lost my temper and that I was planning to apologize.

10        Q    Did he tell you that you were going to have

11   to control your tone and language to co-workers?

12        A    Yes.

13        Q    Okay.  And then you subsequently

14   apologized?

15        A    Yes.

16        Q    Did you -- did that make you feel

17   undermined?

18        A    No.

19        Q    Did it make you feel embarrassed?

20        A    No.

21        Q    Okay.

22        A    I mean, I knew before I left that afternoon

23   that -- or as I got in the car that I should not have

24   acted the way I did.

25        Q    And so did you apologize to people one at a

Page 116

1    time, or did you -- was everybody gathered and you

2    just came and --

3         A    Well, they were all there talking earlier

4    in the morning, so I just, Hey, girls, I just need

5    to tell you I'm very sorry for the way I acted

6    yesterday.

7         Q    Do you -- did you also speak with

8    Ms. Mathews, Alice Mathews?

9         A    I think I talked to her one-on-one.

10        Q    One-on-one.

11             Did you talk to Denise one-on-one?

12        A    It seems like I did, because she was back

13   there.  Her office was next to mine.

14        Q    Do you remember telling Alice that if she

15   had a problem with you in the future, that she

16   should, you know, talk to you before going above you

17   to Ken or one of the other supervisors?

18        A    Uh-huh.  Yeah, I did, per Denise.

19        Q    Okay.

20        A    Denise and I had a, you know, conversation.

21   And she said, I did not say anything.  I knew that

22   you were upset with me.  She said, It had to be

23   Alice.

24        Q    Okay.  But you understand that, like, under

25   the reporting policy, for it to be effective,

Page 117

1    somebody's got to be able to go to HR or somebody

2    above --

3         A    Yes.

4         Q    -- the person in question, right?

5         A    Yes.

6         Q    And is it true that from time to time

7    before this, while not documented in writing, there

8    were occasions where Ken had talked to you about your

9    delivery in speaking with other workers?

10        A    Yes.  A couple of times we had talked about

11   it.

12        Q    And had he kind of suggested, you know,

13   here's different wordings you might have used or

14   maybe try to keep your voice lower, things of that

15   nature?

16        A    Yes.

17        Q    How many times would you say that happened

18   over the years?

19        A    Two, maybe three.

20        Q    Now, I have what my wife tells me is a loud

21   voice.

22        A    I do, too.

23        Q    I'm not using my loud voice in here, but

24   I have to close my office door when I'm on a

25   conversation.

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 119

1    already gotten this done.

2         Q    Do you maintain that what you said was not

3    offensive?

4         A    Well, I mean, you know, it wouldn't have

5    been offensive to me, but I guess if you look at

6    everybody that was there, it was probably more

7    offensive to the younger people.

8         Q    All right.  And so after this April

9    counseling and then the May one, you started to send

10   your personal email copies of certain communications,

11   right?

12        A    Yes.

13        Q    Okay.  And that's because you were

14   concerned about your employment status, correct?

15        A    Yes.

16        Q    Okay.

17             (Defendant's Exhibit No. 13 marked for

18             identification.)

19   BY MR. BENNETT:

20        Q    Let's go to Exhibit 13.

21             We're not going to spend much time on this,

22   but this is an email chain -- true and correct copy

23   of an email chain between you and Mr. Bibb between

24   March the 22nd, 2019 and March the 23rd, 2019, right?

25        A    Right.

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 120

1      Q    Okay.  And it -- basically what happened

2  was one of your duties was to communicate with the

3  FDIC representative about compliance exam response,

4  right?

5      A    Right.

6      Q    And there was a response that was due on

7  March the 1st that you had forgotten about, right?

8      A    I don't know that I forgot about it because

9  I was waiting on John Henwood and Matias to get some

10  information back to me.

11      Q    Okay.  But you don't dispute that what Ken

12  said was that on March the 22nd, he got a call from

13  someone with the FDIC to follow up on the compliance

14  exam response?

15      A    Right.

16      Q    Okay.  And he asked you to let him know as

17  soon as you had made the call and gotten the

18  information, right?

19      A    Right.

20      Q    Okay.  And you basically said -- and your

21  response the next day, which looks like a Saturday,

22  you said, This had slipped my mind.  I'll do it

23  promptly, right?  I'm paraphrasing, but you did say,

24  It slipped my mind?

25      A    I thought I had sent that that night

Page 121

1   after -- my daughter got married that Saturday.  I

2   thought I had sent it that night, but maybe it was

3   the next morning.

4           Yes, I did reply to him.

5       Q    Okay.  And you wrote, The response has

6   completely slipped my mind, right?

7       A    Right.

8       Q    Okay.  Okay.  You can put that aside.

9           Do you remember an issue where a couple of

10  years prior to the events of 2019, Lamar Doolittle

11  was working with a vendor to implement an e-signature

12  system?

13      A    Yes.

14      Q    Okay.

15      A    We implemented an e-signature system.

16      Q    Okay.  So that you didn't have to

17  physically come in and sign certain bank-related

18  documents, right?

19      A    Uh-huh.

20      Q    Okay.  You could DocuSign?

21      A    Right.

22      Q    Okay.  And he -- he was the CIO, so that

23  was within his purview, right?

24      A    (Witness nods head affirmatively.)

25      Q    You've got to give a verbal, I'm sorry.

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 123

1   BY MR. BENNETT:

2        Q    Okay.  I'm handing you what's marked as

3   Exhibit 14.

4             Have you seen this before?

5        A    This doesn't have anything to do with

6   e-sign.

7        Q    Well, I'm moving to a different topic.

8        A    Yes.

9        Q    Okay.  When is the first time that you saw

10  this document?

11       A    I think you sent it to my -- the attorney.

12            THE WITNESS:     Do you have this?

13  BY MR. BENNETT:

14       Q    Okay.  Okay.  Do you recognize the

15  signature of Ashley Haynes on this document?

16       A    I'm going to be honest, I -- I have not

17  seen Ashley's signature that much, so I can't tell

18  you yes or no.

19       Q    That's okay.  That's okay.

20            All right.  So, you know who Ivan Gonzalez

21  is, right?

22       A    Yes, I do.

23       Q    And what is -- what was his position in

24  October of 2019?

25       A    He -- October of 2019?

Page 124

1     Q    Uh-huh.

2     A    If we were scanning, he did the scanning

3  and he put together a report and other jobs in the

4  loan operations department.  I cannot be specific.

5     Q    Okay.  But he was in the loan operations

6  department?

7     A    Yes.

8     Q    His supervisor was Ashley Haynes?

9     A    Yes.

10    Q    Who was in charge of the operations

11  department?

12    A    Yes.

13    Q    Okay.  And then who was Peggy Veal?

14    A    She did escrow.

15    Q    Okay.  Also in operations, right?

16    A    Yes.

17    Q    And she's since deceased; is that right?

18    A    That's correct.

19    Q    But she also reported to Ashley, correct?

20    A    Yes.

21    Q    Okay.  So what's described on Exhibit 14

22  is an incident where Ashley was informed by Ivan and

23  Peggy on the week of September the 23rd, 2019, that

24  you had raised your voice at Ivan about the rates on

25  ARM loans.

Page 125

1              Do you see that?

2       A     Yes, I see that.

3       Q     All right.  What is -- is that adjustable

4    rate mortgage loan?

5       A     Yes.

6       Q     Okay.  Now, is it true that you asked

7    Mr. Gonzalez to make a change to a loan while Ashley

8    was out?

9       A     I do not remember that.

10      Q     Okay.

11      A     I don't remember ever hollering at Ivan,

12   because he was -- I mean, he was just -- I don't know

13   why he would have had to do anything with ARM loans

14   at that time.

15      Q     Do you have any reason to believe that he

16   would make this up?

17      A     No.

18      Q     And you don't know any reason why he would

19   be untruthful under oath, do you?

20      A     The only thing that I can remember is that

21   we put together a report for the board on Mondays.

22   And the report was built in Report Writer.  And if

23   that was not something to do with this, I don't

24   remember what it was.

25      Q     Okay.  But you would agree with me that as

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 124

1     Q     Uh-huh.

2     A     If we were scanning, he did the scanning

3  and he put together a report and other jobs in the

4  loan operations department.  I cannot be specific.

5     Q     Okay.  But he was in the loan operations

6  department?

7     A     Yes.

8     Q     His supervisor was Ashley Haynes?

9     A     Yes.

10    Q     Who was in charge of the operations

11 department?

12    A     Yes.

13    Q     Okay.  And then who was Peggy Veal?

14    A     She did escrow.

15    Q     Okay.  Also in operations, right?

16    A     Yes.

17    Q     And she's since deceased; is that right?

18    A     That's correct.

19    Q     But she also reported to Ashley, correct?

20    A     Yes.

21    Q     Okay.  So what's described on Exhibit 14

22 is an incident where Ashley was informed by Ivan and

23 Peggy on the week of September the 23rd, 2019, that

24 you had raised your voice at Ivan about the rates on

25 ARM loans.

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 125

1            Do you see that?

2       A    Yes, I see that.

3       Q    All right.  What is -- is that adjustable

4    rate mortgage loan?

5       A    Yes.

6       Q    Okay.  Now, is it true that you asked

7    Mr. Gonzalez to make a change to a loan while Ashley

8    was out?

9       A    I do not remember that.

10      Q    Okay.

11      A    I don't remember ever hollering at Ivan,

12   because he was -- I mean, he was just -- I don't know

13   why he would have had to do anything with ARM loans

14   at that time.

15      Q    Do you have any reason to believe that he

16   would make this up?

17      A    No.

18      Q    And you don't know any reason why he would

19   be untruthful under oath, do you?

20      A    The only thing that I can remember is that

21   we put together a report for the board on Mondays.

22   And the report was built in Report Writer.  And if

23   that was not something to do with this, I don't

24   remember what it was.

25      Q    Okay.  But you would agree with me that as

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 126

1   of May the 13th, 2019 you had been instructed to

2   stick to your compliance duties and to stay out of

3   other departments, right?

4        A    Right.

5        Q    Okay.  And if you were asked -- if you had

6   asked -- if you had, in fact, asked Ivan to make a

7   change to a loan, that would be something within the

8   purview of the operations department, right?

9        A    No, because I reviewed all real estate

10  loans the way they were put on the system.  And if

11  there was a problem or something that needed to be

12  corrected, then at that point, I had to ask somebody

13  in the loan operations area to correct it.

14       Q    Okay.  Let's go to the other parts of this

15  letter.  You remember the events of October the 7th,

16  2019, don't you?

17       A    Yes.

18       Q    Okay.  So as I understand it, there was

19  a -- a ongoing dispute or disagreement between you

20  and Ashley about the collection sequence for loans,

21  right?

22       A    Correct.

23       Q    Okay.

24       A    For the overpayment.

25       Q    Right.

Page 127

1            And so at the time, it was defaulted to

2    principal, interest, escrow and late fees, right?

3        A    That's what we needed to change it to.  It

4    needed to go -- it needed to be -- the first one is

5    what it needed to be.

6        Q    But you --

7        A    -- yes.

8        Q    You're saying you wanted the sequence for

9    overpayments, meaning if someone had a mortgage --

10       A    Uh-huh.

11       Q    -- for $500 a month and you paid $600 --

12       A    Uh-huh.

13       Q    -- you wanted the sequence for that extra

14   hundred dollars to be applied in the order of

15   principal, interest, late fees and escrow?

16       A    True.

17       Q    Okay.  And the way it was defaulted was

18   principal, interest, escrow and late fees, right?

19       A    Right.

20       Q    So the only disagreement was the order of

21   escrow and late fees?

22       A    Right.

23       Q    Okay.  Okay.  And Ashley supervised the

24   loan department, correct?

25       A    Yes.

Debra Helton , Volume II                                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 128

1       Q    Okay.  And so -- so y'all had been

2   discussing this over time, had you not?

3       A    Right.

4       Q    Okay.

5       A    Along with Karen Duncan.

6       Q    Okay.  And then on the morning of

7   October the 7th, 2019, there was a verbal

8   disagreement between you and Ashley, correct?

9       A    Right.

10      Q    Okay.  And as -- as part of this, you

11  raised your voice, didn't you?

12      A    Yes.

13      Q    Okay.  And then you ended up leaving the

14  office?

15      A    Yes.

16      Q    You kind of rushed out of the office,

17  didn't you?

18      A    Yes.

19      Q    And you turned the lights off in your

20  office?

21      A    Yes.

22      Q    Okay.  Did that happen in front of other

23  employees?

24      A    Well, I was in Ashley's office, so -- yes,

25  I guess would be the same -- best way, because she's

Page 129

1   got windows, yes.

2       Q    Would you agree that your voice was higher

3   than its normal level?

4       A    Yes.

5       Q    All right.  At some point did you return

6   that day or did you not come back?

7       A    No, I didn't come back.  I took vacation

8   that afternoon.

9       Q    You took vacation that afternoon?

10      A    Yes.

11      Q    To cool -- to kind of cool off?

12      A    Yes.

13      Q    Okay.

14      A    Well, actually, no.  I was terminated about

15  12:30 on this -- oh, that was the 9th, okay.  Yes.

16      Q    Okay.  I've handed you Exhibit 15.

17           (Defendant's Exhibit No. 15 marked for

18           identification.)

19  BY MR. BENNETT:

20      Q    Is this a true and correct copy of an email

21  that you sent to Ashley Haynes on October the 7th,

22  2019?

23      A    Yes.

24      Q    All right.  And this is 10:26 a.m., right?

25      A    Yes.

Page 130

1     Q     So this is after the incident that we just

2   discussed; is that right?

3     A     Uh-huh.

4     Q     Okay.  And you wrote, Hey, after thinking

5   about it, this is not a compliance issue, so don't

6   working -- worry about making that change, correct?

7     A     Right.

8     Q     And you were referring to the sequence for

9   overpayments to loans that we were just talking

10  about?

11    A     Right.

12    Q     Okay.  And I take it you sent this from

13  your iPhone?

14    A     No, I sent it from my office computer.

15    Q     Well, it says, Sent from my iPhone.  Do you

16  see that?

17    A     Okay.

18    Q     And I thought you said you had taken --

19    A     Yes, I left.  So, yes, it would have been

20  from my own iPhone.

21    Q     So this incident happened in the morning,

22  and then you left and took vacation the rest of

23  the day?

24    A     Uh-huh.  Yes.

25    Q     At that point, were you aware that you

Page 131

1    were probably about to lose your job with the bank?

2         A    Yes.

3         Q    And you had already started to look for

4    other jobs, hadn't you?

5         A    Yes.

6         Q    Okay.  And would you agree with me that

7    if a company honestly believed that, you know, an

8    officer level employee had engaged on multiple

9    occasions within a seven-month period of abusive,

10   unprofessional behavior towards co-workers, that that

11   would be a legitimate reason for separating the

12   employee?

13        A    Yes.

14            MR. BARTON:      Object -- object to

15        form.  Sorry.  Go ahead.

16            THE WITNESS:      Answer it?

17            MR. BARTON:      Yeah.

18            THE WITNESS:      Yes.

19   BY MR. BENNETT:

20        Q    Well, you would -- you would agree that an

21   employer should not have to tolerate an employee who

22   doesn't conduct themselves in a professional and

23   courteous manner in communicating with employees,

24   right?

25            MR. BARTON:      Object to form.  You

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 138

1    you did it monthly, you'd -- you'd have greater

2    payments over time?

3        A    Uh-huh.

4        Q    So you were pondering an early retirement

5    at that time?

6        A    I was checking into it.

7        Q    So you're looking for jobs and at the same

8    time you're looking --

9        A    To see --

10       Q    -- you're considering whether you need a

11   new job?

12       A    Right.

13       Q    Okay.  Okay.

14            MR. BENNETT:      Y'all good to keep

15       going?

16            THE WITNESS:      Uh-huh.

17   BY MR. BENNETT:

18       Q    I want to talk about your termination

19   meeting.

20            As I understand it, you -- you were at the

21   bank and Ken and Karen Wilson came to meet with you

22   on October the 9th, 2019; is that right?

23       A    I went to his office.

24       Q    You went to his office?

25       A    Uh-huh.

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 139

1      Q    Okay.  Ken's office?

2      A    Uh-huh.

3      Q    All right.  So this is two days after the

4    incident of October the 7th, 2019, right?

5      A    Yes.

6      Q    Okay.  Was anyone present other than you,

7    Ken and Karen?

8      A    No.

9      Q    Did you make a recording of the meeting?

10     A    No.

11     Q    Do you remember what time of day it was?

12     A    It was before lunch.

13     Q    It was in the morning?

14     A    (Witness nods head affirmatively.)

15     Q    How long did the meeting last?

16     A    Maybe ten minutes.

17     Q    All right.  And tell me -- actually, let

18   me -- let me do it this way.

19          At the beginning of the meeting, did

20   Mr. Bibb basically just come right out and tell you

21   that you were being terminated?

22     A    No, he said, I don't know what we are going

23   to do about your attitude.

24     Q    Okay.  That was the first thing that was

25   said?

Page 140

1        A     Uh-huh.

2        Q     And how did you respond?

3        A     I said, What are you talking about, I

4   think.

5              And he said, The meeting with you and

6   Ashley.  Someone told me that y'all had a

7   confrontation.  And I really don't remember the rest

8   of it.

9        Q     Did he tell you who told him?

10       A     No.

11       Q     But he -- he reported that he had learned

12  from someone about the confrontation?

13       A     Yes.

14       Q     And I take it you presumed that person was

15  Ashley?

16       A     No, I didn't presume the person was Ashley.

17       Q     Who do you believe it was?

18             MR. BARTON:      Object to form.

19             THE WITNESS:     I really don't know.

20  BY MR. BENNETT:

21       Q     Okay.  You've never been told who it was,

22  right?

23       A     No.

24       Q     Okay.  And then how did you respond?

25       A     I think I told him that Ashley wouldn't

Page 141

1   listen to anything anybody tried to show her how to

2   do.

3        Q    And what did he say?

4        A    He didn't say anything.

5        Q    Well, how did -- what else was said in the

6   rest of the meeting that led to the discussion of

7   your termination?

8        A    I do not know.  I could speculate, but I do

9   not know.

10       Q    Well, what do you remember?

11       A    What do I remember?  I remember the

12  discussion that he had the package and I could sign

13  the document and he would continue to pay me until

14  year end.  And I would come in and work as he needed

15  me, maybe five hours a week, to train someone.

16            And I had maybe seven days, I think -- I

17  don't remember that exactly, to sign the document.

18  Let's see.  What else do I remember?  That's pretty

19  much all I remember.

20       Q    All right.  So there was no mention of your

21  sex or your age?

22       A    No.

23       Q    He mentioned the altercation with Ashley

24  Haynes?

25       A    Yes.

Page 142

1      Q    And he mentioned that the issues with your

2    attitude had been unresolved?

3      A    Yes.

4      Q    Okay.  All right.  So then you were

5    presented with a -- basically a severance agreement

6    which had you executed, it would have paid you

7    through the end of the year, right?

8      A    Uh-huh.

9      Q    Okay. And COBRA continuation, I believe,

10   through the end of the year or something like that?

11     A    Yes.

12     Q    Okay.  Now, you were not intoxicated during

13   this meeting, right?

14     A    No.

15     Q    You weren't under the influence of some

16   medication that made your -- your mind unclear,

17   right?

18     A    No.

19     Q    Okay.  And nobody threatened you in any way

20   that something would happen if you didn't sign the

21   document, right?

22     A    No.  He told me that I needed to sign it

23   in order to get my pension.

24     Q    In -- in order to get your pension?

25     A    (Witness nods head affirmatively.)

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 145

1        2:06.

2              (Whereupon, a recess was had from 2:06 p.m.

3        until 2:19 p.m.)

4              THE VIDEOGRAPHER:  Back on the record.

5        The time, 2:19.

6    BY MR. BENNETT:

7        Q    Okay.  Back on.

8              All right.  So during the termination

9    meeting, nobody told you that you were being

10   terminated because of your age or sex, right?

11       A    No.

12       Q    And that was never set forth in any written

13   document you were given about your termination,

14   right?

15       A    Right.

16       Q    You understood that it was Ken who had made

17   the decision; is that right?

18       A    Yes.

19       Q    And he's older than you, isn't he?

20       A    Yes.

21       Q    Is it true that at the time of your

22   termination, the bank had about 32 employees?

23       A    Yes, I would -- I thought there were more,

24   like 49, but we had at least 32.

25       Q    Less than 100?

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 146

1     A     Yes.

2     Q     Less than 50?

3     A     Yes.

4     Q     And would you agree that less than a third

5  of the employees are under the age of 40?

6     A     Yes.

7     Q     And nearly half of the employees at the

8  time of your separation were older than you?

9     A     I don't agree that they were older.  Some

10 were close to the same age.

11    Q     Well, would you agree that during the last

12 year of your employment, the bank had more people

13 employed over the age of 60 than under the age of 40?

14    A     No.  That's a -- that's a tough question,

15 but I don't think so.

16    Q     You would need a roster, right?

17    A     I would need a roster.

18    Q     Okay.  Now, you don't have any personal

19 knowledge of what happened to your duties after your

20 termination, right?

21    A     Yes.

22    Q     Yes, you do or you agree that you do not?

23    A     Yes, I do.

24    Q     From who?

25    A     I'm not going to disclose -- I don't want

Page 147

1    to disclose the name, but just different employees

2    talking.

3         Q    You have to tell me who it was.

4         A    Well, at that time Kathy Brooks, Jennifer

5    Wright.  I think that's it.

6         Q    Okay.  Well, then you're aware, aren't you,

7    that a -- a third-party contractor by the name of

8    Stephen LeBlanc (phonetically) Compliance Services

9    started assuming most of your compliance duties?

10        A    Yes.

11        Q    Okay.  And do you have any basis for

12   disputing that the bank also, following your

13   separation, formed an internal compliance committee

14   to work with Mr. Moore to manage the compliance

15   responsibilities?

16        A    Yes.

17        Q    Okay.  And are you aware that there's seven

18   people on that committee?

19        A    Yes.

20        Q    One of whom is Mr. Bibb, right?

21        A    Yes.

22        Q    One of whom is Karen Duncan?

23        A    Yes.

24        Q    She's over 60, right?

25        A    Yes.

Page 148

1       Q    Denise Griswell?

2       A    Yes.

3       Q    Stephanie McAfee?

4       A    Yes.

5       Q    Tracy Welch?

6       A    Yes.

7       Q    Kim Balcom?

8       A    Yes.

9       Q    And Ashley Haynes, right?

10      A    Yes.

11      Q    Okay.  So six women and one man?

12      A    Yes.

13      Q    And everyone but Ashley and Kim would have

14  been over the age of 40 as of October 2019?

15      A    Yes.

16      Q    Okay.  All right.  So what was

17  Stephanie's -- Stephanie Wright's position at the

18  time of your separation?

19      A    Stephanie?

20      Q    Stephanie Wright.  I'm sorry, Stephanie

21  McAfee.

22      A    And what was her now?  What was her...

23      Q    What was her position at the time of your

24  separation?

25      A    I'm going to be honest, I don't really know

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 149

1    what Stephanie did.  She was the -- she, like, looked

2    after customer service and did a lot of reviews on

3    the computer to get rid of old accounts and stuff.

4         Q    Okay.  All right.  And Stephanie was in --

5    I'm sorry.  Ashley was over compliance and

6    operations -- or I mean, she was over loans and

7    operations --

8         A    Uh-huh.

9         Q    -- right?

10             And the FDIC requires a bank to have a

11   compliance officer, right?

12        A    Uh-huh.

13        Q    Okay.  And are you aware that Ashley Haynes

14   was named the bank's interim loan compliance officer

15   and Stephanie McAfee was named the -- the interim

16   deposit compliance officer?

17        A    Yes.

18        Q    Okay.  So your duties were not absorbed by

19   male employees?

20        A    Right.

21        Q    Okay.  With respect to your allegation that

22   the bank has a pattern of, you know, terminating

23   people close to the age of 60 and making them sign

24   severance packages, that's one of your allegations,

25   right?

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 150

1        A    Yes.

2        Q    Okay.  And that's based on the 2016 events

3    surrounding the branch closure, right?

4        A    Yes.

5        Q    Okay.  Now, isn't it true that of

6    the individuals who were over 60 who were affected by

7    that reorganization -- and it was a reorganization,

8    right?

9        A    Yes.

10       Q    They were not actually terminated, they

11   were given the option to retire early, right?

12       A    Right.

13       Q    Okay.  Four of them accepted that, but one

14   of them did not; is that true?

15       A    I don't know exactly.  I don't -- I mean, I

16   don't really know about anyone that did not accept

17   it.

18       Q    But were you even a part of that

19   decision-making process?

20       A    No.

21       Q    And you don't have any personal knowledge

22   of what was discussed with those people at the time?

23       A    No.

24       Q    Are you aware that Pat McAfee - I mean Pat

25   Herringdine was offered an early retirement and she

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

                                                        Page 151

1    decline it?

2          A     Yes.

3          Q     And then she continued -- she continued

4    working until she voluntarily retired, right?

5          A     Right.

6          Q     Okay.  And do you remember a person by the

7    name of Andrea Calloway?

8          A     Yes.

9          Q     Do you remember she was initially separated

10   as part of the closure process?

11         A     Yes.

12         Q     But then she was subsequently rehired,

13   wasn't she?

14         A     Yes.

15         Q     Do you remember she was about 49, 50 at the

16   time?

17         A     Yes.

18         Q     Do you remember Ashley Hooks?

19         A     Yes.

20         Q     Okay.  She was about 33 years old and she

21   was terminated as part of the branch closure, right?

22         A     Yes.

23         Q     Who is Andrea Helton?

24         A     She was working in the loan department.

25         Q     No relation to you, right?

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 152

1       A     Yes, my niece.

2       Q     Okay.  But she's your niece?

3       A     Yes.

4       Q     Okay.  And she was about 23 years old,

5   right?

6       A     Yes.

7       Q     And she was separated as part of the branch

8   closure?

9       A     Yes.

10      Q     Okay.  So people of all ages were impacted,

11  right?

12      A     Yes.

13      Q     Okay.  And you were not terminated as part

14  of the branch closure, were you?

15      A     No.

16      Q     None of those people who lost their jobs as

17  part of that reorganization were terminated for poor

18  performance or attitude problems, were they?

19            MR. BARTON:        Object to form.  You

20        can answer.

21            THE WITNESS:       Not that I'm aware of.

22  BY MR. BENNETT:

23      Q     Do you have any knowledge that any of them

24  had been accused of conducting personal banking

25  business on company time?

Debra Helton , Volume II                          June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 153

1      A     No.

2      Q     Okay.  Are you aware of any male employees

3  who were accused of violating the bank's policies

4  regarding personal financial transactions?

5      A     No.

6      Q     Are you aware of any male employees who

7  were accused of inappropriately speaking to multiple

8  co-workers within a seven-month period and yet

9  remained employed?

10      A     Yes.

11      Q     Within a seven-month period?

12      A     Of today or seven month...

13      Q     Are you aware of any male employee who was

14  accused of inappropriately speaking to co-workers by

15  three different co-workers within a seven-month

16  period and remained employed?

17      A     Read it one more time.

18          MR. BENNETT:     Will you read it?

19          MADAM COURT REPORTER:  Yes.

20          (Whereupon, requested portion of record was

21     read by the court reporter.)

22          THE WITNESS:     Yes.

23  BY MR. BENNETT:

24      Q     Who?

25      A     Lamar Doolittle.

Page 155

1      A      The -- the request for their statements.

2             (Defendant's Exhibit No. 20 marked for

3      identification.)

4   BY MR. BENNETT:

5      Q      Let me show you Exhibit 20.

6             So this is a composite exhibit which has

7   some statements from Jessica Ford, Della Brown, Pat

8   Herringdine and Rachel Black, right?

9      A      Right.

10     Q      Did you tell each of these people that they

11  were going to be witnesses in the lawsuit and likely

12  deposed if they gave you a statement?

13     A      No.

14     Q      Did you tell them that you were going to be

15  sending their statements to your lawyer?

16     A      Yes.

17     Q      But you didn't tell them that they were

18  going to be witnesses in a lawsuit?

19     A      I asked them if they would be a witness and

20  would they please write their story, and they said

21  yes, be glad to.

22     Q      All right.  Who's Jessica Ford?

23     A      She was the ACH coordinator at the bank.

24     Q      Okay.  So she was the coordinator over

25  online banking?

Page 156

1       A    Yes.

2       Q    Okay.  She was terminated on August the

3   23rd, 2013, right?

4       A    Yes.

5       Q    So six -- over six years after you were

6   terminated?

7       A    Yes.

8       Q    So she has no personal knowledge of

9   anything that happened in 2018 or 2019?

10      A    No.

11      Q    All right.  And do you remember there was

12  an incident -- an incident in 2012 when the bank was

13  experiencing frequent complaints regarding the online

14  bill pay program?

15      A    Yes.

16      Q    She was the coordinator for that, right?

17      A    Yes.

18      Q    Okay. And she claims that while Lamar

19  Doolittle was out at a conference, more complaints

20  came in and she reached out to you for help?

21      A    Yes.

22      Q    Is that true?

23      A    Yes.

24      Q    Okay.  And then she says that you reached

25  out to whoever the vendor was?

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

                                                    Page 157

1        A     Right.

2        Q     Was that during the e-signature process?

3        A     I can't answer that honestly.  If -- I

4    don't believe it was.

5        Q     Okay.

6        A     I think we had had an update to the

7    software that had caused some problems.

8        Q     Okay.  And what she claims is that when he

9    got back, he was firm and ugly with her for reaching

10   out to you, right?

11       A     Yes.

12       Q     All right.  There's no allegation in this

13   letter that she ever complained to Karen Wilson or

14   Mr. Bibb about this incident, right?

15       A     Right.

16       Q     Or Chris Irwin, right?

17       A     Right.

18       Q     And you didn't actually witness the

19   incident between her and Lamar, right?

20       A     I didn't witness it, no.  Lamar did tell me

21   about it, but I didn't witness it.

22       Q     Okay.  What did Lamar tell you?

23       A     That he had terminated Jessica.

24       Q     Now, one of the things you alleged in your

25   complaint was that she was forced to sign the

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 158

1    severance agreement.

2            You're aware of that, right?

3        A    Yes.

4        Q    That never happened, did it?

5        A    She never told me for sure that she did or

6    didn't sign it.

7        Q    She doesn't say anything in this statement

8    about being forced to sign a severance, right?

9        A    Right.

10       Q    It says she was given a severance pay?

11       A    Right, yes.

12       Q    And you don't have any knowledge that she

13   was required to sign anything to get that pay, right?

14       A    Right.

15       Q    You weren't present in her termination

16   meeting, were you?

17       A    No.

18       Q    You also allege that she was demoted at

19   some point.

20            Do you remember that?

21       A    Yes.

22       Q    She was never demoted, was she?

23       A    Other than she said she was, I do not know.

24       Q    Okay.  And you don't have any personal

25   knowledge that her salary was reduced at the time of

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 159

1    termination, right?

2         A    No.

3         Q    So did she tell you those things?

4         A    She told me that she had been demoted.

5         Q    Did she tell you that she had her salary

6    reduced?

7         A    No.

8         Q    So you would agree that that's not true,

9    that that would be a lie?

10            MR. BARTON:        Object to form.

11   BY MR. BENNETT:

12        Q    Let's go to the second page of this

13   exhibit, which is your email from Della Brown.

14            Okay.  Now, she retired from the bank on

15   November the 2nd, 2012.

16            Do you have any basis to dispute that?

17        A    No.

18        Q    Okay.  And she voluntarily retired, right?

19        A    Yes.

20        Q    Do you know how old she was at the time?

21        A    No.

22        Q    Okay.  And she was a customer service rep,

23   right?

24        A    Yes.

25        Q    So she wouldn't have any personal knowledge

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 162

1    she's a very meek person.

2        Q    Well, you know that she continued working

3    for the bank --

4        A    Yes.

5        Q    -- right?

6        A    (Witness nods head affirmatively.)

7        Q    Okay.  And if this -- if this incident

8    actually happened, it had to have been some point

9    before Ms. Brown retired in 2012, right?

10       A    Yes.

11       Q    And you understand she continued to work

12   through 2022 as far as you know, right?

13       A    Yes.

14       Q    Now, you and Mr. Bibb had totally different

15   jobs, right?

16       A    Yes.

17       Q    He was the president, you were an officer?

18       A    Yes.

19       Q    You and Lamar had different jobs too,

20   right?

21       A    Yes.

22       Q    Let's go to Page 3 of this exhibit.

23            This is an email from Pat Herringdine to

24   you, right?

25       A    Yes.

Page 171

1    know if she did reply?

2        A    I don't think so, and I don't have her in

3    my contacts.

4        Q    Okay.  Okay.  Another person you identify

5    is -- as a witness is Kathy Brooks?

6        A    Uh-huh.

7        Q    And you allege that when she worked in the

8    loan department, she found herself in disagreement

9    with a manager concerning a compliance issue and that

10   after the disagreement she was demoted?

11       A    Yes.

12       Q    Okay.  What was her position?

13       A    She was doing the collateral.

14       Q    Collateral.

15            Were you employed when that happened?

16       A    Yes.

17       Q    Okay.  Isn't it true that what actually

18   happened was her position was eliminated because it

19   was determined that the loan department was

20   overstaffed?

21       A    Yes.  But we still had after school help.

22       Q    Okay.  And so a teller was needed on the

23   teller line.  And she was transferred from the loan

24   department to the teller line?

25       A    Yes.

Debra Helton , Volume II                      June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 172

1      Q     And you understand she filed an EEOC charge

2      but then withdrew it?

3      A     Yes.

4      Q     Has she given you a statement or anything

5      like that?

6      A     She didn't withdraw it.  She -- the guy

7      didn't complete it or -- I don't know exactly what

8      happened.  She missed a deadline.  Her salary was cut

9      $15,000.

10     Q     Have you obtained a statement from her?

11     A     No.

12     Q     Have you had any communications with her?

13     A     Nothing in general, except just in general

14     conversation.

15     Q     Have you talked to her about your lawsuit?

16     A     No.

17     Q     Have you talked to her about your

18     employment?

19     A     She knows I'm working at the Farmers Bank.

20     Q     No, no.  Your employment with the bank?

21     A     I mean, we worked side by side, so she is

22     perfectly aware.

23     Q     Do you have those communications?

24     A     No.  It was verbal.

25     Q     Are there any other women who you think

Debra Helton , Volume II                    June 8, 2022
Helton, Debra Vs. The Geo D. Warthen Bank

Page 174

1        A     I don't know of anything that would be

2    relevant for Jen- -- Jennifer.

3        Q     Okay.  You never heard Mr. Bibb make any

4    age-based kind of discriminatory comments, have you?

5        A     No.

6        Q     What about sex-based discriminatory

7    comments?

8        A     No.

9              (Defendant's Exhibit No. 21 marked for

10             identification.)

11   BY MR. BENNETT:

12       Q     Okay.  Let me hand you Exhibit 21.

13             All right.  Do you recognize Exhibit 21 as

14   a copy of your -- your responses to our

15   interrogatories?

16       A     Yes.

17       Q     Okay.  And if you look at the second to

18   last page, you verified that these were true and

19   correct to your -- the best of your knowledge on

20   March the 31st, 2022, right?

21       A     Yes.

22       Q     And I think you said these were -- this is

23   one of the documents that you looked at in

24   preparation for today?

25       A     Yes.

The Rosewood     (478) 841-9007 tel
170 College Street    (478) 841-9002 fax
Macon, Georgia 31201   cooperbarton.com



KENNETH E. BARTON
KEB@COOPERBARTON.COM

January 6, 2020

RECEIVED

JAN 2 2 2020

EEOC-ATDO

<u>**VIA CERTIFIED MAIL/**</u>
<u>**RETURN RECEIPT REQUESTED &**</u>
<u>**VIA FACSIMILE TO: (404) 562-6909**</u>
Equal Employment Opportunity Commission
Atlanta District Office
100 Alabama Street, S.W., Suite 4R30
Atlanta, Georgia 30303

Re:     **Charge of Discrimination**
       *Debra Helton v. The Geo. D. Warthen Bank*
       Equal Employment Opportunity Commission (Charge No. 410-2020-00723)
       *Cooper, Barton & Cooper File No.: 15974.0001*

To Whom It May Concern:

     Our law firm has been retained to represent Ms. Debra Helton, and we wish to file a Charge of Discrimination on her behalf. Enclosed, please find a true and correct copy of a Notice in which Ms. Helton has designated me and our law firm as her legal representative. The Equal Employment Opportunity Commission will find that, while Ms. Helton was employed with The Geo. D. Warthen Bank (hereinafter, "Bank"), she was <u>wrongfully terminated due to her sex and age in violation of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act, respectively.</u>

     Ms. Helton has made an initial inquiry with the EEOC and has an interview scheduled for January 22, 2020. With the submission of this Charge, we do not believe that the interview will be necessary, but we will be more than happy to provide additional information upon request.

     Ms. Helton began her employment with the bank on October 31, 1988, and other than nine months of leave in 1995, *she has been consistently employed with the bank for the intervening thirty-one (31) years.* At the time of her termination, Ms. Helton was fifty-seven (57) years old and she planned on working for the Bank until she reached the age of retirement. Most recently, Ms. Helton served as Vice President and the Bank's Compliance Officer. The Bank's principal office is located at 216 North Harris Street, Sandersville, Washington County, Georgia 31082. The Bank has employed in excess of 20 individuals for 20 calendar weeks in 2019 and in prior calendar years.

     At all relevant times, Ms. Helton's performance was exemplary. In fact, for the first thirty years and six months, she was never disciplined or issued *any* write ups. However, this began to change in April 2019, when Ms. Helton began to be targeted by Bank President Ken Bibb. From April until September, Ms. Helton was targeted several times by Mr. Bibb for minor issues that should not have resulted in any discipline. During that same time, Mr. Bibb began removing Ms. Helton's access to certain Bank records and he began to reassign many of her duties to other employees. As explained herein, Ms. Helton's termination appears



DEFENDANT'S
EXHIBIT
1   Helton
6/8/22 SB

PL RPD 00051
Def Ex. 1

Equal Employment Opportunity Commission
January 6, 2020
Page 2 of 4

to be consistent with the Bank's notions sex stereotyping, in that the Bank takes issue with female officers who assert their authority, but certainly permits their male counterparts to engage in offensive conduct while not suffering any adverse consequences. Moreover, the Bank has a history of forcing its older employees out of their positions.

Specifically, around October 2019, Mr. Bibb reassigned all of Ms. Helton's responsibilities to the Bank's thirty (30) year old Loan Operations Supervisor, Ashley Haynes. The EEOC will find that Ms. Haynes was named the Interim Loan Compliance Officer after Ms. Helton was terminated. Ms. Haynes had not received any prior training for these duties and she did not have the requisite knowledge or experience regarding loan and banking compliance. However, before she was terminated, Ms. Helton remained ultimately responsible for the Bank's compliance as the Compliance Officer – which was a duty that Ms. Helton took very seriously.

On one day in early October, Ms. Helton requested that Ms. Haynes make corrections to the Bank's database of loans because some of the information was incorrect or inaccurate. Ms. Haynes flatly refused to make any corrections to the inaccurate information, and she insisted that the information was not wrong. Ms. Helton believed that these corrections were crucial because the Bank could be subject to liability and/or fines if the information was not corrected and the Bank were to be audited. Ms. Helton told Ms. Haynes that she was not going to certify any of this loan information as being correct unless the appropriate changes were made. The discussion became somewhat heated and Ms. Helton admits that she was stern; although, Ms. Helton certainly did not yell, use profanity, make threats, or engage in any other conduct that would not be expected in any workplace. Critically, before Mr. Bibb had started taking away Ms. Helton's administrative rights to the Bank's databases over the prior several months, Ms. Helton could have simply made these corrections herself.

On the next day, October 9, 2019, Mr. Bibb called Ms. Helton into his office, where Ms. Helton found that a representative from Human Resources was also present. The conversation was relatively brief, especially in light of Ms. Helton's three decades of service to the Bank. Mr. Bibb simply said to Ms. Helton, "I don't know what we're going to do about your attitude." He also stated that one employee who overheard the prior day's discussion "felt uncomfortable." However, Mr. Bibb did not ask Ms. Helton anything about the conversation with Ms. Haynes or the circumstances giving rise to it.

Interestingly, when Ms. Helton was terminated, the Bank offered her a severance package. The Bank wanted Ms. Helton to work for five hours per week during a transition period until the end of the year. In exchange, Ms. Helton would have been required to waive and release any claims that she had against the Bank. The Bank's request suggests that Ms. Helton was indeed a valued employee who should not have been terminated. Ms. Helton did not accept the severance because she believed that her termination was discriminatory and improper.

Ms. Helton's supervisors had only ever raised an issue with her "attitude" on one prior occasion. On April 8, 2019, another Bank officer had been assigned to close the Bank. However, this other person was also scheduled for a vacation that week and she had not been able to find someone else to fill in for her. Upon request, Ms. Helton agreed to help by supervising the closings for the week. However, Ms. Helton had an appointment on Wednesday afternoon, and she asked the other Bank officers if they could fill-in for

her. She was unable to find someone to replace her, so Ms. Helton asked the tellers to try to hurry so everyone could get out shortly after the 5:00 pm closing. Finding that the tellers were actually moving slower than normal, Ms. Helton offered her help and she asked them to move faster. In no way did Ms. Helton raise her voice or do or say anything that should have been considered offensive. The next day, Mr. Bibb called Ms. Helton into his office, told her that she had an "attitude" when she rushed the tellers to finish their work, and he demanded that she apologize to all of the tellers, which Ms. Helton did. There was no other disciplinary action taken as a result of this situation.

The Bank's problem with Ms. Helton's "attitude" appears to actually be the Bank's problem when female officers assert their authority. However, the Bank tolerates similarly-situated male officers who raise their voice, argue with other employees, and even use profanity in the workplace. For example, Ms. Helton can recount when Mr. Bibb, himself, has argued with another employee. On several occasions, Mr. Bibb was so mean to a female employee that he made her cry. There have been several occasions when Lamar Doolittle, another officer of the Bank, has argued with other employees and even raised his voice at Mr. Bibb in a meeting; yet, no actions have ever been taken against him. Mr. Doolittle has also been known to have used profanity when speaking to female employees whom he supervises. Moreover, Mr. Ronnie May was so harsh in how he spoke to his secretary, Pat Herringdine, that he made her nervous and fearful. His treatment of Ms. Herringdine was so offensive that she was diagnosed with anxiety due to this treatment. Mr. Bibb observed this behavior and even admitted that Mr. May needed anger management classes; however, no action was ever taken against him and he worked at the Bank until his voluntary retirement.

The EEOC will also find that the Bank has a history of targeting and either terminating or separating its older employees. For example, in October 2016, the Bank closed its second branch and consolidated its workforce. When it did so, the Bank terminated a sixty-seven (67) year old Loan Officer, a sixty-nine (69) year old Loan Supervisor, and its Vault Custodian who was sixty-one (61). Similar to its offer to Ms. Helton, the Bank offered all three of these individuals a severance package in exchange for a waiver of all possible claims, which the three individuals accepted due to the likelihood of being unable to find new work due to their ages.

Through its investigation, the EEOC will find that on October 8, 2019, The Geo. D. Warthen Bank subjected Ms. Helton to discrimination by terminating her employment due to her sex and sex stereotypes in violation of Title VII of the Civil Rights Act and/or due to her age in violation of the Age Discrimination in Employment Act. We appreciate the EEOC's time and attention to this matter and please do not hesitate to contact us if you have any questions or concerns.

Sincerely yours,

KENNETH E. BARTON

KEB/nagm
Enclosure
cc:          Ms. Debra Helton (via email)
158970001.L01.EEOC Charge

COOPER, BARTON & COOPER
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

Equal Employment Opportunity Commission
January 6, 2020
Page 4 of 4

I want this Charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my Charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

Jan 6, 2020

DEBRA HELTON          DATE

The Rosewood          (478) 841-9007 tel
170 College Street    (478) 841-9002 fax
Macon, Georgia 31201  cooperbarton.com


COOPER,
BARTON &
COOPER
TRIAL ATTORNEYS

### Notice of Designation of Attorney

Effective Date: November 19, 2019

I, DEBRA HELTON, do hereby designate the individual(s) and law firm(s) named below to act as my attorney/representative in all matters pertaining to my formal Charge of Discrimination to be filed with the Equal Employment Opportunity Commission.

**Charging Party:**
Ms. Debra Helton

Sandersville, Georgia 31082

**Attorney/Representative:**
Kenneth E. Barton, Esq.
COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007- telephone
(478) 841-9002- facsimile
keb@cooperbarton.com

I understand that I, or any other individual that I so delegate, may cancel this notice, and that I am responsible for notifying the Equal Employment Opportunity Commission in writing in the event of a cancellation.

DEBRA HELTON

11-25-2019
DATE

PL RPD 00055

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

DEBRA HELTON,

      Plaintiff,

v.

THE GEO. D. WARTHEN BANK,

      Defendant.

Civil Action No.:

5:21-cv-00404

**JURY TRIAL DEMANDED**

### COMPLAINT

COMES NOW, Plaintiff Debra Helton, and brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and the Age Discrimination in Employment Act, 29 U.S.C. § 623. Plaintiff alleges that Defendant The Geo. D. Warthen Bank subjected Plaintiff to discrimination based her sex and age, including through said Defendant's termination of Plaintiff's employment, respectfully showing the Court as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 & 1343 and the enforcement provisions of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was employed, and the events underlying this action occurred, in Washington County, Georgia, which is located within this judicial district.

DEFENDANT'S
EXHIBIT
2 Helton
6/8/22 SB
PENGAD 800-631-6989

## PARTIES

3.

Plaintiff Debra Helton (hereinafter, "Plaintiff" or "Helton") is a citizen of the United States and a resident of Georgia, and she was between 40 and 70 years of age at all times at issue. At all times relevant to this suit, Ms. Helton was employed with Defendant The Geo. D. Warthen Bank.

4.

At all relevant times, Ms. Helton was considered a covered, non-exempt employee under Title VII of the Civil Right Act of 1964 and the Age Discrimination in Employment Act.

5.

Defendant The Geo. D. Warthen Bank (hereinafter, "Defendant") is a domestic banking corporation, incorporated under the laws of the State of Georgia. Defendant's principal address is 216 North Harris Street, Sandersville, Washington County, Georgia 31082. Defendant may be served with process through its Registered Agent, Karen Wilson, located at 213 North Thomas Street, Davisboro, Washington County, Georgia 31018.

6.

Defendant is a private employer engaged in interstate commerce with an annual revenue in excess of $500,000.00. Defendant has employed in excess of 20 employees, working for at least twenty calendar weeks, in 2020 and preceding years. Defendant is a covered employer within the meaning of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act.

## STATEMENT OF FACTS

7.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 6, as if the same were set forth herein.

8.

Ms. Helton began her employment with Defendant on October 31, 1988, working as a bank teller.

9.

On October 8, 2019, as Ms. Helton approached nearly thirty-one years of service to Defendant, she was abruptly terminated from her position.

10.

Before she was fired, Ms. Helton had risen through Defendant's ranks, and she served most recently as Defendant's Vice President and Compliance Officer, working out of Defendant's sole branch in Sandersville, Georgia.

11.

At all relevant times, Ms. Helton's performance was exemplary, and, but for the incidents alleged herein, Defendant had not subjected Ms. Helton to any disciplinary action in any of the four decades that she was employed.

12.

However, Defendant is known to target its older employees on occasion.

13.

By way of example, in October 2016, Defendant closed its second banking location, and underwent a purported consolidation of its workforce. During this process, Defendant laid off three of its employees who were all in their sixties, and whose performance had otherwise been satisfactory. Like Ms. Helton, Defendant offered these employees a severance package, which the three employees accepted on account of the difficulty that they anticipated in finding other work,

but despite the fact that the agreement purportedly required such employees to waive and release any claims of age discrimination.

14.

Moreover, Defendant not only ignores, but effectively encourages, its male employees and officers who exhibit assertive or aggressive conduct toward other employees, behavior that often rises to the level of being inappropriate for the workplace. As a result, male employees who exhibit such assertive or aggressive conduct generally do not receive disciplinary action.

15.

Conversely, when Defendant's female employees express conduct that is seen as aggressive, abrasive, or even merely assertive, they are generally subjected to disciplinary action, up to and including demotion or termination of their employment.

16.

When Defendant considers its female employees' behavior to be assertive, Defendant's frequently justifies its response as having a problem with the woman's "attitude."

17.

By way of example, Ken Bibb, one of Defendant's other officers who is male, was known to routinely speak to other employees so harshly that they ultimately ended up in tears and considered resigning their employment as a result. Defendant refused to subject this male officer to any disciplinary action or otherwise address his conduct in any way.

18.

Lamar Doolittle, another male officer, displayed aggressive conduct much more frequently; however, Defendant has entirely failed to address the conduct. According to one female employee, Della Brown, Mr. Doolittle spoke to her disrespectfully over a period of years.

On one specific occasion, when Ms. Brown asked Mr. Doolittle for assistance over a matter in which he supervised, Mr. Doolittle yelled at Ms. Brown, telling her that he did not like her "attitude."

19.

On another occasion, Mr. Doolittle got upset with a subordinate, Rachel Black, when the teller's counting of cash in anticipation of opening prevented him from performing routine maintenance on the computers that the tellers were assigned. According to Ms. Black, Mr. Doolittle "lost his marbles," yelling at the tellers in a manner so harshly that it caused the female tellers to be concerned for their own safety. While Mr. Doolittle spoke severely to Ms. Black, he actually invaded her personal space and yelled in her face, telling Ms. Black that if she did not like the way that Mr. Doolittle was speaking to her, she could pack her stuff and go. Not only was Mr. Doolittle's conduct not addressed by Defendant, Defendant subjected Ms. Black to disciplinary action for this incident instead.

20.

Jessica Ford last served as Defendant's coordinator for online banking and manager over credit card transactions. Defendant had been receiving a number of complains concerning its online banking, but when Ms. Ford asked for Mr. Doolittle's help on several occasions, she was ignored. When Mr. Doolittle was out of the office and Defendant received several more online banking complaints, Ms. Ford instead asked Ms. Helton for help since she was the next person in Ms. Ford's chain of command. Ms. Helton and Ms. Ford were able to quickly resolve the issue with the vendor. However, when Mr. Doolittle found out about what happened, he got very loud and disrespectful with Ms. Ford, used profane language toward her, and from that point forward would tell Ms. Ford that she was not a "team player." Even though Ms. Ford had not received any

discipline in her nine-year tenure, she was first demoted, and then she found herself terminated soon thereafter. Defendant also had Ms. Ford sign a severance agreement, waiving and releasing any claims of discrimination, at her separation.

21.

Like Ms. Helton, Kathy Brooks has worked for Defendant for approximately thirty years, and she previously worked in Defendant's loan department. Like Ms. Helton, Ms. Brooks found herself in a disagreement with a manager in the loan department concerning a compliance issue. After the disagreement, Defendant ultimately demoted Ms. Brooks and slashed her salary by approximately $16,000.00, explicitly telling Ms. Brooks that Defendant took issue with her "attitude."

22.

Mr. Doolittle was not only rude and disrespectful to female employees. On several occasions, Mr. Doolittle actually raised his voice and yelled at the bank's president in a meeting and in front of subordinate employees. Defendant did not subject Mr. Doolittle to any disciplinary action for such conduct.

23.

Similarly, another one of Defendant's officers, Ronnie May, was frequently so rude to his female secretary that it made her so nervous and anxious that she and her doctor felt it necessary to prescribe medication. Not only was the bank's present aware of Mr. May's behavior, he acknowledged that Mr. May may need anger management classes; however, Mr. May was not subjected to any discipline for this conduct.

24.

Ms. Helton had achieved much success during her career that had entered its fourth decade with Defendant, both for herself and for the bank.

25.

In the 1990s, Ms. Helton earned her certification as an accredited Automated Clearing House ("ACH") Professional. After earning this certification, Ms. Helton was responsible for implementing Defendant's ACH program, which allowed Defendant to process electronic transfers of funds.

26.

Subsequently, Ms. Helton oversaw the department over services for certificates of deposit and individualized retirement accounts ("IRA").

27.

Ms. Helton was promoted to the position of loan officer in the year 2001, and in 2009, she became the Compliance Officer after she completed banking school and compliance school.

28.

In 2012, Ms. Helton and one other person were responsible for initiating Defendant's escrow program, which required extensive study of the applicable rules and regulations. This was a significant accomplishment because it was something that Defendant's officers had simply written off as being too complicated up to that point.

29.

While this matter was pending before the Equal Employment Opportunity Commission, Defendant contended that Ms. Helton engaged in grossly improper conduct in Summer 2018.

30.

However, Ms. Helton engaged in no such violations, and she was not subjected to any discipline for any incidents in Summer 2018, suggesting that these new allegations were false.

31.

Moreover, had Ms. Helton engaged in such violations now alleged by Defendant, Defendant would have been required to report the incident to the appropriate federal authorities. Defendant failed to do so, which suggests that Ms. Helton's conduct did not violate rules of any kind.

32.

Defendant's assertion concerning the Summer 2018 incident is false, and it had nothing to do with her termination over a year later.

33.

On April 11, 2019, there was a separate incident that, by Defendant's own statements, did not play into Ms. Helton termination.

34.

During that week in April 2019, one Defendant's employees, who was normally tasked with overseeing the nightly closure of the bank, was out of work on personal leave for the week. Since all of Defendant's other authorized officers declined to step in to oversee the nightly closure, Ms. Helton volunteered to do so.

35.

However, when the day came for Mr. Helton to stand in as the supervisor for the nightly closing, she remembered that she had a medical appointment scheduled the same day after work.

As a result, Ms. Helton asked another officer to take her place. The other officer declined Ms. Helton's request, responding that she too had an appointment scheduled that afternoon.

36.

At 4:45 pm on the day in question, Ms. Helton began watching the clock, and she offered her assistance to the employees who were counting money to close out for the day. Around a half-hour later, around the time that Ms. Helton would have needed to leave to arrive at her appointment on time, the employees just began counting the drawer of money from the drive-in window. This made Ms. Helton upset, not only because the employees had known that this drawer needed to be counted a thirty minutes earlier when Ms. Helton's offer to help had been declined, but because Ms. Helton's coworker who was present, who was also considered one of Defendant's officers, could have supervised the closing without requiring Ms. Helton's presence.

37.

When Ms. Helton got upset, she acknowledges that, while she did not raise her voice at the other employees, she did use a profane word in speaking to them. The word that she used was far from the worst that had been used in this workplace, but Ms. Helton still felt the need to apologize to her coworkers for her reaction the next morning.

38.

Ms. Helton was not subjected to any disciplinary action because of the April 11, 2019 incident.

39.

However, in a meeting the day after the incident, the bank president told Ms. Helton that she had an "attitude" the prior day.

40.

Still, the April 2019 incident did not appear to be an issue, and within the next several weeks, the bank president told Ms. Helton that she had been doing a "fabulous job."

41.

Defendant later claimed that it felt like Ms. Helton had not been "respectful" to her subordinates. This is a term that Defendant has never used to describe its male employees' conduct.

42.

Ms. Helton had previously observed what Defendant had done to female employees with an "attitude," so she tried her best to avoid controversy over the course of the next several months.

43.

However, in hindsight, it is now clear that Defendant had begun its attempts to remove Ms. Helton due to her age, and because she had exhibited conduct contrary to Defendant's expectations of how its female employees should behave.

44.

In May 2019, Defendant began slowly removing many of Ms. Helton's duties, and gave such responsibilities to its thirty-year-old Loan Operations Supervisor, Ashley Haynes.

45.

However, unlike Ms. Helton, Ms. Haynes had not completed compliance school, and she neither had any training or experience with banking compliance at that time.

46.

During this time, Defendant also removed Ms. Helton's access to certain electronic tools and record-keeping programs. As a result, Ms. Helton had to notate compliance issues and

necessary changes to accounts by hand, which was extremely inefficient and caused Ms. Helton to experience frustration as she simply attempted to perform her job.

47.

It became even more clear that Defendant was trying to push Ms. Helton out when Defendant reassigned Ms. Helton's loan portfolio to other officers in the first week of October 2019. Which, given that this was the week before Ms. Helton was terminated, would suggest that Defendant was already planning to fire Ms. Helton, and the reason provided was pretextual.

48.

As the designated Compliance Officer, one of Ms. Helton's duties was to review Defendant's electronic records to ensure that the information contained therein was consistent with the agreement underlying a customer's loan.

49.

Similarly, Ms. Helton was required to ensure that the electronic system applied customers' payments in the manner consistent with agreement. Specifically, she had to ensure that overpayments were applied to principal, interest, escrow, and late fees in a manner consistent with the loan agreement.

50.

By October 2019, there had been a number of discussions between Ms. Helton and Ms. Haynes concerning changes that Ms. Helton believed needed to be made to the payment sequences for numerous loans.

Case 5:21-cv-00404-MTT Document 1 Filed 11/12/21 Page 12 of 22

51.

Before Ms. Helton raised the issue with Ms. Hayes, Ms. Helton had sent several emails to both the bank's president and the Chief Information Officer to seek their clarification. However, these men refused to respond to Ms. Helton's emails.

52.

Because she did not get a response, Ms. Helton was able to verify with a member of Defendant's Compliance Committee that the approach that Ms. Helton intended to suggest to Ms. Haynes was indeed the correct and appropriate approach.

53.

When Ms. Helton asked Ms. Haynes to make changes to the sequence of payments, Ms. Haynes flatly refused.

54.

Indeed, Ms. Helton and Ms. Haynes had a disagreement concerning this compliance issue. However, there is nothing to suggest that Ms. Helton's conduct was anything less than professional or that she had been rude, disrespectful, abusive, or even that she used any inappropriate language.

55.

When Ms. Haynes described this discussion, purportedly on the same day, she merely stated that Ms. Helton kept "fussing about the payment collection sequence for the loans" and further.

56.

Ms. Helton had indeed asserted herself during her attempts to ensure that the bank was in compliance with its loan agreements with its customers.

57.

Ms. Helton was certainly frustrated by the dispute and the fact that Ms. Haynes, a subordinate employee, refused to comply with Ms. Helton's directives. As a result, she calmly stepped away from the conversation, collected a few of her personal belongings, and left the bank to take an early lunch break.

58.

Ms. Helton decided that the disagreement was not worth her time, and a few minutes after she excused herself from the conversation with Ms. Haynes, Ms. Helton sent an email to Ms. Haynes from her mobile phone, stating, "[h]ey after thinking about it, this is not a compliance issue so don't worry about making that change. I won't check that part anymore. I will just do the exceptions on the loan code sheet and documents that go with the real estate loans. This will keep it simple."

59.

However, two days later, on October 9, 2019, the bank president called Ms. Helton into a meeting with the Human Resources Manager. Mr. Bibb did not ask Ms. Helton anything about the conversation or for her side of the story. Instead, the bank president told Ms. Helton that her conversation with Ms. Haynes had made another employee "feel uncomfortable."

60.

At that time, Mr. Bibb said to Ms. Helton, "I don't know what we're going to do about your *attitude*."

61.

This conversation occurred merely twelve days prior to Ms. Helton's thirty-first anniversary of working for Defendant.

62.

However, Ms. Helton would not make it to that milestone as Mr. Bibb advised Ms. Helton that she was being fired, effective immediately.

63.

At that time, Defendant attempted to coerce Ms. Helton into signing a "Resignation and Transition Agreement."

64.

This severance agreement would have required Ms. Helton to waive and release her claims of discrimination based on her age and sex.

65.

In exchange for this release, the severance agreement would have allowed Ms. Helton to continue receiving her salary and health insurance until a little over two months later when such payments would end on December 31, 2019.

66.

However, what Defendant tried to force Ms. Helton to sign was not actually a severance agreement. Defendant wanted Ms. Helton to continue working, including to train the employee who would be replacing her, during the entire time that Defendant continued to compensate Ms. Helton.

67.

Defendant threatened Ms. Helton, telling her that, if she did not sign the severance agreement, she would not receive the pension that she would have otherwise been entitled.

68.

At that time, Ms. Helton knew that she had been discriminated against based on her age and because Ms. Helton did not conform to the stereotypes held by Defendant concerning how its female employees should behave. As a result, she refused to sign the severance agreement and waive her claims against Defendant.

69.

Defendant's personnel policies provide the following:

If an involuntary termination is due to reasons other than for lack of work, such as insubordination, failure to follow instructions, inability to perform job requirements, attendance, malfeasance, or a situation where the employee violated bank policy or showed disregard for the best interests of the bank, [Defendant] will generally not pay severance pay.

70.

Defendant's desire for Ms. Helton to continue working under the terms of the severance agreement, along with the payment of a severance itself in light of Defendant's policies, suggests that Ms. Helton was not terminated for any misconduct or failure to perform her job.

71.

Defendant's stated reasons for terminating Ms. Helton are false, and instead, she was fired because of her age and because she did not conform to Defendant's stereotypes concerning how it expected its female employees and officers to behave.

72.

Defendant ultimately replaced Ms. Helton with a female who was not known to be strong willed or assertive.

73.

Ms. Helton's replacement was nearly thirty years her junior.

Procedural/Administrative Background

74.

In December 2019, Ms. Helton made initial contact with the Equal Employment Opportunity Commission (hereinafter, "EEOC").

75.

On or about January 6, 2020, Ms. Helton submitted her Charge of Discrimination to the EEOC, alleging that she had been subjected to discrimination based on her age and sex. The EEOC assigned Ms. Helton Charge Number 410-2020-00723.

76.

Defendant had actual notice of the EEOC Charge, participated in the administrative proceedings, and was represented by counsel at that time.

77.

Ms. Helton subsequently requested that the EEOC issue a "Right to Sue letter."

78.

On August 16, 2021, the EEOC issued its Notice of Right to Sue, which Ms. Helton received, through counsel, on the same day.

79.

Ms. Helton has exhausted her administrative remedies as to the claims in her Charge of Discrimination, and she is filing the instant action within ninety days of the EEOC's issuance of the Notice of Right to Sue.

## COUNT I:
## WRONGFUL TERMINATION IN VIOLATION OF
## THE AGE DISCRIMINATION IN EMPLOYMENT ACT

80.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 79, as if the same were set forth herein.

81.

Pursuant to the Age Discrimination in Employment Act, it is unlawful for an employer to discriminate against any individual with respect to the compensation, terms, conditions, or privileges of his or her employment because of such individual's age. 29 U.S.C. § 623.

82.

As alleged herein, Defendant has routinely treated its older employees less favorably than those who are younger. Specifically, Defendant has a history of terminating, including laying off, its older employees, and when so doing Defendant attempts to have the separated employee waive and release any claims of discrimination.

83.

Plaintiff is between the ages of forty and seventy.

84.

As alleged herein, Plaintiff was qualified for the positions of Vice President and Compliance Officer. Plaintiff had been performing the duties and responsibilities of her positions, and her performance was exemplary.

85.

On October 9, 2019, Defendant terminated Plaintiff's employment.

86.

Even if the reasons that Defendant gave for the termination were true, which they are not, Defendant has failed and refused to take similar adverse actions against similarly situated, younger employees who purportedly engaged in the same conduct as Plaintiff.

87.

Defendant replaced Plaintiff with someone who is significantly younger than Plaintiff and who is under the age of forty.

88.

Defendant will be unable to present any evidence of a legitimate, nondiscriminatory motive for terminating Plaintiff's employment and for otherwise treating Plaintiff less favorably than her coworkers who were younger than Plaintiff.

89.

Plaintiff will prove that the Defendant's stated reasons are pretextual, and that Defendant's actions were willful and indeed motivated by Plaintiff's age.

90.

Plaintiff has been injured by Defendant's discrimination based on age, and she is entitled to all damages allowed under the Age Discrimination in Employment Act, including back pay and all fringe benefits of her employment, including but not limited to health, dental, and vision insurance, accrued paid leave, contributions to a 401(k) plan and pension benefits, front pay or reinstatement, injunctive relief, liquidated damages, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT II:
## WRONGFUL TERMINATION
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

91.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 79, as if the same were set forth herein.

92.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discharge any employee on the basis of sex. *See* 42 U.S.C. § 2000e-2(a).

93.

"In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989).

94.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively. *See* 42 U.S.C. §§ 2000e & 2000e-1.

95.

Plaintiff is a member of a protected class in that she is female.

96.

Defendant values and rewards its male employees and officers who exhibit assertive traits or are considered strong-willed. Moreover, Defendant has a history of failing and refusing to address its male employees and officers when they conduct themselves in an aggressive, hostile, abusive, or even offensive way.

97.

Defendant also has a history of taking adverse actions, including demotion and termination, against female employees or officers who are assertive or considered by Defendant as being strong-willed. In such situations, Defendant often cites its female employee's "attitude" as the reason for taking such adverse action.

98.

Plaintiff's job performance during her nearly thirty-one year tenure working for Defendant was exemplary.

99.

Before she was terminated, Plaintiff acted assertively in the performance of her duties on several occasions.

100.

However, as alleged herein, Plaintiff's conduct was neither aggressive nor inappropriate for the workplace.

101.

At the time of her termination, Defendant explicitly referenced Plaintiff's "attitude."

102.

When Defendant terminated Plaintiff, Defendant was acting on the basis of a belief that a woman was unable to act in an assertive manner in the performance of her duties, or in the alternative, that a woman must not be assertive.

103.

Defendant terminated Plaintiff's employment on October 9, 2019, due to Defendant's notions of sex stereotyping.

104.

Accordingly, Defendant terminated Plaintiff's employment on October 9, 2019, specifically on the basis of her sex.

105.

Plaintiff will prove that Defendant's stated reasons for terminating Plaintiff's employment are inaccurate and were instead pretext to hide Defendant's discriminatory animus based on sex.

106.

Plaintiff has been injured by Defendant's wrongful termination of her, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including an award of back pay and all fringe benefits of her employment, including but not limited to health, dental, and vision insurance, accrued paid leave, contributions to a 401(k) plan and pension benefits, reinstatement and/or front pay, compensatory and punitive damages in an amount of not less than $300,000.00, or such other amount as limited by statute, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Debra Helton respectfully prays for the following relief:

1) That Summons and Process be issued to Defendant The Geo. D. Warthen Bank, and that said Defendant be served as provided by law;

2) That this matter be tried before a jury;

3)     That judgment be awarded for and in favor of Plaintiff Debra Helton and against

Defendant The Geo. D. Warthen Bank on Count I for discrimination based on age, and grant

Plaintiff all relief allowable under the Age Discrimination in Employment Act;

4)     That judgment be awarded for and in favor of Plaintiff Debra Helton and against

Defendant The Geo. D. Warthen Bank on Count II for discrimination based on sex, and grant

Plaintiff all relief allowable under Title VII of the Civil Rights Act; and,

5)     For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 12th day of November, 2021.

KENNETH E. BARTON III
Georgia Bar No. 301171
*Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com

## Table of Contents

*Welcome Letter*........................................................................................................................**5**

*Preface* ....................................................................................................................................6

Service to Customers ...............................................................................................................7

*Customer Relations* .................................................................................................................**7**

*Our Employee Relations*...........................................................................................................8

General Policy and Procedure...................................................................................................8

Our History ...............................................................................................................................9

### Section 1: Employment Policies and Procedures

Equal Employment Opportunity.............................................................................................11
Harassment: Sexual, Racial, Religious, Age ...........................................................................11
How and Why You Were Selected...........................................................................................12
Training and Development......................................................................................................12
Introductory Period –First 90 Days........................................................................................12
Employee Definitions..............................................................................................................13
Transfers and Career Opportunities.......................................................................................13
Complaint Procedures.............................................................................................................13
Nepotism Policy......................................................................................................................15
Length of Service....................................................................................................................16
    Discharge..........................................................................................................................16
Termination.............................................................................................................................16
    Exit Interviews...................................................................................................................16
    Return of Bank Property....................................................................................................17
    Resignation........................................................................................................................17
Work Schedules.......................................................................................................................17
    Time Records.....................................................................................................................16
    Lunch ................................................................................................................................17
    Overtime............................................................................................................................18
Wages and Salaries.................................................................................................................19
    Payday...............................................................................................................................19
    Your Payroll Deductions....................................................................................................19
    Bonuses.............................................................................................................................20
Checking Accounts..................................................................................................................20
Travel and Expense Reimbursement.......................................................................................20
Employee Parking....................................................................................................................21
Code of Ethics.........................................................................................................................21
    Conflict of Interest............................................................................................................21

1

DEFENDANT'S
EXHIBIT
3 Helton
6/8/22  SB
PENGAD 800-631-6989

GDWB 000376
Def Ex. 3

Employee Indebtedness...............................................................................................21
Staff Lending Program................................................................................................22
Credit Cards..............................................................................................................23
Personal Finances......................................................................................................23
Confidential Information.............................................................................................24
Outside Employment..................................................................................................25
Gifts and Fees............................................................................................................25
Political Contributions and Activities...........................................................................25
Business Conduct.......................................................................................................26
Customer Referral......................................................................................................26
Fiduciary Appointment...............................................................................................26
Visitors, Friends and Children...........................................................................................27
Voting...............................................................................................................................27
Progressive Discipline.......................................................................................................27
Substance Abuse...............................................................................................................28
Definitions.................................................................................................................28
Pre-employment Drug Testing.....................................................................................28
Policy........................................................................................................................29
General Procedures...............................................................................................29
Employee Drug and Alcohol Testing Only for Cause.................................................29
Grounds for Termination or Discipline....................................................................29
Failure to Consent to Tests....................................................................................30
Failure to Test Negative........................................................................................30
Authority...................................................................................................................30

## Section 2:  Your Employee Benefit

Your Vacation/Personal Days..............................................................................................32
Scheduling Vacation....................................................................................................33
Vacation Pay..............................................................................................................33
Holidays...........................................................................................................................34
Sick Leave.........................................................................................................................34
Saturday Time...................................................................................................................35
Education..........................................................................................................................35
Health Care/Insurance Plan...............................................................................................36
Life Insurance...................................................................................................................36
Disability...........................................................................................................................36
Social Security and Medicare.............................................................................................36

## Section 3: Leave of Absence

Family and Medical Leave...................................................................................................38
Eligibility for Family and Medical Leave.......................................................................38
Types and Duration of Leave........................................................................................38
Scheduling Family and Medical Leave...........................................................................39
Certification of Leave..................................................................................................40

GDWB 000377

Pay During Leave...........................................................................................................................40
Benefits During Leave....................................................................................................................41
Duties of the Employee.................................................................................................................41
   Notice Requirements...............................................................................................................41
   Failure to Return from Leave...................................................................................................41
   Returning from Leave..............................................................................................................41
   Reinstatement........................................................................................................................42
Minimum Medical Leave Policy.....................................................................................................42
Bereavement Leave.............................................................................................................................43
Jury Duty Pay.......................................................................................................................................43
Military Service Leave for Active Duty.................................................................................................43
Reemployment Rights...................................................................................................................44
Reemployment Requirements.......................................................................................................44
Benefit Rights During Military Leave.............................................................................................45
Pay During Military Leave..............................................................................................................45
Endorsement.................................................................................................................................45
Discrimination...............................................................................................................................46

## Section 4: Your Responsibility to the Bank

Job Duties............................................................................................................................................48
Attendance..........................................................................................................................................48
Your Personnel Record........................................................................................................................49
Accidents.............................................................................................................................................50
Driving on Bank Business.....................................................................................................................50
Telephone Etiquette.............................................................................................................................50
Cell Phones..........................................................................................................................................51
Computer Usage...................................................................................................................................51
Appearance..........................................................................................................................................51
Casual Friday........................................................................................................................................53
Rumors.................................................................................................................................................55
Care of Equipment...............................................................................................................................55
Housekeeping and Office Appearance..................................................................................................55

## Section 5: Security and Work Rules

Health and Safety.................................................................................................................................57
Lost and Found....................................................................................................................................57
Improper Conduct................................................................................................................................57
Security................................................................................................................................................59
Searches...............................................................................................................................................59
Entering and Leaving the Building.................................................................................................59
Keys...............................................................................................................................................60
In the Event of a Robbery..............................................................................................................60
In the Event of a Bomb Threat.......................................................................................................61
In the Event of a Fire.....................................................................................................................61

GDWB 000378

Disaster Recovery/Resuming Business Operations.................................................................62
    Preparation.....................................................................................................................62
    The Disaster...................................................................................................................62
    Recovery.........................................................................................................................63
Acknowledgement Statement................................................................................................64

GDWB 000379

**Welcome to The Geo. D. Warthen Bank family!**

This handbook outlines personnel policies, benefits, and standards that should help you feel more at home. This is your personal guide to policies that we developed to reach our commitment to excellence in the banking business, to provide the environment employees need to do their job effectively and achieve job satisfaction. You should study the handbook carefully from time to time.   You will receive new pages and updates to insert, so we suggest that you keep this booklet convenient for ready reference.

Perhaps some statements will need clarification.   Personnel in your Human Resources Department will explain policies and assist you in any way possible.

The public looks upon every employee as a representative of the bank.  This is true regardless of whether your job brings you into direct contact with our customers.  We are confident that you will do your part in maintaining our high quality of service to our customers and the community.

I hope you will like being a member of the Geo. D. Warthen Bank family.  Management will do all we can to make your employment a happy and satisfying experience.

Sincerely,


The Geo. D. Warthen Bank
Chris F. Irwin, III, CEO

5

GDWB 000380

We are happy that you have joined our bank family. As you learn more about the banking business, we hope you will find The Geo. D. Warthen Bank a fertile field for the development of your talents.

Our progress depends directly on you and your fellow employees' contributions, measured by the effort exerted and the results achieved. You, in turn, will be directly affected by your contribution to our progress, both in salary and advancement. Your conduct, character, dress, speech, and manners all affect the bank. Remember to take pride in yourself, your job, and your organization.

The bank's purpose in using this manual is to help ensure that each employee will be treated fairly, equally, with dignity, as an individual, and as an important part of the bank. *Although this manual contains human resource policies for the bank, it is not an employment contract. None of the provisions of this handbook are meant to guarantee employment for any specific duration.* As such, these policies are guidelines, and the management of the bank reserves the right to change and interpret them. Although we hope you are happy here, all employees have a right to resign if it is in their best interest. The bank has a commensurate right to take actions in the bank's best interest. *In other words, the bank is an employment-at-will employer.*

This handbook is designed so all employees may be aware of the policies of the bank in matters that pertain to them. Employees should feel free to discuss its contents with the Human Resources Department.

Attitudes, environments, and society are in a constant state of change. The bank must keep pace with these changes and encourage suggestions from its employees regarding employment policies. All policy changes will be reviewed and approved by the Board of Directors.

The rules and policies stated in this handbook are guides and do not cover every possible situation. This manual contains the authorized employment policies and procedures and renders obsolete any other versions. Management reserves the right to exercise its discretion as needed.

This handbook is the property of The Geo. D. Warthen Bank and intended solely for the use by the bank, its managers, and its employees. Distribution to anyone outside the bank requires the prior approval of the president or human resources manager.

GDWB 000381

## SERVICE TO CUSTOMERS

Cultivating the goodwill of our customers requires the teamwork, customer sensitivity, and cooperative effort of every department and every member of our staff.  We must first understand our customers and their needs.  The most important part of our customer relations program starts when we persuade new customers that we can meet their banking needs.  This is because our main product to sell is service, and we are judged not by what we say about it, but how we actually deliver it.

The Geo. D. Warthen Bank has many products and services to offer individual and business customers, many of which can be tailored to fit the special needs of the person or organization.

You should have a basic knowledge of all of the bank's services even if you do not work with them every day.  You can help to sell the bank's products at any time.

Other banks offer the same services we do.  So, good customers can simply move their business if they become dissatisfied.  Therefore, understanding and meeting our customer needs are essential.  Whether you deal directly with customers or not, the way you do your job influences the opinions of our customers.  At the bank, service includes the following actions:

> ➢ Seek the customer out; do not wait for the customer.
> ➢ Smile and say hello.
> ➢ Address the customer by name at first opportunity.
> ➢ Ask how you can help the customer.
> ➢ Satisfy the customer's need or escort the customer to someone who can meet the need.
> ➢ Say "Good to see you, Mr. or Ms. _____."

**To the customer, you are the bank.**

## CUSTOMER RELATIONS

You are expected at all times to conduct yourself in a professional manner.  Cooperate cheerfully with personnel in your department and in other departments.  Customers know when our team is cooperating.  Always be courteous, considerate, and congenial in any contact with the public.

Maintaining a reputation for quality, integrity, and services is our primary objective.  In your contacts with customers, you represent the bank.  We have everything to gain by being courteous, friendly, and helpful.

7

No matter what work you do at the bank, it is important to our basic objective of providing quality service to our customers.   The customers will appreciate your contribution.

## OUR EMPLOYEE RELATIONS POLICY

We cannot meet our customer needs without a complete team of employees.  To attract and retain this team of employees, we have developed the following employee relations policy.

The objective of our employee programs is to build one of the most competent, harmonious teams in banking.  Teamwork involves effort and cooperation by management and every member of our organization.

With that philosophy in mind, we have developed the following homework to our employee relations policy.  Please consider that to protect the bank and its employees' interests, business is always a primary consideration.

- We value each employee as an individual. "Courtesy," "dignity," and "consideration" are key words for how we should treat each other.
- We believe our best resource is a team of well-trained, efficient, and loyal employees.
- We will provide competitive wages and benefits, and good working conditions.
- We encourage frank, open discussions, and constructive comments.
- Where feasible, we will promote from within.
- We will encourage equal opportunity employment to broaden our choices of qualified candidates.

## GENERAL POLICY AND PROCEDURE

As employees of the bank, we assume a duty to the bank, its customers, its stockholders, and our fellow employees. This duty is to act in all matters in a way that will encourage public trust and confidence.  This extends to both personal and professional activities.

All bank employees will be governed by two fundamental principles:

1. Bank employees will place the interests of the bank ahead of their own private interests when conducting bank business.

2. Bank employees will make full disclosure of any situation that may appear to be a potential conflict of interest.

If any employee believes that extenuating circumstances will justify participation in an activity that may be in potential conflict with this policy, the employee may request an exception from bank management or the board of directors.

8

GDWB 000383

## OUR HISTORY

Shortly after returning from the Civil War, Mr. Geo. D. Warthen entered the mercantile business in partnership with Jeff A. Irwin, Sr. and began business in a building on West Haynes St. (present location of Hair Force)

In 1871, a rear corner of the building was partitioned off and they entered the banking business under the name of Warthen & Irwin, Bankers, private bank, not incorporated.

This firm grew and continued to operate until 1915, at which time Mr. Jeff A. Irwin, Sr. withdrew from the partnership.  Subsequently, Mr. Warthen operated under the name of The Geo. D. Warthen Bank, private bank, not incorporated, until his death in 1927.

Early in 1928, a state banking charter was obtained and the bank continued to operate as The Geo. D. Warthen Bank.  In 1932, a national charter was obtained and the bank's name became The Geo. D. Warthen National Bank.  The bank continued to operate as a national bank until the mid-fifties, when the national charter was surrendered and new state charter obtained.  The bank has operated as a state chartered bank since that time.

Today the bank is the oldest in Washington County and enjoys a reputation as a leading business both in the county and surrounding area.

GDWB 000384

# Section 1:

# Employment Policies and Procedures

GDWB 000385

## EQUAL EMPLOYMENT OPPORTUNITY

The Geo. D. Warthen Bank is an equal opportunity employer. It is the bank's policy to grant equal employment opportunity (EEO) to all qualified persons without regard to race, sex, religion, age, national origin, physical or mental disability, or veteran's status. The bank provides equal opportunities in employment, promotion, wages, benefits, and all other privileges, terms, and conditions of employment. It is our policy to make reasonable accommodations for the disabled. We will endeavor to concentrate on the disabled person's abilities and not disabilities. This policy has the support of the highest levels of management.

## HARASSMENT: SEXUAL, RACIAL, RELIGIOUS, AGE

The bank does not approve of harassment and feels harassment of any kind is not productive and does not belong in a work setting. Any individual who is subject to verbally abusive language relating to sex, race, religion, or age or who experiences sexually oriented physical touching is expected to report it immediately to the human resources representative or to the manager with whom the employee is most comfortable. Any individual who is aware of such verbally, physically, or visually abusive, hostile, or offensive conditions, as described in this section, should report such activity immediately.

Senior management will:

1. Initiate an investigation of the allegations within 24 hours of receiving a complaint. The investigation will consist of an initial interview with the complainant and a written record of the complaint, and interviews with the individual who is accused and any other employee who might have information regarding the incident. All discussions will be confidential.

2. Protect the identity of the person reporting the harassment.

3. Take prompt actions to ensure that the reported harassment will not occur in the future. These actions will include:

   a. If the allegations are found to be true, appropriate disciplinary action, up to and including termination will be taken against the offending party.

   b. If the allegations are found to be false, no action will be taken against the alleged party and no notation will be made in the party's file. If a false complaint is determined to be in any way malicious or meant to do harm to the bank or the alleged offender, appropriate discipline will be taken to maintain the effectiveness of this complaint procedure.

11

GDWB 000386

If sufficient evidence is not discovered to support or deny the allegations, both parties will be advised. Every effort will be made to ensure that the alleged events will not occur again.

4. Ensure that in the event of harassment or retaliation against the person filing the complaint or the alleged offending party, the employee responsible for the harassment or retaliation will be subject to disciplinary action up to and including termination.

5. Ensure that these matters are dealt with in the most confidential manner possible to protect the best interest of all parties.

6. Attempt to ensure that no one will suffer from false accusations.

## HOW AND WHY YOU WERE SELECTED

The bank's success and your future job security depend to a large degree upon you. That is why we carefully select our employees through the use of a written application, an interview, and thorough reference and background check.

Our purpose in being this thorough is to find employees who want to do a job well. We need people who can accomplish their work with good abilities and are comfortable working in our offices.

## TRAINING AND DEVELOPMENT

We ask that all employees strive to continue learning new and better ways to do their job. Please ask your supervisor and fellow employees about things you do not understand. If you feel a course would help you do your job better, please let your supervisor know. If you see a better or more efficient way to do something, talk with your coworkers and supervisor. Your suggestions will be considered, but all changes must be approved by proper authorities.

## INTRODUCTORY PERIOD — FIRST 90 DAYS

A 90-day introductory period exists for newly hired and promoted employees. Management may, at its sole discretion, extend the introductory period. During the introductory period, you will have an opportunity to demonstrate whether you can meet the job requirements and can determine whether you like working here.

Introductory employees may resign or terminate at any time. The existence of the introductory period is a training period and in no way limits the bank's ability to discipline employees during or after an introductory period. **We are an employment-at-will employer.** Please refer to the Leave and Benefits Sections to determine your benefit eligibility.

12

## EMPLOYEE DEFINITIONS

The following are definitions of different employment categories at the bank:

1.   **Regular full-time:** Employees who are regularly scheduled for at least 30 hours in a one-week pay period.

2.   **Regular part-time:** Employees hired to work fewer than 30 hours in a one-week pay period.   Part-time employees are hired for an indefinite period.

3.   **Temporary:** Employees hired for period known to be less than six months.  Temporary employees are not eligible for benefits.

4.   **Leave of absence:** Employees on an approved leave for family and medical, military, or similar purposes.

Except for benefits eligibility, which is discussed in further detail later in this handbook, the policies and procedures described in this handbook apply to all of the employment categories.

## TRANSFERS AND CAREER OPPORTUNITIES

Career opportunities are provided to all employees through promotion, transfer, and other job changes.  Job postings communicate to employees the availability of jobs for which they may apply based on their qualifications, including education skills, work experience, past performance, attendance, and length of service.  Outside applications for employment may be sought by such methods as advertisements at the same time jobs are posted internally.

The most qualified candidate will be chosen.  Internal candidates will be given preference when equally qualified.  When transfers are requested, the primary consideration will be whether the transfer is in the best interest of the bank.

## COMPLAINT PROCEDURE

The sole purpose of our complaint procedure is to help you work out any complaint or problem you might have to the satisfaction of both you and anyone else concerned.  Remember, the only way we can understand and help you with your problems or complaints is if you give us a chance to talk with you about them.

This complaint procedure may be used by all employees who have any complaints about pay, working conditions, supervision, coworkers, or any other job-related problems.  Problems dealing with discrimination or harassment are dealt with in a previous section of this handbook.

13

GDWB 000388

Here is how the procedure works:

1. First, talk with your supervisor within two work days of the occurrence of the problem. If your problem is with your supervisor, omit this step and go directly to step 2.

2. If you have not received a satisfactory resolution from your supervisor within five days of discussing your complaint, talk with the human resources department within the next five-day period. The human resources department will make every attempt to give you an answer within five days of your having contacted them.

3. If you are not satisfied with the response from the human resources department, please talk with the president within five days after you receive the response. The president will make every attempt to get back with you within five days of the conversation with you. Any decision made by the president will be the final decision.

The times described here are guidelines. Keep in mind that circumstances might prevent management from meeting the exact guidelines provided.

Please remember that this complaint process works only if you use it.

14

GDWB 000389

## NEPOTISM POLICY

The Geo. D. Warthen Bank recognizes the possibility that both positive and negative consequences exist when hiring members of the same family. It is our philosophy that the hiring of family members should not be a yes or no situation but rather a decision guided by a number of job-related factors and circumstances. Factors that will be considered include: reporting to a family member; working in the same department; reporting to the same supervisor; uniqueness of and/or the bank's need for the individual's skills; and meeting the job requirements.

To ensure that these and other important factors are considered, any supervisor or manager who wishes to hire a person related to a current or previous employee, must obtain written approval from management prior to a job offer being discussed or made with the individual.

Employment of married couples is prohibited.

GDWB 000390

## LENGTH OF SERVICE

We believe in recognizing your seniority and length of service. If there is no break in service, your seniority date is your date of hire. If there is a break in service, you will be assigned a seniority date that will give you credit for the total time worked but not for the time you did not work. Your seniority is important to you and the bank because:

- ✓ It enhances your ability to perform your job and your ability to be promoted to other jobs.
- ✓ Seniority increases certain benefits, such as vacation.

## DISCHARGE

Advance notice is not normally given in discharge cases. If an involuntary termination is due to reasons other than lack of work, such as insubordination, failure to follow instructions, inability to perform job requirements, attendance, malfeasance, or a situation where the employee violated bank policy or showed disregard for the best interest of the bank, we will generally not pay severance pay. All severance pay is subject to management's discretionary review of the facts.

## TERMINATION

Whether an employee resigns or is discharged, please remember that we operate under an employment-at-will policy, as outlined in the preface of this handbook.

The following policies also relate to resignations and terminations:

- ➢ All references must come from the human resources department.
- ➢ Supervisors are not permitted to provide references in any form. Please do not ask.
- ➢ Personnel leaving in good standing may receive favorable consideration for reemployment if they wish to return at a later date.
- ➢ Personnel leaving between pay periods will be paid on the next regular payday. (Please see the payroll section for additional details.)
- ➢ Where permitted by applicable laws and to the extent possible, the bank will withhold from the employee's check or final paycheck the cost of any items that are not returned when required.

## EXIT INTERVIEWS

An employee leaving the bank for any reason, whether at the decision of the bank or at the request of the employee, may want to request an exit interview. If appropriate and if time is

16

available, an exit interview will be conducted by using an exit interview form as a guide. The reason or reasons for leaving and beliefs about how the bank might improve will be addressed in the interview.

## Return of Bank Property

All bank property must be returned to the human resources department before leaving the bank. This includes any credit cards, keys, employee handbook, and any bank equipment or property in your possession. We require that arrangements be made concerning any outstanding debts owed to the bank, or to you, such as travel advances, mileage, etc. before the last day of work. Any employee checking account, overdrafts, MasterCard and VISA accounts, bank loans, or other bank relationships will automatically be converted to a nonemployee status.

## Resignation

We hope that your employment experience at the bank will be successful and rewarding. However, you may elect to leave us for any reason. Sometimes personal or other concerns force a change in jobs.

If you are thinking of resigning or seeking other employment, please talk with your supervisor or the human resources department. A two week notice is preferred if possible.

Sometimes, an employee is discharged for other reasons, such as violating a bank rule or policy. We do not anticipate this happening often. If you are discharged and believe you have been treated unfairly, you may appeal to the human resources department or the president. You also have a right to provide a letter that will be placed in your personnel file stating your opinions.

## WORK SCHEDULES

The regular work week for full-time employees is 40 hours. However, because of our need to meet our customers' requirements, your work schedule may vary from time to time. You are hired with the understanding that your work hours may be decreased when work is slow or increased during peak periods. Hours also vary in case of an emergency. Your regular work schedule is set by your supervisor.

Periodically, we may schedule meetings that do not fall within your normal working hours. Such staff meetings are designed to provide information to you about the bank, its procedures and your benefits. These meetings are voluntary unless you are otherwise notified, but you should make every effort to attend so you can learn and grow with the bank.

17

## Time Records

For nonexempt employees, the laws and regulations are very strict about recording the exact number of hours that these employees work. Nonexempt employees are those employees who are not specifically exempt under the Fair Labor Standards Act (FLSA).

Exempt employees are not required to keep time records. These are employees who are defined by the FLSA as executives, administrators, outside sales persons, or professionals.

If you are a nonexempt employee (not an executive, administrator, etc.), it is your responsibility to keep a time report on a daily basis and to make sure it is accurate.

A time record is very important because the information on it is used for payroll computation and gives you an accurate record of your earnings. Please be sure to record the exact time you begin your work each morning and the time you complete work each evening. Also, record any other time you leave the building or take lunch or breaks other than those outlined below.

Fill out your time record each day. Each person is responsible for his or her own time record. Do not complete anyone else's time record.

When leaving work on the last day of the week, please review your time record carefully to see that all hours of work are properly recorded. Time records must be submitted to the human resources department by all nonexempt employees. Be sure your name appears on the time record just as it does on your pay check. Your signature and that of your supervisor certify the accuracy of the time recorded.

If you make an error on your time record, please notify your supervisor at once. Your supervisor will make the correction, and both you and your supervisor will initial it.

## LUNCH

Your work and lunch schedule will be set by the department supervisor. Lunch time is not counted as time worked.

## Overtime

If overtime is required, please cooperate with your supervisor. Working assigned overtime is a condition of employment. Overtime work will be distributed as equally as possible.

No overtime work is authorized except at the request of your supervisor. All hours worked over 40 per week are paid at the rate of one and one-half times your regular hourly rate for all eligible employees. Overtime should not be a regular and continuous practice in any area or department.

18

GDWB 000393

## WAGES AND SALARIES

We regard wages and salaries as a confidential matter between you and the human resources department. Management feels strongly that it is not in the best interest of employees to discuss their compensation with anyone but their supervisor or the human resources department. Employees who gain unauthorized access to other employees' salaries or private financial data will be subject to disciplinary action up to and including termination.

It is our policy to pay wages and salaries that are competitive with those paid for similar jobs in our surrounding area. We maintain the accuracy of our wage and salary structure by periodically checking what the competition pays. We also comply with, as necessary, the business and general economic conditions of the industry.

Your compensation is based on several factors, such as the education, experience, responsibility required to do your job, and your performance. All employees' performance will be reviewed annually.

You will be considered for a pay increase if you are meeting expectation and if the economic position of the bank allows it. The amount of your increase will vary depending on your performance, your position, and your current placement in your salary range. If a salary increase is not awarded, you will be told why. A special review may be set up later.

Formal performance reviews summarize discussions between you and your supervisor about improving the quality and quantity of your work and your level of customer service. During your review, your supervisor will discuss your performance and development openly with you. Please initiate talks with your supervisor to see how you are doing and to see what you can do to improve your performance.

### Payday

All employees will be paid by direct deposit weekly following the end of each pay period.

### Your Payroll Deductions

Your paycheck will not represent the full amount of your earnings due to payroll deductions. As an example, we are required to deduct your federal withholding tax (income tax) from your paycheck. The deducted amount is forwarded to the U.S. Treasury, and you are given credit for it on your income tax at the end of the year. The amount of the tax deduction is determined by your earnings, marital status, and the number of dependents you claim. Each year, you will receive a W-2 form showing your total earnings for the prior year and the amount of deductions withheld.

19

Social Security and Medicare deductions will come out of your paycheck at the rate established by law. As you probably know, this rate can change from time to time, depending on Congressional action. The bank matches dollar for dollar the amount of Social Security and Medicare tax you pay. All other deductions must be authorized by you and will appear on your pay voucher.

The bank allows employees to have automatic deductions deposited to their savings account, Christmas club, or other accounts. You should discuss these deduction options with the human resources department.

### Bonuses

The bank does not pay bonuses as a benefit or as a matter of routine policy. However, the board of directors may, in a profitable year, elect to pay a bonus to officers or employees at the board's discretion.

### CHECKING ACCOUNTS

As an employee of the bank, you will be provided with a checking account with no service charge. The new accounts supervisor can help you select the right account for you. Basic styles of checks are furnished to you free of charge. Payroll deposits will automatically be made into your account. The account may be held jointly with another person if you desire.

All employee accounts must be maintained in strict accordance with bank rules and regulations. Do not attempt to bypass proper banking procedures or use your position with the bank to delay or defeat a valid financial obligation.

Abuse of an account may result in returning of all future checks presented against insufficient funds, cancellation of checking privileges, payment through a savings account with no checking privileges, or more serious disciplinary action.

### Travel and Expense Reimbursement

Authorized travel by employees will be reimbursed at the current rate-per-mile allowance established by the IRS for the use of a personal car. Employees, who at the request of management, report to a location other than their normal office, may file for reimbursement for the mileage commuted in addition to their normal commuting distance. Please discuss with the human resources department the types of travel and expenses that are eligible for reimbursement before traveling or incurring expenses. The bank will normally reimburse reasonable out-of-pocket business expenses. Large expenditures, such as conferences and out-of-town trips, should always be approved in advance.

20

GDWB 000395

## Employee Parking

A designated employee parking area has been provided for bank employees.  As a courtesy to our customers, do not park in the customer parking spaces during banking hours.  Keep your vehicle locked.  The bank is providing free parking but is not liable for damage occurring to your car while parked at the bank.

If you must work late at the bank, please move your car during daylight hours to a space near a well-lit exit close to the building.  Keep your car locked when practical, and exit the building in groups after hours.  Have your keys in your hand.

## CODE OF ETHICS

The bank's reputation for honesty and integrity is determined by the personal reputations of our individual staff members.  To protect this reputation and to warrant our customer's trust, each of us must strive to avoid situations that might cause a conflict of interest among the bank, its customers, its suppliers, and ourselves.  The following principles have been established as the bank's code of ethics.  Any exceptions to these policies must be approved in writing.

## Conflict of Interest

It is the policy of the bank that all staff members conduct their business affairs in such a manner and with such ethics and integrity that no conflict of interest, real or implied, could exist.  Avoid developing a personal relationship with an employee that will interfere with your impartial judgment in bank matters.

### Extension of Credit to Relatives and Business Associates
**No employees shall not make or approve loans to any bank, partnership, estate, trust, association, or other entity or person in which they have an interest directly or indirectly (whether as a director, officer, shareholder, manager, lender, joint venture, or other otherwise controlling investor), or in which a member of their immediate family has such an interest or business associate.  Any such request for credit extension is to be referred to another bank officer with no connection or affiliation to the potential borrower.   All transactions are to be arm's-length transactions.**

## Employee Indebtedness

Employee loan requests must be presented to the employee lending officers. Approval of the loan is granted based on the bank's loan policy. See staff lending section of this handbook.

Borrowing by an employee from an individual or business customer of the bank should always be avoided (unless the customer is a recognized lending institution).  The approval or denial of

GDWB 000396

such a request imposes a wrongful burden on the customer and can impair the judgment of the employee when making business decisions involving the customer.

Executive officers of the bank are reminded of the reporting requirements of Regulation O. If you are unclear about these requirements, please contact the president.

## STAFF LENDING PROGRAM

Our Staff Lending Program will make all in-house loan programs (installment, single pay, first and second mortgages, home equity lines, lines of credit) available at reduced costs to staff members. This program will be open to all staff of The Geo. D. Warthen Bank (including officers, directors, principal shareholders and inside staff.)

Loans will be subject to the following terms. Any loan not covered by this program will be made on terms available to the public.

*All loans will be approved by the Employee Lending Officer, and prior board approval will be obtained where required by regulation or law.

*Installment and single pay loans will be made at a fixed rate of prime or a floor of 5% (whichever is greater), unless a different rate is approved by the Board. Home Equity Lines will be made at a variable rate of prime or a floor of 5% (whichever is greater). Real Estate loans will be made at Prime (or a floor of 5%) on a 5 year adjustable rate mortgage. If there is a special rate available and employee qualifies for this rate, it will be available to the employee. Any applicable loan fees shall be waived. All other terms and conditions will be the same as that offered to the public.

Documentation:    * Application

* Satisfactory credit history

* Debt to income ratios

* Collateral

* Any other credit factors which could affect the debt payback.

Applications that exhibit a significant weakness in any of the areas listed above, will not qualify for the "staff lending program" and may be subject to less favorable terms outside the staff lending program or may be denied.

Minimum Amount:  *$1,000.00.

22

GDWB 000397

* All loans must be made to staff members for the direct benefit of the staff member or spouse (not children of employee) and collateral must be titled in the name of staff member. Loans may be joint with a spouse if requested or if necessary to perfect a lien on jointly owned collateral (or assignment may be taken from the spouse).

* At the time the loan is made, employee must sign a statement indicating that he/she understands the loan will revert to the market rate of interest which was in effect at the time a loan was originally made should employee leave the bank for any reason. Also, if employee's loan is delinquent more than two times over 30 days, the rate will revert to the market rate in effect at time loan was originally made.

* All loans to insiders will be in full compliance with REG O where applicable, including being callable if an executive officer's borrowings at another lender exceed the borrowing limit at The Geo. D. Warthen Bank.

* Any type loan that has a lower published rate than this program (for example, secured by Certificate of Deposit) may be made at a lower rate.

**Transition Rule**:  Requests to convert existing loans into this program should be submitted to employee lending officer and/or President.

Any change in terms for an insider loan must be approved in advance by Board of Directors.

**CREDIT CARD ACCOUNTS**

The same staff lending rules apply to credit card accounts.

*May have one (1) credit card with the GDWB and must be in the employee's name or joint with spouse.

## Personal Finances

Because of our position of trust in the community, personal finances should be managed with prudence.  Officers should discuss any financial emergency with the president.  Employees may discuss any financial emergency with the human resources department.

Since you are an employee of The Geo. D. Warthen Bank, personal financial affairs should be conducted in such a manner as to be above regulatory or auditing criticisms or concerns. **The bank will not allow any employee to overdraw their account.  The $30 overdraft fee will apply**

23

GDWB 000398

**to each NSF transaction.** Proper management of your personal bank accounts, borrowings, and all other financial affairs is expected of all who are employed.

All employees should assume the position of a regular customer when handling their personal bank business. All transactions should be handled in the normal over-the-counter procedure. No employees will be permitted to transact their own or a relative's bank business (including boyfriend, girlfriend, or partner). Avoid direct or indirect financial interest with competitors, customers, and suppliers.

## Confidential Information

All of our records are confidential and may not be copied or disclosed without authorization from management. Never discuss customer affairs, accounts, files, or printed material, except on a need-to-know basis with other employees. Confidential information includes all personnel and payroll records, information about our customers, and anything else about the way we operate.

On a periodic basis, the bank is examined. The reports that examiners furnish must remain the property of the regulatory agency and are strictly confidential. Information contained in the reports is privileged information and should not be communicated to anyone not officially connected with the bank.

The bank respects the right of employees to privacy in matters that have no relation to their employment. Matters of a personal nature concerning fellow employees should be treated with the utmost confidentiality.

Financial information regarding the bank is not to be released to any person unless it has been published in reports to shareholders or otherwise made available to the public in agreement with applicable disclosure regulations currently in effect. Any questions regarding disclosures of confidential financial information should be reviewed with the president and legal counsel prior to disclosure.

Confidential information obtained as a result of comments made within our bank should not be used for private interests.

*Abuse or misuse of confidential information will result in severe discipline, and possible termination.*

24

## Outside Employment

The bank does not wish to control the personal affairs of employees, nor will it attempt to regulate the use of their time outside their employment with us. However, the bank does not look with favor upon a full-time employee working elsewhere if such outside employment in any way affects the individual's work, fellow employees, or the bank. Of particular concern and requiring the president's approval are jobs working for a competitor, supplier, or customer. Engaging in self-employment that in any way competes with bank is prohibited.

Working second jobs may cause a conflict of interest with your job. Whenever this outside employment causes a conflict of interest or a conflict in schedules, the bank definitely will not permit such outside employment.

## Gifts and Fees

Employees and their families (as well as their agents or attorneys) are not to solicit or accept a personal benefit from any customer, vendor, individual, or organization seeking to do business with the bank. A personal benefit is any type of gift, gratuity, loan, fee, compensation, or anything of monetary value. Any deviation from the above must be specifically approved in writing by the president. The bank does recognize that situations may arise when it would be appropriate for a staff member to accept the benefit of a gift. Such situations include:

- Gifts of nominal value (not in excess of $50.00) given at Christmas or other holidays or special occasions that represent expressions of friendship.
- Reasonable entertainment such as luncheon, dinner, or business meetings with present or prospective customers and suppliers, when the return of the expenditure on a comparable basis is likely to occur and is properly chargeable as a business expense.
- Gifts or bequests based strictly on a family relationship.

## Political Contributions and Activities

Individual participation in political and civic activities is encouraged, including the making of personal contributions to political candidates or activities. The bank, or anyone acting on its behalf, is prohibited from making an expenditure or contribution either directly or indirectly in connection with an election to political office.

Therefore, the bank will not make political contributions to individual candidates or political parties. Employees who wish to donate money or services to a candidate or party may do so as individuals, and not as representatives of the bank. To avoid any interpretation of bank sponsorship or endorsement, neither the bank's name nor its address should be used. Do not use the bank name in or associated with any political advertisements or literature.

GDWB 000400

## Business Conduct

In the conduct of the bank's business, no bribe, kickback, or similar remuneration or consideration of any kind is to be given or offered to any individual or organization. The activities of the bank must always be in full compliance with all applicable laws and regulations. The bank expects its staff to comply fully with the letter, spirit, and intent of all laws and regulations.

It is the policy of the bank to comply fully with the anti-bribery provisions. It is a criminal offense for any U.S. enterprise to offer a bribe to an official, political party, party official, or candidate for political office for the purpose of obtaining, retaining, or directing business to any person, regardless of whether that person is the one making the bribe. A bribe may take the form of an offer, payment, promise to pay, or authorization of the payment of any money or anything of value.

## Customer Referral

Bank employees may be requested by bank customers and the general public to provide a referral to professional services, such as attorneys, securities brokers, certified public accountants, insurance agents, and real estate agents. Employees shall, when approved by management, recommend several qualified sources from which the customer can select. Bank employees should not make any adverse or negative comments regarding any outside professional. If an employee cannot give a positive recommendation regarding the outside profession, the employee should indicate to the customer that the employee has no recommendation to give regarding the particular professional. If you do make a positive referral, it should be limited to a statement that you have heard good comments regarding the professional but you or the bank cannot make any specific referrals or endorsements. The employee should exercise extreme care not to make any statement that could subject either the employee or the bank, or both, to an action for libel or slander.

In several instances, discussions with customers may lead to a request that the employee give an opinion or statement about the legality of a particular transaction. Employees are not qualified to give legal advice. The bank also does not engage in the business of giving investment or tax advice. These are areas that are best left to the professional in that particular field. Extreme care must be exercised in discussions with customers, and nothing should be said that could be construed as the giving of legal advice, tax advice, or investment advice.

## Fiduciary Appointment

Without specific approval, employees are not to act as agent or deputy in any signing capacity on any account (except for members of their families) held in the bank. Further, employees may not act as executor, administrator, trustee, guardian, custodian, or in any fiduciary capacity

26

GDWB 000401

without authority granted by the bank. This would normally be granted only to act for spouse, mother, father, brother, sister, son, daughter, or dependent.

There may be instances whereby a bank employee is requested to accept an appointment as a fiduciary or co-fiduciary (personal representative, trustee, administrator, guardian, executor, or custodian) with the bank, another person, or a firm or corporation. Except where the request is for a member of the immediate family, all employees must obtain prior approval of the bank's board of directors before acceptance of the positions.

Employees are reminded to consult senior management because federal or state regulations govern the acceptance of fees as a fiduciary.

## VISITORS, FRIENDS, AND CHILDREN

Because the bank is designed to serve our customers in an efficient and professional manner, we must ask you to restrict visitors on the job to brief, infrequent visits. Friends should not interrupt your work time for purely social reasons. This does not include business associates who have valid business or business development opportunities.

## VOTING

Normally, you will be able to vote before or after work. However, if this not feasible, you will be allowed a sufficient amount of time off with pay to vote in local, state, and federal elections. You must get the prior approval of your supervisor to be away from work. The right to vote is a treasured obligation in our country, and we hope that all employees will fulfill this civic responsibility.

## PROGRESSIVE DISCIPLINE

The rules, policies, and procedures of our bank have been developed so each employee will be treated fairly, equally, and consistently. One of our most important rules is to do your work accurately and timely. Most of our employees perform their work, abide by the policies, and do not break the rules.

If rule or policy violations or improper conduct do occur, normally we use a system called progressive discipline. That is, for most violations, employees will receive a verbal warning. A note will be made and placed in the personnel file. Some form of disciplinary action may be appropriate for some initial violations. For second violations, or serious first violations, employees will receive a written reprimand, which will be placed in the personnel file. The bank may also suspend an employee with or without pay pending an investigation for cases of misconduct or violation of policy.

27

An employee committing a serious offense is subject to discipline or discharge on the first occurrence. When discipline is deemed to be appropriate instead of discharge, management reserves the right to decide what disciplinary action is appropriate. Depending on the nature of the offense, first or repeated violations may result in your discharge. Remember that we are an employment-at-will employer.

These actions are designed to help you improve your performance and work-related behaviors. Our rules and policies are a guide and do not cover every possible situation. They are not exclusive. There may be additional areas of nonperformance or misconduct that would warrant disciplinary action.

When disciplinary action is taken, we may request your signature to show the problem has been discussed with you. Signing a warning does not necessarily mean you agree with the charge or the disciplinary action. You will be required to comply with all instructions on how to improve, particularly when disciplinary action is involved.

## SUBSTANCE ABUSE

The bank strives to provide a safe work environment and encourages good personal health habits. The bank considers the abuse of drugs or alcohol on the job to be an unsafe and counterproductive work practice. The bank respects your right to conduct your personal life as you wish. However, your conduct while you are at work affects the people you work with, your coworkers, and our customers. Use of alcohol or drugs by our employees can influence our customers' confidence in us. Therefore, we have established the following policy about the use, possession, or sale of drugs and alcohol. This policy applies to all bank employees.

### Definitions

The following definitions apply:

- ➢ **Legal drugs** -    Prescribed drugs and over-the-counter drugs that have been legally obtained and are being used for the purpose for which they have been prescribed or manufactured.
- ➢ **Illegal drug** -    Any drug: (a) that is not legally obtainable; (b) that may be legally obtainable but has not been legally obtained; or (c) that is being used in a manner or for a purpose other than as prescribed.

### Pre-employment Drug Testing

During the pre-employment process and before hire, applicants at this bank may undergo screening for the presence of illegal drugs (or alcohol) as a condition for employment.

GDWB 000403

Applicants may be required to voluntarily submit to drug and alcohol testing at a laboratory chosen by the bank. By signing a consent agreement, the employee releases the bank from liability.

Any applicant who fails to test negative will be denied employment at that time but may reapply with the bank after six months.

The bank will not discriminate against applicants for employment because of past use of drugs or alcohol. However, the bank will not tolerate any current abuse of drugs or alcohol that prevents employees from properly doing their jobs.

**Policy**

The bank's policy is to employ a work force free from the use and effects of illegal drugs and abuse of alcohol during working hours. Any employee found to be in violation of this policy is subject to disciplinary action, up to and including termination even for the first offense. To implement this policy, the bank has established and will maintain the programs and rules set forth below.

*General Procedures*

An employee who reports to work while impaired or who is unable to properly perform the required duties may not continue to work. If the supervisor suspects the employee is impaired, the supervisor should consult with senior management for determination of action to be taken.

Prescription drugs prescribed by the employee's physician, or other legal drugs, may be taken during working hours. If the use of such drugs, as prescribed, will affect an employee's work performance, the employee should so notify the employee's supervisor to determine if accommodation can be made. However, we will not tolerate the abuse of prescription drugs, and will address such abuse in the same manner as for illegal drugs.

*Employee Drug and Alcohol Testing Only for Cause*

The bank will maintain testing procedures, via an independent and qualified laboratory, to verify suspected use of illegal drugs or abuse of alcohol. If poor performance or visibly erratic physical or emotional behavior of an employee suggests that the employee is using or has used illegal drugs or alcohol and is under their influence during working hours, the employee must consent to drug and/or alcohol testing as condition of continued employment.

*Grounds for Termination or Discipline*

An employee is in violation of the substance abuse policy for illegal drug use if the employee:

29

- Brings onto the bank's premises or property, has possession of, or is under the influence of any detectable amount of an illegal drug as determined by drug or alcohol testing for cause.
- Uses, consumes, transfers, sells, or attempts to sell or transfer any form of illegal drug, as defined above, while on bank business or at any time during the hours between the beginning and ending of the employee's work day, whether on duty or not.

The violating employee is subject to disciplinary action up to and including discharge or suspension without pay from employment, even for the first offense.

An employee is in violation of the substance abuse policy for alcohol abuse if the employee:

- Is under the influence of alcohol at any time while on bank business.
- Is under the influence of alcohol at any time during the hours between the beginning and ending of the employee's work day, whether on duty or not.

The violating employee is subject to discharge or suspension without pay from employment, even for the first offense.  This bank strongly discourages consumption of alcohol during business lunches or business calls.

*Failure to Consent to Tests*

Failure to consent to medical or physical examinations or tests required by the bank is a violation of this policy and is grounds for discharge or suspension without pay.

*Failure to Test Negative*

An employee's failure to test negative for use of illegal drugs or alcohol abuse, if and when tested for cause, may result in disciplinary action up to and including discharge or suspension without pay.

**Authority**

Only the president or the president's designate is empowered to require drug or alcohol testing or impose termination under the above policy.

GDWB 000405

# Section 2:

# Your Employee

# Benefits

GDWB 000406

## YOUR VACATION/PERSONAL DAYS

We believe that adequate time must be provided to employees annually for rest, relaxation and a change of environment. This provides a time to be away from work and enjoy your family and personal life, and it's a refreshing change that will help your productivity upon return to work. Vacation is also one of the ways we show our appreciation to you for your length of service and good work.

Each employee will be accountable for keeping records of their own annual and sick leave on sheets provided to you by Human Resources entitled "2XXX Attendance Calendar". You will mark your time as you take it, tally the numbers of both vacation time and sick time each month, and turn form in to your supervisor at the end of each month for reconciliation. These attendance calendars will be returned to you each month.

Paid vacations are granted to full-time employees. A new employee, in the calendar year in which they are hired, will earn 2 ½ hours per week vacation time up to a maximum of five (5) days. In the next calendar year, they will be entitled to one week of vacation until they have completed 5 years of service. If an employee is transferred from part-time and full-time status, vacation will begin to accrue on the date of transfer.

The following schedule indicates the amount of vacation available **effective 9/1/2013** for new hires:

| Length of Service | Time Allotted |
| --- | --- |
| 1 – 5 years | 1 week |
| 6 – 10 years | 2 weeks |
| 11 | 2 weeks + 1 day |
| 12 | 2 weeks + 2 days |
| 13 | 2 weeks + 3 days |
| 14 | 2 weeks + 4 days |
| 15 | 3 weeks (+ extra day for additional year up to 20 years) |
| 20 | 4 weeks (Maximum that can be earned) |

The Geo. D. Warthen Bank also grants five (5) personal days per year to each employee that has worked for at least one (1) year. These days may be used for personal or family illness, personal commitments, funerals (other than immediate family members*) or as vacation time. Vacation days and personal days DO NOT carry over to the following year unless extenuating circumstances are initiated by the bank, i.e. FDIC exam.

*Please refer to personnel manual that addresses immediate family members as spouse, children, parents, brothers, sisters, grandparents, parents-in-law, brothers-in-law and sisters-in-

32

GDWB 000407

law. (Death in the immediate family is considered as bereavement leave and is granted differently)

## Scheduling Your Vacation

All vacation and personal days will be taken subject to the needs of the bank and your supervisor's approval. Please schedule your vacation days with your supervisor well in advance and preferably use your vacation days **BEFORE** November 15th of each year. One or two vacation days may be taken between November 15th and December 31st provided an adequate number of personnel remain to completely cover all departments of the bank. **These two days may not be taken before or after Thanksgiving and Christmas.** The bank allows a free holiday during this time and we must be respectful to all co workers. These vacation days will have to be approved by your supervisor. So there is a possibility that if an employee saves days until the end of the year, those days may be lost.

Employees with two (2) weeks vacation and five (5) personal days must take one full week vacation. The remaining ten days may be taken any way the employee chooses.

Employees with three (3) weeks vacation and five (5) personal days must take one full week, and the remaining fifteen days may be taken any way the employee chooses.

Employees with four (4) weeks vacation and five (5) personal days must take two full weeks, not consecutively, and the remaining fifteen days may be taken any way the employee chooses.

When a vacation is taken during a holiday week, the employee will be eligible for an additional day of vacation. The additional vacation day is scheduled at the supervisor's discretion.

Vacation may not be carried over from one year to the next. If a scheduled vacation is canceled by a senior officer so late in the year that it cannot be rescheduled, you will be paid for that vacation time that was previously scheduled. No pay will be granted in lieu of vacation otherwise.

*Order of vacation choice is based on seniority.*

## Vacation Pay

Vacation pay is computed as your standard work week multiplied by your straight-time hourly rate or, for full-time employees, your weekly salary. Employees who leave the bank voluntarily will be paid for unused vacation. If you resign or are terminated, adjustments will be made to your final pay for unearned vacation you have used during that year.

Although vacation pay can be used during leave under the Family and Medical Leave Act, vacation pay cannot be used to extend family and medical leave unless approved in advance.

GDWB 000408

## HOLIDAYS

The bank is normally closed for most legal holidays as approved by the Federal Reserve. The exact dates of these holidays will be posted each year. If a holiday falls on a Saturday, it will not be a paid holiday. If a holiday falls on a Sunday, the bank will be closed on the following Monday, or the day formally designated by the Federal Reserve Bank.

Holidays that may be observed include:

New Year's Day                    Labor Day
Martin Luther King, Jr. Day       Columbus Day
President's Day                   Veteran's Day
Memorial Day                      Thanksgiving Day
Independence Day                  Christmas Day

To receive payment, you must work the scheduled day before and after the holiday unless time off is approved in advance by management. When a holiday falls in a scheduled vacation period, a vacation day may be added to this or another scheduled vacation.

The amount of holiday pay an employee is paid will be determined by the number of hours the employee would have been normally scheduled to work had it not been a holiday. If, for any reason, business needs require you to work on a holiday, you will be paid for the hours you work in addition to your holiday pay. If you work the entire holiday, you may choose to take another day off with pay, subject to approval of the Human Resources Department.

If you need special consideration to observe a religious holiday, we will make every reasonable accommodation to let you have the day off without pay.

## SICK LEAVE

Full-time employees are entitled to time off with pay if they become ill. Our sick leave policy helps ensure you against loss of wages during periods of illness. Each employee is allowed thirteen (13) sick leave days per calendar year. The thirteen days will be categorized by payroll as 104 hours and may be used on an hourly basis. Each employee will be entitled to accumulate up to **90 days** (720 hours).

Payment for sick leave will be computed on the following basis:

- No payment will be made for unused sick leave time upon separation from the bank.
- Payment for accrued sick leave during periods of illness will be made through normal payroll.

GDWB 000409

Employees who are absent due to illness for more than three (3) consecutive working days may be required to provide the human resources department with a letter from their attending physician, verifying the need for the absence and/or permitting the return to work.

Unused sick time may be used by employees for illness in their immediate family (spouse, children, parents, parents-in-law, brother and sister) when their presence is required.

When making a doctor's appointment, please try to schedule it before 9 a.m. or after 4 p.m. if it cannot be made on a day that you are not working.

If you are not able to work due to illness, or if you need to take personal time, you must contact your supervisor before your work time begins on each day of absence.

We encourage you to use sick leave days wisely and safeguard this financial protection for you and your family.

## ½ DAY OFF FOR SATURDAY TIME

Saturday time off may be scheduled on Monday, Tuesday or Wednesday afternoon. Saturday time **cannot** be accumulated.  It must be taken the week after the Saturday you work **unless approved by your supervisor**.  There is **NO** Saturday time off on Fridays. If you are going to be off on Friday for vacation or such, you may take Saturday time rather than being off two afternoons with supervisor approval.

If staffing demand requires it, you may be asked to not take off your half day.  *Non-exempt employees will be paid for overtime.*

## EDUCATION

We strive to provide on-the-job instruction and training to all employees. It is our belief that as you expand your banking knowledge and expertise through on-the-job training and formal education, you become more valuable to the bank.  We also believe that this interest and action on your part indicates initiative.  We will keep a record of your educational training which will be a consideration as promotions become available.  Please keep the human resources department informed of your educational activities.

Your local American Institute of Banking (AIB) chapter offers a number of courses directly related to the banking industry.  The human resources department will distribute course information and enrollment forms throughout the year.  If you enroll during the time of registration, we will pay 100% of your tuition, which includes the cost of the textbook.

GDWB 000410

Full-time employees may also be eligible for tuition assistance for work-related courses taken outside of the AIB through a community college or university. However, the human resources department *must approve each course before you enroll*, if you wish to receive tuition assistance.

## HEALTH CARE / INSURANCE PLAN

A health insurance plan is available to full-time employees. If you choose to enroll in this plan, we will pay 100% of the cost of your coverage. The human resources department will provide you with an insurance booklet that explains the provisions of the insurance plan. So you and your family will have a complete understanding and appreciation of the many benefits available under the plan, we suggest that you read your insurance booklet.

If your coverage is terminated, your health care coverage and that of your dependents may be extended by using Consolidated Omnibus Budget Reconciliation Act (COBRA) provisions, under certain circumstances. Contact the human resources department about how to extend your coverage at group insurance rates.

If you have any questions, please address them to the human resources department.

## LIFE INSURANCE

We are pleased to offer life insurance to our full-time employees. The bank pays the total premium for life insurance. Be sure to review your designation of beneficiaries from time to time to keep current.

## DISABILITY

The bank has a disability insurance policy that provides 60% of your pay after you have been disabled 90 days. If you become disabled, apply for family and medical leave and inquire about the documentation that is required to begin receiving your disability pay.

## SOCIAL SECURITY AND MEDICARE

You will be entitled to retirement, disability, and survivor benefits under the federal government's Social Security program. The cost of your Social Security and Medicare benefits is shared by you and the bank. If you have any questions concerning this additional protection, the local Social Security office can give you complete details.

GDWB 000411

# Section 3:

# Leaves of Absence

GDWB 000412

## FAMILY AND MEDICAL LEAVE

The bank recognizes the need for employees to participate in child rearing and the care of family who have serious health conditions. The bank also recognizes that employees may need to deal with their own serious health conditions from time to time. The bank understands the need to balance these demands with job requirements and the bank's needs. To promote the stability of families and to comply with the Family and Medical Leave Act of 1993, the bank has established the following family and medical leave policy. Family and medical leave is unpaid leave, except to the extent that the employee has available sick leave or vacation time.

### Eligibility for Family and Medical Leave

Eligibility and entitlement for family and medical leave is determined as follows:

- The employee must have been employed for at least 12 months with the bank.
- The employee must have worked at least 1,250 hours during the 12-month period preceding the beginning of the leave.
- When parental status is applicable, the individuals must be natural parents or adoptive parents, foster parents, or an individual standing in "loco parentis" for a child who is under 18 years of age or, if the child is older, the individual must be incapable of self-care because of a mental or physical disability.
- When the leave is to care for a spouse, the term "spouse" means a legal husband or wife.
- Full-time employees *who are not eligible for family and medical leave* and have more than six (6) months of employment will be eligible to apply for leave under a separate minimum medical leave policy. This is described in detail below.

Additionally, the employee's position may not be available at the end of family and medical leave if an undue hardship is caused because:

- The employee is in the highest paid 10% of the bank's work force.
- The employee is in a position where reinstatement from the leave will cause substantial and grievous economic injury to the bank's business if family and medical leave is granted.

### Types and Duration of Leave

Management reserves the right to review and approve the required documentation and conditions of the leave. Conditioned upon that approval, eligible employees may receive leave for up to 12 workweeks during any 12-month period for one or more of the following reasons:

- The birth of the employee's child
- The placement of a child with the employee for adoption or foster care.

38

- The employee's need to care for a child, spouse, or parent who has a serious health condition.
- The employee's inability to perform the functions of the position because of a serious health condition.

## Scheduling Family and Medical Leave

The timing and scheduling of family and medical leave (starting date, ending date, etc.) will be determined as follows:

- The start date for the leave will be:
  - ➢ The date of birth or placement of a child.
  - ➢ In the event of disability, the first day an employee cannot perform the requirements of his/her job.
  - ➢ The first day of medical necessity for the employee's presence by the qualifying family member.

- The ending date is the earliest of the following dates:
  - ➢ When the employee requests to return to work.
  - ➢ When a total of 12 weeks of leave has been taken for one or more of the qualifying reasons
  - ➢ In the event of a leave related to disability of the employee or family member, the end of the medical necessity for the leave.

- The leave must be taken as consecutive weeks for each incident of family and medical leave. Alternatively, leave may be taken as follows:

  - ➢ Intermittent family and medical leave. Any leave involving nonconsecutive weeks of leave, will be allowed only in the event of a specific medical necessity for the intermittent family and medical leave based on:
    - The employee's own serious and certifiable health condition or
    - The serious and certifiable health condition of a child, parent, or spouse

  - ➢ Reduced schedule family and medical leave. Requests to work fewer hours or days than the employee's normally scheduled workweek require:
    - A specific medical necessity for the reduced schedule leave based on the employee's own serious, and certifiable health condition or the serious and certifiable health condition of a child, parent, or spouse and
    - The approval of bank management at its sole discretion.

39

GDWB 000414

- In the event of intermittent leave and reduced schedule leave, the bank may require employees to transfer temporarily to an alternate position that better accommodates the intermittent or reduced schedule leave. The alternate position will provide equivalent pay and benefits.

If two or more members of the same family who are entitled to leave under this policy are both employed by the bank, they are together eligible for a combined total of no more than 12 weeks of leave during a 12-month period for the same qualifying event.

**Certification of Leave**

The bank will require a physician's certification of the medical necessity for all leaves that are based on the serious health condition of an employee or the need to care for a seriously ill child, spouse, or parent of the employee. The certification process will include:

- For the employee's own disability leave, certification must include a statement that the employee is unable to perform the functions of the job and an estimate of the amount of time it will take the employee to recuperate.
- To care for a seriously ill child, spouse, or parent, the documentation must include certification of the medical necessity of the employee's care and an estimate of the amount of time the employee is needed to care for the child, spouse, or parent.
- If the bank so desires, it may at its sole discretion require and pay for a second medical opinion of the necessity for family and medical leave.
- If first and second opinions differ, the bank may require and pay for a binding opinion of a third health care provider, jointly approved by the bank and the employee.
- The bank may require, at its discretion, periodic recertification.
- The bank may also require employees on family and medical leave to report on their leave status and re-verify their intention of returning to work.

**Pay During Leave**

As previously mentioned, leaves are unpaid unless vacation and sick leave are available. The bank will generally require employees to use paid days off during family and medical leave. Employees will receive pay during family and medical leave to the extent that they have any accrued paid days off and any disability insurance policy in effect at the time of the leave. Any paid leave and any unpaid leave will count toward the total 12 weeks of family and medical leave.

Employees who receive bank-provided disability insurance payments will not receive an amount in excess of 100% of pay when such payments are combined with paid absences.

40

**Benefits during Leave**

During the leave period, the bank will maintain the employee's group health care coverage under the same arrangements that were in effect while the individual was an active employee. If the health care plan is amended, the employee will be treated the same as all other currently active employees in comparable positions.

**Duties of the Employee**

Employees using family and medical leave must meet the following requirements.

*Notice Requirements*

In the event of need for family and medical leave, the employee must submit a leave request to the bank no less than 30 days prior to the date the leave is to begin.   Whenever practical, employees will make every effort to schedule elective or planned medical treatments to minimize the interruptions of their duties at the bank. In the event of medical emergencies, the employee will provide the bank with such notice as is practical.

The employee will keep the bank advised of the probability and date of return.  The employee must cooperate with any certification requirements requested by the bank.

*Failure to Return from Leave*

If the employee fails to return from leave after the end of the 12-week period or the end of the qualifying event, as certified by the physician, the bank will recover from the employee the premiums paid for maintaining the coverage during the leave.  Premiums will not be recovered when the reason for the employee not returning is the continuation of or the onset of a certifiable health condition.

Employees who do not return from leave may apply for reemployment when they are able to return to work.  If rehired, these employees will be offered available positions for which they are qualified, if any exist.  They will receive the then-current rates of pay and the associated benefits for the job they accept.

*Returning from Leave*

Employees must deliver a request to return to work to the human resources manager 30 days prior to their desired date of return.

The bank will require a statement from the employee's physician upon return from the employee's own medical leave, certifying that the employee is able to resume work.

GDWB 000416

*Reinstatement*

Employees returning from family and medical leave within the 12-week period will be placed in the same or an equivalent position upon return from leave. Seniority will not accrue, nor will any benefit increase during the period of family and medical leave. Seniority and eligibility for benefits will not decrease as a result of the employee taking family and medical leave. In other words, employees will be treated the same as if they had not taken family and medical leave but credit will not be given for the time spent on leave.

The bank is an equal opportunity employer and as such will ensure that no discrimination against the employee occurs as a result of the employee having requested or having received family and medical leave.

**Minimum Medical Leave Policy**

Full-time employees who are not eligible for family and medical leave and who need time away from work for family and medical reasons may apply for minimum medical leave.

If you have been employed for six (6) months or longer, you may be eligible to obtain a leave of absence if you must be absent from work for sickness, disability, pregnancy, or related conditions. Absences of longer than ten (10) days at a time are considered to be leaves and must be requested in writing and accompanied by a doctor's statement. Employees who do not return from leave will be considered to have resigned. Leaves are granted for up to 30 days at a time and may not be taken for personal reasons. Leaves may be extended twice up to a maximum leave time of 90 days, at management's discretion regarding the medical necessity for the leave based on the documentation furnished.

If your illness or disability causes you to be absent for an extended length of time, you will be placed on leave, and your seniority is protected in the following way:

- If you are absent for 90 consecutive calendar days or fewer, we will attempt to place you in your old job or the first available job that is similar in terms of status, pay, and seniority to your former job.

- Employees whose leave lasts longer than 90 days may reapply for work when they are physically able.

While on leave, you must make arrangements to pay for your part of the insurance premium. The bank will pay its normal part of the premium for the first 90 days, and **you must pay the full premium for the remainder of your leave.**

GDWB 000417

## BEREAVEMENT LEAVE

The bank's intent is to lessen the hardships associated with a death in the family. Therefore, if a death in the employee's immediate family (spouse, children, parents, brothers, sisters, grandparents, parents-in-law, brothers-in-law, and sisters-in-law) occurs, time off and continuance of pay will be granted as follows:

- Spouse/children – to be determined with supervisor
- Parents – 5 days
- Brothers, Sisters, Grandparents – 3 days
- Sister-in-law/Brother-in-law – 1 day
- Vacation leave can be used to attend funerals if the person is not immediate family with supervisor approval.

***If the funeral is more than 300 miles away, extra days may be taken with approval of supervisor.

Please give your supervisor as much notice as possible that you will need bereavement leave. If the death in the family is unexpected and no notice can be provided, please call your supervisor at the first opportunity on the first work day missed to advise your supervisor that you are taking bereavement leave, the relationship of the person, whose funeral you are attending, and your expected date of return.

## JURY DUTY PAY

Employees should fulfill jury duty obligations when possible. Provide the human resources department a copy of the jury summons as soon as you receive it. Full salary will be paid to employees serving on jury duty, provided the employee reports to work during hours the employee is not required to be in court.

## MILITARY SERVICE LEAVE FOR ACTIVE DUTY

The bank's policy is to provide military leave for regular, non-temporary employees. The following policies and procedures are intended to simplify and comply with, not expand the provisions of the Uniformed Services Employment and Reemployment Rights Act of 1994.

Please realize that it is possible that the bank's circumstances will have changed to make reemployment impossible or unreasonable because it might cause undue hardship in the form of requiring significant difficulty or expense. However, the bank will attempt to minimize the disruption to the lives of members of uniformed services through the following policy.

GDWB 000418

**Reemployment Rights**

The bank will offer the first available position for which the person is qualified that:

- Does not cause undue hardship to the bank.

- Is a position as similar as is practical to the prior position and if possible a position that is estimated to be similar to the position that might have been reasonably achieved (in management's judgment), had the employee remained in the continuous employment of the bank for the duration of uniformed service.

- If disability is incurred (after reasonable accommodation) is as similar as feasible to the prior position.

**Reemployment Requirements**

Whether the duty is voluntary or involuntary, National Guard members and Reservists are entitled to reemployment rights if they meet the following requirements:

- They were employed as regular employees and not as temporary employees before beginning military duty.

- The employee is on cumulative leave of absence from the bank in the uniformed services for a period not longer than five (5) years (excluding military training time and time spent on active duty during a war or national emergency declared by the President or Congress or other exempted duty under the Act).

- The employee received an honorable discharge.

- The employee properly gives advance written or verbal notice, submits necessary documentation and applies for reinstatement within the required amount of time as follows:
  - On the first work day following eight hours after the elapse of safe travel time from the place of service to the person's residence if the service in the uniformed services was fewer than 31 days.

  - Within 14 days of the completion of the period of service if the service in the uniformed services was more than 30 days but fewer than 181 days.

  - Within 90 days of the completion of the period of service if the service in the uniformed services was 180 days or longer.

GDWB 000419

Failure to report for employment within the appropriate period will be considered to be voluntary termination, as is the case with all other leaves of absence.

A person who is hospitalized or convalescing underwritten doctor's instruction from an injury incurred in or aggravated during the performance of uniformed services will report at the first opportunity to the bank and submit an application, except that such period may not exceed two years.

### Benefits Rights during Military Leave

In general, a person who is reemployed under this policy will receive benefits that are as similar as can be provided by the vendor companies to those that would have been in place on the day of reinstatement had the person been continuously employed during the military service. Any benefits that require the employee to contribute funds will be funded only if the employee makes such contributions. If you miss making contributions to plans such as to your 401(k) plan, you must begin making contributions on your date of reemployment and must make all missed contributions within three times the amount of time you spend in uniformed service, not to exceed five (5) years.

Any estimates of plan earnings and wage increases will be made by vendor companies and management of the bank. Employees on military leave may elect to continue health coverage for 18 months or until the first day after the employee failed to apply for reemployment, whichever is shortest. This coverage depends on the employee paying normal cost if the leave is less than 31 days and 100 percent of the cost if the leave is 31 days or longer. Upon reemployment, vesting and contributions for employer-paid benefits will be treated as if there were no break in service.

### Pay During Military Leave

Employees will be paid the difference in their military base pay and their bank base pay, provided the latter is greater, for up to 90 days. Vacation may be taken separately from military leave.

### Endorsement

The bank endorses the commitment that military service demonstrates and is pleased to respond with these commitments to its participating employees.

If you are inducted in the U.S. Armed Forces, please show your orders to the human resources department as soon as you receive them.

GDWB 000420

## Discrimination

The bank will not discriminate against persons who serve in the uniformed services or exercise their rights under this law in the following areas: employment, reemployment, retention in employment, promotion, and any benefit of employment.

GDWB 000421

# Section 4:

# Your  Responsibilities

# to the Bank

GDWB 000422

## JOB DUTIES

Along with the advantages and opportunities offered by your employment with the bank come certain responsibilities and obligations that you must meet. *Your most important responsibilities to the bank are to provide superior customer service, to perform your job, and to comply with policies and procedures.*

Your supervisor is responsible for what you do, so it is a good idea to respect your supervisor's experience, learn and grow from instructions, and carry out your duties promptly and cheerfully. Completing each assignment to the satisfaction of your supervisor is the best way to make progress. If you have completed your work, check with your supervisor to see what other jobs must be done. There is always work to do.

Doing a good job also implies certain obligations on your part. These include:

- ✓ Actively seeking solutions to problems
- ✓ Making suggestions for improvements
- ✓ Maintaining your health and mental alertness
- ✓ Using good judgment
- ✓ Being prompt and regular in your attendance
- ✓ Cooperating with your fellow workers and being loyal to the bank
- ✓ Keeping yourself well informed about the bank
- ✓ Meeting deadlines and goals

All officers and employees must conduct their personal affairs so there can be no opportunity for unfavorable reflection on the bank, either expressed or implied. The use of common sense, good ethical standards, and discretion will guide you in proper conduct. Please refer to our code of ethics earlier in this handbook for additional information.

You have been hired for a variety of job duties. Besides your daily assignments, you will be asked to help with other work. Our purpose is to identify our customers' financial needs and fulfill them. Therefore, no employee's duties are limited to one assigned job. Your assistance is expected for any work necessary for our bank.

## ATTENDANCE

Because individual working hours may vary, your schedule will be given to you by your supervisor. At the bank, full-time employees' work schedules may consist of 40 hours or more a week. Consult your supervisor regarding the work schedule in your department.

If you need time off, request permission from your supervisor before you leave. If you expect to be absent or late, it is your responsibility to notify your supervisor as soon as possible, but in

GDWB 000423

no case should you call later than **your regular starting time**. You should call your supervisor on each succeeding day of absence unless you are confined for a definite period of time and your supervisor is so advised. This notification will allow adequate time to shift personnel to serve our customers properly. Unexcused or unexplained absences, at any time, will be deducted from your pay or paid days off and may result in termination.

If an employee is absent without calling in, the employee will be considered to have voluntarily quit. Excessive and repeated absences or tardiness are just cause for dismissal. Remember: Good attendance includes returning on time from your breaks and your lunch.

It is very important that you report to work at your scheduled time. We need your contribution. You are expected to be at your desk, ready for work, at your starting time. You must attend to all personal business, such as grooming or having a snack, before you are scheduled to begin work. If you need to be away from your desk or work space during office hours, let your supervisor know where you will be and when you will return. You are not to leave the bank building during working hours, other than during your lunch period, without permission from your supervisor.

## YOUR PERSONNEL RECORD

When you were first employed by the bank, you completed an application form supplying us with various facts we must know about you. This information is transferred to a permanent and confidential file, which is the bank's employment record. Keeping this record correct and up to date is important to you because it enables the bank to reach you in an emergency, properly maintain your insurance and other benefits, and compute your payroll deductions.

The human resources department should be notified promptly of changes in the following:

- Address and telephone number
- Marital status (for insurance and tax purposes)
- Name
- Beneficiaries listed for your insurance policies
- Number of dependents (for insurance and tax purposes)
- Person to notify in case of an accident

In addition, please let us know about the completion of training or educational courses so that you may receive proper consideration as better job opportunities become available throughout the bank. Your supervisor will send all this information to the human resources department, where it will be maintained in your personnel file.

GDWB 000424

## ACCIDENTS

The bank is committed to providing a safe workplace for employees. You are the bank's eyes and ears to spot unsafe work conditions. Therefore, you have a responsibility to help us maintain a safe workplace. Please utilize safe work practices and follow the safety instructions on all equipment you operate. Report hazards to customers and employees immediately. Contact your supervisor or the human resources department to locate the first aid supplies nearest to your department or office.

Contact your supervisor or the human resources department to determine the location of the nearest doctor or hospital.

Please refer to the Health and Safety section of this handbook for more details.

If you or a customer should meet with an accident on the bank premises, even though you may consider it of no consequence, report it immediately, within the hour, to the bank's workers' compensation representative. The bank must report some serious injuries to government officials within 24 hours. The workers' compensation representative will follow through with the appropriate actions. Under no circumstances are you authorized to tell an injured person the bank will be responsible for medical bills.

## DRIVING ON BANK BUSINESS

When driving on bank business you must:

- Obey all traffic rules
- Maintain a valid driver's license

## TELEPHONE ETIQUETTE

A good telephone personality will win friends for you and the bank. Telephone contacts warrant special consideration because the person calling cannot see you. Customers can only draw impressions from your voice and manner. You should apply the following guidelines:

- Be alert, pleasant, natural, distinct, and expressive.
- Speak at a moderate rate of speed to allow the caller time to hear and understand your message.
- Answer the telephone promptly, no later than the second ring. Prompt answering helps build a reputation of service for you and the bank.
- Always identify yourself by name and department.
- Have pen and paper available so you can write messages.
- Use the hold key when leaving the phone line.

50

- Exercise care that one customer's confidential matters are not discussed where another party can hear the conversation.
- Remember to use the caller's name in the conversation.
- Say "Thank you for waiting," when you return to the line.

Each work area is supplied with telephone directories.

## CELL PHONE

Customer Service comes first. Personal cell phone usage, texting, etc. should be kept to a minimum.

## COMPUTER USAGE

Customer service comes first.   Please refer to the Network Policy regarding the rules of computer usage.

N:\public\GDWB Policy Book 2013\ComputerPolicyManual

## APPEARANCE

First impressions are so significant in our relationships with customers that good grooming and appropriate dress are important. Our customers are extremely sensitive to the appearance of bank employees. They judge us by the employees they see every day. Therefore, all employees are expected to maintain high standards of personal appearance and hygiene regardless of where they work. After hours work and work not involving public or customer contact may require less emphasis on style of dress. You should present a neat, businesslike appearance at all times during working hours.

Any employee whose personal appearance is unacceptable to the bank's general standards will be informed of this immediately. You will be asked to change as soon as possible. Failure to correct the problem may result in dismissal.

Due to changing dress styles and fashions, the bank will from time to time provide suggested guidelines for appropriate dress. If you have any questions concerning personal attire, you should discuss it with your supervisor or the human resources department.

GDWB 000426

The following guidelines for personal appearance apply to all the bank employees:

- *Clothing* – You should exhibit professionalism in your dress.   Use conservative, businesslike taste in selecting the clothes you wear, avoiding extreme styles, excessively tight clothes, and fad type clothing.  Businesslike dresses or well-coordinated pants and blouses are considered acceptable for women.  For men, ties, dress shirts, a suit or blazer, and dress slacks are considered acceptable.

- *Hair styles* -  Your hair style should be conservative and businesslike.  Your hair must be clean and neatly styled.  Beards or mustaches should always be well groomed.

- *Footwear* -  You should wear business style shoes and keep them clean and polished.  Safety, comfort, and appearance are the main consideration for acceptable footwear.  Tennis shoes, jogging shoes, or thong shoes are not appropriate.  Men should always wear socks.

**MEN** are expected to wear: ties, dress shirts, dress slacks (with belt) and appropriate shoes & socks. No earrings or visible tattoos. Men cannot wear jewelry except a watch and one ring on each hand. No extreme hair colors (Fad Colors – purple, pink, blue, etc.)

**WOMEN** are expected to wear dresses, suits, dress slacks, skirts, with well coordinated blouses or jackets and appropriate shoes. Moderation of makeup and accessories are encouraged. Avoid extreme styles, tight clothing and fad type clothing. Dress crop pants may be worn.

**Dress denim pants/jackets may be worn. This does not mean blue jeans or blue jean jackets. Seek supervisor approval if in doubt.

**ABSOLUTELY NO, NO, NO..................**

NO sundresses (unless covered by a jacket)
NO sleeveless tops (unless covered by a jacket)
NO blue jeans or blue jean denim material
NO thong sandals, flip flops, casual slides, strappy sandals (dress, open toe sandals may be worn)
NO tennis shoes or athletic shoes
NO low riding pants or hip huggers or stretch pants
NO halter tops
NO tank tops
NO low cut tops revealing cleavage
NO midriff revealing tops
NO tight t-shirts, short t-shirts, long oversized t-shirts

GDWB 000427

NO shirts that do not meet skirts or pants
NOTHING with a logo bearing name across the chest (only GDWB logos on Friday)
NO skirts shorter than 2" above knees
NO tight skirts or pants
NO shorts, cargo pants, jeans of any description
NO sweatshirts or sweatpants
NO heavy makeup (only normal daily wear at a minimum)
NO visible tattoos, body jewelry, body piercing (must be covered)
NO long, flashy painted nails
NO jingling jewelry
NO extreme hair styles
NO extreme hair colors (fad colors – purple, pink, blue, etc.)

## "PLEASE USE COMMON SENSE."     IF IN DOUBT, DON'T.

### CASUAL FRIDAY

We will wear specialized Bank shirts with business casual skirts or pants and shoes. Denim is acceptable provided it is **NOT BLUE JEANS.** Crop pants are acceptable as long as they look nice and fit properly. T-Shirts, stirrup pants, tight stretch pants, athletic shoes, flip flops are not appropriate.

Keep in mind that an employee represents not him or herself, but the company he or she works for at all times.

Appropriate appearance is clean hair, clean nails and clean clothes.  Clothes should always be crisp, clean and pressed (not like they came right out of the dryer).

GDWB 000428

# PROFESSIONAL DRESS

## Six Questions You Should Ask Before Buying Something to Wear

1. Is it comfortable?
2. Does it fit properly?
3. Is the fabric of good quality?
4. Is this appropriate for the kind of job I have?
5. Will it be considered fashionable for two or more seasons?
6. Will my budget allow for this purchase?

## Six Strategies for Dressing Professionally

1. View your clothes as an investment.
2. Choose clothes that compliment your body style.
3. Wear clothing appropriate to your audience.
4. Clean and maintain your wardrobe.
5. Count your shoes as a part of your outfit.
6. Read a good book on executive dress.

GDWB 000429

## RUMORS

When you hear a business-related rumor, please ask your supervisor if there is any truth in it. Your supervisor will get you an answer.

Personal gossip can be vicious. Do not participate. If you do not gossip about others, chances are others will not gossip about you.

Our main goal is keep the lines of communications open. We are committed to keeping you well informed. If you want to know something, ask your supervisor. It is the supervisor's job to keep you informed.

## CARE OF EQUIPMENT

The bank has invested thousands of dollars in equipment designed to enable you to do your work more efficiently. Your cooperation in the care and use of this equipment is necessary to keep it in good operating condition.

If any of our equipment is defective or is not best for the job, please notify your supervisor immediately. A few timely repairs may prevent a complete breakdown of the equipment. You should be sure that all equipment is secured, turned off, and covered before you leave work.

## HOUSEKEEPING AND OFFICE APPEARANCE

Supervisors are responsible for making sure that employees' work areas are maintained in a neat, orderly, and businesslike manner. At the end of the day, all areas should be cleaned and prepared for the start of the next day's work. All confidential records, cash items, and any other sensitive documents must be locked in a secure area.

55

# Section 5:

# Security and Work Rules

GDWB 000431

## HEALTH AND SAFETY

Employees must follow all health and safety regulations. Any accident or injury must be reported to the Bank's workers' compensation representative immediately. We will see that you receive proper medical care and that an accident report is completed.

Keep your work area neat and clean. Assist in keeping all areas of our premises clean **(especially restroom facilities)**. Return supplies to their proper place when you have finished with them.

Remember to clear your own lunch area and maintain cleanliness in the rest rooms. Use trash containers for debris.

## LOST AND FOUND

If you find any valuables, they must be returned to your supervisor immediately. This is an area where we will certainly lose or gain our customers' confidence. Failure to turn in lost items will be grounds for termination.

## IMPROPER CONDUCT

The following list highlights some examples of behaviors the bank considers to be improper conduct:

- Performing inefficiently or unsatisfactorily, or failing to apply effort on the job, including intentionally slowing down work or productivity
- Committing unsafe acts that affect equipment or personnel
- Violating a safety rule or safety practice
- Knowingly completing the time card of another employee, having one's card completed by another employee, or unauthorized altering of a time card
- Being tardy without proper notice
- Being absent without proper notice or excuse
- Loafing or spending unnecessary time away from the job
- Leaving your job or your regular work place during working hours for any reason without authorization from your supervisor except for scheduled lunches, rest periods, and going to the rest room
- Leaving work before the end of the regular workday or not being ready to work at normal starting time
- Reporting to work in an intoxicated condition or under the influence of drugs
- Participating in disorderly conduct or indecency reflecting on the bank

57

GDWB 000432

- Participating in immoral conduct or indecency reflecting on the bank
- Misrepresenting facts in seeking employment
- Being dishonest or removing another employees' property or bank property without permission
- Writing checks on insufficient funds (NSF checks)
- Willfully destroying bank property
- Refusing to perform a service connected with an employee's job as required by the employee's supervisor or by management, or being insubordinate
- Contributing to unsanitary conditions or poor housekeeping
- Failing to follow instructions
- Arguing with your supervisor
- Conducting yourself in a manner that shows disregard for the bank's best interest
- Intentionally violating a work rule or inducing another employee to violate a work rule
- Participating in criminal or illegal activities
- Repeatedly wearing improper attire or evidence of uncleanliness
- Failing to notify the bank immediately of any accident on the property
- Conducting activities that endanger life, safety, or the health of others or self
- Failing to respect the confidential nature of the bank's business, customer information, and bank records
- Using, altering, removing, or destroying bank records without authorization
- Engaging in horseplay, running, fighting, shoving, or throwing objects
- Failing to observe traffic and parking regulations
- Sleeping on the job or during working hours
- Posting, altering, or removing any materials on bank bulletin boards
- Exhibiting carelessness affecting the employee's own or another employee's safety
- Using profane or abusive language, as determined by management
- Falsifying bank records
- Making false or malicious statements
- Violating federal or state law on bank property or while conducting bank business
- Harassing an employee or customer, including sexual and racial harassment
- Violating conflict of interest and code of ethics policies
- Failing to report a conviction within five (5) days under criminal statutes
- Refusing to take a drug test or alcohol test

This list is provided to assist supervisors and employees.  It contains examples and is not considered to be all inclusive.  The list is subject to change by management without notice.

GDWB 000433

Violations of the bank policies outlined here and in other sections of the handbook will be dealt with by written correction or corrective actions up to and including dismissal, depending on the frequency and nature of the offense.

## SECURITY

Security is an important element of any business. Please read this policy with great care.

Any individual entering a bank office should be there to transact business with the bank. Seek out and greet the customer, then ask if you can be of help. If the individual appears to have no definite purpose for being in the office or acts nervous or suspicious in any way, bring this fact to the attention of your supervisor immediately. Please train yourself to be able to identify, not just recognize people - that is, you should be able to provide a detailed description of their physical appearance (height, weight, hair and eye color, skin, etc).

Do not permit visitors in restricted work areas without prior authorization from your supervisor. Unless requested, do not remain in the bank after scheduled work time or arrive excessively early before your scheduled starting time. Please do not take packages from our premises unless approved in advance by your supervisor. This includes material that is thrown away. Do not take anything that does not belong to you. Bank employees must preserve the public's confidence. Therefore, participation in any illegal activity will not be tolerated.

## SEARCHES

The bank may need to search desks, lockers, and personal items brought into the bank as part of its investigation of suspicious occurrences in the bank. Please do not bring items into the bank that you would not want searched.

## ENTERING AND LEAVING THE BUILDING

The following procedure applies when you enter or leave the bank:
- Before entering, look for any strangers who may be loitering nearby.
- Make positive identification before admitting anyone at other than business hours.
- Always lock doors when the offices are not open for business.
- People requesting appointments outside regular business hours must be known to an officer or employee. They should be met at the doors at a predetermined time.
- When leaving at the end of the business day, carefully observe the area near the door.

GDWB 000434

## KEYS

Those people to whom keys have been assigned are completely responsible for such keys and should avoid unnecessary advertisement that they have them.   Upon termination of employment, all keys are to be returned, in person, to the human resources department. Immediately advise your supervisor of any lost or stolen keys.

## In the Event of a Robbery

Employees should familiarize themselves with the procedures outlined below and carefully follow these instructions.   Bank security measures and the location of vaults, cash, checks, safes, and alarms are classified information and should not be discussed with anyone outside the bank.

It is not a part of your job to jeopardize yourself if a robbery occurs.   Follow these rules:

- Be calm.
- Cooperate.  Do what you are told – no more, no less.
- Observe the following features of the robbers:
  - ➢ Size in relation to doors and furniture
  - ➢ Clothing – type & color
  - ➢ Scars, defects, hair, eyes, nose and lips
  - ➢ Mannerisms
  - ➢ Names, leaders, and speech
- Set off alarm if one exists and it is safe to do so.

After a robbery, you should follow this procedure:

- Activate the alarm as soon as the robber has left.
- Inform the security officer or the nearest bank officer and provide the officer with a detailed description and the direction of the escape.   The officer will notify law enforcement officials.
- Do not touch anything in the robbery area.  (The robber may have left fingerprints) Isolate and protect the area.  Retain any notes or objects the robber leaves behind.
- Lock up all cash.
- Complete the robbery description form without the help of other witnesses.

GDWB 000435

- Avoid discussing the holdup with anyone except the officer in charge or the police. Witnesses should not confer with each other until after they have been interviewed by law enforcement officers.
- Do not reopen the affected window until it is released by the security officer.
- Refer all news media questions to the bank president or the bank's official representative.

## In the Event of a Bomb Threat

Most bomb threats are false. However, it is essential that employees remain calm and assist customers and other employees in leaving the bank premises in a safe and prompt manner.

The following procedure applies in the event of a bomb threat:

- In most instances, the bomb threat will be received via a phone call. Get as much information as possible. Listen and repeat what is said to you.
- As soon as the caller hangs up, quickly and quietly contact the senior manager in charge and convey the information.
- The manager will contact the police and fire departments and the Federal Bureau of Investigation.
- The manager will contact each department head to proceed in an orderly evacuation.
- The tellers will secure all money drawers and all drawers containing important files and documents. Keys are to be taken with you.
- All employees will exit the doors nearest to their work area and congregate in the employee parking lot as soon as the evacuation order has been received. No employee is to leave before receiving the official evacuation order.

## In the Event of a Fire

All employees need to learn the location of fire extinguishers in case the fire is localized and can be extinguished quickly. If this is not possible, the procedure will be the same as in the event of a bomb threat, beginning with the second step.

It is crucial that all employees remain calm in order to avoid panic. Your composure will provide reassurance to those around you, employees and customers alike.

GDWB 000436

**DISASTER RECOVERY / RESUMING BUSINESS OPERATIONS**

All employees are expected to report to work unless notified by the media or their supervisor that work has been suspended. If a disaster warning occurs during working hours, the bank will make very attempt to allow employees to leave in time to reach their homes and families safely. Supervisors will be the primary communications link with employees. Therefore, employees and supervisors should keep each other informed of their current telephone numbers, and these should be kept both at home and at the office.

Getting a bank back to business after a natural disaster or emergency involves concentrating on three phases of action:

- Preparation
- The disaster
- Recovery

**PREPARATION**

All employees and supervisors of the bank should attempt to anticipate their own needs in the event of a disaster, such as a hurricane, earthquake, or flood, with regard to personal needs, fellow employee needs, and customer needs. The following steps are taken in preparation for disaster recovery:

- The bank will provide training materials for the purpose of disaster preparedness.
- Emergency communication procedures with cellular phone numbers and 800 number emergency information systems will be developed for employees.
- Each department must make preparations for records retention and systems back-up so that any files that may be destroyed can be recovered.
- Each department should designate an employee to conduct a damage survey of the department and to make a list of needs to begin operations as soon as possible.

**The Disaster**

If a branch or location is rendered dysfunctional, the closest branch capable of dealing with the customer and employee workload will be used. A disaster recovery officer will be designated, and employees will call that officer for instructions regarding work, transportation, and personal needs during the disaster, and return-to-work and work processes after the disaster.

GDWB 000437

The employee designated to conduct the damage survey will, in conjunction with the department head, prepare the department for a move or cleanup. Additionally, he or she will, if a natural disaster makes it impossible for certain vendors to reach the facility, identify alternatives to provide essential supplies and replacement parts.

Every effort will be made to restore bank operations as quickly as possible. Senior management will utilize the media, cellular phones, and 800 numbers to keep employees, customers, and vendors informed of service hours, locations, and any changes in procedure.

**Recovery**

Senior management will meet to consider whether the disaster required special assistance with transportation to work, housing near work, emergency financial assistance to employees for immediate needs, needs for disaster leave, and establishing a disaster recovery headquarters. Department heads, senior management, and supervisors will be considered an information and action team that takes appropriate action to return the bank to full operations in the quickest possible stages.

Employees will notify the human resources department of their needs and work availability at the first opportunity on the day of or during the next work day after the disaster, or as soon as feasible.

GDWB 000438

## ACKNOWLEDGMENT STATEMENT

The policies stated in the employee handbook are intended to give an employee an indication of how most employment situations are normally handled.

## STATEMENT

I have read the policies and programs outlined in this Employee Handbook. Specifically, I have read the Code of Ethics stated therein. I understand that I must adhere to these policies.

I understand that this handbook is not a contract of employment between me and the bank and I should not view it as such. No employee is guaranteed employment for any specific duration. I also understand that no one from the bank has any authority to represent to me, orally or in writing that this handbook or any particular personnel policy or procedure contained in it is or may be viewed as an agreement or as a commitment to me, and no such representation shall be binding upon the bank. I further understand that the bank reserves the right to unilaterally modify, amend, or eliminate policies, procedures, and/or benefits at any time, or to require and/or increase contributions toward these benefits with or without notice to me.

I also understand that the information in this handbook is confidential and for the use of our employees only. It will, at all times, remain the property of the bank. Should employment be terminated for any reason, I will return this handbook to the bank.

I further understand that the bank may withhold from my final paycheck the cost of any items that are not returned prior to my last day of employment.

I further understand that:

> Policies and the handbook may be updated from time to time as described herein.

> The bank has a formal 90-day introductory period for all employees. During this get-acquainted period, I or the bank may end the relationship. If this happens, the bank may not be charged with any unemployment benefits paid, nor will any additional benefits accrue.

> Use of the bank's email, telecommunications and office equipment constitutes consent to monitoring the use of this equipment.

> The bank has a right to search its property and for prohibited property anywhere on bank property as described in this handbook.

> The bank is an employment-at-will employer. This basically means that at any time during my employment I may resign, if it is in my best interest. The bank has a commensurate right to protect the bank's best interest. By signing this statement, I acknowledge that I have received and read, not necessarily agree with, our employee handbook and this statement

_____           _____
Employee Name   (Please Print)                           (Date)

EMPLOYEE SIGNATURE

NOTE:  This page should be signed, dated and remain in your handbook.

GDWB 000439

## ACKNOWLEDGMENT STATEMENT (FOR PERSONNEL FILE)

The policies stated in the employee handbook are intended to give an employee an indication of how most employment situations are normally handled.

### STATEMENT

I have read the policies and programs outlined in this Employee Handbook. Specifically, I have read the Code of Ethics stated therein. I understand that I must adhere to these policies.

I understand that this handbook is not a contract of employment between me and the bank and I should not view it as such. No employee is guaranteed employment for any specific duration. I also understand that no one from the bank has any authority to represent to me, orally or in writing that this handbook or any particular personnel policy or procedure contained in it is or may be viewed as an agreement or as a commitment to me, and no such representation shall be binding upon the bank. I further understand that the bank reserves the right to unilaterally modify, amend, or eliminate policies, procedures, and/or benefits at any time, or to require and/or increase contributions toward these benefits with or without notice to me.

I also understand that the information in this handbook is confidential and for the use of our employees only. It will, at all times, remain the property of the bank. Should employment be terminated for any reason, I will return this handbook to the bank.

I further understand that the bank may withhold from my final paycheck the cost of any items that are not returned prior to my last day of employment.

I further understand that:

> Policies and the handbook may be updated from time to time as described herein.

> The bank has a formal 90-day introductory period for all employees. During this get-acquainted period, I or the bank may end the relationship. If this happens, the bank may not be charged with any unemployment benefits paid, nor will any additional benefits accrue.

> Use of the bank's email, telecommunications and office equipment constitutes consent to monitoring the use of this equipment.

> The bank has a right to search its property and for prohibited property anywhere on bank property as described in this handbook.

> The bank is an employment-at-will employer. This basically means that at any time during my employment I may resign, if it is in my best interest. The bank has a commensurate right to protect the bank's best interest. By signing this statement, I acknowledge that I have received and read, not necessarily agree with, our employee handbook and this statement

_____          _____
Employee Name   (Please Print)                                      (Date)


**EMPLOYEE SIGNATURE**

NOTE:     This page should be signed, removed from the handbook, and returned to the Human Resources Department.

GDWB 000440

File Maintenance Report for [REDACTED] - R/ W CHECKING - Real     Bank #: 033     THE GEO D WARTHEN BANK
Saver                                                            User:   kbaucom   Kim Baucom

Customer                                                        Relationship
DEBRA D HELTON                                                  Owner - Single                          $            |
DO NOT MAIL
DO NOT, GA  31089

*Debra's personal acct*

| Date | Item Changed | From<br>To | By |
|------|-------------|-----------|-----|
| 04/13/2019<br>09:17 | Suspended memo post<br>record | Amount:        $5.97  Debit<br>Do not post as next business day<br>transac | DEBRA HELTON<br>0242 |
| 04/12/2019<br>15:44 | Suspended memo post<br>record | Amount:        $94.97  Debit<br>Do not post as next business day<br>transac | DEBRA HELTON<br>0242 |
| 06/25/2018<br>12:34 | Funds transfer purged | To [REDACTED]        Amount:<br>25.00<br>Tc:061   Times:999   Days:007<br>06/29/18 | DEBRA HELTON<br>0242 |

DEFENDANT'S
EXHIBIT
5 Helton
6/8/22  SB

**File Maintenance Report for** ▮▮▮▮ **Business**

Bank #:  033     THE GEO D WARTHEN BANK
User:    kbaucom   Kim Baucom

Customer

DEAN HELTON DBA
▮▮▮▮▮▮▮▮▮

Relationship

Business - Authorized Signer     $   S
Owner - Business                 $

| Date | Item Changed | From / To | By |
|------|--------------|-----------|-----|
| 04/26/2019 12:54 | Funds transfer purged | To : ▮▮▮▮  Amount: 81.00 Tc:061  Times:999  Days:007 05/03/19 | DEBRA HELTON 0242 |
| 04/11/2019 12:48 | Funds transfer added | To : ▮▮▮▮  Amount: 81.00 Tc:061  Times:999  Days:007 04/19/19 | DEBRA HELTON 0242 |
| 04/09/2019 10:39 | Funds transfer added | To : ▮▮▮▮  Amount: 120.00 Tc:061  Times:999  Days:007 04/09/19 | DEBRA HELTON 0242 |



**File Maintenance Report for** ▮▮▮▮▮▮▮ **Installment Loans**

| | |
|---|---|
| Bank #: | 033   THE GEO D WARTHEN BANK |
| User: | kbaucom   Kim Baucom |

Customer

NICHOLAS POWELL GREEN
ASHLEY HELTON GREEN

| Relationship | | |
|---|---|---|
| Borrower | $ | S | I |
| Co-borrower | $ | S | I |

| Date | Item Changed | From / To | By |
|---|---|---|---|
| 04/26/2019 12:54 | Funds transfer purged | From: ▮▮▮▮7   Amount: 81.00 Tc:674   Times:999   Days:007 05/03/19 | DEBRA HELTON 0242 |
| 04/26/2019 12:54 | Funds transfer added | From: ▮▮▮▮   Amount: 81.00 Tc:674   Times:999   Days:007 05/03/19 | DEBRA HELTON 0242 |
| 04/11/2019 12:48 | Funds transfer purged | From: ▮▮▮▮   Amount: 162.00 Tc:674   Times:999   Days:014 04/19/19 | DEBRA HELTON 0242 |
| 04/11/2019 12:48 | Funds transfer added | From: ▮▮▮▮   Amount: 81.00 Tc:674   Times:999   Days:007 04/19/19 | DEBRA HELTON 0242 |

File Maintenance Report for CL 419989100 - 5/5 ARM

Bank #:  033  THE GEO D WARTHEN BANK
User:  kbaucom  Kim Baucom

Customer

HEATHER DEAN HELTON
441 WARTHEN ST
SANDERSVILLE, GA  31082

Relationship

Borrower                                    $    S                I

| Date | Item Changed | From To | By |
|------|-------------|---------|-----|
| 04/22/2019 11:16 | Change name relationship | HEATHER DEAN HELTON <nothing> | DEBRA HELTON 0242 |

File Maintenance Report for ▮▮▮▮▮ - Business

Bank #:  033  THE GEO D WARTHEN BANK
User:  3897  KAREN WILSON

Customer

DEAN HELTON DBA
▮▮▮▮▮▮▮▮▮▮▮▮▮

Relationship

Business - Authorized Signer    S  S    I
Business Entity (DBA)    S

*Husband's business checking acct*

| Date | Item Changed | From / To | By |
|------|-------------|-----------|-----|
| 04/26/2019 12:54 | Funds transfer purged | To ▮▮▮▮ D  Amount: 81.00 Tc:061  Times:999  Days:007 05/03/19 | DEBRA HELTON 0242 |
| 04/11/2019 12:48 | Funds transfer added | To : ▮▮▮▮  Amount: 81.00 Tc:061  Times:999  Days:007 04/19/19 | DEBRA HELTON 0242 |
| 04/09/2019 10:39 | Funds transfer added | To : ▮▮▮▮  Amount: 120.00 Tc:061  Times:999  Days:007 04/09/19 | DEBRA HELTON 0242 |
| 05/19/2014 17:22 | Funds transfer added | To : ▮▮▮▮  Amount: 222.55 Tc:061  Times:001  Mth:001 05/19/14 | DEBRA HELTON 0242 |
| 12/28/2011 12:26 | Funds transfer added | To : ▮▮▮▮  Amount: 99999,999.99 Tc:061  Times:999  Mth:001 01/15/12 | DEBRA HELTON 0242 |
| 12/06/2011 12:54 | Funds transfer added | To : ▮▮▮▮  Amount: 245.00 Tc:061  Times:999  Days:007 12/06/11 | DEBRA HELTON 0242 |
| 12/06/2011 12:54 | Funds transfer added | To : ▮▮▮▮  Amount: 465.00 Tc:061  Times:999  Days:007 12/06/11 | DEBRA HELTON 0242 |

**File Maintenance Report for** ███████████ **- Installment R/E**     Bank #: 033    THE GEO D WARTHEN BANK
Mortgage                                                   User:    3897    KAREN WILSON

<u>Customer</u>                                    <u>Relationship</u>

CHESTER DEAN'S STEAK & SEAFOOD LLC      Borrower                          S    S        I

██████████ ██ ███

*Husband's business loan*

| Date | Item Changed | From | By |
| --- | --- | --- | --- |
| | | To | |
| ███████████████████████████████████████████████████████ |
| 04/09/2019 10:39 | Funds transfer added | From: ██████ Amount: 120.00 Tc:088  Times:999  Days:007 04/09/19 | DEBRA HELTON 0242 |

File Maintenance Report for ▓▓▓▓▓▓▓ - 5/5 ARM

Bank #: 033   THE GEO D WARTHEN BANK
User: 3897   KAREN WILSON

Customer

DEAN HELTON
DEBRA D HELTON

Relationship

Borrower                $  S    I
Co-borrower            $  S    I

*Debra + husband personal loan*

| Date | Item Changed | From / To | By |
|------|-------------|-----------|-----|
| 12/02/2014 10:41 | FHLB Eligible | Yes / No | DEBRA HELTON 0242 |
| 12/02/2014 10:40 | FHLB Eligible | No / Yes | DEBRA HELTON 0242 |
| 07/17/2012 10:27 | Added note record | changed to collect interest as | DEBRA HELTON 0242 |
| 07/17/2012 10:26 | Escrow analysis option | 0 / 1 | DEBRA HELTON 0242 |
| 07/17/2012 10:26 | Interest collection code | Collect outstanding interest / Collect interest as billed | DEBRA HELTON 0242 |
| 06/07/2012 15:01 | Escrow analysis option | 0 / 1 | DEBRA HELTON 0242 |
| 06/07/2012 15:01 | Interest collection code | Collect interest as billed / Collect outstanding interest | DEBRA HELTON 0242 |
| 06/06/2012 12:01 | Fair Lending Act | Not applicable / Covered home | DEBRA HELTON 0242 |
| 06/06/2012 12:01 | Interest collection code | Not applicable / Collect interest as billed | DEBRA HELTON 0242 |
| 02/28/2012 10:56 | Over payment collection seq | Esc, Prin, Int, Late chg / Prin, Int, Late chg, Esc | DEBRA HELTON 0242 |
| 02/28/2012 10:56 | Payment collection sequence | Int, Prin, Late chg, Esc / Esc, Int, Prin, Late chg | DEBRA HELTON 0242 |

**File Maintenance Report for** ▮▮▮▮▮ **REWARD CHECKING**   Bank #: 033   THE GEO D WARTHEN BANK
**Consumer**                                    User:   3897   KAREN WILSON

Customer                                   Relationship

DEAN HELTON                                Owner - Single                    $              |
▮▮▮▮▮

*Husband's personal acct*

| Date | Item Changed | From / To | By |
|---|---|---|---|
| 10/08/2009 12:20 | Funds transfer changed | To ▮ Amount: 100.00 Tc:061 Times:999 Days:007 10/09/09 | DEBRA HELTON 0242 |
| 09/01/2009 13:06 | Funds transfer purged | To : ▮ Amount: 100.00 Tc:061 Times:999 Days:007 09/04/09 | DEBRA HELTON 0242 |
| 08/24/2009 08:58 | Funds transfer changed | To : ▮▮▮ Amount: 200.00 Tc:061 Times:999 Days:007 08/28/09 | DEBRA HELTON 0242 |
| 08/13/2009 15:01 | Funds transfer changed | To ▮ Amount: 100.00 Tc:061 Times:999 Days:007 08/14/09 | DEBRA HELTON 0242 |
| 07/30/2009 12:27 | Funds transfer added | To ▮▮▮ Amount: 100.00 Tc:061 Times:999 Days:007 08/07/09 | DEBRA HELTON 0242 |
| 01/03/2009 08:05 | Funds transfer changed | To : ▮▮ Amount: 100.00 Tc:061 Times:999 Days:007 01/09/09 | DEBRA HELTON 0242 |
| 01/03/2009 08:05 | Funds transfer added | To : ▮▮ Amount: 100.00 Tc:061 Times:999 Days:007 01/09/09 | DEBRA HELTON 0242 |
| 12/03/2008 15:26 | Funds transfer changed | To : ▮ Amount: 126.84 Tc:061 Times:001 Days:007 12/09/08 | DEBRA HELTON 0242 |
| 08/20/2008 09:43 | Funds transfer added | To : ▮▮ Amount: 100.00 Tc:061 Times:999 Days:007 08/29/08 | DEBRA HELTON 0242 |
| 08/20/2008 09:42 | Funds transfer added | To : ▮▮ Amount: 99999,999.99 Tc:061 Times:001 Mth:001 08/20/08 | DEBRA HELTON 0242 |
| 01/17/2008 13:12 | Funds transfer changed | To : ▮ Amount: 100.00 Tc:061 Times:999 Days:007 01/22/08 | DEBRA HELTON 0242 |

Generated on:  10/11/2019 3:15.57 PM

File Maintenance Report for ▮▮▮▮▮▮ REWARD CHECKING
Consumer

Bank #:  033    THE GEO D WARTHEN BANK
User:  3897    KAREN WILSON

Customer

DEAN HELTON

Relationship

Owner - Single          $    I

| Date | Item Changed | From To | By |
|---|---|---|---|
| 04/06/2007 15:17 | Funds transfer added | To : ▮▮▮▮▮D  Amount: 99999,999.99 Tc:061  Times:999  Mth:001 04/15/07 | DEBRA HELTON 0242 |
| 03/05/2007 13:39 | Funds transfer changed | To : ▮▮▮▮  Amount: 508.90 Tc:061  Times:999  Mth:001 03/20/07 | DEBRA HELTON 0242 |
| 03/02/2007 13:24 | Funds transfer changed | To : ▮▮▮▮  Amount: 508.90 Tc:061  Times:999  Mth:001 04/20/07 | DEBRA HELTON 0242 |
| 01/24/2007 11:58 | Funds transfer added | To : ▮▮▮▮▮▮  Amount: 99999,999.99 Tc:061  Times:999  Mth:001 02/01/07 | DEBRA HELTON 0242 |
| 09/18/2006 16:25 | Funds transfer changed | To ▮▮▮▮▮D  Amount: 458.04 Tc:061  Times:999  Mth:001 10/20/06 | DEBRA HELTON 0242 |
| 06/27/2003 | ODP transfer increment | 100 10 | DEBRA HELTON 0242 |
| 06/27/2003 | ODP account(1) | ▮▮▮▮▮ ▮▮▮▮▮ | DEBRA HELTON 0242 |
| 06/27/2003 | ODP account(1) application | Line of Credit Demand Deposit | DEBRA HELTON 0242 |
| 02/28/2002 | Stop purged | WORK NOT SATISFACTORY Amount:  $175.03 Check# 2640 | DEBRA HELTON 0242 |
| 02/27/2002 02:25 | Stop payment added | WORK NOT SATISFACTORY Amount:  $175.03 Check# 2640 | DEBRA HELTON 0242 |
| 10/09/2001 | NSF charge waived | Yes No | DEBRA HELTON 0242 |
| 10/09/2001 | Image statement rows | Unknown value 2 rows per column | DEBRA HELTON 0242 |
| 10/09/2001 | Image statement columns | Unknown value 1 column per page | DEBRA HELTON 0242 |
| 10/09/2001 | NSF charge waived | No Yes | DEBRA HELTON 0242 |
| 10/23/2000 | Internet access code | Yes No | DEBRA HELTON 0242 |
| 10/20/2000 | Internet access code | No Yes | DEBRA HELTON 0242 |

File Maintenance Report fo[REDACTED] - REWARD CHECKING     Bank #: 033     THE GEO D WARTHEN BANK
Consumer                                                     User:   3897    KAREN WILSON

Customer                                          Relationship
DEAN HELTON                                       Owner - Single                              $

| Date | Item Changed | From<br>To | By |
|------|--------------|------------|-----|
| 10/04/1999<br>21:45 | Stop payment added | BILL INCORRECT<br>Amoun   0 | DEBRA HELTON<br>0242 |
| 10/04/1999 | Stop purged | CANCELLATION<br>Amoun   0 | DEBRA HELTON<br>0242 |
| 09/27/1999<br>10:52 | Geographic location | NOT ASSIGNED<br><nothing> | DEBRA HELTON<br>0242 |
| 07/29/1999 | Stop payment added | CANCELLATION<br>Amoun   0 | DEBRA HELTON<br>0242 |

File Maintenance Report for ▓▓▓▓▓ Select Home Equity     Bank #: 033   THE GEO D WARTHEN BANK
Lines Of Credit                                          User:   3897   KAREN WILSON

Customer                                    Relationship

DEAN HELTON                                 Borrower                         $   S        |
DEBRA D HELTON                              Co-borrower                      $   S        |

*Personal line of credit*

| Date | Item Changed | From / To | By |
|------|--------------|-----------|-----|
| 09/25/2018 10:44 | Stop Draw Date | Unknown / 8/09/33 | DEBRA HELTON 0242 |
| 09/25/2018 10:44 | Prime code | PRIME RATE / Employee Rate | DEBRA HELTON 0242 |
| 09/25/2018 10:44 | Secondary officer | Unknown value / Kenneth A Bibb | DEBRA HELTON 0242 |
| 09/25/2018 10:44 | Date of expiration | Unknown / 8/09/33 | DEBRA HELTON 0242 |
| 09/25/2018 10:44 | Director/Officer/Employee | Customer / Officer | DEBRA HELTON 0242 |
| 09/25/2018 10:44 | Officer | Not Assigned / Tracy B Welch | DEBRA HELTON 0242 |

**File Maintenance Report for LC**

Bank #: 033       THE GEO D WARTHEN BANK
User: 3897      KAREN WILSON

Customer

CHESTER DEAN'S STEAK & SEAFOOD LLC

Relationship

Borrower            $   S

*Husband's business*

| Date | Item Changed | From To | By |
|------|--------------|---------|-----|
| 08/07/2012 10:05 | Maximum late charge | $50.00      $.00 | DEBRA HELTON 0242 |
| 08/07/2012 10:05 | Payment minimum (1) | 25      50 | DEBRA HELTON 0242 |
| 08/07/2012 10:05 | Product payment override | No Yes | DEBRA HELTON 0242 |
| 08/07/2012 10:05 | Limit | $0      $5,175 | DEBRA HELTON 0242 |
| 08/07/2012 10:05 | Date limit changed | 6/19/12 8/07/12 | DEBRA HELTON 0242 |
| 12/28/2011 12:26 | Funds transfer added | From: ▮▮▮   Amount: 99999,999.99 Tc:070 Times:999 Mth:001 01/15/12 | DEBRA HELTON 0242 |

File Maintenance Report for ▇▇▇▇▇▇ - REWARD CHECKING    Bank #: 033    THE GEO D WARTHEN BANK
Consumer    User:   3897    KAREN WILSON

Customer                  Relationship

ASHLEY HELTON GREEN       Owner - Single                  $   S     I

*Debra's daughter*

| Date | Item Changed | From / To | By |
|---|---|---|---|
| 04/11/2019 15:02 | Suspended memo post record | Amount:   $162.00 Debit<br>Do not post as next business day transac | DEBRA HELTON 0242 |
| 04/11/2019 12:52 | Funds transfer purged | To : ▇▇▇▇D   Amount:<br>50.00<br>Tc:061   Times:999   Mth:001<br>04/15/19 | DEBRA HELTON 0242 |
| 04/11/2019 12:52 | Funds transfer purged | To : ▇▇▇▇   Amount:<br>50.00<br>Tc:061   Times:999   Mth:001<br>05/01/19 | DEBRA HELTON 0242 |
| 04/11/2019 12:48 | Funds transfer purged | To : ▇▇▇▇   Amount:<br>162.00<br>Tc:061   Times:999   Days:014<br>04/19/19 | DEBRA HELTON 0242 |
| 06/25/2018 12:35 | Funds transfer added | To : ▇▇▇▇   Amount:<br>50.00<br>Tc:061   Times:999   Mth:001<br>08/01/18 | DEBRA HELTON 0242 |
| 06/25/2018 12:34 | Funds transfer added | To : ▇▇▇▇   Amount:<br>50.00<br>Tc:061   Times:999   Mth:001<br>07/15/18 | DEBRA HELTON 0242 |
| 10/23/2014 12:08 | Funds transfer changed | To ▇▇▇▇   Amount:<br>900.00<br>Tc:061   Times:360   Mth:001<br>11/01/14 | DEBRA HELTON 0242 |
| 10/01/2009 16:57 | Funds transfer purged | From: ▇▇▇▇   Amount:<br>50.00<br>Tc:006   Times:999   Days:007<br>10/02/09 | DEBRA HELTON 0242 |
| 06/19/2007 14:43 | Funds transfer added | From: ▇▇▇▇5   Amount:<br>50.00<br>Tc:006   Times:999   Days:007<br>06/22/07 | DEBRA HELTON 0242 |
| 10/14/2004 | Added memo post record | Amount:   $50.00 Credit<br>Do not post as next business day txs | DEBRA HELTON 0242 |

GDWB 000460

File Maintenance Report for ▉▉▉ REWARD CHECKING    Bank #: 033    THE GEO D WARTHEN BANK
Consumer                                                            User:  3897    KAREN WILSON

Customer                                              Relationship
NICHOLAS POWELL GREEN                                  Owner - Primary                        $    S        I

*Debra's son-n-law*

| Date | Item Changed | From To | By |
|------|-------------|---------|-----|
| 06/07/2018 09:34 | Funds transfer purged | To : ▉▉▉ Amount: 575.00<br>Tc:061  Times:002  Cycle:055 | DEBRA HELTON 0242 |
| 06/07/2018 09:34 | Funds transfer changed | To : ▉▉▉ Amount: 430.00<br>Tc:061  Times:999  Cycle:055 | DEBRA HELTON 0242 |
| 05/31/2018 13:03 | Funds transfer changed | To : ▉▉▉ Amount: 575.00<br>Tc:061  Times:003  Cycle:055 | DEBRA HELTON 0242 |
| 05/31/2018 13:02 | Funds transfer added | To : ▉▉▉ Amount: 430.00<br>Tc:061  Times:999  Cycle:055 | DEBRA HELTON 0242 |
| 05/31/2018 13:01 | Funds transfer added | To : ▉▉▉ Amount: 575.00<br>Tc:061  Times:003  Days:007<br>06/01/18 | DEBRA HELTON 0242 |

File Maintenance Report for ▮▮▮▮▮▮ - Installment Loans

Bank #: 033    THE GEO D WARTHEN BANK
User: 3897    KAREN WILSON

Customer

NICHOLAS POWELL GREEN
ASHLEY HELTON GREEN

Relationship

| Borrower | $ | S | I |
| Co-borrower | $ | S | I |

*Debra's son-N-law*

| Date | Item Changed | From / To | By |
|------|-------------|-----------|-----|
| 04/26/2019 12:54 | Funds transfer purged | From: ▮▮▮ Amount: 81.00 Tc:674 Times:999 Days:007 05/03/19 | DEBRA HELTON 0242 |
| 04/26/2019 12:54 | Funds transfer added | From: ▮▮▮ Amount: 81.00 Tc:674 Times:999 Days:007 05/03/19 | DEBRA HELTON 0242 |
| 04/11/2019 12:48 | Funds transfer purged | From: ▮▮▮ Amount: 162.00 Tc:674 Times:999 Days:014 04/19/19 | DEBRA HELTON 0242 |
| 04/11/2019 12:48 | Funds transfer added | From: ▮▮▮ Amount: 81.00 Tc:674 Times:999 Days:007 04/19/19 | DEBRA HELTON 0242 |
| 08/27/2018 12:19 | RATE | No Yes | DEBRA HELTON 0242 |
| 08/27/2018 12:19 | TERM | No Yes | DEBRA HELTON 0242 |

**File Maintenance Report for** [REDACTED] **Installment Loans**

Bank #: 033　　THE GEO D WARTHEN BANK
User:　3897　　KAREN WILSON

Customer

ASHLEY HELTON GREEN

Relationship

Borrower　　　　　　　　　　　$　S

*Debra's daughter*

| Date | Item Changed | From / To | By |
|------|-------------|-----------|-----|
| 04/11/2019 12:52 | Funds transfer purged | From: [REDACTED] Amount: 50.00 Tc:674 Times:999 Mth:001 04/15/19 | DEBRA HELTON 0242 |
| 04/11/2019 12:52 | Funds transfer purged | From: [REDACTED] Amount: 50.00 Tc:674 Times:999 Mth:001 05/01/19 | DEBRA HELTON 0242 |
| 04/11/2019 12:52 | Funds transfer added | From: [REDACTED] Amount: 25.00 Tc:674 Times:999 Days:007 04/26/19 | DEBRA HELTON 0242 |
| 06/25/2018 12:35 | Funds transfer added | From: [REDACTED] Amount: 50.00 Tc:674 Times:999 Mth:00[REDACTED] 08/01/18 | DEBRA HELTON 0242 |
| 06/25/2018 12:34 | Funds transfer purged | From: [REDACTED] Amount: 25.00 Tc:674 Times:999 Days:007 06/29/18 | DEBRA HELTON 0242 |
| 06/25/2018 12:34 | Funds transfer added | From: [REDACTED] Amount: 50.00 Tc:674 Times:999 Mth:001 07/15/18 | DEBRA HELTON 0242 |

File Maintenance Report for ▮▮▮▮▮▮ - Installment Loans

Bank #: 033    THE GEO D WARTHEN BANK
User: 3897    KAREN WILSON

Customer

HEATHER DEAN HELTON

Relationship

Borrower            $  S    |

*Debra's daughter*

| Date | Item Changed | From<br>To | By |
|---|---|---|---|
| 11/26/2018<br>12:21 | Added note record | skipping draft for 11/30 since | DEBRA HELTON<br>0242 |
| 11/26/2018<br>12:20 | Funds transfer changed | From: ▮▮▮▮ Amount:<br>220.00<br>Tc:674  Times:999  Days:014<br>12/14/18 | DEBRA HELTON<br>0242 |
| 03/23/2018<br>13:02 | Change name<br>relationship | Internet access off<br>Internet access on | DEBRA HELTON<br>0242 |
| 03/23/2018<br>13:02 | Change name<br>relationship | HEATHER D HELTON<br><nothing> | DEBRA HELTON<br>0242 |

**Kim B. Baucom**

| | |
|---|---|
| **From:** | Kim B. Baucom |
| **Sent:** | Tuesday, September 04, 2018 3:31 PM |
| **To:** | GDWB |
| **Subject:** | Account Reminder |

Please remember that as an employee of the bank, you are not permitted to make changes to anything pertaining to relatives or immediate family members. This includes teller transactions, account transfers, and any maintenance changes including loans. If you find something that needs to be changed, please have someone else in the necessary department handle the change. Feel free to let me know if you have any questions or concerns about a transaction.

Thanks!

*Kimberly B. Baucom,* AAP

Vice President of Operations
Internal Auditor/Asst. BSA Officer
Enterprise Risk Manager
The Geo. D. Warthen Bank
216 N. Harris St
Sandersville, GA  31082
478-552-6906
478-553-0961 Ext. 2013
Fax 478-552-2728

1



DEFENDANT'S
EXHIBIT
6 Helton
6/8/22  SB
PENGAD 800-631-6989

**GDWB** 000446
Def Ex. 6

## DISPLINARY WARNING

DATE ISSUED:              May 13, 2019

ISSUED BY:                Ken Bibb

ISSUED TO:                Debra D. Helton

EMPLOYEE'S POSITION:      Vice President/Compliance Officer

This warning is being issued to you as a result of your violation of certain bank policies. Specifically, the bank's policy with regard to an employee either transacting their own bank business or that of a relative. The bank's **EMPLOYEE HANDBOOK** sets forth the following:

"All employees should assume the position of a regular customer when handling their personal bank business. All transactions should be handled in the normal *over-the-counter* procedure. No employees will be permitted to transact their own or a relative's bank business (including boyfriend, girlfriend, or partner). "

The attached information sets forth the dates of personal bank business and the transactions performed by you on each date in violation of the bank's policy with regard to same.

***Effective immediately***, you are expected to adhere to this policy and refrain from such behavior going forward. Failure to demonstrate immediate and sustained compliance with regard to bank policy will result in further disciplinary action, up to and including dismissal.

By your signature below, you acknowledge this violation and what is expected of you in the future.

DATE: 5-13-2019

Employee Signature

DATE: 5-13-2019

Supervisor

DEFENDANT'S
EXHIBIT
7 Helton
6/8/22
PENGAD 800-631-6989

GDWB 000466
Def Ex. 7

**EXHIBIT "A"**                          RE:  DEBRA HELTON ***-**-0242

Monday, May 13, 2019

RE:  Disciplinary Warning / Debra Helton


Ken Bibb, Lamar Doolittle and I met with Debra this morning to discuss a policy violation as well as other points of concern.  The policy violation had to do with her transacting her own business or that of her family members.  See attached.

In further discussion, Ken advised Debra that she is to focus completely on her compliance duties and to leave the other department heads to handle their area of responsibility.  He further stated that her loan portfolio would be divided up among other loan officers in the near future, so that she could focus primarily on compliance issues only.

He reemphasized the importance of her being present at the bank more than she has in the past (i.e. attending multiple conferences, out sick or vacation being taken consecutive with conferences).

Ken further stated that Banc Pac maintenance issues and/or the setting up of new bank products would be delegated to Ashley Haynes, as the Loan Ops Manager, and she may be called upon the help Ashley with taking on that new role.  Lamar has removed a considerable amount of admin privileges from Debra and will monitor the issue accordingly.

In further discussion, Ken reminded Debra that each of us should be respectful when talking to our fellow co-workers and that angry outbursts will not be tolerated.  Each bank officer is to maintain a professional and levelheaded demeanor at all times.

CONFIDENTIAL                    GDWB 000310

| | |
|---|---|
| **Sent:** | Fri, 17 May 2019 11:00:57 -04:00 |
| **To:** | Ken Bibb (KBIBB@GDWBANK.NET) |
| **Cc:** | Chris Irwin |
| **Attachments:** | Information requested, RE: EXTERNAL: call codes |

May 17, 2019
Good morning.
I would like to discuss our Monday morning meeting and see if I can get some answers to questions I have tossed around in my mind for a week.

After 30 years of employment I have never been so devastated but I am fully aware that I did do and knowledge completely the transactions until further review.

After discussing the funds transfer addition and change, this is nothing that could not have been done on my phone or any computer worldwide thru my internet banking. I did sign into the internet banking and tried to set up scheduled transactions. I could not figure it out and even asked Lamar if we had any instructions for doing this. There are no instructions and not user friendly for me. It was a knee jerk reaction to do it at my computer, after trying desperately to do it online. None the less I am guilty of setting up transfers and deleting.

Heather name change- After reviewing report 85 and discussing the report with FIS there were no changes to Heather's account name. Her name was changed 9/10/18 by Krystal Pittman. This was an inquiry to Heather's account reviewing the collateral screen and adding info LOps is not adding. I have asked Ashley twice I know to please add this info while the loan is being added and her reply is it does not matter or make a difference. However the collateral subsystem is a growing product in the FIS world and at any time these fields can provide information to the loan officer. Currently if everything was completed you could look at the customer in BancPac and tell what collateral they had available and the amount available to process another loan.

During our meeting there was no discussion of removal of any of my administrative rights. When I returned to my computer everything had been completely wiped away and/or deleted. Due to the conversation in your office, I understand the removal of administrative rights in BancPac but not FLO. There was no discussion of any FLO problems or issues with the FLO product. We moved to this loan document processing in 2009 I believe. This product was not being monitored and updated so we began having issues with some documents. At that time, I began to study the program and make changes needed to run the loan processing smoothly. I have considered this my baby and some fore warning that it was being taken away would have been nothing but considerate. The only issue that I can think could be the problem is the setup of a new product that I discussed with you before setup. This new product was created to straighten out the call codes brought to my attention from an FIS email that were in the wrong product (see attached). I even discussed with you that you would need to know the amounts being moved and the call report code that would be moved from and to because someone would be calling from FDIC asking why our numbers had changed so much from the previous call report. Your reply was to move forward and let me know. No this is not my job, but I happen to be at this time the only employee that is watching the call codes on new loans to be sure they are in the right call code field.( I have given these changes to Ashley.)



**DEFENDANT'S EXHIBIT**
10 Helton
6/8/22 DJC
PENGAD 800-631-6989

Def. Ex. 10

This is not my job is a remark that you will not hear me say. I was raised that if there is something that needs doing then you do it.

The E-Oscar program is a program where credit reporting companies submit disputes on their credit reports. At one time I was receiving the email concerning these disputes and somehow they just stopped coming. Fair Credit Reporting act is a part of loan compliance. Ashley is the only person set to change credit reports and this is fine, but no one is monitoring the reports. This is a subject that FDIC is beginning to monitor and as I said in the meeting we need to be sure it is monitored. I would like to make a note that this responsibility is being transferred to the "Deposit Operations Manager". Also when customers enter the bank with credit report disputes, the loan officers and loan assistants can make those changes in Kroll as well. Ashley will need copies of these changes. I have been making these corrections and giving Ashley a copy of the changed credit report for her files. This process is pretty much instant.

Attitude – I have addressed my attitude reminding myself every day when I enter the building to have self-discipline regarding attitude. – Not to mention we all have an attitude when the last button is pushed.
To be questioned why I need access to E-Oscar is understandable but to be denied when the Fair Credit reporting act is a part of compliance is not understandable.

I also asked the question if this was a probationary period to be sure I did nothing else wrong or a permanent suspension. I have not received your answer but I have read between the lines and know that it is permanent. I will just work harder to be a better compliance officer.

For thirty years I have worked and treated this job (bank) as much my own knowing that it is not, but to make sure everything that I knew was corresponded to other employees and when new products or services were adopted to embrace them and learn as much as possible. When customers were told they could not be helped, usually with extra time and effort there problems could be resolved. (Priscilla credit card payment) (JoAnne Mathis refund of $1700+ in fraudulent ACH insurance drafts).

I appreciate my job and can promise you I will do it to the best of my ability. I do understand now that loan compliance is the only thing I should be concerned with and making sure all loans are correct. I will also make sure that the training for loan compliance and any other compliance training is done annually. If there are any other job responsibilities that I have left out please let me know.

Respectfully submitted:

Debra D. Helton

*Debra D. Helton*
AAP, ACT Specialist
Vice President/Compliance Officer
NMLS #433212

"It takes less time to do a thing right than to explain why you did it wrong." Henry Wadsworth Longfellow

The Geo. D. Warthen Bank
NMLS Co. ID# 408904
P. O. Box 637
216 N Harris St.
Sandersville, GA  31082

Phone – 478-552-6901 x 2009
Fax – 478-552-8517

GDWB_000780

| From: | Brieno, Cynthia |
|---|---|
| **Sent:** | Wed, 01 May 2019 11:05:26 -04:00 |
| **To:** | Debra Helton |
| **Subject:** | RE: EXTERNAL: call codes |
| **Attachments:** | The Geo D Warthen Bank bk 033 product vs call code.docx |

Hi Debra,
This may help you also.
I'll give you a call to review.
Thank you

**From:** Debra Helton <dhelton@GDWBANK.NET>
**Sent:** Wednesday, May 01, 2019 10:03 AM
**To:** Brieno, Cynthia <Cynthia.Brieno@fisglobal.com>
**Subject:** EXTERNAL: call codes
**Importance:** High

I think I have fixed the problem. I went into bank maintenance and selected the loan products for the information. If this is not correct please let me know. Also when should the customer receive SCRA disclosure, I have been told those are not printing with past dues.

*Debra D. Helton*
AAP, ACT Specialist
Vice President/Compliance Officer
NMLS #433212

"It takes less time to do a thing right than to explain why you did it wrong." Henry Wadsworth Longfellow

The Geo. D. Warthen Bank
NMLS Co. ID# 408904
P. O. Box 637
216 N Harris St.
Sandersville, GA 31082

Phone – 478-552-6901 x 2009
Fax – 478-552-8517

The information contained in this message is proprietary and/or confidential. If you are not the intended recipient, please: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately. In addition, please be aware that any message addressed to our domain is subject to archiving and review by persons other than the intended recipient. Thank you.

File Maintenance – Customer Level – Name Record

## File Maintenance

| Date | Item Changed | From / To | By |
|------|-------------|-----------|-----|
| 04/22/2019 11:32 | Coll RE Instrument Type | ███████████ | DEBRA HELTON 0242 |
| 04/22/2019 11:32 | Coll internal account1 | No<br>Yes | DEBRA HELTON 0242 |
| 04/22/2019 11:32 | Coll Pledged Percent | ███████ | DEBRA HELTON 0242 |
| 04/22/2019 11:32 | Coll Pledged Amount | ███████ | DEBRA HELTON 0242 |
| 04/22/2019 11:32 | Coll Original Value | ████████ | DEBRA HELTON 0242 |
| 04/22/2019 11:32 | Coll Insurance Required | Not Required<br>Required | DEBRA HELTON 0242 |
| 04/22/2019 11:32 | Coll Change Date | 4/08/2019<br>4/22/2019 | DEBRA HELTON 0242 |
| 04/22/2019 11:32 | Coll Current Value | ███████ | DEBRA HELTON 0242 |
| 04/22/2019 11:32 | Collateral System | HELTON    -042219███████<br>Changed, 04/22/19 | DEBRA HELTON 0242 |

File Maintenance – Account Level

## File Maintenance

| Date | Item Changed | From / To | By |
|------|-------------|-----------|-----|
| 04/22/2019 11:16 | Change name relationship | TQMGTQI PQMZ TQXGLZ<br><nothing> | DEBRA HELTON 0242 |

File Maintenance – Customer Level – Name Record Collateral level

## Linked

| Priority # Status | Collateral Record Type Description | Collateral Owners | Amount Pledged Available to Lend | Linked To | Total Balance Number of Loans | Date Date |
|---|---|---|---|---|---|---|
| Active | 2-Real Estate 003 DMIGTQZ HGI More... | FERN DEAN HARDING | | | 1 | 04/2: |

RPT 085 from 4/22/19

| Date | Time | User ID | User Name | Station | IP address | Request | Request data | Result code and description |
|---|---|---|---|---|---|---|---|---|
| 4/22/2019 | 11:13:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEINQ | | 5515 |
| 4/22/2019 | 11:13:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQACCT | | HEATHER DEAN HELTON |
| 4/22/2019 | 11:13:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQACCT | | HEATHER DEAN HELTON |
| 4/22/2019 | 11:13:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQTRANS | | |
| 4/22/2019 | 11:14:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEAREL | | 5515 |
| 4/22/2019 | 11:14:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMESTYLST | | |
| 4/22/2019 | 11:14:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQNEWCLST | | |
| 4/22/2019 | 11:16:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEINQ | | 5515 |
| 4/22/2019 | 11:16:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEINQ | | 5515 |
| 4/22/2019 | 11:16:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMERELA | | 55150000000000 |
| 4/22/2019 | 11:16:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | CHGACCT | | HEATHER DEAN HELTON |
| 4/22/2019 | 11:16:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | CHGENOTICE | | |
| 4/22/2019 | 11:16:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQENOTICE | | |
| 4/22/2019 | 11:17:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEAREL | | 5515 |
| 4/22/2019 | 11:17:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEINQ | | 5515 |
| 4/22/2019 | 11:17:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEINQ | | 5515 |
| 4/22/2019 | 11:17:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEINQ | | 5515 |
| 4/22/2019 | 11:17:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQACCT | | HEATHER DEAN HELTON |
| 4/22/2019 | 11:17:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQACCT | | HEATHER DEAN HELTON |
| 4/22/2019 | 11:17:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQACCT | | HEATHER DEAN HELTON |
| 4/22/2019 | 11:17:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQNEWCLST | | |
| 4/22/2019 | 11:17:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQTRANS | | |
| 4/22/2019 | 11:32:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEAREL | | 5515 |
| 4/22/2019 | 11:32:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEINQ | | 5515 |
| 4/22/2019 | 11:32:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEINQ | | 5515 |
| 4/22/2019 | 11:32:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEINQ | | 5515 |
| 4/22/2019 | 11:32:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | NAMEINQ | | 5515 |
| 4/22/2019 | 11:32:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQNEWCLST | | |
| 4/22/2019 | 11:32:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQNEWCLST | | |
| 4/22/2019 | 11:35:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQXFERSFR | | |
| 4/22/2019 | 11:35:00 AM | 242 | DEBRA HELTON | GD05321 | 172.020.053.021 | INQXFERSTO | | |

October 16, 2019

On April 11, 2019, Debra Helton was the officer in charge of closing the bank. It was sometime after 5:00 when she came to the teller line. A teller in the drive-thru was having problems balancing and had called inside needing assistance. Since this is one of the closing officer responsibilities, Debra was asked if she would go to the drive-thru and recount the teller's drawer. At that moment, she replied, "SHIT", I have a "DAMN" appointment. Afterwards, she stormed out and went to the drive-thru. The incident was very upsetting to several of the tellers, and one made the remark "I don't work well when people are using profanity and yelling at me". The department supervisor was on the phone with the bank's processor at the time of the outburst. She noticed the tellers' reactions and tried to allay the situation by replying, "Don't take it personal everyone, because no doubt Debra's upset with me because I refused to close the bank this afternoon for her". The following witnesses were present during this incident:

1. Belinda Salisbury

2. Pat Herringdine

3. Starkayla Wiley

4. Alice Mathews (Head Teller)

5. Jimmy Lewis (Maintenance)

6. Denise Griswell (Dept. Supervisor)

*Ken spoke w/ Debra April 15th about outburst in front of tellers - He told her to apologize & that she must control her tone + language to co-workers*

Banking Officer of Teller Operations



DEFENDANT'S
EXHIBIT
12 Helton
6 8 22 DJC
PENGAD 800-631-6989

GDWB 000470
Def Ex. 12

| | |
|---|---|
| **From:** | Debra Helton |
| **Sent:** | Sat, 23 Mar 2019 00:07:49 -04:00 |
| **To:** | Ken Bibb |
| **Subject:** | Re: FDIC Compiance Exam Response |

I will call her no problem. I have been in conversations with John Henwood and Matias Cerda on several different issues and the response has completely slipped my mind. It will be in the mail on Tuesday. I will call her Tuesday without fail.

Sent from my iPhone

On Mar 22, 2019, at 2:09 PM, Ken Bibb <kbibb@gdwbank.net> wrote:

> Debra,
>
> Ms Adger from the FDIC called today to follow up on the compliance exam response that was due on March 1st. I told her I would speak with you about it and have you return her phone call. Could you please call her at 678-916-2422. I told her you were out of the bank and would call her as soon as you got back, so please try to do this first thing Tuesday Morning when you return and let me know that you have made the call. Also, please complete the response and copy me so that I can have for my records. If for some reason you are not able to do this please let me know so that I can follow up with Ms Adger.
>
> Thanks,
>
> Kenneth A. Bibb
> President
> The Geo. D. Warthen Bank
> PO Box 637
> Sandersville GA 31082
> Ph 478-552-6901 FAX 770-234-6744



DEFENDANT'S
EXHIBIT
13  Helton
6/8/22 DJC
PENGAD 800-631-6989

Def Ex. 13
GDWB_000801

Date of Incident: 10/07/19

Background Info: Debra keeps fussing about the payment collection sequence for the loans. She wants me to go in and make a hard code fix for the overpayments on commercial loans to where the default for overpayments is "Principal, Interest, Late Fees, Escrow". Right now it is defaulted to "Principal, Interest, Escrow, Late Fees". I have told her before that this is a non-issue and that the system would know how to disburse any overpayments. If the loan doesn't have escrow, it moves to the next option. It doesn't make a difference which one is selected.

Today's Situation:
Debra came up to my office door raising her voice and talking in a condescending tone, and wanted to know if I was going to change the payment collection for the loans. She proceeded to tell me that she had talked to Lamar, Ken, and me, and that no one would make the change. I reminded her again that it works the same way no matter which choice is selected and that it was not causing any issues. She told me that she is covering herself and that it needs to be right. She said she was tired of writing up the change sheets for it and that that it was a waste of time for her. I told her that it wasn't a compliance issue and that she really didn't even have to worry about writing up a sheet for that. She told me, while waiving her arms all around to my department, that "they" needed to do it right. I told her that they aren't the only ones that add loans and that it could be someone else that was doing it. She said "well, there needs to be some training"! We went back and forth about it until she finally walked out. She went out to the lobby then came back here and turned off her light, closed her door, and said that she would see us later. Then she left.

Situation during the week of September 23rd:
After I get back from vacation, I get informed by Ivan and by Peggy (separately) that Debra had been raising her voice at Ivan about the rates on the ARM loans. She asked him about something with them and when he told her, she got upset...I guess because he didn't go along with what she said. So she starts hollering at him that they are all wrong and that Ashley can just worry about it.

*Ashley Uley*
10/7/19

(2) OTHER EMPLOYEES IN THE LOAN DEPARTMENT WITNESSED THIS ENCOUNTER:
    IVAN GONZALEZ & PEGGY VEAL



**DEFENDANT'S EXHIBIT**
14 Helton
6|8|22 DJC

**GDWB 000472**
Def. Ex. 14

## Ashley Haynes

**From:** Debra Helton
**Sent:** Monday, October 07, 2019 10:26 AM
**To:** Ashley Haynes
**Subject:** Compliance

Hey after thinking about it, this is not a compliance issue so don't worry about making that change. I won't check that part any more.
I will just do the exceptions on the loan code sheet and documents that go with the real estate loans. This will keep it simple.
Thanks so much.

Sent from my iPhone



DEFENDANT'S
EXHIBIT
15 Helton
6 8 22 DJC

GDWB 000474
Def Ex. 15

1