EXHIBIT 2
To Defendant's Motion for Summary Judgment

Declaration of Kenneth A. Bibb

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| DEBRA HELTON, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| | ) | 5:21-cv-00404-MTT |
| v. | ) | |
| | ) | |
| THE GEO. D. WARTHEN BANK, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

## <u>DECLARATION OF KENNETH A. BIBB</u>

1.

My name is Kenneth A. Bibb.  I am over the age of 21, not laboring under any disability or mental condition that would prevent from giving this declaration, and freely and voluntarily provide it for use in the above civil action.  All of the statements contained in this declaration are true and correct based on my personal knowledge, information, and belief.

2.

I am employed by the Geo. D. Warthen Bank (the "Bank") as its President, a position I have held for over twenty (20) years.  I was born in 1960, making me sixty-six (62) years old as of the date of this Declaration and older than Debra Helton, the Plaintiff in this case, who was born in 1962.

3.

As the Bank's President, I supervise the day-to-day activities of the Bank as a whole and am responsible for its strategic direction.  I directly supervise all of the C-Suite employees below me, as well as all of the various vice presidents and non-C-Suite level officers.  My direct

supervisor is the Bank's Chief Executive Officer ("CEO"), Chris Irwin, who is older than I am.

4.

I report directly to the CEO and a five (5) member Board of Directors.  Four (4) out of the five (5) directors are older than Mrs. Helton.

5.

The Plaintiff, Mrs. Helton, was promoted to the position of Compliance Officer in 2009, which was a decision that I personally made.  At the time, she replaced a male employee (Jimmy Jones) who voluntarily retired for health related reasons.  Mrs. Helton was younger than Mr. Jones, the male employee whom she replaced.

6.

It is the Bank's policy and has been the Bank's policy for as long as I have been President, for all employees to conduct themselves in a professional manner and to cooperate cheerfully with personnel in their department and other departments.  One of the reasons for this policy is because banks like our Bank are open to customers, who frequently come in the lobby to conduct business, and therefore arguments between staff have a negative impact to the company.

7.

One of the Bank's most important policies is its Personal Finances policy.  This policy requires employees' personal financial affairs to be conducted in a manner as to be above regulatory or auditing criticisms or concerns.  Towards this end, employees of the Bank are required to assume the position of a regular customer when handling their personal bank business and are not permitted to use the Bank's financial software in order to transact or make changes to their own personal accounts with the Bank, as well as the accounts of their relatives or family members.  In other words, employees are not permitted to make changes to their own accounts or

the accounts of their relatives using software and systems that they only have access to as an employee of the Bank.  Unlike Mrs. Helton, I have never been accused of violating the Bank's Personal Finance policy.

8.

Kim Baucom is the Bank's Vice President of Operations, as well as the Bank's Internal Auditor.  One of her roles as the Bank's Internal Auditor is to monitor employee accounts and account activities, including via the Bank Pac Maintenance Program.  I was informed in late August or early September by Mrs. Baucom that, while conducting a routine audit, she discovered that Debra Helton appeared to be making changes to her own accounts and/or those of her relatives while on Company time.  While I was gravely concerned about this issue, especially because Mrs. Helton was the Bank's compliance officer at the time, I chose not to directly punish her, and instead asked Kim to send out an email to all Bank employees reminding them that, "as an employee of the bank, you are not permitted to make changes to anything pertaining to relatives or immediate members.  This includes teller transactions, account transfers, and any maintenance changes including loans."  A true and correct copy of this email is attached as Exhibit A.  It was my hope that Mrs. Helton would realize that the email was directed at her and that she would never again make a similar mistake.

9.

As Compliance Officer, one of Plaintiff's duties was to communicate with FDIC representatives in connection with compliance examinations for the Bank.  On March 22, 2019, I personally received a call from our Bank's FDIC representative indicate that a compliance examination response was due on March 1, 2019, but that Mrs. Helton was non-responsive to the FDIC's queries.  Accordingly, the same date, I emailed Mrs. Helton advising her of my call from

the FDIC, and asked her to do this "first thing" the next date that she was at work and to "let me know when you have made the call." I also asked her to "copy me so that I can have for my records." In response, Mrs. Helton wrote me the next day, March 23, 2019, indicating that the FDIC compliance exam had "completely slipped my mind." A true and correct copy of this email exchange is attached hereto as Exhibit B.

10.

A short time later, I was notified of an unprofessional incident involving Mrs. Helton on April 11, 2019, during which she was in charge of closing the Bank. This incident was reported to me by Denise Griswell and Jason Prince. According to Mrs. Griswell, around 5:15 p.m. on the day in question, a teller in the drive-through was having problems balancing and requested a recount, which is the closing officer's responsibility. At that point, Mrs. Helton responded, "Shit, I have a damn appointment" in a very loud voice. Mrs. Griswell reported that she found the incident to be unprofessional, which she first reported to the Bank's Branch Manager, Jason Prince, and both she and Jason thereafter discussed the incident with me. At that point, I directly counseled and reprimanded Mrs. Helton, advising her that additional outbursts, unprofessional language, profanity, and a loud tone of voice would not be tolerated. I also directed Mrs. Helton to apologize to Mrs. Griswell and anyone else who witnessed the incident. Following Mrs. Helton's termination, Mrs. Griswell was subsequently asked to prepare and sign the statement attached as Exhibit C. Notably, the April 11th incident was not the first time that I had spoken with Mrs. Helton about her tone of voice or word usage – on several previous occasions, I had directly spoken with Mrs. Helton about her delivery in speaking with co-workers and suggested different word usage as well as to try to keep her voice down when speaking with others.

11.

In late April 2019, less than a month after I had counseled Mrs. Helton about her actions on April 11, 2019, Kim Baucom – the Bank's Vice President of Operations and Internal Auditor – reported to me that she had uncovered information indicating that Mrs. Helton had been engaged in violations of the Bank's Personal Finances policy, including by making changes to her own accounts and those of her family members while on company time. This was a significant violation of the Bank's policies and highly unethical, particularly in light of Mrs. Helton's position as the Bank's Compliance Officer. Accordingly, I thereafter asked both Karen Wilson (the Bank's Corporate Secretary and HR official) and Lamar Doolittle (the Bank's Chief Information Officer and Chief Operating Officer) to sit in on a disciplinary meeting with Mrs. Helton. During this meeting, Mrs. Helton was reprimanded by me for violating the Personal Finances policy. In further discussion, I advised Mrs. Helton that she was to focus solely on her compliance duties and to leave the other department heads to handle their respective areas of responsibility, which was something we had spoken about in the past, because other employees had complained about Mrs. Helton attempting to interfere with other departments. During this meeting, I also reminded Mrs. Helton that all employees of the Bank are required to be respectful when talking to fellow co-workers and that angry outbursts will not be tolerated, which was a reference to the April 11, 2019 incident and subsequent disciplinary action. Mrs. Helton was instructed to maintain a positive attitude in the workplace going forward, which was something I felt was becoming a serious issue at the time. A true and correct copy of the disciplinary warning that was provided to Mrs. Helton during the meeting, and a related note that was placed in her personnel file, are attached to this Declaration as Exhibit D. After this incident, Mrs. Helton's administrative access to the BankPac Maintenance program was removed.

12.

Although Mrs. Helton's financial misconduct was very serious and highly unethical, I ultimately chose not to file a suspicious activity report with the FDIC in connection with the issue, because had I done so, Mrs. Helton would have never been able to work in the banking industry again. It would have destroyed her career. Given that she was a long-tenured employee, and because I generally try to be compassionate when dealing with my employees, I chose not to go that route out of sympathy and in an act of compassion. In no way did my act of compassion lessen the severity of Mrs. Helton's misconduct.

13.

Despite the warnings that Mrs. Helton was given in April and May of 2019, two additional incidents involving unprofessional altercations and the use of an inappropriate tone of voice was brought to my attention on October 7, 2019. These incidents are described in the incident report attached to this Declaration as Exhibit E, which was prepared by Ashley Haynes, who supervised the Bank's Loan Operations Department. The first incident described in Mrs. Haynes' report occurred on September 23, 2019 and was reported by Ivan Gonzalez. In essence, Mr. Gonzalez reported that while Mrs. Haynes was on vacation, Mrs. Helton asked Mr. Gonzalez to make changes to the sequence of collections on overpayments associated with Adjustable Rate Mortgage ("ARM") loans, and thereafter yelled at him in an unprofessional manner for refusing to make the change. This behavior violated the directives given to Mrs. Helton during the May 15, 2019 meeting, because Mrs. Helton did not supervise the Loan Operations Department – rather, Mrs. Haynes supervised that Department – and had been instructed to leave the other department heads to handle their respective areas of responsibility, as well as because Mrs. Helton had been directed to behave courteously and professionally towards her co-workers. The second incident described

in Mrs. Haynes' report involved another unprofessional argument involving ARM loans that occurred on October 7, 2019, this time between Mrs. Haynes and Mrs. Helton. Following the argument, which reportedly involved Mrs. Helton using a very loud tone of voice, Mrs. Helton apparently turned the lights off in her office and left work for the day. Mrs. Haynes subsequently complained to me and Karen Wilson and was asked to prepare the October 7, 2019 incident report.

14.

I subsequently made the decision to terminate Mrs. Helton's employment, which was communicated to her on October 9, 2019. I am a very mild-mannered, kind person, and both I as well as the Bank's personnel policies require employees to conduct themselves in a professional and courteous manner. This is particularly true for the Bank's management and banking officers, because they are supposed to set the example. Ultimately, Mrs. Helton was terminated for her inappropriate and disruptive workplace conduct during the week of September 23rd and then again on October 7, 2019, which followed prior discipline related to the Personal Finance policy in May 2019 and discipline for her inappropriate and unprofessional use of language towards other co-workers on April 11, 2019. At the time of her termination, I had simply lost confidence in her ability to interact with her co-workers, from whom I had received multiple complaints in less than (7) months from three (3) different people, and during the same time period had discovered evidence of multiple violations of the Personal Finance policy.

15.

At no point during my employment with the Bank have I ever heard, observed, or witnessed any manager or supervisor of the Bank make any statement (orally or in writing) that was either ageist or sexist, and I have never made any such comments. I also have no personal knowledge that any officer or employee of the Bank other than Debra Helton has ever been accused of

violating the Bank's Personal Finances policy.

16.

At no point during my employment with the Bank did I ever personally hear, observe, or witness anyone other than Mrs. Helton yell, curse, or raise their voice in an unprofessional manner or in a manner that would be inappropriate in the workplace.  No employee of the Bank, male or female, over or under forty, has ever complained directly to me about Lamar Doolittle (the Bank's CIO and COO), nor has any such complaint indirectly come to my attention.  Moreover, when former employee Pat Herringdine reported to me that Ronnie May – a former vice president and bank manager – was harsh in how he was speaking with Mrs. Herringdine, I promptly discussed the issue with Mr. May and reprimanded him, and no further incidents were reported.  This incident occurred well over ten (10) years ago, because Mr. May retired from the Bank in 2012.   In fact, both Mr. May and Mrs. Herringdine subsequently spoke favorably about each other at their respective retirement parties.

17.

In October of 2016, the Bank closed its second branch.  As part of this process, four (4) individuals who were over the age of sixty (60) were offered and accepted an early retirement package.  However, none of these employees were forced or otherwise required to retire early – it was purely their choice to accept or reject the early retirement offer.   Notably, one of the individuals who was offered early retirement, Pat Herringdine (age 62 at the time), rejected the offer and instead chose to continue working until she voluntarily retired at the age of sixty-five (65), which was a decision that the Bank allowed and supported. As part of the branch closure, there were four other employees who were involuntarily separated (ages 45, 48, 33, and 23) at the same time, two of whom were under the age of 40. Thus, the branch's closure impacted employees

across all age levels.  Moreover, one of the over-forty individuals who was initially involuntarily separated at the time of the branch closure – Andrea Calloway, who was around 48 or 49 years old at the time – was ultimately rehired a short time later.

18.

At the time of Mrs. Helton's termination, less than one-third (1/3) of the Bank's employees were under forty (40) years of age.

19.

Following Mrs. Helton's termination, she was not replaced in her position by another employee of the Bank.  Instead, the majority of Mrs. Helton's compliance duties were contracted out to a third-party, Steven Moore Compliance Services.  The remainder of her duties were absorbed following the formation of a seven (7) member internal compliance committee, which works with Mr. Moore to manage the Bank's compliance responsibilities.  The seven (7) member committee is comprised of six (6) women.  Five (5) members of the committee are over the age of forty (40).  Simultaneously, Bank employee Ashley Haynes was given the title of "Interim Loan Compliance Officer" and Bank employee Stephanie McAfee was given the title of "Interim Deposit Compliance Officer"; however, these are merely descriptive titles, as their primary job responsibilities did not materially change – they were given these titles simply because the FDIC requires banks to have a compliance officer.  As noted above, Plaintiff's duties were almost exclusively absorbed by our third-party compliance contractor, Steven Moore.  A true and correct copy of Mr. Moore's contract for the calendar year 2020 is attached hereto as Exhibit F.

20.

I understand that Mrs. Helton has made references to Jessica Ford during the discovery period in this case and has claimed that she was demoted.  This is untrue – Jessica was never

demoted, nor did she have her salary reduced at any time prior to her termination.  Furthermore, contrary to Plaintiff's allegations, Jessica was not given or otherwise required to sign a separation agreement or general release of claims, although the Bank did choose to voluntarily provide her with several weeks' severance pay.

21.

I understand that Mrs. Helton has also made references to Kathy Brooks during the discovery period.  In or around August 2019, it was determined that the bank's Loan Department (where Mrs. Brooks worked at the time) was overstaffed.  However, rather than terminate an employee, the Bank chose to place the extra employee in another understaffed department.  In this regard, at the time, an additional teller.  Accordingly, Mrs. Brooks was transferred to that department, resulting in her salary being downgraded to a teller's pay scale.  Mrs. Brooks thereafter continued working for the Bank until she voluntarily resigned on or about September 1, 2021.

22.

At the time of her separation, Mrs. Helton was offered a standard form severance agreement that included a clause indicating that she may potentially be asked to assist with her transition and devote up to five (5) hours per week through the end of the calendar year.  This is standard language that we include in such situations.  However, I had no intention of ever asking Mrs. Helton to perform any further services and have never asked a terminated employee to do so under similar circumstances.  Mrs. Helton chose to reject the severance package.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this ___ day of September, 2022.

Signature of Kenneth A. Bibb

**Kim B. Baucom**

| | |
|---|---|
| **From:** | Kim B. Baucom |
| **Sent:** | Tuesday, September 04, 2018 3:31 PM |
| **To:** | GDWB |
| **Subject:** | Account Reminder |

Please remember that as an employee of the bank, you are not permitted to make changes to anything pertaining to relatives or immediate family members. This includes teller transactions, account transfers, and any maintenance changes including loans. If you find something that needs to be changed, please have someone else in the necessary department handle the change. Feel free to let me know if you have any questions or concerns about a transaction.

Thanks!

*Kimberly B. Baucom,* AAP

Vice President of Operations
Internal Auditor/Asst. BSA Officer
Enterprise Risk Manager
The Geo. D. Warthen Bank
216 N. Harris St
Sandersville, GA  31082
478-552-6906
478-553-0961 Ext. 2013
Fax 478-552-2728

1

GDWB 000446
Ex. A

**From:**          Debra Helton
**Sent:**          Sat, 23 Mar 2019 00:07:49 -04:00
**To:**            Ken Bibb
**Subject:**       Re: FDIC Compiance Exam Response


I will call her no problem. I have been in conversations with John Henwood and Matias Cerda on several different issues and the response has completely slipped my mind. It will be in the mail on Tuesday. I will call her Tuesday without fail.

Sent from my iPhone

On Mar 22, 2019, at 2:09 PM, Ken Bibb <kbibb@gdwbank.net> wrote:

> Debra,
>
> Ms Adger from the FDIC called today to follow up on the compliance exam response that was due on March 1st.   I told her I would speak with you about it and have you return her phone call.  Could you please call her at 678-916-2422.  I told her you were out of the bank and would call her as soon as you got back, so please try to do this first thing Tuesday Morning when you return and let me know that you have made the call.  Also, please complete the response and copy me so that I can have for my records.  If for some reason you are not able to do this please let me know so that I can follow up with Ms Adger.
>
> Thanks,
>
> Kenneth A. Bibb
> President
> The Geo. D. Warthen Bank
> PO Box 637
> Sandersville GA 31082
> Ph 478-552-6901 FAX 770-234-6744

Ex. B

October 16, 2019


On April 11, 2019, Debra Helton was the officer in charge of closing the bank.  It was sometime after 5:00 when she came to the teller line.  A teller in the drive-thru was having problems balancing and had called inside needing assistance.  Since this is one of the closing officer responsibilities, Debra was asked if she would go to the drive-thru and recount the teller's drawer.  At that moment, she replied, "SHIT", I have a "DAMN" appointment.  Afterwards, she stormed out and went to the drive-thru.  The incident was very upsetting to several of the tellers, and one made the remark "I don't work well when people are using profanity and yelling at me".   The department supervisor was on the phone with the bank's processor at the time of the outburst.  She noticed the tellers' reactions and tried to allay the situation by replying, "Don't take it personal everyone, because no doubt Debra's upset with me because I refused to close the bank this afternoon for her".  The following witnesses were present during this incident:

1. Belinda Salisbury

2. Pat Herringdine

3. Starkayla Wiley

4. Alice Mathews (Head Teller)

5. Jimmy Lewis (Maintenance)

6. Denise Griswell (Dept. Supervisor)

*Ken spoke w/ Debra April 15th about outburst in front of Tellers - He told her to apologize & that she must control her tone + language to co-workers*

Banking Officer of Teller Operations

GDWB 000470
Ex. C

## DISPLINARY WARNING

DATE ISSUED:              May 13, 2019

ISSUED BY:               Ken Bibb

ISSUED TO:               Debra D. Helton

EMPLOYEE'S POSITION:     Vice President/Compliance Officer

This warning is being issued to you as a result of your violation of certain bank policies. Specifically, the bank's policy with regard to an employee either transacting their own bank business or that of a relative. The bank's **EMPLOYEE HANDBOOK** sets forth the following:

"All employees should assume the position of a regular customer when handling their personal bank business. All transactions should be handled in the normal *over-the-counter* procedure. No employees will be permitted to transact their own or a relative's bank business (including boyfriend, girlfriend, or partner). "

The attached information sets forth the dates of personal bank business and the transactions performed by you on each date in violation of the bank's policy with regard to same.

***Effective immediately***, you are expected to adhere to this policy and refrain from such behavior going forward. Failure to demonstrate immediate and sustained compliance with regard to bank policy will result in further disciplinary action, up to and including dismissal.

By your signature below, you acknowledge this violation and what is expected of you in the future.

DATE: 5-13-2019

Employee Signature

DATE: 5-13-2019

Supervisor

GDWB 000466

Ex. D

**EXHIBIT "A"**                               RE:   DEBRA HELTON ***-**-0242

Monday, May 13, 2019


RE:   Disciplinary Warning / Debra Helton



Ken Bibb, Lamar Doolittle and I met with Debra this morning to discuss a policy violation as well as other points of concern.   The policy violation had to do with her transacting her own business or that of her family members.  See attached.

In further discussion, Ken advised Debra that she is to focus completely on her compliance duties and to leave the other department heads to handle their area of responsibility.   He further stated that her loan portfolio would be divided up among other loan officers in the near future, so that she could focus primarily on compliance issues only.

He reemphasized the importance of her being present at the bank more than she has in the past (i.e. attending multiple conferences, out sick or vacation being taken consecutive with conferences).

Ken further stated that Banc Pac maintenance issues and/or the setting up of new bank products would be delegated to Ashley Haynes, as the Loan Ops Manager, and she may be called upon the help Ashley with taking on that new role. Lamar has removed a considerable amount of admin privileges from Debra and will monitor the issue accordingly.

In further discussion, Ken reminded Debra that each of us should be respectful when talking to our fellow co-workers and that angry outbursts will not be tolerated.  Each bank officer is to maintain a professional and levelheaded demeanor at all times.

GDWB 000310

**Sent:**          Mon, 13 May 2019 11:03:49 -04:00
**To:**            Ken Bibb (KBIBB@GDWBANK.NET)
**Subject:**       Debra

Good morning again.
I would like for you to think about this and let's discuss.
You made the comment this morning that I had lost my enthusiasm for my job. You could not be more right. This is a tough position and it is hard to work and keep a good attitude when you cannot get the staff to make changes when they are needed. In my 38 years of working, I have never ever had the problem with attitude that I do now. Yes I am the old person on the block but I still know what I am doing.
We are adults and need to take our jobs seriously.

*Debra D. Helton*
AAP, ACT Specialist
Vice President/Compliance Officer
NMLS #433212

"It takes less time to do a thing right than to explain why you did it wrong." Henry Wadsworth Longfellow

The Geo. D. Warthen Bank
NMLS Co. ID# 408904
P. O. Box 637
216 N Harris St.
Sandersville, GA  31082

Phone – 478-552-6901 x 2009
Fax – 478-552-8517

GDWB_000968

Date of Incident: 10/07/19

Background Info: Debra keeps fussing about the payment collection sequence for the loans. She wants me to go in and make a hard code fix for the overpayments on commercial loans to where the default for overpayments is "Principal, Interest, Late Fees, Escrow". Right now it is defaulted to "Principal, Interest, Escrow, Late Fees". I have told her before that this is a non-issue and that the system would know how to disburse any overpayments. If the loan doesn't have escrow, it moves to the next option. It doesn't make a difference which one is selected.

Today's Situation:
Debra came up to my office door raising her voice and talking in a condescending tone, and wanted to know if I was going to change the payment collection for the loans. She proceeded to tell me that she had talked to Lamar, Ken, and me, and that no one would make the change. I reminded her again that it works the same way no matter which choice is selected and that it was not causing any issues. She told me that she is covering herself and that it needs to be right. She said she was tired of writing up the change sheets for it and that it was a waste of time for her. I told her that it wasn't a compliance issue and that she really didn't even have to worry about writing up a sheet for that. She told me, while waiving her arms all around to my department, that "they" needed to do it right. I told her that they aren't the only ones that add loans and that it could be someone else that was doing it. She said "well, there needs to be some training"! We went back and forth about it until she finally walked out. She went out to the lobby then came back here and turned off her light, closed her door, and said that she would see us later. Then she left.

Situation during the week of September 23rd:
After I get back from vacation, I get informed by Ivan and by Peggy (separately) that Debra had been raising her voice at Ivan about the rates on the ARM loans. She asked him about something with them and when he told her, she got upset...I guess because he didn't go along with what she said. So she starts hollering at him that they are all wrong and that Ashley can just worry about it.

*Ashley Ulery*
10/7/19

(2) OTHER EMPLOYEES IN THE LOAN DEPARTMENT WITNESSED THIS ENCOUNTER:
        IVAN GONZALEZ & PEGGY VEAL

GDWB 000472
Ex. E



**Bank Compliance Services**



December 30, 2019

Ken Bibb
President
The Geo D Warthen Bank
216 North Harris Street
Sandersville, GA  31082

Re:     **Compliance Review & Compliance Training Services for 2020**

Dear Mr. Bibb:

I appreciate the opportunity to present this engagement letter to provide ongoing compliance review and compliance training services for The Geo D Warthen Bank, Sandersville, GA ("the Bank").

The scope of the engagement will include the following:

- ◆  Review of Current Loan and Deposit Transactions
- ◆  Review of BSA/AML/CIP/OFAC Compliance Program
- ◆  Provide Compliance Training (as requested)


◆  **Review of Current Loan and Deposit Transactions**

BCS will review a sample of current loan and deposit transactions and the documentation used by the Bank for all loan and deposit products.  The focus of the review is to ensure compliance with the federal consumer protection laws and regulations reviewed by the Federal Deposit Insurance Corporation ("FDIC").

As part of the review, BCS assists Management in identifying the source or cause of disclosure violations or errors and documentation deficiencies (if any); and will work with Management and the operating systems used by the Bank to develop and implement "practical" solutions intended to prevent recurring violations, errors or deficiencies.

Ex. F

Each independent review evaluates the Bank's substantive and procedural compliance with each compliance law and/or regulation identified herein.

### *Lending Compliance*

- Truth-in-Lending Act / Regulation Z
- Real Estate Settlement Procedures Act / Regulation X
- Flood Disaster Protection Act
- Equal Credit Opportunity Act / Regulation B
- Fair Credit Reporting Act
- CRA Public File Contents
- Servicemembers' Civil Relief Act
- Military Lending Act
- Fair Lending

### *Deposit / Operation Services Compliance*

- Electronic Fund Transfers Act / Regulation E
- Expedited Funds Availability Act / Regulation CC
- Truth in Savings Act / Regulation DD
- Garnishment of Accounts with Federal Benefit Payments
- FDIC Supervisory Guidance on Overdraft Payment Programs

### *Bankwide Compliance*

- Consumer Financial Privacy Regulation
- UDAAPs (including Third Party Compliance Risk)

At the conclusion of each review, BCS will prepare a Report detailing the scope, findings, and recommendations. The Report conveys the same information discussed in detail with Management at the conclusion of the review.

♦ **Scope of BSA/AML/CIP/OFAC Review**

A detailed and comprehensive description of the review scope has been attached as a separate document. The scope "mirrors" the FFIEC BSA/AML Examination Procedures and includes:

- Testing the Bank's compliance with the reporting and recordkeeping requirements of the Bank Secrecy Act and various Treasury regulations, including currency transaction reports (and exemptions), cash purchases of monetary instruments, wire transfers, suspicious activity reporting, and CIP;

- Evaluating the Bank's BSA and OFAC risk assessments and reviewing customer due diligence and monitoring procedures for "high-risk" customers, "high-risk" products and services, and "high-risk" geographic locations.

♦ **Confidential Matters and Proprietary Information**

During the course of this engagement, the Bank may disclose certain nonpublic personal information about the Bank's customers. BCS agrees to maintain the confidentiality of all such information to the same extent that the Bank is required to maintain it.  BCS further agrees not to disclose or use any such information except to carry out the purposes for which Bank provided such information or as otherwise permitted by the federal "Privacy of Consumer Financial Information" regulations or any similar state regulation by which Bank may be bound.

BCS has implemented information security measures and a document destruction process is used to ensure that bank customers' identity information is not retained and identity theft concerns are minimized.

♦ **Professional Fees and Expenses**

Professional fees are estimated at $15,000 per calendar year and cover all of the services described above, i.e., on-site review and transaction testing, management meeting, and report writing.  The fee will be prorated and billed monthly ($1,250) beginning January 1, 2020.  Travel and other engagement-related expenses will be itemized separately on the invoice.

Please acknowledge your acceptance of this engagement letter by emailing the signed page to me at stmoore@ix.netcom.com.

Sincerely,
Stephen Moore
Principal

Accepted this _3_ day of _January_ ,~~2019~~ 2020

By: _____

For:   **THE GEO D. WARTHEN BANK**
       **SANDERSVILLE, GEORGIA**