EXHIBIT 7
To Defendant's Motion for Summary Judgment

Declaration of Ashley Haynes

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| DEBRA HELTON, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | CIVIL ACTION FILE NO. |
| ) | 5:21-cv-00404-MTT |
| v. ) | |
| ) | |
| THE GEO. D. WARTHEN BANK, ) | |
| ) | |
| DEFENDANT. ) | |
| ) | |

**DECLARATION OF ASHLEY HAYNES**

1.

My name is Ashley Haynes. I am over the age of 21, not laboring under any disability or mental condition that would prevent from giving this declaration, and freely and voluntarily provide it for use in the above civil action. All of the statements contained in this declaration are true and correct based on my personal knowledge, information, and belief.

2.

I am employed by the Geo. D. Warthen Bank (the "Bank") as its Loan Operations Manager, a position I have held for around six (6) years.

3.

On October 7, 2019, I reported two incidents involving Debra Helton's unprofessional altercations and the use of an inappropriate tone of voice to the Bank's President, Ken Bibb. These incidents are described in the incident report attached to this Declaration as Exhibit A, which I prepared. The first incident described in my report occurred on September 23, 2019 and was reported to me by my subordinate, Ivan Gonzalez. In essence, Mr. Gonzalez reported that while I

was on vacation, Mrs. Helton asked Mr. Gonzalez to make changes to the sequence of collections on overpayments associated with Adjustable Rate Mortgage ("ARM") loans, and thereafter yelled at him in an unprofessional manner and in a loud voice for refusing to make the change. The second incident described in my report involved another unprofessional argument involving ARM loans that occurred on October 7, 2019, this time directed at me by Mrs. Helton. In essence, Mrs. Helton was angry and was fussing about the collection sequence for ARM loans when a customer makes an overpayment. At the time of our argument, the default collection sequence was "Principal, Interest, Escrow, and Late Fees," whereas Mrs. Helton felt that late fees should be collected before escrows. This was an issue that she had brought up on several times before. However, it was not a compliance issue, and Mrs. Helton did not supervise the Loan Operations Department  I did  and her intermeddling was improper. On the day in question, she came to my office raising our voice very loud and spoke in a very condescending tone about whether I was going to make the change to her preferred collections sequence. When I told her that it was not a compliance issue, she began waiving her arms all around, said that my subordinates needed to "do it right" (referring to them as "they"), and then said "well, there needs to be some training!" Following the argument, Mrs. Helton turned the lights off in her office, stormed out of the building, and left work for the day. I subsequently complained to Mr. Bibb and Karen Wilson and was asked to prepare the October 7, 2019 incident report.

4.

The same date, about an hour or so after Mrs. Helton stormed out of the building, she sent me an email in which she admitted that the payment sequence dispute "is not a compliance issue." That email is attached to this Declaration as Exhibit B.

5.

At no point during my employment with the Bank have I ever heard, observed, or witnessed any manager or supervisor of the Bank make any statement (orally or in writing) that was either ageist or sexist, and I have never made any such comments. I also have no personal knowledge that any officer or employee of the Bank other than Debra Helton has ever been accused of violating the Bank's Personal Finances policy.

6.

At no point during my employment with the Bank did I ever personally hear, observe, or witness anyone other than Mrs. Helton yell, curse, or raise their voice in an unprofessional manner or in a manner that would be inappropriate in the workplace.

7.

Following Mrs. Helton's termination, I did not "replace" her as the Bank's Compliance Officer. Instead, the majority of Mrs. Helton's compliance duties were contracted out to a third-party, Steven Moore Compliance Services. The remainder of her duties were absorbed following the formation of a seven (7) member internal compliance committee, which works with Mr. Moore to manage the Bank's compliance responsibilities. The seven (7) member committee, of which I am a member, is comprised of six (6) women. Five (5) members of the committee are over the age of forty (40). I was also subsequently given the additional title of "Interim Loan Compliance Officer" and Bank employee Stephanie McAfee was given the title of "Interim Deposit Compliance Officer"; however, these are merely descriptive titles, as neither of our primary job responsibilities did not materially change  we were given these titles simply because the FDIC requires banks to have a compliance officer. In fact, the signature line of my company email still lists my title as "Loan Operations Manager" and makes no reference to compliance.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 2ND day of September, 2022.

_Ashley Haynes_
Signature of Ashley Haynes

Date of Incident: 10/07/19

Background Info: Debra keeps fussing about the payment collection sequence for the loans. She wants me to go in and make a hard code fix for the overpayments on commercial loans to where the default for overpayments is "Principal, Interest, Late Fees, Escrow". Right now it is defaulted to "Principal, Interest, Escrow, Late Fees". I have told her before that this is a non-issue and that the system would know how to disburse any overpayments. If the loan doesn't have escrow, it moves to the next option. It doesn't make a difference which one is selected.

Today's Situation:
Debra came up to my office door raising her voice and talking in a condescending tone, and wanted to know if I was going to change the payment collection for the loans. She proceeded to tell me that she had talked to Lamar, Ken, and me, and that no one would make the change. I reminded her again that it works the same way no matter which choice is selected and that it was not causing any issues. She told me that she is covering herself and that it needs to be right. She said she was tired of writing up the change sheets for it and that it was a waste of time for her. I told her that it wasn't a compliance issue and that she really didn't even have to worry about writing up a sheet for that. She told me, while waiving her arms all around to my department, that "they" needed to do it right. I told her that they aren't the only ones that add loans and that it could be someone else that was doing it. She said "well, there needs to be some training"! We went back and forth about it until she finally walked out. She went out to the lobby then came back here and turned off her light, closed her door, and said that she would see us later. Then she left.

Situation during the week of September 23rd:
After I get back from vacation, I get informed by Ivan and by Peggy (separately) that Debra had been raising her voice at Ivan about the rates on the ARM loans. She asked him about something with them and when he told her, she got upset…I guess because he didn't go along with what she said. So she starts hollering at him that they are all wrong and that Ashley can just worry about it.

*Ashley Ney*
10/7/19

(2) OTHER EMPLOYEES IN THE LOAN DEPARTMENT WITNESSED THIS ENCOUNTER:
      IVAN GONZALEZ & PEGGY VEAL

GDWB 000472
Ex. A