IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| DEBRA HELTON,<br><br>    Plaintiff,<br><br>v.<br><br>THE GEO. D. WARTHEN BANK,<br><br>    Defendant. | Civil Action No.:<br><br>5:21-cv-00404-MTT |

**PLAINTIFF'S SUPERSEDING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiff Debra Helton (hereinafter, "Plaintiff" or "Helton"), by and through undersigned counsel, and files her Superseding Brief in Opposition to Defendant's Motion for Summary Judgment. (Doc. 15.)[1] For the reasons that follow, Defendants are not entitled to summary judgment and their Motion should be denied, respectfully showing the Court as follows:

### I.   INTRODUCTION

In this action, Ms. Helton alleges that she was subjected to discrimination based on age and sex when she was terminated from her employment with a Sandersville, Georgia bank in October 2019. Due to the relatively small size of this bank, the instant proceeding is not one that may be easily fit into the traditional box of the *McDonnell Douglas* framework. Rather, this is a case in which the circumstances and timing are suspect and there is evidence of employees being held to completely different standards. This argument was one that Defendant clearly anticipated, but opted to address in less than a single page in its brief. (*See* Doc. 17-1 at 18-19.) The Court should find that Defendant failed to meet its burden, and as a result, it not entitled to summary judgment.

---

[1] After Defendant initially filed its Motion for Summary Judgment (Doc. 15), Defendant filed its Amended Memorandum of Law in Support of its Motion (Doc. 17-1).

Defendant The Geo. D. Warthen Bank (hereinafter, "Defendant), has only employed around 30-some individuals over recent years. (Doc. 37-2 at 32.)  Ms. Helton began her employment with Defendant *on October 31, 1988*, where she remained until she was terminated on October 9, 2019. (SOF,[2] ¶ 1.)  In 2009, Ms. Helton was promoted to Defendant's Compliance Officer. (SOF, ¶ 9.)

For the first 29 years, ten months, and four days of Ms. Helton's employment, Defendant has failed to raise a single issue with Ms. Helton's performance or conduct until a purported incident that occurred in September 2018. (*See* SOF, ¶¶ 25-32.)  Defendant contends that, in that month, Ms. Helton engaged in conduct involving changes to her own personal accounts, and those of several relatives, that caused Defendant to be "gravely concerned." (*Id.*)  Indeed, it is difficult for Ms. Helton to explain what actions she took to individuals who do not have knowledge of the banking industry, but she attempted to do so before the EEOC. (*See* Doc. 37-2 at 42-44; Doc. 37-3.) For example, on one occasion prior to 2013, Ms. Helton made a change to an account associated with her husband's business to *increase* the minimum monthly payment for a loan and ensuring that there was no limit to the maximum amount of late charges that could be assessed on her husband's business, all in an effort to ensure that this loan was consistent with the terms of the underlying loan documents.  (Doc. 37-2 at 42-43.)  In a later April 2019 circumstance, after Ms. Helton's daughter had lost her job, Ms. Helton made a change to her daughters account *so that Ms. Helton and her husband* would take over the payments of their newly unemployed daughter's loan. (*Id.* at 44.)  Two days later, on a Saturday morning when Ms. Helton was the only person in the bank with access to the banking program, she noticed what appeared to be fraudulent activity on her account, she "suspended" the memo to prevent her money from being stolen over the weekend,

---

[2] "SOF" refers to Defendant's Statement of Material Facts as to Which There is No Genuine Issue to be Tried (Doc. 15-2), and Plaintiff's responses (Doc. 36-1, and refiled at Doc. 37-1) to the respective facts.

and then advised Defendant Vice President of Operations and Internal Auditor what she had done first thing on the following Monday morning. (*Id.*; SOF, ¶ 44.)

These were the only types of changes that Ms. Helton made to any accounts, many of which were to ensure compliance with loan agreements and were in the best interests of the Defendant. Moreover, the actions that Ms. Helton took were largely those that any customer could make to their own accounts using Defendant's internet banking services. (*See* SOF, ¶¶ 19, 45.)

Again, Defendant now purports to be "gravely concerned" about what it discovered in September 2018, and later in April 2019. (*See* SOF, ¶ 30.) However, back in September 2018, Defendant was *so* concerned about its the purported financial misconduct of its Compliance Officer, Ms. Helton, that Defendant's President, Ken Bibb (hereinafter, "President Bibb"), "chose not to directly punish" Ms. Helton, instead having Defendant's Internal Auditor send a company-wide email – "*hoping*" (emphasis added) that Ms. Helton would realize it was directed at her. (SOF, ¶ 30.) Ms. Helton testified that she did not even recall receiving or reviewing the email at that time. (SOF, ¶ 48.) Defendant took no additional actions concerning the now-alleged financial misconduct at that time.

Fast forward to March 2019, where Defendant discovered an email from President Bibb to Ms. Helton, referencing a call from a representative of the Federal Deposit Insurance Corporation ("FDIC") about late submission regarding a compliance examination. (SOF, ¶¶ 31-32.) This situation did not involve a "deadline" so to speak; instead, as Ms. Helton testified, the FDIC representative had merely requested some information from the bank by March 1, 2019, Ms. Helton was awaiting receipt of some information from two other individuals, and based on what she had going on at the time, it had slipped her mind. (Doc. 25 at 120:1-7.) On the afternoon of Friday March 22, 2019, President Bibb sent Ms. Helton an email concerning his call with the

FDIC, and asked for Ms. Helton to follow up first thing when she returned to the office. (SOF, ¶¶ 31-32.) While Ms. Helton was preparing for her daughter's wedding that was set to occur later that day, she responded to Defendant's President at 12:07 am on that Saturday morning, confirming with President Bibb that she would follow-up with the FDIC representative. (*Id.*; Doc. 15-4.) Ms. Helton then responded to the FDIC immediately upon her return to the office after the wedding. (SOF, ¶¶ 31-32.) While Defendant now zeroes in on this incident (*see* Doc. 15-4, ¶ 9), there is nothing outside of President Bibb's Declaration that would suggest that this situation was ever even brought up again, that it was a basis for Ms. Helton's termination, or that this was actually a legitimate issue in the first place back in March 2019.

Instead, Defendant began taking issue with Ms. Helton's *attitude*. In April 2019, one of Ms. Helton's colleagues was planning to be out of the office on vacation, but she was having trouble finding one of Defendant's officer-level employees who could fill-in to stay late and handle the bank closing for the day. (SOF, ¶¶ 33-41.) Ms. Helton volunteered to help her colleague, making Ms. Helton the individual responsible for ensuring that the door was locked at the end of the day. (SOF, ¶ 34.) Defendant's tellers remained responsible for counting and documenting the money. (*Id.*) After volunteering to be the "closing" officer, Ms. Helton remembered that she had a personal appointment after work that afternoon. (SOF, ¶ 35.)

As the clock neared closing time, Ms. Helton also realized that there were two other officers on-site who could have handled the closing. (SOF, ¶ 34.) At around 4:45 pm that afternoon, an antsy Ms. Helton asked the other employees if she could help them with anything, and she asked the employees to work quickly on account of her approaching conflict. (SOF, ¶ 35.) Ms. Helton's offer to assist was declined. (*See id.*) A half hour later, at around 5:15 pm, the person in charge of the teller line, asked for Ms. Helton's assistance counting the drawers in the drive-through. (*Id.*)

Ms. Helton became frustrated because she knew that employees could have begun counting the drive-through drawers when the bank closed and they lowered the security screen in the drive-thru window at 5:00 pm. (*Id.*)  At some point, a frustrated Ms. Helton blurted out, "shit, I have a damn appointment." (*Id.*) Ms. Helton apologized to her coworkers the following morning, even before the issue was raised several days in a meeting with President Bibb. (SOF, ¶ 39.) This incident was when Defendant really began taking issue with Ms. Helton's "attitude." (*See* SOF, ¶ 50.)

Specifically, on May 13, 2019, Defendant's President met with Ms. Helton concerning several issues. (*Id.*)  First, Defendant, *for the very first time*, met and communicated directly with Ms. Helton concerning Defendant's Personal Finances Policy that had had purportedly left Defendant's President "gravely concerned" eight months earlier. (SOF, ¶ 49.)  During the same meeting, President Bibb also brought up what had occurred during the April 11, 2019 closure of the bank. (SOF, ¶ 50.)  Defendant advised Ms. Helton "that she was to focus solely on her compliance duties and to leave other department heads to handle their areas of responsibility." (*Id.*)  However, Defendant also spent substantial time discussing Ms. Helton's purported "attitude." (SOF, ¶¶ 49-50.)  Indeed, this became the focus going forward. (SOF, ¶ 51.)

Along with removing Ms. Helton's administrative access to one of the bank's maintenance programs, Ms. Helton was warned during the May 13, 2019 meeting that she needed to maintain a "positive attitude" in the workplace going forward. (SOF, ¶ 52.)  It should be noted that Ms. Helton testified that a large part of the problem was that she could not get Defendant's staff to make necessary changes that she was requesting, and that President Bibb and Defendant's Chief Executive Officer had not been communicating with Ms. Helton. (SOF, ¶ 53.) Ms. Helton's supervisors did not address the concerns she raised. (*Id.*)  Moreover, the administrative access that Defendant removed was for a bank program that Ms. Helton needed to be able to do her job as

Compliance Officer (*See* Doc. 25 at 68:6-70:11), despite Defendant having just told Ms. Helton to focus on her role in compliance.

While Ms. Helton acknowledged unprofessionalism was not acceptable in the workplace, she also testified that it had always been acceptable for Defendant's male employees to use profanity in the workplace. (SOF, ¶ 75.) Moreover, when female employees did the same, Defendant's management would tell the women "you've got an *attitude*, you don't need to be using this language." (*Id.*) Ms. Helton specifically recalled certain male employees, such as Defendant's long-time Chief Information Officer and Chief Operating Officer, Lamar Doolittle (hereinafter, "CIO Doolittle"), using far harsher language in the workplace than she ever had. (*Id.*) Some of CIO Doolittle's remarks caused other employees to cry. (*Id.*) But such conduct was never addressed by Defendant. (*Id.*)

In fact, Ms. Helton was not aware of Defendant addressing any of her male colleagues' behavior for similar outbursts, with the exception one of employee, Ronnie May, who retired way back in 2012. (*Id.*) One of Defendant's more-notable failures to address male employees' attitudes was when CIO Doolittle actually "hollered" at President Bibb during a meeting. (*Id.*)

In fact, the employee who retired in 2012, Mr. May, had been so harsh with a female employee that it caused her to abruptly leave the office so she could immediately go to the doctor to get something "for her nerves." (SOF, ¶ 90.) While President Bibb insinuates that he has never heard of such incidents from Mr. May or otherwise in his workplace (*see* Doc. 15-4, ¶ 16),[3] the employee who was the victim of Mr. May's abusive conduct stated that, after she reported the incident to President Bibb, he responded by asking her whether Mr. May needed anger

---

[3] Specifically, President Bibb states in his Declaration, "[a]t no point during my [more than twenty] year employment with the Bank did I ever personally hear, observe, or witness anyone other than Mrs. Helton yell, curse or raise their voice in an unprofessional manner or in a manner that would be inappropriate in the workplace." (Doc. 15-4, ¶ 16.)

management. (SOF, ¶ 90.) Mr. May later confronted the female employee, necessarily suggesting that President Bibb had, at least, mentioned her complaint to Mr. May. (*Id.*)

CIO Doolittle was involved in a separate incident with another female employee just before she was fired in 2015 or 2016. (SOF, ¶ 100.) This altercation also happened to be observed by numerous employees, including tellers. (*Id.*) These observers were so taken aback they asked the female employee if she was alright, and told her that CIO Doolittle's conduct had also scared them. (*Id.*) According to this female employee, it was as though CIO Doolittle had "lost his marbles! Yelling so loud he scared a couple of other ladies." (*Id.*) While Defendant claims that this female employee did not report the incident to President Bibb, she confirmed that she at least reported the incident to her direct supervisor. (*Id.*) The victim of the incident was terminated soon thereafter for unknown reasons. (*Id.*) But, CIO Doolittle remains employed with Defendant. (Doc. 15-5, ¶ 2.)

A different female employee stated that she also felt targeted by CIO Doolittle. This other employee raised concern about Defendant's online banking program with Ms. Helton since CIO Doolittle had been out of the office, and thus unavailable, that week. (SOF, ¶ 105.) CIO Doolittle was angry that the employee went over his head, and Mr. Doolittle used "ugly language" toward his female subordinate. (*Id.*) Subsequently, the victim was moved *under* CIO Doolittle's supervision, and on an occasion when she reported an error that she made to CIO Doolittle, he used the opportunity to report to President Bibb, and the victim was fired soon thereafter. (*Id.*) Again, CIO Doolittle remains employed with Defendant. (Doc. 15-5, ¶ 2.)

According to an unsworn statement by a witness identified by both parties to this litigation, and who is expected to testify at trial, President Bibb even spoke to Defendant's former Corporate Secretary and human resources employee in a manner that left her in tears and almost caused her

to quit. (SOF, ¶ 109.) President Bibb continues to enjoy his twenty-plus-year tenure in that position. (Doc. 15-4, ¶ 2.)

For Ms. Helton, the final incident occurred on October 7, 2019, after several months of no apparent issues. Again, in Spring 2019, Ms. Helton had been told by President Bibb to watch her "attitude" and to focus on her duties as a vice president and the Compliance Officer. (SOF, ¶ 50.) Apparently, prior to October 2019, Ms. Helton and the Loan Operations Manager, Ashley Hayes, had several discussions about the appropriate collection sequence for loan payments and how such payments should be applied to customer's accounts. (SOF, ¶ 58.) Ms. Haynes apparently thought it was proper for adjustable rate mortgage loan payments to applied to principal, interest, escrow, and the late fees, while Ms. Helton believed that late fees were supposed to be paid before escrow. (SOF, ¶ 59.) While Ms. Helton disputes having a conversation, or certainly any altercation, with one of Ms. Haynes' subordinates in the loan department while she was away on vacation several days earlier, this loan employee states that when Ms. Helton asked him about the loan sequencing, he said he would have to check with Ms. Haynes when she returned. (SOF, ¶ 63.)[4]

On October 7, 2019, after Ms. Haynes had returned, Ms. Helton followed up with her concerning the loan sequencing issue. (SOF, ¶ 64.) According to Ms. Haynes, Ms. Helton was speaking "in a loud and condescending manner," to which Ms. Haynes responded that this was not a compliance issue. (SOF, ¶ 65.) Ms. Helton purportedly "began waiving her arms all around" and told Ms. Haynes that her employees need to do it right, and suggested that they might need to be trained. (*Id.*) At this end of this conversation, during which Ms. Helton acknowledged that her voice was higher than the normal level, but did not admit to "raising" her voice, Ms. Helton left

---

[4] This other employee, Ivan Gonzalez, reported that Ms. Helton approached him about the loan sequencing, and apparently since Ms. Haynes was on vacation and Ms. Helton was not his direct supervisor, he explicitly "refused to make the changes that Mrs. Helton requested…" (Doc. 15-10, ¶ 3.) It was apparently after such refusal that Ms. Helton "became upset and she started yelling and hollering in what I felt was an inappropriate tone of voice." (*Id.*)

her office, turned off the lights, and took a vacation for the remainder of the day in an attempt to cool off. (SOF, ¶ 68.)  About an hour later, Ms. Helton sent Ms. Haynes an email, saying that it was "not a compliance issue." (*Id.*) Even though it clearly was a compliance issue, *see generally* 12 C.F.R. § 1026.1, *et seq.*, Ms. Helton was clearly just trying to avoid any additional discussion. Ms. Helton continues to believe that it was a compliance issue. (SOF, ¶ 69; Doc. 25 at 126:5-13.) Ms. Haynes reported this conversation to Defendant's President, and she was asked to prepare an "incident report" for Ms. Helton's file. (SOF, ¶ 70.)

On October 9, 2019, 30 years, eleven months, and nine days into Ms. Helton's employment, Defendant's President advised her that she was fired. (SOF, ¶¶ 71-72.)  Defendant's primary reason appears to have been Ms. Helton's attitude. (*See* SOF, ¶ 72.)   Specifically, in her verified Charge of Discrimination filed with the EEOC, Ms. Helton described the October 9, 2019 meeting as brief. (Doc 37-2 at 53.) President Bibb did not say much, he did not address any of the alleged financial misconduct, he did not discuss the topic underlying the disagreement with Ms. Haynes two days earlier – instead, he merely remarked, "I don't know what we're going to do about your *attitude*." (*Id.*)

On approximately 30th year, eleventh month, and ninth day of Ms. Helton's employment, she was terminated as a result of her attitude.  Defendant did offer Ms. Helton a severance agreement; however, it would have required her to continue to work for the remainder of the calendar year to train her replacement, it would have required her to waive and release any discrimination claims, and President Bibb told Ms. Helton that she would not get her pension if she did not sign. (SOF, ¶ 77.)  After Ms. Helton was fired, the much younger Ms. Haynes either replaced Ms. Helton, or according to Defendant, took on at least some of her compliance duties. (*See* SOF 82-86.)

## II.     ARGUMENT AND CITATION OF AUTHORITY

This case is not quite as straightforward as Defendant contends. Ms. Helton has established a *prima facie* case supporting her sex and age discrimination case, and she had met her burden at this stage in the proceeding as to the remaining considerations under the *McDonnell Douglas* frame, especially given that she has shown that she was treated less favorably than at least two similarly situated comparators. Notwithstanding said comparators, Ms. Helton is able to establish the convincing mosaic necessary to send her discrimination claims to the finder of fact. As a result, the Court should deny Defendant's Motion for Summary Judgment in its entirety.

### A. Legal Standard for Summary Judgment.

The Court should deny summary judgment when the record reflects that there are genuine issues as to material facts. *See* Fed. R. Civ. P. 56(a). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* Such a motion should only be granted if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249.

In ruling on the instant Motion, the Court must view all evidence in the light most favorable to Ms. Helton as the non-moving party and resolve all factual disputes in her favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there

is a genuine issue for trial. *Id*. at 324-26. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### B. Doolittle and May are Similarly Situated Comparators, Helping to Establish Plaintiff's Case Under the *McDonnell Douglas* Framework.

The Court should deny summary judgment to Defendant on Ms. Helton's claims for age and sex discrimination as she is able to make the required showing for both claims under the McDonnell Douglas framework. In order to establish a *prima facie* case of age discrimination in violation of the ADEA, a plaintiff must show that:

> (1) she was a member of a protected group of persons between the ages of 40 and 70, (2) she was subject to an adverse employment action, (3) a substantially younger person filled the position from which she was discharged, and (4) she was qualified to do the job for which she was rejected.

*Lawson v. Plantation Gen. Hosp., L.P.*, 704 F. Supp. 2d 1254, 1281 (S.D. Fla. 2010) (citing *Chapman v. A.I. Transp.*, 228 F.3d 1012, 1024 (11th Cir. 2000); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999)). A plaintiff claiming discrimination based on sex under Title VII must meet a similar standard. *See Maynard v. Bd. of Regents of Div. of Unvs. of Fla..*, 342 F.3d 1281, 1289 (11th Cir. 2003) ("To prevail on a claim for discrimination under Title VII based on circumstantial evidence, Maynard must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class.") (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, (1973)).

There does not appear to be much of a dispute concerning whether Ms. Helton has established most of the *prima facie* elements on either claim. It is undisputed that Ms. Helton was a 57 year old female at the time that Defendant terminated her employment. (SOF, ¶ 2.) Ms. Helton

had been serving as one of Defendant's vice presidents and a Compliance Officer since 2009 (SOF, ¶ 9), and while Defendant has raised issues concerning her conduct, there does not appear to be any dispute that Ms. Helton was qualified for her position. Ms. Helton was fired on October 9, 2019. (SOF, ¶ 2.) As it pertains to a case of *prima facie* age or sex discrimination, Defendant argues that Ms. Helton is unable to established that she was replaced by someone significantly her junior, or that she was treated less favorably than similarly-situated male employees. (*See* Doc. 17-1 at 12-16.)

First, Defendant argues that Ms. Helton is unable to show that she was replaced at all. (*Id.* at 12-13.) Instead of replacing Ms. Helton, Defendant contends that Ms. Helton's former position was effectively eliminated, most of her former duties were contracted out to a third-party contractor, and the remainder of her duties were absorbed by a seven-member compliance committee. (*Id.*) Ms. Helton alleged that she was replaced by a female employee who was not known to be strong-willed or assertive, and who was around 30 years younger than her. (Doc. 1, ¶¶ 72-73.) Specifically, that person was Ashley Haynes. (Soc. 26-19 at 8.)

Defendant's assertion that Ms. Haynes did not replace Ms. Helton fails primarily for one reason. In her Declaration, Ms. Haynes attempts to make an argument consistent with Defendant, in that Ms. Helton's duties were farmed out to an outside contractor and other duties were split among a compliance committee. (Doc. 15-9, ¶ 7.)

Ms. Haynes also explains that she was "given the title of 'Interim Loan Compliance Officer,'" and that another employee become "Interim Deposit Officer." (*Id.*) But Ms. Haynes notes that these are merely "descriptive titles." (*Id.*) The Court should question why Defendant would provide someone with a new, descriptive title, without changing such person's job duties. Ms. Haynes addresses that question in her Declaration, asserting that "the FDIC requires banks to

have a compliance officer." (*Id.*)  If Ms. Haynes' statement is indeed correct, and given that it is Defendant's contention that it split Ms. Helton's former duties between its internal compliance committee and farmed the others out a third-party contractor, then the next question should be why Defendant still felt the need to provide "descriptive titles" indicating that Ms. Haynes and another employee were handling internal compliance.  The reasonable inference should be that Defendant replaced Ms. Helton as its internal compliance officer.

Plaintiff acknowledges that the question of comparators, or similarly-situated employees outside of Ms. Helton's protected class, is not quite as simple. Based on the dueling SOFs, Plaintiff has created, at least, a genuine issue of material fact as to whether she was treated less favorably than her former male colleagues, Mr. Bibb, Mr. Doolittle, and Mr. May.  However, Plaintiff acknowledges that, due to the difference in titles, duties, and responsibilities, whether these men would be properly considered as comparators under the law. The fact that Defendant employed only a few more than thirty employees, and Ms. Helton was the only person to serve in her role, indeed makes this a tricky circumstance. (Doc. 36-2 at 32; SOF, ¶ 9.)

However, the Court can find that Ms. Helton has indeed identified at least one similarly-situated comparator. In the Eleventh Circuit, a comparator is one who: 1) engaged in the same basic conduct or misconduct as the plaintiff; 2) was subject to the same employment policies, guidelines, or rules; 3) is normally under the jurisdiction of the same supervisor; and, 4) shares the plaintiff's employment history. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1227-28 (11th Cir. 2019).  Indeed, it would be an uphill battle to show that Defendant's president was similarly situated, but the same is not true for two of Defendant's other officers.

The Court can consider Lamar Doolittle and Ronnie May as similarly-situated comparators to Ms. Helton.  As with Ms. Helton, both Mr. Doolittle and Mr. May have been accused of

engaging in altercations, disagreements, or an offensive tone with other employees. (*See* SOF, ¶ 99-101, 103-05.) There is every reason to believe, and nothing to dispute, that Ms. Helton, Mr. Doolittle, and Mr. May were all subject to the same employment policies. (*See, e.g.*, Doc. 17-1 at 15 ("…unlike Plaintiff, [Mr. Bibb, Mr. Doolittle, and Mr. May] were *ever* accused of violating the Personal Finance policy.").) Mr. Bibb implicitly acknowledged that Mr. Doolittle, Ms. Helton, and the now-retired Mr. May would have all reported to him. (SOF, ¶ 3.) Similarly, Mr. Doolittle (*see* Doc. 15-5, ¶ 1), Ms. Helton (*see* SOF, ¶ 1), and Mr. May (*see* Doc. 15-11, ¶ 6) where all long-time employees and officers of Defendant, who were not accused of any deficiencies in their conduct until toward the end of their tenure. (*Compare* SOF, ¶ 99-101, 103-05, *with* Doc. 15-4, ¶¶ 16.)

Indeed, Lamar Doolittle and Ronnie May meet each of the *Lewis* factors, and may be properly considered comparators. The following section addressed issues that largely match the remainder of the *McDonnell Douglas* framework, and as a result, the Court should find that Ms. Helton has carried her burden at this stage in the proceeding and Defendant is not entitled to summary judgment.

### C. Plaintiff has Clearly Met Het Burden of Showing a Convincing Mosaic of Discrimination.

Ms. Helton may establish her claim of sex and age based discrimination under the theory of a "convincing mosaic" of discriminatory evidence. Even if a plaintiff were unable to establish the fourth element of a *prima facie* case of discrimination, "establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Gibson*

*v. JetBlue Airways Corp.*, 2021 WL 5368056, at *6 (11th Cir. 2021) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).

"The Eleventh Circuit has recognized at least three categories of circumstantial evidence for establishing a convincing mosaic of discriminatory intent: '(1) suspicious timing, ambiguous statements, similar behavior directed at other members of the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systematically better treatment of those outside the protected class; and (3) pretext in the employer's justification.'" *Robertson v. Riverstone Communities, LLC*, No. 1:17-cv-02668-CAP, 2019 WL 3282991, at *6 (N.D. Ga. July 22, 2019), aff'd, 849 F. App'x. 795 (11th Cir. 2021) (quoting *Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 976 (11th Cir. 2014)).

The Court should find that the first factor is easily met, with the clearest example being the suspiciousness of the timing. Ms. Helton was employed with Defendant for literally 29 years, ten months, and four days before Defendant raised a single issue with her performance. It was at that point, that Defendant became "gravely concerned" over an incident that occurred in September 2018. (Doc. 15-4, ¶ 8.) However, despite this concern, Defendant entirely failed to address the issue directly with Ms. Helton, and the issue was not brought up again, at least until a May 2019 meeting. Even still, and again despite such grave concern, Ms. Helton remained employed for a more than a year after the September 2018 incident occurred. The explanation for such delay may be that Defendant took issue with Ms. Helton's "attitude" as the result of an event in October 2019. However, this not only supports the idea that Defendant's timing was suspicious, Defendant appears to have an on-going problem its female employees' "attitudes," while not expressing any concerning for the males. (SOF, ¶¶ 50-53, 56, 75, 93, 99-101, 103-05.)

In addition to the suspicious timing, Ms. Helton meets the first factor because Defendant expressed similar behavior directed at other female employees, along with its disregard of male employee's offensive conduct, these are other bits and pieces from which an inference of discriminatory intent might be drawn. It is for the same reason that Ms. Helton is able to show that Defendant is engaged in systematically better treatment of those outside the protected class.

The suspiciousness of the timing, as discussed above, also supports a showing that Defendant's stated reasons are pretextual. Defendant does not have a legitimate explanation as to why, if it were so "gravely concerned" about Ms. Helton's conduct in Fall 2018 and Spring 2019, it did not address Ms. Helton at that point. Instead, Defendant waited until Ms. Helton had a disagreement concerning a legitimate workplace issue, and one that was within Ms. Helton's role of compliance, to take action. However, Defendant made its motives clear as, when Defendant's president met with Ms. Helton to terminate her employment, he did not discuss compliance issues, there was no mention of Defendant's Personal Finance policy, Mr. Bibb simply said, "I don't know what we're going to do about your *attitude*." (Doc 37-2 at 53.)

The manner in which Defendant clearly ignores the attitudes of its male employees, but uses the same as the basis to terminate females, along with the other factors discussed herein, is sufficient to establish a convincing mosaic under *Lewis*. Moreover, the evidence in this matter presents sufficient disagreement concerning Defendant's treatment, particularly, of its female employees as to require submission to a jury, and the evidence is not, as Defendant argues, so one-sides that one party must prevail as a matter of law. That is particularly true in a case, such as this, with several witnesses with competing versions of events, as "[o]n a summary judgment motion, the Court may not weigh the credibility of the parties… If the determination of the cast rests on which competing version of the facts or events is true, the case should be presented to the trier of

fact." *Liberti v. Walt Disney World Co.*, 912 F. Supp. 1494, 1500 (M.D. Fla. 1995) (citing *Rollins v. TechSouth Inc.*, 833 F.2d 1525, 1531 (11th Cir.1987)).

### III.   CONCLUSION

Accordingly, for the above and foregoing reasons, Plaintiff Debra Helton respectfully requests that the Court deny Defendant The Geo. D. Warthen Bank's Motion for Summary Judgment (Doc. 15) in its entirety, and allow this matter to proceed to trial.

Respectfully submitted, this 15th day of November, 2022.

                                              KENNETH E. BARTON III
                                              Georgia Bar No. 301171
                                              *Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com

## **CERTIFICATE OF SERVICE**

This is to certify that I have this date served a copy of the above and foregoing PLAINTIFF'S SUPERSEDING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT to the Clerk of Court using the CM/ECF system, which will automatically send electronic mail notification of such filing to the following counsel of record, who is/are CM/ECF participant(s):

Alyssa K. Peters, Esq.
David S. Cromer, Esq.
Constangy, Brooks, Smith & Prophete, LLP
577 Mulberry Street, Suite 710
P.O. Box 1975
Macon, Georgia 31202-1975
apeters@constangy.com
dcromer@constangy.com
*Attorneys for Defendant*

This 15th day of November, 2022.

_____
KENNETH E. BARTON III
Georgia Bar No. 301171
*Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com