**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **DEBRA HELTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:21-CV-404 (MTT)** |
| | ) | |
| **THE GEO. D. WARTHEN BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Plaintiff Debra Helton brings claims against defendant The Geo. D. Warthen Bank for sex discrimination under Title VII of the Civil Rights Act of 1964 and age discrimination under the Age Discrimination in Employment Act ("ADEA"). Doc. 1. The Bank moves for summary judgment. Doc. 15. For the following reasons, that motion (Doc. 15) is **GRANTED**.

### I. BACKGROUND[1]

Ms. Helton, a female born in 1962, began working for the Bank as an at-will employee in October 1988. Docs. 15-2 ¶¶ 1, 12; 37-1 ¶¶ 1, 12. The Bank's president is Kenneth Bibb, a male born in 1960, who is supervised by the Chief Executive Officer. Docs. 15-2 ¶¶ 3-4; 37-1 ¶¶ 3-4. Mr. Bibb "supervises the Bank's day to day activities, C-Suite officials … and all of the Bank's vice-presidents and non-C-Suite level officers." Docs. 15-2 ¶ 3; 37-1 ¶ 3. Other relevant employees include Lamar Doolittle, the Chief

---

[1] Unless otherwise stated, these facts are undisputed and are viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Information Officer and Chief Operating Officer; Karen Wilson, the former Corporate Secretary who also assisted with human resources functions until her 2022 retirement; Kim Baucom, the Vice President of Operations, Internal Auditor, and Assistant BSA Auditor; and Ronnie May, a former vice president and bank manager.  Docs. 15-2 ¶¶ 3, 8, 25, 95; 37-1 ¶¶ 3, 8, 25, 95.

In 2009, Mr. Bibb appointed Ms. Helton to be the Bank's Compliance Officer, a non-C-Suite officer level position.  Docs. 15-2 ¶¶ 9, 23; 37-1 ¶¶ 9, 23.  Although Ms. Helton participated in certain interviews and sparingly supervised other employees, she "did not have any direct subordinates, and lacked the ability to hire, fire, or recommend disciplinary action as to the Bank's lower-ranking employees" and "did not participate in employee disciplinary conferences or meetings."  Docs. 15-2 ¶¶ 21-22; 37-1 ¶¶ 21-22. As the Bank's compliance officer, she "was charged with developing, implementing, and administering its compliance management program, making sure the Bank was complying with applicable state and federal banking regulations, and assisting with reviews, [Federal Deposit Insurance Corporation ('FDIC')] audits, and compliance examinations."  Docs. 15-2 ¶ 18; 37-1 ¶ 18.

The Bank had two relevant policies in place.  Docs. 15-2 ¶¶ 13, 16; 37-1 ¶¶ 13, 16.  First, "for employees to conduct themselves at all times in a professional manner, and to cooperate cheerfully with personnel in their department and in other departments."  Docs. 15-2 ¶ 13; 37-1 ¶ 13 (hereinafter referred to as the "Employee policy").  Second, the Personal Finances policy: "no employees were permitted to transact their own or a relative's bank business while on company time using company software."  Docs. 15-2 ¶ 16; 37-1 ¶ 16.  The company software includes the "Bank Pac

Maintenance Program," which "allowed an employee of the Bank to make changes to customer accounts while the employee using the software was physically at work, on duty, and on company time."  Docs. 15-2 ¶ 19; 37-1 ¶ 19.  Ms. Helton acknowledges that she was aware of these policies, and that "she had a duty to support the Bank's goals and values and to treat her co-workers with dignity and respect."  Docs. 15-2 ¶¶ 11, 16, 20; 37-1 ¶¶ 11, 16, 20.

All Bank employees, including Ms. Helton, received an email in September 2018 from Ms. Baucom stating: "as an employee of the Bank, you are not permitted to make changes to anything pertaining to relatives or immediate family members.  This includes teller transactions, account transfers, and any maintenance changes including loans."[2] Docs. 15-2 ¶ 29; 37-1 ¶ 29.

In March 2019, the FDIC informed Mr. Bibb that Ms. Helton failed to submit the Bank's compliance examination response on time.  Docs. 15-2 ¶ 31; 37-1 ¶ 31.  Mr. Bibb informed Ms. Helton of her failure to do so, and Ms. Helton admitted the response had "completely slipped [her] mind."  Docs. 15-2 ¶ 32; 37-1 ¶ 32.

In April 2019, Ms. Baucom discovered that Ms. Helton had committed multiple violations of the Personal Finances policy.  Docs. 15-2 ¶ 42; 37-1 ¶ 42.  For example, in June 2018 and April 2019, Ms. Helton made changes to her own account using the Bank Pac Maintenance program.  Docs. 15-2 ¶¶ 44-45; 37-1 ¶¶ 44-45.  Ms. Helton, while at work, had "also made changes to her child's loan payment, to the account of

---

[2] Ms. Baucom testified that this email was sent because she discovered violations of the Personal Finances policy by Ms. Helton.  Docs. 15-2 ¶¶ 28-29; 37-1 ¶¶ 28-29.  Ms. Helton does not dispute Ms. Baucom's testimony, but does dispute whether this email was in response to the Bank discovering the alleged violations.  Docs. 15-2 ¶ 28; 37-1 ¶ 28.

her daughter's husband, to [her] husband's business checking account, and to the payment sequence on her husband's loan."  Docs. 15-2 ¶ 46; 37-1 ¶ 46.

On April 11, 2019, Ms. Helton was in charge of closing the Bank.  Docs. 15-2 ¶ 34; 37-1 ¶ 34.  The time was getting close to an appointment Ms. Helton had after work, and a teller requested Ms. Helton's help in "recounting the drawers."  Docs. 15-2 ¶ 35; 37-1 ¶ 35.  Ms. Helton, because of the time of her appointment, became stressed and stated in response something similar to "shit, I have a damn appointment."  Docs. 15-2 ¶ 35; 37-1 ¶ 35.  Ms. Helton admitted "that the language she used during the … incident was 'inconsistent with the company's policies,' 'profane,' 'inappropriate,' 'unprofessional,' and 'problematic behavior.'"  Docs. 15-2 ¶ 36; 37-1 ¶ 36.  Denise Griswell, another employee who witnessed the incident, reported it to Mr. Bibb, who then "directly counseled and reprimanded [Ms. Helton], advising her that additional outbursts, unprofessional language, profanity, and a loud tone of voice would not be tolerated."  Docs. 15-2 ¶¶ 37-38; 37-1 ¶¶ 37-38.  Before this incident, Mr. Bibb, "on two, maybe three, prior occasions," had advised Ms. Helton on "her delivery in speaking with co-workers and suggested different word usage as well as to try to keep her voice down when speaking with others."  Docs. 15-2 ¶ 41; 37-1 ¶ 41.

In May 2019, in response to Ms. Helton's conduct, Mr. Bibb, Ms. Wilson, and Mr. Doolittle met with Ms. Helton.  Docs. 15-2 ¶ 49; 37-1 ¶ 49.  In the meeting, Ms. Helton "was reprimanded for violating the Personal Finances policy," was advised "that she was to focus solely on her compliance duties and to leave the other department heads to handle their respective areas of responsibility," and was reminded "that all employees of the Bank are required to be respectful when talking to fellow co-workers, and that

angry outbursts will not be tolerated."  Docs. 15-2 ¶¶ 49-50; 37-1 ¶¶ 49-50.  The Bank subsequently removed Ms. Helton's "administrative access to the Bank Pac Maintenance program," but did not report her misconduct to the FDIC.  Docs. 15-2 ¶¶ 52, 54; 37-1 ¶¶ 52, 54.  Ms. Helton admitted "that she was having difficulty maintaining a positive attitude at work at the time."  Docs. 15-2 ¶ 53; 37-1 ¶ 53.  And in late May, Ms. Helton emailed Mr. Bibb and the Bank's CEO stating: "I am fully aware that I did do and knowledge [sic] completely the transactions until further review … Nonetheless I am guilty of setting up transfers and deleting."  Docs. 15-2 ¶ 56; 37-1 ¶ 56.

Around September 30, 2019, Ivan Gonzalez, a subordinate of Ms. Haynes' in the loan operations department, "reported to Ms. Haynes that [Ms. Helton] raised her voice and yelled at him in a loud voice and in an unprofessional matter."  Docs. 15-2 ¶¶ 60, 62; 37-1 ¶¶ 60, 62.  Ms. Helton does not dispute Mr. Gonzalez's testimony, but does "not recall" the incident.  Docs. 15-2 ¶ 62; 37-1 ¶ 62.

On October 7, 2019, a disagreement occurred between Ms. Helton and Ms. Haynes.  Docs. 15-2 ¶¶ 64-65; 37-1 ¶¶ 64-65.  Ms. Helton disagreed with an action Ms. Haynes took and approached Ms. Haynes about it with a raised voice, "began waving her arms all around," told Ms. Haynes that her "subordinates needed to 'do it right,'" and stated, "well, there needs to be some training!"  Docs. 15-2 ¶¶ 65-66; 37-1 ¶¶ 65-66.  Ms. Helton then "turned off the lights in her office and left work for the day."  Docs. 15-2 ¶ 66; 37-1 ¶ 66.  Ms. Haynes reported the incident to Mr. Bibb and Ms. Wilson.  Docs. 15-2 ¶ 67; 37-1 ¶ 67.

On October 9, 2019, Mr. Bibb terminated Ms. Helton's employment with the Bank.  Docs. 15-2 ¶ 71; 37-1 ¶ 71.  Mr. Bibb and Ms. Wilson testified that "[Ms.] Helton

was terminated for her inappropriate and disruptive workplace conduct during the week of September 23rd and then again on October 7, 2019, which followed prior discipline related to the Personal Finance policy in May 2019 and discipline for her inappropriate and unprofessional use of language towards other co-workers on April 11, 2019."  Docs. 15-2 ¶ 72; 37-1 ¶ 72.  Mr. Bibb further testified that he "had simply lost confidence in [Ms. Helton]'s ability to interact with her co-workers."  Docs. 15-2 ¶ 74; 37-1 ¶ 74.

Ms. Helton was fifty-seven years old at the time of her termination.  Docs. 15-2 ¶ 2; 37-1 ¶ 2.  The "majority" of Ms. Helton's previous duties were contracted out to a third-party, and her remaining "duties were absorbed by a seven-member internal compliance committee … comprised of six (6) women and five (5) members who are over the age of forty (40)."  Docs. 15-2 ¶¶ 83-84; 37-1 ¶¶ 83-84.  Moreover, because federal regulations require banks to designate a compliance officer, "[Ms.] Haynes and Stephanie McAfee were given the additional titles of 'Interim Loan Compliance Office[r]' and 'Interim Deposit Compliance Officer,' respectively—however these are merely descriptive titles, as neither of their primary job responsibilities changed following [Ms. Helton]'s separation."  Docs. 15-2 ¶ 85; 37-1 ¶ 85.

On November 12, 2021, after Ms. Helton exhausted her administrative remedies with the Equal Employment Opportunity Commission ("EEOC"), she filed this suit against the Bank alleging wrongful termination in violation of Title VII and the ADEA. Doc. 1.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id*. at 1438 (quoting *Celotex*, 477 U.S. at 324) (alterations in original). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id*.

The burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed

fact."  *Id*. (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), "the court may … consider the fact undisputed for purposes of the motion[.]"  Fed. R. Civ. P. 56(e)(2).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

Title VII and the ADEA make it unlawful "for an employer … to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's" sex or age, respectively.  42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a)(1). The ADEA is "limited to individuals who are at least 40 years of age."  29 U.S.C. § 631(a).  Moreover, "[t]he burden of persuasion always remains on the plaintiff in an ADEA case to proffer evidence sufficient to permit a reasonable fact finder to conclude that the discriminatory animus was the 'but-for' cause of the adverse employment action."  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

A Title VII and ADEA plaintiff may prove her case circumstantially when there is no direct evidence of discrimination.  The framework for analyzing circumstantial evidence to establish a prima facie case of discrimination is found in *McDonnell Douglas Corp. v. Green*.  411 U.S. 792 (1973).  Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination, the test for which differs

slightly depending on the nature of the claim. *Id*. at 802. If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons," but must produce evidence sufficient to "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff." *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (internal quotation marks and citation omitted).

A plaintiff can then show that the employer's stated reason is in fact pretext for discrimination. *Id*. This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*. (quoting *Burdine*, 450 U.S. at 256). "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). And where "a plaintiff produces sufficient evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer." *Kragor*, 702 F.3d at 1309.

To establish a prima facie case of discrimination, Ms. Helton must show: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) she was replaced by an individual outside her protected classes or was treated less favorably than a similarly-situated

individual outside her protected classes.  *Maynard v. Bd. of Regents*, 342 F.3d 1281,

1289 (11th Cir. 2003); *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000);

*see also Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220-21 (11th Cir. 2019).

The parties agree that because Ms. Helton seeks to prove her case with

circumstantial evidence of discrimination, the *McDonnell-Douglas* framework is

appropriate.  Docs. 17-1 at 11-21; 37 at 10-17.  The Bank argues it is entitled to

summary judgment because Ms. Helton was not replaced by a male or younger

employee (she was not replaced at all, the Bank says), male employees were not

treated more favorably than her, her termination was for legitimate, nondiscriminatory

reasons, she cannot establish pretext, and she cannot show a "convincing mosaic."[3]

Doc. 17-1 at 11-22.

**A. Prima Facie Case**

Only the fourth element of Ms. Helton's prima facie case—whether she was

replaced by a male or younger employee or was treated less favorably than a male or

younger employee—is in dispute.  Doc. 37 at 11-12.

*1. Replacement*

Ms. Helton, in support of her age discrimination claim, argues she was replaced

by a younger employee, Ms. Haynes.[4]  Doc. 37 at 12-13.  She offers no evidence she

---

[3] The Bank also argues that Ms. Helton's response (Doc. 37) should be stricken in its entirety because it was filed late.  Doc. 41 at 1-2.  Even with an extension, Ms. Helton's counsel failed to file his response on time, instead putting a "placeholder" on the docket—which was also technically late.  Docs. 16; 36.  Ms. Helton's counsel stated the delay was for "the verification of legal citations."  Doc. 36 at 1.  This explanation is suspect because Ms. Helton's counsel still input incorrect citations.  *See, e.g.*, Doc. 37 at 11.  It is also worth noting that the Bank had to find entirely new counsel—a task little more difficult than citation checks—and its new counsel had no difficulty filing their client's reply brief on time.  Doc. 33.  The Court echoes the Bank's frustrations.

[4] Ms. Helton failed to include Ms. Haynes' exact age in her response to the Bank's statement of material facts, or in her response brief.  In any event, Ms. Helton's initial EEOC pleadings suggest Ms. Haynes

was replaced by a male.  The Bank argues that "[t]he undisputed record demonstrates that [Ms. Helton] was simply not 'replaced' by an employee of the Bank."  Doc. 17-1 at 13.  The Court agrees with the Bank.

To show that Ms. Haynes was her replacement, Ms. Helton "must develop a record to show that a purported replacement actually performed [her] duties."  *Hawkins v. Ceco Corp.*, 883 F.2d 977, 982 (11th Cir. 1989).  The evidence supports the opposite conclusion.  For example, Mr. Bibb—the Bank's president—testified that Ms. Helton "was not replaced in her position by another employee of the Bank."  Doc. 15-4 ¶ 19.  The Bank's position is also supported by Ms. Haynes' testimony, where she states she "did not 'replace' [Ms. Helton] as the Bank's compliance Officer."  Doc. 15-9 ¶ 7.  Ms. Helton's duties, Mr. Bibb testifies, were mostly "contracted out to a third-party," and those that were not, "were absorbed following the formation of a seven (7) member internal compliance committee," which included Ms. Haynes.  Docs. 15-2 ¶ 83; 15-4 ¶ 19; 15-9 ¶ 7; 37-1 ¶ 83.  Even though Ms. Haynes was "given the title of 'Interim Loan Compliance Officer,'" the Bank gave her this title solely to comply with FDIC regulations—not because Ms. Haynes replaced Ms. Helton and "actually performed [her] duties."  Docs. 15-2 ¶ 85; 15-4 ¶ 19; 15-9 ¶ 7; 37-1 ¶ 85; *Hawkins*, 883 F.2d at 982.  Moreover, another employee, Ms. McAfee, also had a title that included "compliance," but Ms. Helton does not allege that Ms. McAfee replaced her.  Docs. 15-4 ¶ 19.

---

was around 30 years old at the time of Ms. Helton's termination.  Docs. 37 at 12; 37-2 at 45.  Moreover, Ms. Helton contradicts her position earlier in her brief and states, "Ms. Haynes either replaced Ms. Helton, or according to [the Bank], took on at least some of her compliance duties."  Doc. 37 at 9.

Ms. Helton provides no evidence to lead a reasonably jury to find that she was replaced by Ms. Haynes.  She instead asserts that "[t]he Court should question why [the Bank] would provide someone with a new, descriptive title, without changing such person's job duties."  Doc. 37 at 12.  But it is undisputed that Ms. Haynes was part of the Bank's Compliance Committee, and as previously mentioned, "the FDIC requires banks to have a designated compliance officer," and thus the Bank gave Ms. Haynes and Ms. McAfee the roles of "Interim Loan Compliance" officer and "Interim Deposit Compliance" officer, respectively.[5]  Docs. 15-2 ¶ 85; 37-1 ¶ 85.

In sum, Ms. Helton's duties were in part contracted out to a third-party and in part assigned to seven other Bank employees.  Ms. Helton picks one of only two individuals younger than she from the seven employees who took *some* of her responsibilities and ignores completely that most of her duties were contracted out.  Doc. 15-4 ¶ 19 ("The seven (7) member committee is comprised of six (6) women.  Five (5) members of the committee are over the age of forty (40).").  Thus, Ms. Helton has failed to provide any "evidence beyond the pleadings" indicating she was replaced.  *Josendis*, 662 F.3d at 1315.

### 2. Comparators

The Bank further argues that Ms. Helton has not produced evidence that a similarly situated person outside of her protected classes was treated more favorably than her.  Doc. 17-1 at 14-16.  A valid comparator must be someone "similarly situated in all material respects."  *Lewis*, 918 F.3d at 1226.  She need not prove "that she and

---

[5] The Court notes that Ms. Helton made no objection to the Bank's statement of fact that these titles are "merely descriptive" and "neither of their primary job responsibilities changed following [Ms. Helton's] separation."  Docs. 15-2 ¶ 85; 37-1 ¶ 85.

her comparators are identical save for their" protected trait.  *Id*. at 1227.  Rather, she

can show the similarly situated individual (1) "engaged in the same basic conduct (or

misconduct)," (2) was "subject to the same employment policy, guideline, or rule," (3)

was "under the jurisdiction of the same supervisor," and (4) "share[s] the plaintiff's

employment or disciplinary history."  *Id*. at 1227-28.  Ms. Helton argues that Mr. Bibb,

Mr. May, and Mr. Doolittle are appropriate comparators who received more favorable

treatment.[6]  Doc. 37 at 13-14.

> a. Mr. Bibb

First, Ms. Helton points to Mr. Bibb as an appropriate comparator.[7]  *Id*. at 13.

She recognizes that "it would be an uphill battle to show that [the Bank's] president was

similarly situated."  *Id*.  That is an understatement.  It is undisputed that Ms. Helton and

Mr. Bibb did not have the same supervisor—Ms. Helton was supervised by Mr. Bibb,

who was supervised by the Bank's CEO.  Docs. 15-2 ¶¶ 3-4; 37-1 ¶¶ 3-4.  Moreover,

Mr. Bibb's position as president and Ms. Helton's former position as compliance officer

are distinguishable.[8]  For example, Mr. Bibb "supervises the Bank's day to day

activities," and Ms. Helton was solely in charge of the Bank's compliance management

program.  Docs. 15-2 ¶¶ 3, 18; 37-1 ¶¶ 3, 18.  Mr. Bibb has various direct subordinates,

---

[6] Ms. Helton "acknowledges that the question of comparators, or similarly-situated employees outside of Ms. Helton's protected class, is not quite as simple. … The fact that [the Bank] employed only a few more than thirty employees, and Ms. Helton was the only person to serve in her role, indeed makes this a tricky circumstance."  Doc. 37 at 13.  But *Lewis* provides a route for a plaintiff in Ms. Helton's position.  918 F.3d at 1227-28 (holding that comparators will not invariably have been under the same supervisor).

[7] Ms. Helton mentions Mr. Bibb as a former male colleague who was treated more favorably than her, but subsequently lists only Mr. Doolittle and Mr. May as comparators.  Doc. 37 at 13.  In any event, the Court evaluates Mr. Bibb as a comparator.

[8] Interestingly, Ms. Helton admitted her and Mr. Bibb "had 'completely different jobs.'"  Docs. 15-2 ¶ 113; 37-1 ¶ 113.

including C-Suite officials, vice presidents, and non-C-Suite level officers, whereas Ms.

Helton "did not have any direct subordinates, and lacked the ability to hire, fire, or

recommend disciplinary action" and "did not participate in employee disciplinary

conferences or meetings."[9]  Docs. 15-2 ¶¶ 3, 21-22; 37-1 ¶¶ 3, 21-22.

　　Ms. Helton argues Mr. Bibb had a similar disciplinary history, noting he "spoke to

[the Bank]'s former Corporate Secretary and human resources employee in a manner

that left her in tears and almost caused her to quit."  Doc. 37 at 7-8.  And that, unlike

Ms. Helton, he "continues to enjoy his twenty-plus-year tenure" as president.  *Id*. at 8.

In support of this allegation, Ms. Helton cites to an inadmissible email from a former

employee, Della Brown.  Docs. 37 at 7-8; 37-1 ¶ 109[10]; 37-2 at 29.  Even if this

"unsworn statement"—as Ms. Helton herself labels it—describes an incident that

actually happened involving Mr. Bibb, this allegation would only show that Mr. Bibb lost

his temper *once*.  Docs. 37 at 7; 37-2 at 29.  The Court notes, but does not rely on, the

suspect veracity of the email.  It alleges that Mr. Bibb made Ms. Wilson cry, but Ms.

Wilson testified that she never heard "anyone other than [Ms.] Helton yell, curse, or

raise their voice in an unprofessional manner."  Doc. 15-6 ¶ 10.

---

[9] Ms. Helton disputes this fact insofar as "she participated in interviewing prospective employees" and
"there were times in which [she] did supervise other employees."  Doc. 37-1 ¶ 21.

[10] In response to the Bank's statement of fact that "[t]here is no admissible evidence that Mr. Bibb has
ever yelled, cursed, or raised his voice in an unprofessional manner," Ms. Helton, relying on Ms. Brown's
admittedly "unsworn statement," stated that fact was disputed.  Docs. 15-2 ¶ 109; 37-1 ¶ 109.  Ms.
Helton's counsel understands the meaning of "no admissible evidence."  Clearly, Ms. Helton had no
admissible evidence of Mr. Bibb's alleged inappropriate behavior, regardless of whether she "intends to
call Ms. Brown as a witness a [sic] trial."  Doc. 37-1 ¶ 109.  The Court reminds Ms. Helton's counsel of his
duty of candor.  *See* Ga. R. Prof. Cond. 3.3.

Most significantly, Ms. Helton does not allege, nor does the evidence suggest, that Mr. Bibb ever violated the Bank's Personal Finances policy.  Docs. 15-4 ¶ 15; 15-6 ¶ 9; 37-1 ¶ 109.

Mr. Bibb is not an appropriate comparator.

b. Mr. May

Next, Ms. Helton claims that Mr. May is an appropriate comparator.  Doc. 37 at 13-14.  Mr. May served as a vice president and bank manager until 2012.  Docs. 15-2 ¶ 95; 37-1 ¶ 95.  Although Mr. May and Ms. Helton were subject to the same policies and were both under Mr. Bibb's supervision, Mr. May is not a comparator because Ms. Helton and Mr. May did not engage in similar misconduct or have similar disciplinary histories.  Docs. 15-2 ¶ 3; 37-1 ¶ 3.  The record shows that on one occasion, Bank teller Pat Herringdine complained to Mr. Bibb about Mr. May's behavior towards her.  Docs. 15-2 ¶ 96; 15-11 ¶ 6; 37-1 ¶ 96.  Mr. Bibb reprimanded Mr. May, and "no further incidents were reported."  Docs. 15-2 ¶ 96; 15-11 ¶ 6; 37-1 ¶ 96.  In fact, Ms. Herringdine testified that, after the incident, she "had no further issues with Mr. May, and [they] spoke favorably about each other at [their] respective retirement parties."  Docs. 15-2 ¶ 97; 15-11 ¶ 6; 37-1 ¶ 97.  The record does not support, as Ms. Helton alleges, that Mr. May was *repeatedly* reprimanded for his tone, or that he engaged in various "altercations" or "disagreements" with other employees.  Doc. 37 at 13-14.

Finally, just like Mr. Bibb, Mr. May has never been accused of violating the Personal Finances policy.  Docs. 15-4 ¶ 15; 15-6 ¶ 9.

Mr. May is also not an appropriate comparator.

c. Mr. Doolittle

Finally, Ms. Helton argues that Mr. Doolittle is an appropriate comparator. Doc. 37 at 13-14. Mr. Doolittle has served as the Bank's Chief Information Officer and Chief Operating Officer for the past twenty years. Docs. 15-2 ¶ 3; 15-5 ¶ 2; 37-1 ¶ 3. Mr. Doolittle is supervised by Mr. Bibb. Docs. 15-2 ¶¶ 3, 7; 37-1 ¶¶ 3, 7. "[T]he only employees of the Bank who exceed Mr. Doolittle's level of authority are the President and CEO." Docs. 15-2 ¶ 7; 37-1 ¶ 7. Mr. Doolittle has several direct reports and "the power to hire and fire employees and to recommend disciplinary action." Doc. 15-5 ¶ 3. Thus, Mr. Doolittle first fails as a comparator because of the significant differences between his and Ms. Helton's job responsibilities.[11]

Ms. Helton argues Mr. Doolittle is an appropriate comparator because he has allegedly "been accused of engaging in altercations, disagreements, or an offensive tone with other employees" but remains in his position. Doc. 37 at 13-14. To prove this, Ms. Helton points to three alleged incidents involving Rachel Green, Jessica Ford, and Ms. Brown. Doc. 37-1 ¶¶ 99-100, 103-105, 109.

Ms. Green worked as a teller for the Bank from 2011 until around 2016. Docs. 15-2 ¶ 99; 15-12 ¶ 2; 37-1 ¶ 99. She testified that Mr. Doolittle requested to change something on her computer, and she responded that she needed to put money away before the Bank opened. Docs. 15-2 ¶ 100; 15-12 at 5, 3 ¶ 5; 37-1 ¶ 100. Mr. Doolittle became outwardly angry and "[y]ell[ed] so loud he scared a couple of the other ladies." Doc. 15-12 at 5. Ms. Green reported Mr. Doolittle's behavior to her supervisor, but not to Mr. Bibb. *Id*. ¶ 5; 15-2 ¶ 100; 37-1 ¶ 100.

---

[11] Ms. Helton further admitted her and Mr. Doolittle "had 'completely different jobs.'" Docs. 15-2 ¶ 113; 37-1 ¶ 113.

Ms. Ford was a coordinator of online banking for the Bank until the Bank terminated her in 2013.  Docs. 15-2 ¶ 105; 37-1 ¶ 105.  Ms. Helton provides no admissible evidence indicating Mr. Doolittle communicated inappropriately with Ms. Ford.  Ms. Helton cites a letter from Ms. Ford concerning one alleged incident involving Ms. Ford and Mr. Doolittle.  Docs. 15-2 ¶ 105; 37 at 13-14; 37-1 ¶ 105; 37-2 at 1.  But this letter is not Ms. Ford's sworn testimony.  And even if the incident did occur, it would not change the Court's conclusion because the incident was not reported to Mr. Bibb.

Finally, Ms. Helton provides an inadmissible email from Ms. Brown to, presumably, Ms. Helton, detailing an alleged encounter where Mr. Doolittle yelled at Ms. Brown and told her he did not like her attitude.  Doc. 37-2 at 29.  Again, this is unsworn testimony.  Even if the incident did occur, the email does not indicate whether Ms. Brown reported this behavior to Mr. Bibb.[12]

There is no evidence suggesting that Mr. Doolittle engaged in similar misconduct or has a similar disciplinary history as Ms. Helton.  He was never reprimanded for violating either the Bank's Employee or Personal Finances policies.  Rather, the evidence supports the conclusion that he potentially violated the employee policy once with his encounter with Ms. Green, but this incident was not reported to Mr. Bibb and he did not receive a disciplinary warning.  Docs. 15-4 ¶ 15; 15-5 ¶ 4; 15-6 ¶ 9.  Moreover, Mr. Doolittle testified that "none of [his] subordinates or other employees of the Bank

---

[12] Knowing, surely, these statements are inadmissible, Ms. Helton's counsel makes no express mention of Ms. Ford or Ms. Brown's statements in her response brief.  Doc. 37.  Instead, Ms. Helton's brief cites to her response to the Bank's statement of facts without acknowledging that the response is one based on inadmissible evidence.  *Id.* at 6-8, 14; Doc. 37-1 ¶¶ 105, 109.

Ms. Helton's counsel's reliance on the inadmissible email from Ms. Brown to his client is particularly galling.  Ms. Brown emailed his client directly for goodness' sake.  Doc. 37-2 at 29.  He certainly knew he needed her declaration to get her alleged account into evidence.  Again, Ms. Helton's counsel is reminded of his duty of candor.

have ever complained to [Mr.] Bibb about [his] professionalism … At no point has Mr. Bibb ever had to counsel [him] about the tone of [his] voice, [his] professionalism, or [his] use of inappropriate language."  Docs. 15-2 ¶ 104; 15-5 ¶ 6; 37-1 ¶ 104.

Mr. Doolittle is not a valid comparator.

Ms. Helton cannot show that any evidence supports the conclusion that she was replaced by or treated less favorably than a male or younger employee.  Having failed to do so, she fails to make out a prima facie case for sex or age discrimination.

**B. The Legitimate, Nondiscriminatory Reasons for Ms. Helton's Termination**

Even if Ms. Helton had established a prima facie case, the Bank argues it still is entitled to summary judgment because it had legitimate, nondiscriminatory reasons for terminating Ms. Helton: on multiple occasions, she violated the Bank's Employee and Personal Finances policies.  Doc. 17-1 at 17.

*1. Workplace behavior*

At all relevant times, Ms. Helton was subject to the Employee policy which requires "employees to conduct themselves at all times in a professional manner, and to cooperate cheerfully with personnel in their department and in other departments." Docs. 15-2 ¶ 13; 15-6 ¶ 4 ("The Bank's Employee Handbook … was in effect during the last two years of [Ms.] Helton's employment."); 37-1 ¶ 13.  Ms. Helton violated this policy on multiple occasions.

On April 11, 2019, Ms. Helton was "antsy" to leave work to arrive to an appointment on time, and when a coworker requested her assistance, Ms. Helton irritably responded "shit, I have a damn appointment."  Docs. 15-2 ¶ 35; 15-3 at 112:4-6; 15-4 ¶ 10; 15-6 at 2-3, 7; 15-8 at 2-4; 37 at 5; 37-1 ¶ 35.  Ms. Griswell, the supervisor

who observed the incident, reported it to the branch manager, and it was then discussed with Mr. Bibb.  Docs. 15-2 ¶ 37; 15-4 ¶ 10; 15-8 ¶ 3; 37-1 ¶ 37.  After Ms. Helton's termination, Ms. Griswell prepared an incident report outlining the details of Ms. Helton's behavior, which indicates that there were six witnesses and that Mr. Bibb spoke to Ms. Helton about her behavior on April 15, 2019.  Docs. 15-2 ¶ 40; 15-8 at 4; 37-1 ¶ 40.  At that meeting in April 2019, Mr. Bibb "directly counseled and reprimanded" Ms. Helton and made clear "that additional outbursts, unprofessional language, profanity, and a loud tone of voice would not be tolerated."  Docs. 15-2 ¶ 38; 15-3 at 117:12-16; 15-4 ¶ 10; 37-1 ¶ 38.

Ivan Gonzalez, a loan operations assistant supervised by Ms. Haynes, testified that Ms. Helton also spoke inappropriately to him.  Docs. 15-2 ¶¶ 62-63; 15-10 ¶¶ 2-3; 37-1 ¶¶ 62-63.  On September 23, 2019, Ms. Helton asked Mr. Gonzalez to make changes to something outside of her department.  Docs. 15-2 ¶¶ 62-63; 15-10 ¶ 3; 37-1 ¶¶ 62-63.  Mr. Gonzalez refused, because he wanted to discuss the changes with Ms. Haynes, and "[Ms.] Helton became upset and she started yelling and hollering in what [he] felt was an inappropriate tone of voice."  Docs. 15-2 ¶ 63; 15-10 ¶ 3; 37-1 ¶ 63.  He reported the incident to Ms. Haynes, which is confirmed by Ms. Haynes' testimony and incident report.  Doc. 15-9 at 6.  However, Ms. Helton does "not recall the event at issue and [does] not recall hollering at Mr. Gonzalez."  Docs. 15-2 ¶¶ 62-63; 15-3 at 125:6-24; 37-1 ¶¶ 62-63.

On October 7, 2019, Ms. Helton spoke inappropriately to Ms. Haynes.  Docs. 15-2 ¶ 65; 15-9 ¶ 3; 37-1 ¶ 65.  Ms. Helton felt an issue outside of her department needed to be fixed.  Doc. 15-3 at 230.  Specifically, she wanted to speak to Ms. Haynes about

the Bank's loan collection sequence.  Docs. 15-2 ¶ 65; 15-9 ¶ 3; 37-1 ¶ 65.  Ms. Helton

approached Ms. Haynes about the issue "in a loud and condescending manner," Ms.

Haynes responded that "it was not a compliance issue," and Ms. Helton "began waving

her arms all around, said that Ms. Haynes' subordinates needed to 'do it right' and then

said, 'well there needs to be some training!'"  Docs. 15-2 ¶ 65; 15-9 ¶ 3; 37-1 ¶ 65.  Ms.

Helton subsequently "turned off the lights in her office and left work for the day."  Docs.

15-2 ¶ 66; 15-9 ¶ 3; 37-1 ¶ 66.

Ms. Haynes reported the September 23, 2019 and October 7, 2019 incidents to

Mr. Bibb and Ms. Wilson, who asked Ms. Haynes to prepare an incident report.  Docs.

15-2 ¶ 67; 15-6 ¶ 6; 37-1 ¶ 67.  The incident report confirms Ms. Helton's behavior.

Doc. 15-9 at 6.

### 2. Failure to respond to the FDIC

 "On March 22, 2019, [Mr. Bibb] personally received a call from [the] Bank's FDIC

representative," who informed him "that a compliance examination response was due

on March 1, 2019, but that [Ms.] Helton was non-responsive to the FDIC's queries."

Docs. 15-2 ¶ 31; 15-4 ¶ 9; 37-1 ¶ 31.  After Mr. Bibb told Ms. Helton about her failure to

respond, Ms. Helton admitted that it had "completely slipped [her] mind."  Docs. 15-2 ¶

32; 15-4 at 5-6, 13; 37-1 ¶ 32.  As the Bank's compliance officer, Ms. Helton "was

charged with … making sure the Bank was complying with applicable state and federal

banking regulations," which included assisting with FDIC compliance examinations.

Docs. 15-2 ¶ 18; 37-1 ¶ 18.  The Bank, as an institution that must comply with FDIC

regulations, has a strong interest in having a compliance officer who ensures the Bank

timely responds to requests from the FDIC.

*3. Personal Finances policy violations*

At all relevant times, Ms. Helton was subject to the Bank's Personal Finances policy.  Docs. 15-2 ¶¶ 11, 16-17; 37-1 ¶¶ 11, 16-17.  The policy provides, in pertinent part:

> All employees should assume the position of a regular customer when handling their personal bank business.  All transactions should be handled in the normal over-the-counter procedure.  *No employees will be permitted to transact their own or a relative's bank business* (including boyfriend, girlfriend, or partner).   Avoid direct or indirect financial interest with competitors, customers, and suppliers.

Doc. 15-3 at 159 (emphasis added).  At her deposition, Ms. Helton testified that she understood this policy and the parameters of it.  Docs. 15-2 ¶ 11; 15-3 at 59:19-60:20; 37-1 ¶ 11.  Ms. Helton was found in violation of the Personal Finances policy because of certain transactions she made on company time through the Bank's Pac Maintenance system.

As the Bank's Internal Auditor, Ms. Baucom is tasked with "monitor[ing] employee accounts and account activities, including via the Bank Pac Maintenance Program."  Docs. 15-2 ¶ 26; 15-7 ¶ 4; 37-1 ¶ 26.  In this role, Ms. Baucom discovered multiple violations of the Personal Finances policy by Ms. Helton.  Docs. 15-2 ¶ 28; 15-7 ¶¶ 4-5; 37-1 ¶ 28.

"While conducting a routine audit in late August or early September 2018, [Ms. Baucom] discovered that … [Ms.] Helton appeared to be making changes to her own accounts and/or those of her relatives while on Company time."  Docs. 15-2 ¶ 28; 15-7 ¶ 4; 37-1 ¶ 28.  Ms. Baucom informed Mr. Bibb of these violations.  Docs. 15-2 ¶ 29; 15-7 ¶ 4; 37-1 ¶ 29.  Although Mr. Bibb "was gravely concerned about this issue," instead of punishing Ms. Helton, he "asked [Ms. Baucom] to send out an email to all Bank

employees reminding them" of the Personal Finances policy.  Docs. 15-2 ¶¶ 29-30; 15-4 ¶ 8; 37-1 ¶¶ 29-30.  On September 4, 2018, Ms. Baucom sent out an email to all Bank employees, including Ms. Helton, which stated:

> Please remember that as an employee of the bank, you are not permitted to make changes to anything pertaining to relatives or immediate family members.  This includes teller transactions, account transfers, and any maintenance changes including loans.  If you find something that needs to be changed, please have someone else in the necessary department handle the change.  Feel free to let me know if you have any questions or concerns about a transaction.

Docs. 15-2 ¶ 29; 15-7 at 5; 37-1 ¶ 29.  Ms. Helton does not dispute that she received this email, but testified that she "probably" did not read it and did not know it was sent because of her conduct.  Docs. 15-2 ¶¶ 28-30; 15-3 at 84:3-85:2; 37-1 ¶¶ 28-30.

In April 2019, Ms. Baucom conducted a routine audit of Ms. Helton's account.  Docs. 15-2 ¶ 42; 15-7 ¶ 5; 37-1 ¶ 42.  The audit "uncovered additional violations of the Bank's Personal Finances policy" by Ms. Helton.  Docs. 15-2 ¶ 42; 15-7 ¶ 5; 37-1 ¶ 42.  Ms. Helton conducted various transactions while at work "to her account and several other accounts of her relatives."  Docs. 15-2 ¶ 43; 15-4 ¶ 11; 15-7 at 3, 6-9; 37-1 ¶ 43.  For example, on June 25, 2018, Ms. Helton used the Bank's PAC Maintenance Program to create a purged funds transfer on her account.  Docs. 15-2 ¶ 45; 15-3 at 74:18-75:15; 15-7 at 6; 37-1 ¶ 45.  On April 11, 2019, Ms. Helton removed money from her account to apply it to her daughter's loan payments.  Docs. 15-2 ¶ 46; 15-3 at 75:22-77:12; 15-7 at 7-8; 37-1 ¶ 46.  On April 12, 2019, Ms. Helton created a "suspended memo post … to prevent the money from being removed from [her] account."  Docs. 15-3 at 73:21-74:10; 15-7 at 6.  The next day, Ms. Helton created another "suspended memo post" on her account.  Docs. 15-2 ¶ 44; 15-3 at 73:17-74:7;

15-7 at 6; 37-1 ¶ 44.  She also made various changes to her husband's business checking account and loans, and to her son-in-law's account.  Docs. 15-2 ¶ 46; 15-3 at 77:16-78:25, 80:4-81:1; 15-7 at 10-22; 37-1 ¶ 46.

Ms. Baucom again informed Mr. Bibb of Ms. Helton's various violations.  Docs. 15-2 ¶ 47; 15-4 ¶ 11; 15-7 ¶ 5; 37-1 ¶ 47.  Mr. Bibb found the violations "significant" and "highly unethical," and scheduled a disciplinary meeting on or around May 13, 2019—less than a month after the April meeting—with Ms. Helton, Ms. Wilson, and Mr. Doolittle.  Docs. 15-2 ¶¶ 48-49; 15-4 ¶ 11; 37-1 ¶¶ 48-49.  Mr. Bibb reprimanded Ms. Helton, advised her "that she was to focus solely on her compliance duties and to leave the other department heads to handle their respective areas of responsibility," and reminded her "that all employees of the Bank are required to be respectful when talking to fellow coworkers and that angry outbursts will not be tolerated."  Docs. 15-2 ¶ 50; 15-4 ¶ 11; 37-1 ¶ 50.  Ms. Helton was also issued a disciplinary warning on May 13, 2019, and her "access to the BankPac Maintenance program was removed."  Docs. 15-2 ¶ 52; 15-4 at 6, 15-16; 37-1 ¶ 52.

In sum, the Bank has adduced ample admissible evidence of strong, legitimate, nondiscriminatory reasons for Ms. Helton's termination.

## C. Pretext

The Eleventh Circuit has "repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law."  *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).  Federal courts "are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, [the] sole concern is whether unlawful discriminatory animus motivates

a challenged employment decision." *Id*.  In other words, "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers … our inquiry is limited to whether the employer gave an honest explanation of its behavior."  *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (internal quotation marks and citation omitted).

For a plaintiff to show that unlawful discriminatory animus motivated her employer's decision, "the evidence produced must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."  *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1313 (11th Cir. 2016) (internal quotation marks and citation omitted).  "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  *Chapman*, 229 F.3d at 1030.

Therefore, "[t]he question to be resolved is not the wisdom or accuracy of [the employer]'s conclusion that [the employee]'s performance was unsatisfactory, or whether the decision to fire her was 'prudent or fair.'"  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).  "The question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints about [the employee] as cover for discriminating against her because of her" protected class.  *Id*.  Ms. Helton

must show "*both* that the reason was false, *and* that discrimination was the real reason."
*Brooks v. Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Again, the Bank's proffered reasons for Ms. Helton's termination are that (1) she failed to respond to an FDIC audit; (2) she communicated inappropriately to coworkers on multiple occasions; and (3) she repeatedly violated the Bank's Personal Finances policy.  Doc. 17-1 at 17.  Ms. Helton does not dispute that this conduct occurred.[13] Instead, Ms. Helton argues the Bank "made its motives clear as, when [the Bank]'s president met with Ms. Helton to terminate her employment, he did not discuss compliance issues, there was no mention of [the Bank]'s Personal Finance policy, Mr. Bibb simply said, 'I don't know what we're going to do about your *attitude*.'"  Doc. 37 at 16.

Left unstated is why mention of Ms. Helton's "attitude" calls the Bank's motives into question.  The Bank admitted Ms. Helton's termination was due in part to her behavior, and the record suggests Ms. Helton had an attitude problem.  Specifically, Mr. Bibb and Ms. Wilson testified that "[Ms.] Helton was terminated for her *inappropriate and disruptive workplace conduct* during the week of September 23rd and then again on October 7, 2019, which followed prior discipline related to the Personal Finance policy in May 2019 and discipline for her inappropriate and unprofessional use of language towards other co-workers on April 11, 2019."  Docs. 15-4 ¶ 14; 15-6 ¶ 7 (emphasis added).  Mr. Bibb "simply lost confidence in her ability to interact with her co-workers."

---

[13] The Court notes that Ms. Helton "admitted at her deposition that if a company honestly believed that an officer level employee had engaged in unprofessional behavior towards co-workers on multiple occasions within a seven-month period, that would be a legitimate reason for separating the employee."  Docs. 15-2 ¶ 75; 15-3 at 131:6-18; 37-1 ¶ 75.

Doc. 15-4 ¶ 14.  If anything, the Bank's concern about Ms. Helton's attitude buttresses its argument that it had legitimate, nondiscriminatory reasons to fire her.

Ms. Helton also argues that, in combination with the Bank's dissatisfaction with her "attitude," "the circumstances and timing are suspect and there is evidence of employees being held to completely different standards."  Doc. 37 at 1.  The Court addresses each argument in turn.

*1. Suspicious timing*

Ms. Helton argues the timing of her termination was suspicious, stating she "was employed with [the Bank] for literally 29 years, ten months, and four days before [the Bank] raised a single issue with her performance.  It was at that point, that [the Bank] became 'gravely concerned' over an incident that occurred in September 2018."  *Id*. at 15.  Further, the Bank "waited until Ms. Helton had a disagreement concerning a legitimate workplace issue, and one that was within Ms. Helton's role of compliance, to take action."  *Id*. at 16.

Ms. Helton suggests the Personal Finances policy violations were not a reason for her termination because the Bank first discovered that misconduct many months prior to her termination.  *Id*. at 5.  However, it is within the sole decision of the employer to determine when misconduct will lead to adverse action.  *See Alvarez*, 610 F.3d at 1266.  Waiting until Ms. Helton committed multiple other violations before terminating her is not "suspicious."  On the contrary, the "timing" is evidence that the Bank refrained from taking definitive action until Ms. Helton herself forced the Bank to act.  Doc. 17-1 at 10-11 ("Mr. Bibb therefore made the decision to terminate [Ms. Helton]'s employment on October 9, 2019, which followed prior counseling in March, April, and May 2019.").  In

any event, the Bank's timing of its action was an objectively reasonable business decision.  *See Chapman*, 229 F.3d at 1030.  Finally, Ms. Helton admitted she was having an issue with her attitude at work.  Docs. 15:3 at 103:17-104:15; 15-4 at 17 (Ms. Helton emailed Mr. Bibb stating, "You made the comment this morning that I had lost my enthusiasm for my job.  You could not be more right.  This is a tough position and it is hard to work and keep a good attitude when you cannot get the staff to make changes when they are needed.  In my 38 years of working, *I have never ever had the problem with attitude that I do now*.") (emphasis added).

Ms. Helton is merely quarreling with the Bank's proffered reasons, and nothing about the timing of her termination suggests that the Bank's legitimate, nondiscriminatory reasons are pretextual.  *Chapman*, 229 F.3d at 1030.

*2. Actions to other employees*

Second, Ms. Helton argues that because the Bank "expressed similar behavior directed at other female employees" and "disregard[ed] … male employee's offensive conduct," the Bank's discriminatory intent, rather than its proffered reasons, is obvious. Doc. 37 at 16.  Ms. Helton claims "the evidence in this matter presents sufficient disagreement concerning [the Bank]'s treatment, particularly, of its female employees as to require submission to a jury, and the evidence is not, as [the Bank] argues, so one-sides [sic] that one party must prevail as a matter of law."  *Id*.  Further stating that "when female employees did the same, [the Bank]'s management would tell the women 'you've got an attitude, you don't need to be using this language.'"  *Id*. at 6.  Ms. Helton "recalled certain male employees … using far harsher language in the workplace than

she ever had" and the Bank not "addressing any of her male colleagues' behavior for similar outbursts." *Id*. at 6.

Ms. Helton provides no admissible evidence that other female employees raised their voice in the office on multiple occasions, missed a deadline, violated the Personal Finances policy, and were then terminated after an "outburst." *See id*.  She does, however, provide an *inadmissible* letter from Ms. Ford to Ms. Helton's counsel indicating she was terminated as well—but even if true, the facts in the letter are not relevant to the facts here because the letter does not indicate Ms. Ford committed similar misconduct as Ms. Helton.  Doc. 37-2 at 1.  And for the reasons provided above, Ms. Helton also does not provide any admissible evidence that male employees committed similar violations and were treated differently.

Here, again, Ms. Helton has no evidence that the Bank's legitimate, nondiscriminatory reasons are pretextual.

*3. Competing witness accounts*

Ms. Helton also attempts to discredit the Bank's proffered reasons by alleging that there are "several witnesses with competing versions of events."  Doc. 37 at 16. That is, at best, disingenuous.  Had Ms. Helton provided additional witness testimony, this argument would be understandable.  But she did not.  The only sworn witnesses are (1) Ms. Helton, and (2) the Bank's witnesses.  All the admissible testimony by these witnesses supports the credibility of the Bank's proffered reasons, and none of the testimony gives "competing versions of events."  The Court again reminds Ms. Helton's counsel of his duty of candor.

*4. Certain testimony*

Although Ms. Helton does not address the issue in her brief, in her response to the Bank's statement of material facts, she twice states that Ms. Baucom's testimony is untrustworthy.  Doc. 37-1 ¶¶ 28, 42.  Ms. Helton claims, "there is no other documentary evidence suggesting that Ms. Baucom's September 4, 2018 email had been sent due to information obtained at that time concerning Ms. Helton" and questions the timing of the preparation of the reports of Ms. Helton's violations.  *Id*. ¶ 28.  But Ms. Helton does not provide any evidence to counter Ms. Baucom's testimony.  In fact, Ms. Baucom's testimony is supported by Mr. Bibb's testimony, as well as the reports produced on Ms. Helton's accounts.  Docs. 15-4; 15-7 at 6-22.  Ms. Helton's unawareness that the email was directed at her does not automatically bring Ms. Baucom's testimony into question. If Ms. Helton wished to discredit the fact that Ms. Baucom discovered the violations in 2018, she needed to support that position with evidence.  She did not.  And even if all of Ms. Baucom's testimony was false, that would not change the Court's conclusion because the Bank offered various other reasons for Ms. Helton's termination.  Ms. Baucom's' testimony is not unworthy of credence.

*5. Fairness of Ms. Helton's termination*

Finally, Ms. Helton quibbles with the fairness of the Bank's proffered reasons by attempting to explain why she acted the way she did.

 For instance, Ms. Helton explains why she made the change to her husband's business account: "[T]o *increase* the minimum monthly payment for a loan and ensuring that there was no limit to the maximum amount of late charges … all in an effort to ensure that this loan was consistent with the terms of the underlying loan documents."

Doc. 37 at 2 (emphasis supplied).  And why she made a change on her daughter's account: "[A]fter Ms. Helton's daughter had lost her job, Ms. Helton made a change to her daughter's account *so that* Ms. Helton and her husband would take over the payments of their newly unemployed daughter's loan."  *Id*. (emphasis supplied).  And why she made the change to her own account: "[W]hen Ms. Helton was the only person in the bank with access to the banking program, she noticed what appeared to be fraudulent activity on her account, she 'suspended' the memo to prevent her money from being stole over the weekend, and then advised Defendant Vice President of Operations and Internal Auditor what she had done first thing the following Monday morning."  *Id*. at 2-3; Doc. 37-3 ¶ 5.  Further stating that, "[t]hese were the only types of changes that Ms. Helton made to any accounts, many of which were to ensure compliance with loan agreements and were in the best interests of the [Bank]."  Doc. 37 at 3.

She also tries to explain her missed deadline: "This situation did not involve a 'deadline' so to speak; instead, as Ms. Helton testified, the FDIC representative had merely requested some information from the bank by March 1, 2019, Ms. Helton was awaiting receipt of some information from two other individuals, and based on what she had going on at that time, it had slipped her mind."  *Id*.  Ms. Helton alleges "there is nothing outside of President Bibb's Declaration that would suggest that this situation was ever even brought up again, that it was a basis for Ms. Helton's termination, or that this was actually a legitimate issue in the first place."  *Id*. at 4.  First, it is unclear how the March 1, 2019 date is not a deadline.  Second, if Ms. Helton wished to prove that this

reason was not a reason for her termination, she should have provided admissible evidence supporting that position.

Finally, she explained why she acted inappropriately on April 11, 2019.  *Id*. at 5 ("[Ms.] Helton became frustrated because she knew that employee could have begun counting the drive-through drawers when the bank closed and they lowered the security screen in the drive-thru window.").

Ms. Helton's effort to explain *why* she committed numerous violations does not change the fact that she transgressed, and is irrelevant.  Indeed, Ms. Helton's mitigation evidence, if anything, confirms that the Bank's legitimate, nondiscriminatory reasons are not pretextual.  As previously stated, it is not in the Court's discretion to quarrel with the wisdom of the Bank's reasons for its decision, as long as the reasons are not a cover for discrimination.  *Chapman*, 229 F.3d at 1030; *Alvarez*, 610 F.3d at 1266.

**D. Convincing Mosaic of Circumstantial Evidence**

Ms. Helton also argues that she "may establish her claim of sex and age based discrimination using the theory of a 'convincing mosaic' of discriminatory evidence." Doc. 37 at 14.  The Court recognizes that successfully navigating *McDonnell Douglas* is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  Thus, Ms. Helton can avoid summary judgment, notwithstanding her failure to establish a prima facie case, by creating a triable issue concerning the Bank's discriminatory intent.  *Sims*, 704 F.3d at 1333.  Ms. Helton can do this by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Id*. (internal quotation marks and

citation omitted).  But, as previously determined by the Court, Ms. Helton fails to provide

any admissible evidence suggesting discrimination, much less a "convincing mosaic" of

evidence that would lead a reasonable jury to conclude she was subjected to intentional

sex or age discrimination.[14]

## IV. CONCLUSION

Ms. Helton failed to establish that there is a dispute of material fact as to why she

was terminated.  Accordingly, the Bank's motion for summary judgment (Doc. 15) is

**GRANTED**.

**SO ORDERED**, this 28th day of February, 2023.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[14] The Bank references (1) a 2016 restructuring by the Bank which resulted in layoffs, and (2) another former employee, Kathy Brooks.  Docs. 15-2 ¶¶ 87-94, 106-108; 17-1 at 20-21.  It appears the Bank anticipated Ms. Helton would mention these topics in responding to the Bank's pretext arguments because she mentioned both topics in her complaint.  Doc. 1 ¶¶ 13, 21.  But Ms. Helton failed to address either topic in her response brief.  Accordingly, the Court deems those arguments abandoned by Ms. Helton.  *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (holding that "failure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned"); *Rd. Sprinkler Fitters Loc. Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding the district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").